Joe Piucci, OSB # 135325
PIUCCI LAW LLC
900 SW 13th Ave., Ste. 200
Portland, OR 97205
Tel: 503-228-7385
Fax: 503-228-2571
joe@piucci.com
*Lead Counsel*

David D. Park, OSB # 803358
ELLIOTT & PARK, P.C.
0324 S.W. Abernethy Street
Portland, Oregon 97239-4356
Tel: 503-227-1690
Fax: 503-274-8384
dave@elliott-park.com

Michelle R Burrows, OSB # 861606
MICHELLE R. BURROWS P.C.
1333 Orenco Station Parkway # 525
Hillsboro, OR 97124
Tel: 503-241-1955
michelle.r.burrows@gmail.com

Christopher A. Larsen, OSB # 910679
PICKETT DUMMIGAN MCCALL LLP
210 SW Morrison St., 4th Fl.
Portland, Oregon 97204
Tel: 503-223-7770
Fax: 503-227-5350
chris@pdm.legal

David F. Sugerman, OSB # 862984
Nadia Dahab, OSB #125630
SUGERMAN LAW OFFICE
707 SW Washington St., Ste. 600
Portland, OR  97205
Tel: 503-228-6474
Fax: 503-228-2556
david@sugermanlawoffice.com
nadia@sugermanlawoffice.com

Gabriel Chase, OSB # 142948
CHASE LAW, PC
621 S.W. Alder St., Ste. 600
Portland, OR 97205
Tel: 503-294-1414
Fax: 503-294-1455
gabriel@chaselawpc.net

Jane L. Moisan, OSB # 181864
PEOPLE'S LAW PROJECT
818 S.W. 4th Ave. #221-3789
Portland, OR 97204
Tel: 971-258-1292
peopleslawproject@gmail.com

Erious Johnson, Jr., OSB 130574
HARMON JOHNSON LLC
1415 Commercial St. SE
Salem, OR 97302
Tel: 503-991-8545
Fax: 503-622-8545
ejohnson.HJLLC@gmail.com

Attorneys for Plaintiffs

**1  – CLASS ACTION COMPLAINT**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **THERESA DAVIS**, **RASHAWD DUHART**, and **ROBIN LUNDY**, individually and on behalf of all similarly situated individuals,<br><br>                        Plaintiffs,<br><br>    v.<br><br>**MULTNOMAH COUNTY**, a political subdivision of the state of Oregon; **MICHAEL REESE, STEVEN ALEXANDER, JEFFREY WHEELER, KENDALL CLARK, JOSE PALOMERA, AMY HAY, AARON VAN HOUTE, BRIAN BEARDSLEY, and JOHN DOES 1-50**, acting in concert and in their individual capacities,<br><br>                        Defendants. | Case No. 3:20-cv-2041<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br><br>Violations of Civil Rights (42 U.S.C. § 1983) and Supplemental State Claims<br><br>JURY DEMAND |

**CLASS ACTION ALLEGATION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs bring this complaint herein alleging as follows:

**INTRODUCTORY STATEMENT**

"*I can't breathe.*"

- Eric Garner; Christopher Lowe, Javier Ambler II, Derek Scott, Byron Williams, John Neville, George Floyd; and men and women gassed while in the custody of Multnomah County.

**2** – CLASS ACTION COMPLAINT

1.      Over the summer of 2020 in the United States of America within a global pandemic, the men and women locked in the small concrete cells of the Multnomah County Detention Center, most convicted of no crime, were repeatedly and horrifically tear gassed. Night after night, Multnomah County jail deputies ignored cries for help, stopped responding to emergency calls, and left the men and women trapped in their cells to suffer.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. § 1983 and the 8th and 14th Amendments to the United States Constitution for violations of Constitutional rights held by all citizens.

3.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, pendant jurisdiction of the state law negligence claims pursuant to 28 USC § 1367.

4.      Venue is proper under 28 U.S.C. § 1391(b), because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Oregon, because defendants are subject to personal jurisdiction in the District of Oregon

## PARTIES

5.      Plaintiff Theresa Davis is an individual, a resident of Multnomah County, and a member of the Class and the "8D Subclass" alleged herein. Plaintiff Davis is currently incarcerated at Multnomah County Inverness Jail and has exhausted all available administrative remedies prior to bringing this action as described below in paragraphs 76 through 83.

6.      Plaintiff Rashawd Duhart is an individual, a resident of Multnomah County, and a member of the Class and "7D Subclass" alleged herein. Plaintiff Duhart is not currently incarcerated.

**3 – CLASS ACTION COMPLAINT**

7.      Plaintiff Robin Lundy is an individual, a resident of Multnomah County, and a member of the Class alleged herein. Plaintiff Lundy is currently incarcerated at Multnomah County Detention Center and has exhausted all available administrative remedies prior to bringing this action as described below in paragraphs 89-95.

8.      Multnomah County is an Oregon county. Multnomah County operates a jail, known as the Multnomah County Detention Center ("MCDC"). Multnomah County has a duty to provide for the health and safety of all detainees and persons convicted of crimes held at MCDC.

9.      Defendant Michael Reese is the Sheriff of Multnomah County. At all times herein pertinent, defendant Reese was acting under color of state law.

10.     Defendant Steven Alexander is the Chief Deputy of Corrections for the Multnomah County Sheriff's Office. At all times herein pertinent, defendant Alexander was acting under color of state law.

11.     Defendant Jeffrey Wheeler is a Captain in the Multnomah County Sheriff's Office and is the Facility Commander of MCDC. At all times herein pertinent, defendant Wheeler was acting under color of state law.

12.     Defendant Kendall Clark is a Multnomah County Deputy Sheriff and Corrections Officer. At all times herein pertinent, defendant Clark was acting under color of state law.

13.     Defendant Jose Palomera is a Multnomah County Deputy Sheriff and Corrections Officer. At all times herein pertinent, defendant Palomera was acting under color of state law.

14.     Defendant Amy Hay is a Multnomah County Deputy Sheriff and Corrections Officer. At all times herein pertinent, defendant Hay was acting under color of state law.

//

//

**4  – CLASS ACTION COMPLAINT**

15.    Defendant Aaron Van Houte is a Multnomah County Deputy Sheriff and Corrections Officer. At all times herein pertinent, defendant Van Houte was acting under color of state law.

16.    Defendant Brian Beardsley is a Multnomah County Sheriff's Office Sergeant and Corrections Officer. At all times herein pertinent, defendant Beardsley was acting under color of state law.

17.    Defendant John Does 1-50 are individual and supervisory Multnomah County deputy sheriffs, corrections officers, or other employees of Multnomah County or the Multnomah County Sheriff's Office, sued in their individual capacities. At all times material, said defendants were acting within the scope of their employment and under color of law.

18.    Plaintiffs reserve the right to amend and add additional Defendants as discovery proceeds, including without limitation, any supervisor or individual involved in the events alleged in this complaint.

## FACTUAL ALLEGATIONS

19.    On May 28th, 2020, following George Floyd's gruesome public murder, thousands of people began months of sustained protests in Portland. Nightly protests focused on the Multnomah County Justice Center, which houses the headquarters of the Portland Police Bureau, offices of the Multnomah County Sheriff's Department, and the Multnomah County Detention Center, one of the two county jails.

20.    Local law enforcement met these initial protests with excessive force in the form of generalized violence and most notably, tear gas.

21.    On May 29th, the ventilation system of MCDC began pumping tear gas and smoke into the jail for the first time. Detainees and inmates were left alone to suffer the effects, including

coughing, gagging, inability to breathe, irritation of their eyes, and incredible fear. Many believed the building was on fire, and that they would be left there to die.

22.      Following May 29th, the jail imposed a "media blackout" within the jail. Detainees and inmates knew nothing other than what jail deputies told them.

23.      Between May 30th and June 9th, local law enforcement continued to meet nightly protests at the Justice Center with tear gas. On each night, the building's ventilation system pumped the gas into the jail. On each night, detainees and inmates suffered.

24.      Between June 9, 2020 and June 30, 2020, emergency court orders, city directives, and new police reforms in state law placed limitations on the use of tear gas and other force by local law enforcement.  Still, whenever local law enforcement deployed tear gas in the vicinity of the Justice Center, the ventilation systems pumped the gas into the jail, and the detainees and inmates suffered.

25.      On or about July 1st, 2020, President Trump sent federal agents to Portland unleash unprecedented, sustained violence and intimidation on its people. Federal agents dramatically increased the use of toxic tear gas and other chemical agents, blanketing numerous blocks surrounding the Mark O. Hatfield Federal Courthouse and the Multnomah County Justice Center in a cloud of noxious gas and smoke every night through July 30th.

26.      The cells of the MCDC are small individual concrete rooms with solid metal doors and no functional windows.  The metal doors contain "food ports," small slots through which food is passed to detainees and inmates, which are typically closed. When closed, fresh air is only available from either the ventilation system or the crack between the metal door and the concrete floor.

6  – CLASS ACTION COMPLAINT

27.    Every night between July 1st – July 30th, 2020, the detainees and inmates at MCDC were exposed to tear gas and other pernicious chemical agents. On each night, the ventilation system of the jail drew in the toxic gas and pumped it throughout the jail, directly into the small concrete cells in which detainees and inmates lived and slept, and from which they could not escape.

## Characteristics of Tear Gas and Chemical Agents Deployed in Portland

28.    "Tear gas" is a group of chemical compounds that temporarily make people unable to function by causing irritation to the eyes, mouth, throat, lungs and skin.[1] It is a form of poison. People may experience some or all of the following symptoms immediately after exposure: excessive tearing, burning, blurred vision and redness of the eyes, runny nose, burning and swelling within the nose, difficulty swallowing and drooling, chest tightness, coughing, choking sensation, wheezing, shortness of breath, burns and rash on the skin, nausea and vomiting. It can bring on an asthma attack. Prolonged exposure or a large dose of gas may cause blindness, glaucoma, or immediate death due to severe chemical burns to throat and lungs and respiratory failure. There is also anecdotal evidence that tear gas may cause reproductive health concerns for people with uteruses including miscarriages.[2]

29.    "Pepper-spray" and "OC" (oleoresin capsicum) aerosols are chemical compounds derived from chili peppers. Capsaicin is the compound that makes chili peppers spicy hot. There are powder forms of these compounds, as well. Pepper-spray, similar to tear gas, attacks mucous membranes in the eyes and respiratory system, forcing eyes to close and flood with tears and generating coughing fits and difficulty in breathing. Pepper-spray also induces an intense burning sensation. The immediate effects can last anywhere from 15 minutes to one hour or more.

---

[1] https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp
[2] https://www.salon.com/2020/07/28/experts-alarmed-at-reports-of-expired-tear-gas-being-sprayed-on-protesters/

**July 21st, 2020**

*Dorm 8D*

30.    On or about July 21st, 2020, at approximately 12:30 am, the women housed in dorm 8D of MCDC were jolted awake by tear gas pouring into their cells through the vents. The women were coughing, screaming, kicking and pounding on the doors of their cells, begging for jail staff to help them. No one came. They repeatedly pressed the emergency call buttons within their cells. No one answered. The gas did not stop.

31.    For the next 35 minutes, the women of 8D were left to suffer on their own. Women were having panic attacks, coughing fits, some believed they would die. One was pregnant. Some pressed their faces against crack under the door, trying to breathe, but the gas kept coming.

32.    Defendant Kendall Clark was the on-duty guard. At approximately 1:05 am, Defendant Clark made her required, regular rounds. The women begged her to let them out of their cells, to open the food ports, to let them into the shower, to get a sergeant, to do something. Defendant Clark's responses included: "Deal with it," "Suck it up," "There's nothing I can do, calm down," "So fucking handle it, you and the rest of the jail," "Splash water on your face," "Be quiet," "Get over it," "Put a wet rag on your mouth," "Just put up with it," and in response to a request for a sergeant, "The sergeant has better things to do." One woman told Defendant Clark, "I can't breathe." Defendant Clark kept walking and did not respond at all.

33.    At approximately 1:17 am, Sgt. Bradley Harrington arrived. The women begged him to open the food ports. Sgt. Harrington said no. After the women continued to plead with him, Sgt. Harrington radioed a lieutenant who authorized him to open the small, approximately 6"x12" ports. The cells remained filled with gas for hours.

34.     The next morning the women of 8D, if they even slept, woke up traumatized with swollen eyes, heavy chests, raspy breathing, and worse. "It was terrible."

*Dorm 7D*

35.     One floor below, at the same time, approximately 12:30 am on July 21st, 2020, the men of Dorm 7D were simultaneously jolted awake by tear gas pouring into their cells through the vents. As one man recounted, "It woke me up out of a dead sleep, gagging." The men were screaming, kicking the doors, yelling for the guards. They could hear the women yelling, "I can't breathe" above them. For the men too, the gas kept coming.

36.     Defendant Jose Palomera was the on-duty guard. Some of the men could see him outside of the unit, sitting at a desk next to the phone that answers the emergency calls. The men were pressing the emergency call buttons; the phone was ringing. Defendant Palomera did not answer.

37.     When Defendant Palomera made his required regular rounds, the men begged him to let them out of their cells, to open the food ports, to get a doctor or nurse, to get a sergeant, to do something. Defendant Palomera's responses included "No," "It's just CS gas, there nothing I can do," "Just take your asses to sleep." Defendant Palomera threatened discipline if the men kept pressing the emergency buttons. He refused requests for a sergeant, refused requests for grievance forms, refused requests for medical assistance, and refused to open the food ports. When asked by detainee Kebrin Jones as to why he would not open the food ports, Defendant Palomera responded, "Because your skinny ass can fit through and slide out."

38.     As a result, the men were left all night to suffer on their own. They lied on the ground, near the "little crack" to breathe. One man was bleeding profusely out of both nostrils, several had asthma attacks, and some thought they were going to die.

**9  – CLASS ACTION COMPLAINT**

## Multnomah County Sheriff's Office Response

39.    On July 24th, 2020, The Oregonian, Willamette Week, and other news organizations

published reports of the July 21st gassing of detainees and inmates at MCDC.[3] The Oregonian

reported:

> Chris Liedle, a spokesman from the Multnomah County Sheriff's Office, said adults in custody and staff started on Tuesday experiencing a "decrease in air quality" due to smoke from both fires set by demonstrators on Southwest Second Avenue and "later some effects from tear gas deployed by federal officers."
>
> The sheriff's office decided on Tuesday [July 21st] to regularly close air dampers daily from 8 p.m. to 6 a.m. to reduce the impact of the poor air quality inside the jail by a method called "return air mode," Liedle said.
>
> "While in 100 percent return air mode, the building's airflow is recirculated through a two-step filtration series before reentering the space that is served. Under normal operations, air is drawn from the outside-in," Liedle said.
>
> He noted that air dampers were being closed when necessary before Tuesday. But since Tuesday, the county regularly closes the air dampers during the evening hours, he said.
>
> "We care deeply for the adults in custody and have a legal and moral obligation to protect them, as well as dozens of corrections deputies and county staff that provide rehabilitation, support and health services around the clock," Sheriff Mike Reese said in an emailed message.

Additionally, Willamette Week quoted defendant Reese:

> "Explosions from commercial grade fireworks, smoke, bright lights, lasers and tear gas continue to have significant and traumatizing impacts on the adults in custody and our staff," said Multnomah County Sheriff Mike Reese, who has been critical of federal troops' tactics.

---

[3] https://www.oregonlive.com/crime/2020/07/downtown-jail-inmates-hitting-panic-buttons-due-to-tear-gas-wafting-into-cells-lawyers-say.html; https://www.wweek.com/news/courts/2020/07/24/federal-tear-gas-is-seeping-into-the-jail-next-door-choking-and-terrifying-the-inmates/

40.     The nights of July 22nd and July 23rd, the tear gas was somewhat reduced within dorms 7D and 8D of the jail. While detainees and inmates could smell the acrid smoke and some felt its effects, it was not pouring in through the vents.

41.     On July 22nd and 23rd, many men submitted grievances to jail staff. On information and belief, many of these grievances disappeared or were never returned.

## July 24th, 2020

42.     The night of July 24th, at approximately 11:43 pm, the women of dorm 8D were jolted awake as tear gas again poured into their cells through the vents. Women were coughing, choking, screaming, crying, trying to breathe through the crack – as they had just three nights prior.

43.     Defendant Amy Hay was the on-duty guard. Again, the women were pleading to be let out of their cells, begging to have the food ports opened, to have someone do something. Defendant Hay "acted like they were faking." Her responses to requests for help included, "No," "Stop," "Calm down," and, "Oh just go to sleep." Defendant Hay refused requests for a sergeant, refused requests for grievance forms, refused requests for medical assistance, and refused to open the food ports.

44.     As the gas continued to pour in and Defendant Hay did nothing. The women repeatedly pressed the emergency call buttons within their cells, which would ring a phone or intercom at Defendant Hay's desk outside of the dorm. The women were seeking help. In response, Defendant Hay entered the dormitory and inserted a key into a control module, which disabled the ringing at her desk. She then left the dormitory to sit at her now-silent desk while the gas kept pouring into the women's cells.

//

//

11  – CLASS ACTION COMPLAINT

45.     At the same time, the men of 7D were again roused from their sleep by the toxic chemicals pouring in through the vents. Plaintiff Duhart woke up vomiting. Another man bled out of both nostrils. "It was horrible again," one man described.

46.     Defendant Aaron Van Houte was the on-duty guard. Defendant Van Houte answered the emergency call button at least once, and made his regular rounds, but refused requests for a sergeant, refused requests for grievance forms, refused requests for medical assistance, and refused to open the food ports. Defendant Van Houte told the men, "Just deal with it, it will go away soon." The gas did not relent until many hours later.

47.     Elsewhere in the jail, detainees and inmates were subject to similar gassings on these days and many others, beginning on May 29th, 2020. Many developed routines to attempt to survive the repeated gassings, including hiding under the covers, using extra sheets to make a tent to trap breathable air, covering one's face with a wet towel or shirt, stuffing the vents full of toilet paper, or heavily relying upon asthma inhalers.

48.     Jail deputies and supervisors alike treated detainees callously, inhumanely, and with deliberate indifference verging on torment. One Deputy Sheriff mused, "How are you complaining about smoke in your lungs when you all smoke meth?"

49.     Defendant Clark told Plaintiff Lundy, "Lundy, thank you for not making a big deal about the tear gas. Those bitches next door only got a little bit for two nights and are making a big deal about it. It was 100 times worse over here."

50.     Defendant Beardsley, a sergeant, plainly told female inmates, "I have no empathy." He told them, "It's your people out there that are catching buildings on fire and causing all of this. The only thing that's going to burn in here is the carpet, the books, and oh yeah – you."

51.     Defendant Beardsley cast law enforcement officers as the true victims, saying, "At least you're not getting pig's feet thrown at you," and "The sheriff gives a fuck more about you guys than he does about his own deputies." In front of recently arrested protesters, Defendant Beardsley stated, "I hope you're happy." "Why?" an inmate asked. Beardsley replied, "We've got a shoot to kill order if anyone [protesting] enters the justice center. We're just waiting for the sacrificial lamb."

52.     More recently, deputies threatened detainees and inmates with the specter of mass protests, tear gassings, and jail itself burning down on November 3rd, election night.

53.     As a result of exposure to tear gas and other chemical agents, detainees and inmates at MCDC suffered serious, permanent, and disabling injuries, including:

  a)  Acute respiratory distress, chest tightness, coughing, choking sensation, wheezing, shortness of breath;

  b)  Bloody nose, runny nose, burning and swelling of the nasal passageways;

  c)  Excessive tearing, burning, redness of the eyes;

  d)  Burning skin, rash;

  e)  Vomiting;

  f)  Fluid buildup in lungs and ears;

  g)  Migraines and headaches;

  h)  Irregular menses;

  i)  Asthma attack;

  j)  Panic attack;

  k)  Traumatically acquired stuttering;

  l)  Post-traumatic stress disorder, anxiety, depression;

13  – CLASS ACTION COMPLAINT

m) Fear of imminent death;

n) Worsening of preexisting respiratory conditions;

o) Chronic respiratory, throat, nasal, oral, dermatological, cardiopulmonary, gastrointestinal, and psychiatric symptoms; and

p) Myocardial infarction.

## CLASS ALLEGATIONS

54.     Plaintiffs bring this class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all members of the following Class:

> **All detainees and inmates housed at the Multnomah County Detention Center on or after May 29th, 2020, who were exposed to tear gas or other chemical agents.**

55.     In addition to the Class, there are two subclasses.  The first subclass consists of female detainees and inmates housed in dorm 8D ("8D Subclass") who were subject to particularly horrific exposures of tear gas the week of July 20th, 2020. The second subclass consists of male detainees and inmates housed in dorm 7D of MCDC ("7D Subclass") who were subject to the same tear gas exposures the week of July 20th, 2020.

56.     Specifically excluded from the proposed Class and subclasses are defendants, their deputies, officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them.

### Fed. R. Civ. P.  23(a) Prerequisites

57.     **Numerosity**. Members of the class are so numerous that separate joinder of each member is impracticable. The precise number of class members is unknown at this time but can

be readily determined from Defendants' records. Based on information and belief, Plaintiffs conservatively estimate that there are 300+ persons in the Class.

58. **Adequacy of Representation**. The representative parties will fairly and adequately protect the interests of the class, in that they have identical claims, they have no disabling conflicts of interest, they have retained counsel with decades of experience handling class actions, mass torts, police misconduct cases, civil rights cases, and personal injury cases. Class counsel includes counsel with extensive experience, including trial, appeal, and settlement of class actions and complex cases in federal and state courts, police misconduct cases, jail and prison litigation, civil rights cases, and injury cases.

59. **Typicality**. The claims or defenses of the representative parties are typical of the claims or defenses of the Class and subclasses, in that all suffered similar injuries from the same conduct, and all seek the same relief.

60. **Existence and Predominance of Common Questions of Law and Fact.** There are questions of law or fact common to the class (Fed. R. Civ. P. 23(a)(2), including:

   a) The identities of Does 1-50;

   b) Whether defendants knew about the use of tear gas and other chemical agents before it was deployed;

   c) Whether defendants knew the risk of harm from tear gas and other chemical agents and, if so, when they first became aware of the risk;

   d) Whether defendants knew the risk of harm of repeated exposure to tear gas and other chemical agents, and if so, when they first became aware of the risk;

   e) The policies that apply to contamination events at MCDC, like the mass exposure of detainees and inmates to tear gas and other chemical agents;

f)  The practices in effect that apply to contamination events at MCDC, like the mass exposure of detainees and inmates to tear gas and other chemical agents;

g)  Whether defendants or other MCSO deputies or agents deployed tear gas within the Justice Center building on May 29th, 2020;

h)  Whether defendants or other MCSO deputies or agents deployed tear gas on protesters outside of MCDC on or after May 29th, 2020;

i)  Whether defendants Multnomah County, Reese, and supervisory Doe defendants authorized the deployment of tear gas by MCSO deputies or agents;

j)  Whether, and to what extent, defendants communicated with local law enforcement and others who deployed tear gas or other chemical agents around MCDC on or after May 29th, 2020;

k)  The chronology and details of all communications between defendants and local law enforcement and others regarding the use of tear gas and other chemical agents around MCDC on or after May 29th, 2020;

l)  Whether, following the exposure of detainees and inmates to tear gas, smoke, and other chemical agents on May 29th, 2020, defendants developed a plan to mitigate future exposures;

m)  Whether, and to what extent, defendants implemented any plan or measures to mitigate detainees' and inmates' exposure to tear gas and other chemical agents following the initial exposure on May 29th, 2020;

//

//

16  – CLASS ACTION COMPLAINT

n)  Whether, and to what extent, defendants communicated with federal agents who deployed tear gas and other chemical agents around MCDC in July of 2020;

o)  The chronology and details of all communications between defendants and federal agents regarding use of tear gas and other chemical agents around MCDC in July of 2020;

p)  The capabilities, operation, and settings of ventilation systems at MCDC;

q)  Whether, when, and to what extent, defendants made changes to the operation or settings of the ventilation systems at MCDC after May 29th, 2020;

r)  Whether, and to what extent, defendants made changes to the operation or settings of the ventilation systems at MCDC after July 21st, 2020;

s)  Whether the ventilation system at MCDC was placed in "recirculate air" mode on July 21st, 2020;

t)  Whether the ventilation system at MCDC was placed in "recirculate air" mode on July 22nd, 2020;

u)  Whether the ventilation system at MCDC was placed in "recirculate air" mode on July 23rd, 2020;

v)  Whether the ventilation system at MCDC was placed in "recirculate air" mode on July 24th, 2020;

w)  The policies regarding providing detainees and inmates alternative housing in situations of medical or environmental emergency, or mass contamination;

//

//

**17 – CLASS ACTION COMPLAINT**

x) The practices in effect regarding providing detainees and inmates alternative housing in situations of medical or environmental emergency, or mass contamination;

y) Whether defendants considered transferring any or all detainees and inmates to Multnomah County Inverness Jail following any tear gas exposure after May 29th, 2020;

z) Whether defendants considered transferring any or all detainees and inmates held pursuant to a contract with the United States Marshals Service to another federal or federally contracted facility following any tear gas exposure after May 29th, 2020;

aa) The policies that apply to responses to grievances and other complaints of potential or actual harm by detainees and inmates at MCDC;

bb) The practices in effect that apply to responses to grievances and other complaints of potential or actual harm by detainees and inmates at MCDC;

cc) The handling of the grievances alleged to have been made in this case;

dd) The contents of incident reports regarding exposures to tear gas and other chemical agents at MCDC on or after May 29th, 2020;

ee) The results of any internal investigations or reviews of such exposures at MCDC;

ff) Whether, and to what extent, defendant Multnomah County, defendant Reese, and supervisory Doe defendants disciplined any Multnomah County Sheriff's office employees as a result of the tear gas exposures described in this complaint;

gg) The admissibility of statements made by Sheriff Mike Reese;

hh) The admissibility of statements made by certain Multnomah County

Commissioners;

ii)  Whether plaintiffs and members of the class and subclasses state claims for

which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6); and

jj)  Whether plaintiffs and members of the classes are entitled to recover money

damages.

Federal Rules of Civil Procedure, Rule 23(b)(3) Factors

61.    **Common Issues Predominate**: As set forth in detail hereinabove, common issues of fact and law predominate because plaintiff's claims are based on defendants' common course of conduct.

62.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)  The vast majority of class members have little interest in individually

controlling the prosecution of separate actions;

b)  This action will permit an orderly and expeditious administration of the claims

of Class Members, will foster economies of time, effort, and expense, and will

ensure uniformity of decisions;

c)  As to these proposed classes, counsel are unaware of any other class actions

for damages or individual cases or claims made by prospective class

members;

//

//

**19  – CLASS ACTION COMPLAINT**

d)  The harms giving rise to this litigation occurred within the Multnomah County Detention Center in Portland, Oregon. It is desirable to concentrate the litigation in Oregon;

e)  Without a class action, Class Members may continue to suffer damages, and Defendants' violations of law will proceed without remedy; and

f)  There is no unique issues of manageability or class administration because the class is limited to inmates housed at the Multnomah County Detention Center within a particular time frame, and all class members are identifiable from defendants' records.

## Multnomah County's History of Deliberate Indifference to the Health and Safety of Detainees and Inmates

63.    On April 2, 2003, Nick Baccelleri died at Inverness as a result of a methadone overdose. The methadone was provided by the medical staff at the jail. Multnomah County agreed to pay $200,000 to settle a lawsuit brought by Mr. Baccelleri's family.

64.    October 1, 2004, Anthony Delarosa died at either MCDC or Inverness as a result of opioid withdrawal. On information and belief, he vomited and slipped into a coma in his cell. Multnomah County agreed to pay $200,000 to settle a lawsuit brought by Mr. Delarosa's family.

65.    On September 17, 2006, James Chasse died of blunt force trauma after being booked into and then released from MCDC. The jail staff did not call an ambulance for Mr. Chasse, who died during transport to a local hospital in a deputy's car. On information and belief, Multnomah County agreed to pay $925,000 to settle a lawsuit brought by Mr. Chasse's family.

66.    On January 4, 2008, Holly Jean Casey died at MCDC of pneumonia after repeatedly seeking medical help. On information and belief, Multnomah County and other defendants agreed

to pay $905,000 to settle a lawsuit brought by Ms. Casey's family, and Multnomah County fired one of the nurses who was working in the jail.

67.    In March 2008, the Multnomah County District Attorney's Office issued a memo detailing the results of its investigation into the deaths of Jody Gilbert Norman and Holly Jean Casey (the "2008 DA's Office Memo"). The 2008 DA's Office Memo stated that their deaths "seem to raise serious questions about inmate management and health care practices within the Multnomah County corrections system and the level of health services."

68.    In March 2015, an inmate arrested on federal drug trafficking charges smuggled fentanyl into MCDC within her body. Four inmates overdosed and one died. An investigation into the overdoses and death recommended that Multnomah County Sheriff's Office obtain and utilize a body scanner to prevent the smuggling of drugs into its jails, and to prevent future inmate overdoses and deaths. As of July 2019, Multnomah county had not obtained and was not utilizing a body scanner, leading to the deaths described in paragraphs 69 and 72.

69.    On December 31, 2015, William Coupchiak died of a drug overdose at MCDC. On July 25, 2017, the family of Mr. Coupchiak filed a lawsuit against Multnomah County and other defendants. In September 2018, Multnomah County agreed to pay $195,000 to settle that lawsuit.

70.    In January 2017, Multnomah County received the Corrections Grand Jury 2016 Report (the "2016 GJ Report"). Here are some of the overview findings of the 2016 GJ Report:

> "The number of deputies on staff may be insufficient. There is no current study of the appropriate number of deputies needed to support Multnomah County correctional facilities. The 2006 Post Factor Study indicated that 440 deputies were needed (38 more than currently budgeted). However, this report neither reflects current policies nor the current number of inmates/available beds."

"Some deputies are working multiple straight days of 16-hour shifts. While much of this is certainly voluntary overtime, the Corrections Grand Jury is concerned that working extremely long hours over multiple days is not good for the health of the employees and could put both employees and inmates in danger."

"At MCDC and [Inverness], the medical clinics hours are limited to five hours per day due to deputy availability, although the staff is there longer. Open hours could be expanded and more inmates served if additional deputy time was available to provide security. Many services that should be provided in a clinic setting have to be brought to the inmates in the dorms or cells."

71.     On August 11,2017 Dee Glassman was booked into Multnomah County Detention Center.  Ms. Glassmann appeared to be under the influence of drugs and alcohol and was "[a]t risk for withdrawal."  Approximately 34 hours later, Ms. Glassmann was found dead in her cell.  Ms. Glassman's estate has filed suit.

72.     On July 25th, 2019, Richard Jason Forrest died of a drug overdose at Multnomah County Inverness Jail from heroin and methamphetamine he obtained while in custody at the jail. Mr. Forrest's estate has filed suit.

## Class Representatives and Prison Litigation Reform Act Compliance

73.     Plaintiffs Theresa Davis, Rashawd Duhart, and Robin Lundy are members of the class and were detainees at the Multnomah County Detention Center who were exposed to tear gas on one or more occasions as set out in more detail below.

### *Theresa Davis*

74.     Plaintiff Theresa Davis is the class representative for the "8D subclass."

75.     Plaintiff Davis has been in the custody of Multnomah County since August 19th, 2019. Initially housed at Inverness Jail, she was transferred to dorm 8D of MCDC on June 26th, 2020. Ms. Davis was exposed to tear gas throughout July, with the worst incidents on July 21st and

July 24th, 2020, as described above. As a result of the repeated exposure to tear gas and other chemical agents, plaintiff Davis suffered serious, permanent, and disabling physical, mental, and emotional injuries, including:

a)  Acute respiratory distress including chest tightness, coughing, choking sensation, wheezing, shortness of breath;

b)  Bloody nose, runny nose, burning and swelling of the nasal passageways;

c)  Excessive tearing, burning, redness of the eyes;

d)  Burning skin, rash;

e)  Vomiting;

f)  Migraines and headaches;

g)  Asthma attack;

h)  Panic attack;

i)  Post-traumatic stress disorder, anxiety, depression, and nightmares;

j)  Fear of imminent death;

k)  Worsening of preexisting respiratory conditions; and

l)  Chronic respiratory and psychiatric symptoms.

76.    Plaintiff Davis is incarcerated at Multnomah County Inverness Jail. Plaintiff Davis has exhausted all available administrative remedies as follows:

77.    On July 25th, 2020, Plaintiff Davis submitted a grievance to jail staff. The grievance stated,

> "[L]AST NIGHT APPROX 11:45 PM (7-24-20) I AWOKE NOT
> ABLE TO PROPERLY BREATHE RIGHT AND MY EYES
> WERE BURNING. AGAIN FOR THE 2ND TIME THIS WEEK
> I'VE AWOKEN FOR SAME EXACT REASONS. IT WAS

> WORSE THIS TIME – AIR SO THICK W/TEARGAS. I'M
> APPALLED YOU CONTINUE TO HOUSE ME IN UNSAFE
> ENVIRONMENT. DEPUTY REFUSED TO ACKNOWLEDGE
> AND DISPUTED NEED FOR ASSISTANCE BECAUSE A SGT.
> WAS REQUESTED. AND POWER FOR CALL LITES WAS
> DENIED. THE PHYSICAL & MEDICAL DISTRESS I'M
> EXPERIENCING IS UNDENIABLE. SURALY (sic) [THERE'S]
> MORE YOU CAN DO.

78.     On July 26th, 2020, plaintiff Davis, along with every other woman in the 8D dorm, was transferred to Inverness Jail.

79.     Plaintiff Davis did not receive a response to her July 25th grievance. Because she never received a response, she was not afforded the opportunity to appeal the resolution of the grievance within five days of the resolution, as required by MCSO policy.

80.     In early October, Plaintiff Davis met with a corrections counselor at Inverness Jail. The corrections counselor searched for the grievance on the computer, found it, and gave plaintiff Davis a copy. The grievance had been marked "RESOLVED" on July 27th, 2020, and stated:

> "MCDC HAS BEEN WORKING WITH FACILITIES TO
> ADDRESS THIS ISSUE. THE OUTSIDE AIR INTAKE HAS
> BEEN CLOSED NIGHTLY SINCE 7/21/20. WE ARE
> REPORTING ISSUES AS THEY ARISE."

81.     Plaintiff Davis attempted to submit an additional grievance to jail staff on October 6th, 2020. The deputy, a trainee, took the grievance to his trainer, Deputy Allen. Then, the trainee brought the grievance form back to plaintiff Davis and said he was unable to accept it because the date of the event was more than five days in the past.

82.     Plaintiff Davis again attempted to submit the additional grievance to jail staff on October 7th, 2020.  The deputy took the grievance form, looked at the date of the event, said, "I can't take it," and handed the form back to plaintiff Davis.

83.    Plaintiff Davis attempted to submit another grievance to jail staff on October 9th, 2020. Deputy Adam Leibham took the form, took the grievance into a back room, and then brought the form back to plaintiff Davis. He told her, "I can't accept this, because your incident is past time."

### *Rashawd Duhart*

84.    Plaintiff Rashawd Duhart is the class representative for the "7D subclass."

85.    Plaintiff Duhart was in the custody of Multnomah County from April 22nd, 2020 until his release on October 21st, 2020. He was housed in various dorms at MCDC until July 20th, when he was moved to dorm 7D. Mr. Duhart was exposed to tear gas both at the outset of the protests in May and June, and then again throughout the month of July, with the worst incidents on July 21st and July 24th, 2020, as described above. As a result of the repeated exposure to tear gas and other chemical agents, plaintiff Duhart suffered serious, permanent, and disabling physical, mental, and emotional injuries, including:

a) Acute respiratory distress including chest tightness, coughing, choking sensation, wheezing, shortness of breath;

b) Bloody nose, runny nose, burning and swelling of the nasal passageways;

c) Excessive tearing, burning, redness of the eyes;

d) Burning skin, rash;

e) Vomiting;

f) Migraines and headaches; and

g) Post-traumatic stress disorder, anxiety, depression, and nightmares.

86.    Plaintiff Duhart is not currently incarcerated and is exempt from PLRA compliance.

*Robin Lundy*

87.     Plaintiff Robin Lundy is the class representative for the entire class.

88.     Plaintiff Lundy has been in the custody of Multnomah County since April 28th, 2020, housed in dorm 8A of MCDC as a trustee. Plaintiff Lundy was exposed to tear gas both at the outset of the protests in May and June, and then again throughout the month of July. In her dorm, 8A, the exposures were constant and severe. As a result of the repeated exposure to tear gas and other chemical agents, plaintiff Lundy suffered serious, permanent, and disabling physical, mental, and emotional injuries, including:

      a)  Acute respiratory distress including chest tightness, coughing, choking sensation, wheezing, shortness of breath;

      b)  Bloody nose, runny nose, burning and swelling of the nasal passageways;

      c)  Excessive tearing, burning, redness of the eyes;

      d)  Burning skin, rash;

      e)  Migraines and headaches;

      f)  Panic attack;

      g)  Post-traumatic stress disorder, anxiety, depression, and nightmares;

      h)  Fear of imminent death;

      i)  Chronic respiratory and psychiatric symptoms; and

      j)  Aggravation of preexisting thyroid issues.

89.     Plaintiff Lundy is incarcerated at Multnomah County Detention Center. Plaintiff Lundy has exhausted all available administrative remedies as follows:

90.     Plaintiff Lundy submitted a grievance to Deputy Smith on October 3rd, 2020 at 2:39 pm. Deputy Smith forwarded the grievance to Sgt. Jacobs on the same day. Sgt. Jacobs marked the grievance as "resolved" at 3:30 pm on October 5th, 2020. Plaintiff Lundy received the form back at 10:15 pm that night.

91.     Plaintiff Lundy appealed the resolution of the grievance on October 7th, 2020, submitting the appeal to Deputy Lopez Palacios at 10:51 am. Deputy Lopez Palacios immediately forwarded the appeal to Lieutenant Russell. Lieutenant Russel marked the appeal as "resolved and closed" on October 9th at 3:15 pm.

92.     On October 16th, 2020, plaintiff Lundy submitted an appeal of Lieutenant Russell's resolution of her grievance to Deputy Lindquist at 9:58 am. Deputy Lindquist forwarded the appeal to the "Facility Commander" on the same date. On October 21st, 2020, the Facility Commander, Defendant Wheeler, denied the appeal. He wrote, "I have reviewed your original grievance and subsequent appeals. I find that the resolutions provided to you were appropriate and factual. Your appeal is denied."

93.     Plaintiff Lundy then endeavored to appeal this denial to the Chief Deputy of Corrections, defendant Alexander. Jail staff were not immediately forthcoming with the appropriate process. On November 7th, 2020, plaintiff Lundy submitted a formal appeal of the Facility Commander's denial to Deputy Stidum. This appeal was never forwarded and instead returned to plaintiff Lundy unresolved.

94.     On November 10th, 2020 at 5:43 pm, Deputy J. Johnson accepted plaintiff Lundy's next attempt at an appeal to Chief Deputy Alexander. Deputy Johnson immediately forwarded the appeal to defendant Alexander.

95.     On November 12th, 2020 at 9:45 am, defendant Alexander denied the final appeal.

**FIRST CLAIM FOR RELIEF: 8TH and 14th Amendment violation**

**Failure to Protect**

*All Defendants*

96.    Plaintiffs reallege all previous paragraphs as if more fully set forth herein.

97.    Plaintiffs and class members, as jail detainees and inmates, are entitled to be provided the essential aspects of a safe, sanitary and humane confinement including protection from harms and threats to their safety and security under the laws of the State of Oregon and the 8th and 14th Amendments to the United States Constitution.

98.    Defendants violated the Constitutional rights held by plaintiffs and class members in the following particulars:

  a)  Starting on May 29th, 2020, defendants knew that tear gas and other chemical agents were used each and every night on protesters from roughly 10:30 p.m. to approximately 2 a.m. Defendants knew that the tear gas was flooding into the jail cells and dormitories through the building's ventilation system, and defendants failed to protect plaintiffs and class members from these repeated exposures, night after night, beginning on May 29th, 2020;

  b)  Defendants knew that the ventilation system was pumping tear gas and other chemical agents into the jail, and knew that detainees and inmates were suffering from this exposure as early as May 29th, 2020. Yet for months, defendants made no attempt or effort to stop or control the influx of tear gas;

  c)  When defendants did attempt to adjust the settings of the ventilation system to mitigate the detainees' and inmates' exposure to tear gas and other chemical agents following the July 21st, 2020 exposure, the attempt failed;

d) Once defendants knew detainees and inmates were actively suffering from gas in their cells, defendants failed to remove them from their cells, failed to provide water, respiratory protection including N95 masks or respirator masks, or take any steps to provide those suffering either protection or relief;

e) Defendants kept detainees and inmates incarcerated at MCDC despite the extreme ongoing risk when alternative emergency housing was available at Multnomah County Inverness Jail, or for those detainees and inmates held pursuant to a contract with the United States Marshals Service, at another federal or federally contracted facility; and

f) Defendants treated detainees and inmates inhumanely and with cruelty.

99.    Failures by defendants to warn, protect and provide a safe, humane custodial living situation were deliberately indifferent to the protected rights of class members. The conduct by defendants was compounded by the fact defendants knew the tear gas was being deployed, would continue to be deployed and no meaningful efforts were made to protect the detainees and inmates over the course of several months.

100.    As a direct result of the actions and inactions of defendants, as set forth in the paragraph above, Plaintiffs and class members endured and suffered severe physical and emotional distress and injury as described in Paragraph 53. Plaintiffs and class members are entitled to economic and noneconomic damages in an amount to be determined at trial.

101.    Defendants were deliberately indifferent and callously disregarded the civil rights and physical safety of Plaintiffs and class members. Punitive damages should be awarded against defendants in an amount to be determined at trial.

102.    Defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law herein but was illegal *per se*.

103.    Plaintiffs and class members are entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC § 1988.

**SECOND CLAIM FOR RELIEF:  8TH and 14th Amendment Violations**

**Delay and Denial of Essential Medical Care**

*All Defendants*

104.    Plaintiffs and class members reallege all previous paragraphs as if more fully set forth herein.

105.    Plaintiffs and class members are entitled to timely and adequate medical/psychological care as part of their Constitutionally guaranteed conditions of confinement pursuant to the 8th and 14th Amendments to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the 8th Amendment prohibitions against cruel and unusual punishment.

106.    Plaintiffs and class members were denied timely, adequate medical care and psychological treatment, counseling or mental health care as required by state and federal law and as follows:

a) Defendants failed to provide adequate emergency medical care or assistance to detainees and inmates actively suffering from exposure to tear gas or other chemical agents; and

b) Defendants failed to provide adequate subsequent medical and psychological care or evaluation to detainees and inmates suffering ongoing health consequences of the repeated exposures to tear gas and other chemical agents.

107.    As a result of the failures by defendants herein, Plaintiffs and class members suffered severe physical and emotional distress and injury as described in Paragraph 53, and suffered additional and ongoing physical and psychological trauma. Plaintiffs and class members are entitled to economic and noneconomic damages in an amount to be determined at trial.

108.    Defendants were deliberately indifferent and callously disregarded the civil rights and physical safety of plaintiffs and class members. Punitive damages should be awarded against defendants in an amount to be determined at trial.

109.    Plaintiffs and class members are entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC § 1988.

## THIRD CLAIM FOR RELIEF:  8TH and 14th Amendment Violations

### *Monell* Claims

*Defendant Multnomah County*

110.    Plaintiffs and class members reallege all previous paragraphs as if more fully set forth herein.

111.    The moving forces that resulted in the deprivation of the Eighth and/or Fourteenth Amendment rights of plaintiffs and class members were the following policies, customs or longstanding practices of Multnomah County:

a) A policy, custom or practice of deliberate indifference to the suffering of detainees and inmates;

b) A policy, custom or practice of maintaining unsafe and inhumane living conditions for detainees and inmates;

c) A policy, custom or practice of allowing tear gas and other chemical agents to infiltrate the living quarters of MCDC;

d) A policy, custom, or practice of setting the ventilation system at MCDC to pump tear gas and other chemical agents into the living quarters of the jail;

e) A policy, custom or practice of failing to provide alternative housing in situations in which involuntary exposure to high doses of toxic chemical irritants is certain or highly probable;

f) A policy, custom or practice of failing to provide adequate and timely care and emergency evaluation for detainees and inmates in situations of medical or environmental emergency;

g) A policy, custom or practice of failing to protect medically fragile detainees and inmates in situations in which they have been exposed to toxic chemical irritants;

h) A policy, custom or practice of failing to train jail staff how to respond to the certain deployment of tear gas and other chemical irritants in the immediate vicinity of MCDC;

i) A policy, custom or practice of failing to train jail staff how to respond to the serious medical needs of jail inmates exposed to high doses of toxic chemical irritants in the immediate vicinity of MCDC;

j) A policy, custom or practice of failing to discipline jail staff who treat detainees and inmates inhumanely or with cruelty; and

k) A policy, custom or practice of hiring personnel indifferent to the physical, psychological and medical needs of detainees and inmates.

112. The policies of Multnomah County posed a substantial risk of causing substantial harm to Multnomah County inmates, did cause harm to detainees and inmates, and Multnomah County was aware of and deliberately disregarded the risk.

113. As a direct result of the policies, customs or practices of Multnomah County, plaintiffs and class members suffered severe physical and emotional distress and injury as described in Paragraph 53, and suffered additional and ongoing physical and psychological trauma. Plaintiffs and class members are entitled to economic and noneconomic damages in an amount to be determined at trial.

114. Plaintiffs and class members are entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC § 1988.

## FOURTH CLAIM FOR RELIEF: 8TH and 14th Amendment Violations

### Failure to Supervise

*Defendants Reese, Alexander, Wheeler, & Supervisory Doe Defendants*

115. Plaintiffs and class members reallege all previous paragraphs as if more fully set forth herein.

116. The constitutional deprivations suffered by plaintiffs and class members are the proximate and direct cause of non-interested, indifferent and willfully ignorant supervisory practices by defendants Reese, Alexander, Wheeler, and the supervisory Doe defendants. The supervisors have a constitutional duty to protect detainees and inmates and to provide them with a

33 – CLASS ACTION COMPLAINT

safe and humane condition of confinement including the right to be free from repeated exposure to tear gas either ambiently or through the ventilation system.

117.   The duty is enhanced when the detainee and inmate population is especially vulnerable due a higher incidence of preexisting respiratory conditions such as asthma. Upon information and belief, at all material times defendants Reese, Alexander, Wheeler, and the supervisory Doe defendants knew or should have known that plaintiff Davis and certain other class members had pre-existing respiratory conditions that would be triggered and/or aggravated by tear gas exposure.

118.   Defendants Reese, Alexander, Wheeler, and the supervisory Doe defendants were aware that tear gas in large quantities was being regularly and predictably deployed in response to protests occurring in the immediate vicinity of MCDC, that such tear gas was being drawn into the HVAC system servicing MCDC and contaminating the air in plaintiffs' and class members' cells, that distribution of tear gas by the HVAC system through the jail presented a substantial risk of physical and psychological harm to detainees and inmates, and that measures to avert or mitigate the exposure of detainees and inmates to the tear gas were available and were not being taken by the corrections deputies staffing MCDC. Despite that knowledge, defendant supervisors directed, encouraged, or acquiesced in the corrections deputies' ongoing unconstitutional failures to act.

119.   Defendants Reese, Alexander, Wheeler, and the supervisory Doe defendants, in their supervisory capacities, failed to adequately train Jail Staff employees:

      a)   How to respond to environmental emergencies or widespread contamination events; and

      b)   How to operate the ventilation of the jail such that it would not repeatedly flood the jail's living quarters with tear gas and other chemical agents.

120.    Defendants Reese, Alexander, Wheeler, and the supervisory Doe defendants were aware that failure to train as set forth, above created a substantial risk of causing harm to detainees and inmates.

121.    As a direct result of the actions and inactions of defendants Reese, Alexander, Wheeler, and the supervisory Doe defendants, plaintiffs and class members endured and suffered severe physical and emotional distress and injury as described in Paragraph 53, and suffered additional and ongoing physical and psychological trauma. Plaintiffs and class members are entitled to economic and noneconomic damages in an amount to be determined at trial.

122.    Defendants Reese, Alexander, Wheeler, and the supervisory Doe defendants were deliberately indifferent and callously disregarded the civil rights and physical safety of Plaintiffs and class members. Punitive damages should be awarded against defendants in an amount to be determined at trial.

123.    Plaintiffs and class members are entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC § 1988.

## FIFTH CLAIM FOR RELIEF

(Negligence) – All Defendants

124.    Plaintiffs and class members re-allege and incorporates each previous paragraph.

125.    Defendant Multnomah County and its employees and agents including Reese, Alexander, Wheeler, Clark, Palomera, Hay, Van Houte, Beardsley, and John Does 1-50 were negligent in one or more of the following particulars:

a)    Starting on May 29th, 2020, defendants knew that tear gas and other chemical agents were used each and every night on protesters from roughly 10:30 p.m.

to approximately 2 a.m. Defendants knew that the tear gas was flooding into the jail cells and dormitories through the building's ventilation system, and defendants failed to protect plaintiffs and class members from these repeated exposures, night after night, beginning on May 29th, 2020;

b)  Defendants knew that the ventilation system was pumping tear gas and other chemical agents into the jail, and knew that detainees and inmates were suffering from this exposure as early as May 29th, 2020. Yet for months, defendants made no attempt or effort to stop or control the influx of tear gas;

c)  When defendants did attempt to adjust the settings of the ventilation system to mitigate the detainees' and inmates' exposure to tear gas and other chemical agents following the July 21st, 2020 exposure, the attempt failed;

d)  Once defendants knew detainees and inmates were actively suffering from gas in their cells, defendants failed to remove them from their cells, failed to provide water, respiratory protection including N95 masks or respirator masks, or take any steps to provide those suffering either protection or relief;

e)  Defendants kept detainees and inmates incarcerated at MCDC despite the extreme ongoing risk when alternative emergency housing was available at Multnomah County Inverness Jail, or for those detainees and inmates held pursuant to a contract with the United States Marshals Service, at another federal or federally contracted facility; and

f)  Defendants failed to provide adequate emergency medical care or assistance to detainees and inmates actively suffering from exposure to tear gas or other chemical agents;

g)   Defendants failed to provide adequate subsequent medical and psychological care or evaluation to detainees and inmates suffering ongoing health consequences of the repeated exposures to tear gas and other chemical agents.

h)   Defendants failed to adequately train jail staff how to respond to environmental emergencies or widespread contamination events;

i)   Defendants failed to adequately train jail staff how to respond to the serious medical needs of jail inmates; and

j)   Defendants operated with deference to other law enforcement agencies, which prevented Multnomah County from recognizing the catastrophic suffering it was forcing its detainees and inmates to endure.

126.   As a direct result of the actions and inactions of defendants, plaintiffs and class members suffered severe physical and emotional distress and injury as described in Paragraph 53, and suffered additional and ongoing physical and psychological trauma. Plaintiffs and class members are entitled to economic and noneconomic damages in an amount to be determined at trial.

127.   Plaintiffs and class members have complied with the notice requirements of the Oregon Tort Claims Act by filing this action within 180 days of the first incident date and by giving notice within the time period required by law.

128.   Each nightly exposure constitutes a separate occurrence under ORS 30.272.

//

//

//

//

**37 – CLASS ACTION COMPLAINT**

WHEREFORE plaintiff prays for judgment against defendants, and each of them, as follows:

1.    For an order certifying that the action may be maintained as a Class Action, appointing plaintiffs as Class Representatives, and designating plaintiffs' counsel as counsel for the Class;

2.    For compensatory noneconomic and economic damages in an amount to be determined by a jury and for prejudgment interest on said sums;

3.    For punitive damages;

4.    For plaintiffs' costs and such other and further relief as the Court may deem just and equitable; and

5.    For plaintiffs' reasonable attorney fees pursuant to 42 U.S.C. § 1988.

6.    Plaintiffs demand a jury trial.

DATED this November 23rd, 2020.

Respectfully submitted,

_____

Joe Piucci, OSB # 135325
PIUCCI LAW LLC
900 SW 13th Ave., Ste. 200
Portland, OR 97205
Tel: 503-228-7385
Fax: 503-228-2571
joe@piucci.com
*Lead Counsel*

**38  – CLASS ACTION COMPLAINT**