IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THERESA DAVIS, RASHAWD DUHART, ROBIN LUNDY, and SEAN BERGLUND, individually and on behalf of all similarly situated individuals,

                Plaintiffs,

      v.

MULTNOMAH COUNTY, a political subdivision of the state of Oregon, MICHAEL REESE, STEVEN ALEXANDER, JEFFERY WHEELER, and JOHN DOES 1-50, acting in concert and their individual capacities,

                Defendants.[1]

Case No. 3:20-cv-02041-SB

**FINDINGS AND RECOMMENDATION**

---

**BECKERMAN, U.S. Magistrate Judge.**

       During the early months of the COVID-19 pandemic and mass protests in downtown

Portland, Oregon, the named class plaintiffs were pretrial and post-conviction detainees at the

Multnomah County Detention Center ("MCDC"), a maximum-security facility within the

---

      [1] The Court directs the clerk to update the docket to reflect the proper spelling of Jeffery Wheeler's first name. *See Actkinson v. Vargo*, 284 F. App'x 469, 470 n.1 (9th Cir. 2008) (same).

PAGE 1 – FINDINGS AND RECOMMENDATION

Multnomah County Justice Center (the "Justice Center").[2] For approximately 100 consecutive nights, protests broke out around the Justice Center. In response, law enforcement agents used crowd dispersal and riot control tactics, such as deployment of tear gas and other chemical agents.[3] On the nearby ninth-story façade, the Justice Center's heating, ventilation, and air conditioning ("HVAC") system's outside air intake drew in and pumped tear gas into MCDC's housing cells.

Plaintiffs were often exposed to and suffered from at least the short-term effects of tear gas, as a result of these events and circumstances. That much is undisputed.[4] Plaintiffs allege that Multnomah County (the "County") and the County's then-Sheriff, Michael Reese ("Reese"), Captain and then-Chief Deputy of Corrections Facilities, Steven Alexander ("Alexander"), and Captain and then-Facility Commander at MCDC, Jeffery Wheeler ("Wheeler") (together,

---

[2] Unlike Sean Berglund ("Berglund"), the other named plaintiffs, Theresa Davis ("Davis"), Rashawd Duhart ("Duhart"), and Robin Lundy ("Lundy") (together with Berglund, "Plaintiffs" or the "Named Plaintiffs") were pretrial detainees during the relevant time period of May 29 through July 29, 2020. (*See* Defs.' Mot. Summ. J. ("Defs.' MSJ") at 45, ECF No. 89; & Pls.' Am. Resp. Opp'n Defs.' Mot. Summ. J. ("Pls.' MSJ Resp.") at 34, ECF No. 130; Stipulated Order Granting Pls.' Unopposed Mot. Class Certification ("Certification Order") at 2, ECF No. 60.)

[3] The parties use "tear gas" as an "umbrella term" that refers primarily to (1) a form of "CS" (o-chlorobenzylidene malononitrile), also known as "tear gas," and (2) "OC" (oleoresin capsicum), also known as "pepper spray." (*See, e.g.*, Pls.' MSJ Resp. at 26; *cf.* Defs.' MSJ at 14; Decl. Timothy Lichatowich Supp. Defs.' Mot. Summ. J. ("Lichatowich Decl.") ¶ 6, ECF No. 98; Decl. Christopher Gilmore Supp. Defs.' Mot. Summ. J. ("Gilmore MSJ Decl.") ¶ 1 & Ex. 1 at 6, ECF Nos. 106 and 106-1; Decl. Christian Sloane Supp. Defs.' Mot. Summ. J. ("Sloane Decl.") ¶ 7 & Ex. 1 at 3, ECF No. 102; Decl. Elliott Gall Supp. Defs.' Mot. Summ. J. ("Gall Decl.") ¶ 12 & Ex. 1 at 5, ECF No. 96; Decl. Nadia Dahab Supp. Pls.' Am. Resp. Opp'n Defs.' Mot. Summ. J. ("Dahab MSJ Decl.") ¶ 4 & Ex. 4 at 1, 14, ECF Nos. 131 and 131-4; Decl. Samuel Freedman Supp. Pls.' Resp. Defs.' Mot. Summ. J. ("Freedman Decl.") ¶ 2 & Ex. 2 at 4, ECF Nos. 118 and 118-2.)

[4] Defendants acknowledge that there is a "consensus" with respect to the "short term symptoms" of "tear gas" exposure that Plaintiffs "experienced . . . in this case," and that the Justice Center's HVAC system's outside air intake allowed tear gas to enter MCDC's cells. (Defs.' MSJ at 21-22.)

PAGE 2 – FINDINGS AND RECOMMENDATION

"Defendants"), were deliberately indifferent to the substantial risk of serious harm that tear gas exposure posed to Plaintiffs and other adults in custody ("AICs") at MCDC. Consequently, Plaintiffs filed this class action against Defendants under 42 U.S.C. § 1983, asserting failure-to-protect claims under the Eighth and Fourteenth Amendments, municipal liability claims under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), and negligence claims under Oregon law.

Defendants now move for summary judgment on all claims, pursuant to Federal Rule of Civil Procedure ("Rule") 56.[5] Defendants also move to strike portions of Plaintiffs' summary judgment response and experts' reports, pursuant to Rule 12(f). The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, but not all parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court recommends that the district judge grant in part and deny in part Defendants' motion for summary judgment and grant in part and deny in part Defendants' motion to strike.

///

///

---

[5] Plaintiffs represented at the outset of oral argument that they are no longer pursuing their claims for inadequate medical care under the Eighth and Fourteenth Amendments. (Hr'g Tr. Defs.' Mots. Summ. J. & Strike ("Hr'g Tr.") 5:4-6:13, July 17, 2025, ECF No. 153; *see also* First Am. Compl. ("FAC") ¶¶ 99-104, ECF No. 44, reflecting that under the second claim for relief, Plaintiffs allege inadequate medical care in violation of the Eighth and Fourteenth Amendments). Plaintiffs also represented that they are no longer pursuing related aspects of their state law claim for negligence—namely, subsections (f), (g), (i), and (j) of paragraph 120 in their operative first amended complaint, which they offer in support of their fifth and final claim for relief. (Hr'g Tr. 5:18-6:13; FAC ¶ 120.) Consistent with these representations, the Court recommends that the district judge grant Defendants' motion for summary judgment with respect to Plaintiffs' second claim for relief and the identified portions of Plaintiffs' fifth claim for relief. (*See* Defs.' MSJ at 62-73, 79-91; Defs.' Reply Supp. Mot. Summ. J. ("Defs.' MSJ Reply") at 4, 30-35, 44, ECF No. 137.)

**BACKGROUND**

## I.    HISTORICAL BACKDROP[6]

This case arises from the "highly unusual and well-documented" intersection of "two historic events," which unfolded in spring and summer 2020: the outbreak of the global COVID-19 pandemic, and nationwide racial justice protests and demonstrations against police violence.[7] *See Black Lives Matter L.A.*, 113 F.4th at 1253-56 (describing nationwide protests and "a historic demonstration against police violence and for racial justice"); *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) (taking judicial notice of the "outbreak of the global COVID-19 pandemic" as a "historical event"); *Jeffrey*, 113 F.4th at 178, 180 (citing this "highly unusual and well-documented confluence" of events); *Kinzer*, 99 F.4th at 107-08, 111 (noting the "convergence" of these "historic events" in summer 2020); *Gustilo*, 122 F.4th at 1015 (beginning with spring 2020).

### A.    COVID-19 Pandemic

"In March 2020, the United States confronted a threat unlike any in recent times: the COVID-19 pandemic." *Seaplane Adventures, LLC v. County of Marin*, 71 F.4th 724, 726 (9th

---

[6] To the extent any of the "introductory background in this subsection is not part of the record," the Court "included [it] to assist in understanding the historical precursor to this litigation" and bases its decision and "analysis . . . of the legal issues . . . solely on the record." *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1292 n.1 (11th Cir. 2010).

[7] These events have resulted in extensive litigation. *See Jeffrey v. City of New York*, 113 F.4th 176, 178, 180 (2d Cir. 2024) (both events); *Kinzer v. Whole Foods Market, Inc.*, 99 F.4th 105, 108, 111 (1st Cir. 2024) (same); *Gustilo v. Hennepin Healthcare Sys., Inc.*, 122 F.4th 1012, 1015 (8th Cir. 2024) (same); *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1253-56 (9th Cir. 2024) (protests and demonstrations); *Miller v. City of Scottsdale*, 88 F.4th 800, 802 (9th Cir. 2023) (reviewing "another case arising out of the early days of the COVID-19 pandemic"); *Schaffer v. George Wash. Univ.*, 27 F.4th 754, 759 (D.C. Cir. 2022) (noting that many cases have been "litigated across the country" that are "by-products of the COVID-19 pandemic").

Cir. 2023); *see also Miller*, 88 F.3d at 802 (noting that the Ninth Circuit has "recognized [that] the COVID-19 pandemic was a threat unlike any in recent times") (simplified). On March 11, 2020, the World Health Organization ("WHO") declared that the global outbreak of COVID-19 was a pandemic. *In re Approval of Jud. Emergency Declared in S. Dist. Cal.*, 955 F.3d 1135, 1136 (9th Cir. 2020). Two days later, on March 13, 2020, the President of the United States declared the "novel []virus a national emergency." *Tinius v. Choi*, 77 F.4th 691, 701 (D.C. Cir. 2023) (citing White House Archives, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease* (COVID-19) Outbreak (Mar. 13, 2020), https://perma.cc/7FRL-2L2W (last updated June 27, 2023)); *United States v. Dunn*, 83 F.4th 1305, 1307 (11th Cir. 2023) (citing Proclamation No. 9994, 85 Fed. Reg. 15337, 15337 (Mar. 13, 2020)).

At the time, "vaccines were not yet available[, and] public health policy then in effect for the United States . . . called for physical distancing and limiting large gatherings." *Tinius*, 77 F.4th at 701 (citing *In re Approval of Jud. Emergency Declared in Cent. Dist. of Cal.*, 955 F.3d 1140 (9th Cir. 2020)). Like "other public health authorities," the Centers for Disease Control and Prevention ("CDC") "suggested [that] the public avoid social gatherings in groups of more than [ten] people and practice physical distancing (within about six feet) between individuals to potentially slow the spread of COVID-19." *In re Approval of Jud. Emergency Declared in E. Dist. Cal.*, 956 F.3d 1175, 1178 (9th Cir. 2020). The CDC and others did so because the "virus [was] thought to spread mainly from person-to-person contact[.]" *Id.* Public heath authorities' guidance and the "surge in the COVID-19 pandemic . . . in March 2020, resulted in numerous mandated and voluntary limits on public activity." *Jeffrey*, 113 F.4th at 178, 194 (citing

"restrictions imposed to control [the virus'] spread," such as a "[ten]-person limit on public gatherings").

### B.    Nationwide Protests

On the evening of May 25, 2020, a few months into the surge in the COVID-19 pandemic, Minneapolis police officers arrested George Floyd ("Floyd"), an unarmed, forty-six-year-old Black man, "after a convenience store clerk called 9-1-1 and reported him for allegedly buying cigarettes with a counterfeit $20 bill." *Conn. State Police Union v. Rovella*, 36 F.4th 54, 59 (2d Cir. 2022); *Tinius*, 77 F.4th at 695; *State v. Chauvin*, No. 27-CR-20-12646, 2021 WL 1151154, at *3-10 (Minn. Dist. Ct. Mar. 24, 2021), *aff'd*, 989 N.W.2d 1, 13-38 (Minn. Ct. App. 2023), *rev. denied* (Minn. July 18, 2023), *cert. denied*, 144 S. Ct. 427 (2023). As other courts have recognized, "'[w]hat happened next,' both in Minneapolis and across the nation, 'is now well known,'" *Jeffery*, 113 F.4th at 178-79 (quoting *Conn. State Police Union*, 36 F.4th at 59):

> When Floyd resisted sitting in the back seat of the police squad car, saying he was claustrophobic, three officers pinned him face-down on the ground. A white officer knelt on Floyd's neck for nearly ten minutes while Floyd repeatedly said he could not breathe. Floyd was pronounced dead that night[.]

*Conn. State Police Union*, 36 F.4th at 59; *Tinius*, 77 F.4th at 695; *Beathard v. Lyons*, 129 F.4th 1027, 1029 n.1 (7th Cir. 2025); *Jeffery*, 113 F.4th at 178-79; *see also Chauvin*, 989 N.W.2d at 13-15, 36-38 (recounting the facts based on the evidence presented at trial and the trial court's findings).

Bystanders' cell-phone video recordings of Floyd's encounter with police and the final minutes of Floyd's life went "viral" online and "sparked protests across the country in the ensuing weeks and months," *Beathard*, 129 F.4th at 1029 n.1; *Conn. State Police Union*, 36 F.4th at 59; *Tinius*, 77 F.4th at 695, when "various restrictions" were in place to "control the spread of the COVID-19 virus, including . . . limit[s] on public gatherings." *Jeffrey*, 113 F.4th at

178. "[M]illions took to the streets to protest," *Sanderlin v. Dwyer*, 116 F.4th 905, 908 (9th Cir. 2024), and "cities across the country experienced what would be a nationwide, historic demonstration against police violence and for racial justice."[8] *Black Lives Matter L.A.*, 113 F.4th at 1254; *Dennis v. Pazen*, No. 23-1313, 2025 WL 1375635, at *1 (10th Cir. May 13, 2025) ("Following [Floyd's] murder . . . , millions of Americans gathered in cities across the country to protest.").

Some of the protests and demonstrations that ensued in the weeks and months after Floyd's murder "were peaceful" but "[o]thers were not." *Black Lives Matter L.A.*, 113 F.4th at 1253-54; *United States v. Wilson*, 123 F.4th 1021, 1023-24 (9th Cir. 2024). "In some cities, the protests escalated into rioting and property destruction." *Wilson*, 123 F.4th at 1023-24; *see also Black Lives Matter L.A.*, 113 F.4th at 1253-56 (focusing on protests that "erupted" in Los Angeles, California, which was "one of the first cities to see the[] widescale protests" and where there were incidents of looting and arson and a "single protest [often] include[d] both violent and non-violent protestors"); *Tinius*, 77 F.4th at 696 (stating that "[i]n Washington, D.C., as in some other cities, peaceful demonstrations coincided with incidents of rioting, vandalism, looting, and arson.").

The protests in Portland were no exception.[9] *See, e.g.*, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 821-22 (9th Cir. 2020) (reviewing an appeal "aris[ing] out of the protests in Portland, Oregon"). Some of the protests turned "violent" and included "incidents of

---

[8] The officer was "later convicted of murdering Floyd and . . . sentenced to 270 months' imprisonment." *Flickinger v. King*, No. SC-2024-0153, --- So. 3d ---- , 2025 WL 1352079, at *1 n.3 (Ala. May 9, 2025) (simplified); *Lagoon Partners, LLC v. Silver Cinemas Acquisition Co.*, 999 N.W.2d 113, 116 n.1 (Minn. Ct. App. 2023) (citing a "second-degree unintentional murder" conviction).

[9] The Court describes the protests (and law enforcement's response) in greater detail in Part II.

vandalism, destruction of property, looting, arson, and assault, particularly late at night[,]" and "[m]any of the protests . . . centered around the Mark O. Hatfield Federal Courthouse." *Id.* at 822. When the "protests began," the "response to protesters on the public streets of Portland [were] being handled by the state and local police," who "actively monitored the protests and engaged in crowd control measures." *Id.* at 821-22, 834. Responding to the "threat to federal property," however, the federal government subsequently "deployed federal law enforcement agents to Portland." *Id.* at 822. Federal law enforcement agents also engaged in crowd control measures before reaching an agreement with the State of Oregon regarding their respective efforts. *Id.*

## II.    FACTS[10]

This class action's story begins on the evening of May 29, 2020. Before turning to the events of that evening, the Court provides a brief overview of the Named Plaintiffs, the Multnomah County Sheriff's Office ("MCSO") and its individually named current and former employees, Reese, Alexander, and Wheeler (together, the "Individual Defendants"), MCSO's correctional facilities, MCDC's AIC housing floors and classifications, and the Justice Center's HVAC system.

### A.    Named Plaintiffs

Between May 29 and July 29, 2020, Davis, Duhart, and Lundy were pretrial detainees, and Berglund was a post-conviction detainee, at MCDC.[11] (*See* Pls.' MSJ Resp. at 34 & Defs.'

---

[10] The Court presents the "facts in the light most favorable to [the Named Plaintiffs] as the nonmoving parties, giving them the benefit of factual disputes and reasonable inferences from the evidence." *Silloway v. City & Cnty. of S.F.*, 117 F.4th 1070, 1072 (9th Cir. 2024) (citing *Tuuamalemalo v. Greene*, 946 F.3d 471, 474 (9th Cir. 2019) (per curiam)); *Rice v. Morehouse*, 989 F.3d 1112, 1116 (9th Cir. 2021) ("The following facts were either undisputed at summary judgment or, if disputed, are recounted in the light most favorable to Rice, the non-moving party.").

MSJ at 45; Certification Order at 2.) Duhart and Lundy were housed at MCDC throughout this time. (Decl. Rashawd Duhart Supp. Pls.' Mot. Certify Class Action ("Duhart Decl.") ¶¶ 2-3, 5, 15, ECF No. 33; Decl. Robin Lundy Supp. Pls.' Mot. Certify Class Action ("Lundy Decl.") ¶¶ 2, 5-6, 23-24, ECF No. 34.)

By contrast, Berglund was only housed at MCDC from June 5 through June 13, 2020. (Decl. Sean Berglund Supp. Pls.' Mot. Certify Class Action ("Berglund Decl.") ¶¶ 2-3, ECF No. 31.) Davis, on the other hand, was housed at MCDC from June 11 through June 20, 2020, and from June 24 through July 26, 2020. (*See* Decl. Theresa Davis Supp. Pls.' Mot. Certify Class Action ("Davis Decl.") ¶¶ 2-3, 16, ECF No. 32, describing Davis' temporary departure to and return from Legacy Emanuel Medical Center because of an "emergency umbilical hernia repair surgery").

### B.    MCSO and Individual Defendants

Reese served as the County's Sheriff at all times relevant to this litigation. (Dep. Michael Reese ("Reese Dep.") 9:10-15, Jan. 9, 2023, ECF Nos. 106-3, 131-1, and 151-1.) Reese's duties included managing the MCSO and the MCSO's response to the COVID-19 pandemic and Portland protests. (*Id.* 9:15-25, 20:5-21:16, 30:2-9, 33:4-36:21, 51:24-52:5, 55:5-56:11.) Reese

---

[11] The parties refer at times to the period of May 29 through July 31, 2020, and the period in which the certified class of MCDC AICs "were exposed to tear gas or other chemical agents between May 29 . . . and July 29, 2020," but for present purposes, the distinction is immaterial. (*See* Certification Order at 2, defining the class period; Freedman Decl. Ex. 2 at 1, 7-8 & Dahab MSJ Decl. Ex. 4 at 1, 11, relying on the class period; Pls.' MSJ Resp. at 1-2, 22-25, 42, 52, addressing MCDC's capacity between May 29 and July 31, 2020 but otherwise focusing on exposure during the class period; FAC ¶¶ 20, 22, alleging exposure through "July 30, 2020" before stipulating to the class period; *see also* Defs.' MSJ at 1; Gall Decl. Ex. 1 at 3; Decl. John Lecarno Supp. Defs.' Mot. Summ. J. ("Lecarno Decl.") ¶ 3, ECF No. 97; Decl. Michael Seale Supp. Defs.' Mot. Summ. J. ("Seale Decl.") ¶¶ 9-10, ECF No. 101; Decl. Barrett Taylor Supp. Defs.' Mot. Summ. J. ("Taylor Decl.") ¶ 3, ECF No. 105; Gilmore MSJ Decl. ¶ 1, Ex. 1 at 1, 6 & Ex. 2 at 1-2 & Defs.' MSJ Reply at 8, referring to May 29 through July 31, 2020 as the relevant period).

also ensured that the MCSO discharged its responsibility of keeping AICs safe and maintaining

healthy, safe, and secure facilities. (*See* Decl. Brandon Pedro Supp. Defs.' Mot. Summ. J.

("Pedro MSJ Decl.") ¶ 4 & Ex. 1 at 1, ECF No. 100, reflecting that the County's applicable AIC

manual begins with a message from Reese, informing AICs of the MCSO's "responsibility to

keep [them] safe while maintaining a healthy, safe and secure environment in [its] facilities";

Dep. Jeffery Wheeler ("Wheeler Dep.") 21:21-23:13, Oct. 25, 2022, ECF Nos. 42-3, 106-4, 138-

4, and 151-2 & Dep. Brian Park ("Parks Dep.") 29:13-30:19, June 10, 2022, ECF No. 42-6,

agreeing that the MCSO is responsible for "internal security," conditions of confinement, and

AICs' safety, health, and welfare and AICs are entitled to a safe environment and humane

conditions, and noting that the MCSO works with "corrections health" or "medical" on AICs'

health and welfare; Defs.' Answer & Affirmative Defs. ¶ 8, ECF No. 45, admitting that the

County operates MCDC and must "provide for the health and safety of the [AICs] . . . housed

therein").

     Alexander and Wheeler—both of whom were subordinate members of Reese's

"command staff" or "leadership team"—served as the MCSO's Chief Deputy of Corrections

Facilities and Captain and MCDC Facility Commander, respectively.[12] (Decl. Steven Alexander

Supp. Defs.' Mot. Summ. J. ("Alexander Decl.") ¶¶ 1-2, 6, ECF No. 90; Reese Dep. 30:11-17;

Wheeler Dep. 6:1-22, 45:5-47, 72:11-73:6, 94:11-96:2, 101:5-102:6, 105:15-110:1, 111:16-

112:10, 113:3-24; Decl. Joe Piucci Supp. Pls.' Mot. Certify Class Action ("Piucci Decl.") ¶ 4

& Ex. 21 at 5, ECF Nos. 42 and 42-33.) Alexander's responsibilities included the welfare and

safety of AICs and employees at MCDC. (Alexander Decl. ¶¶ 3, 6.) Wheeler's duties included

---

[12] In December 2021, MCSO promoted MCDC's Administrative Lieutenant, Brian Parks ("Parks"), to Captain and MCDC Facility Commander. (Parks Dep. 13:17-14:24; Dep. Thomas Edwards Jacobs ("Jacobs Dep.") 72:17-25, Apr. 15, 2022, ECF Nos. 42-5 and 138-11, listing Parks' roles).

running MCDC and overseeing day-to-day operations and facility projects. (Wheeler Dep. 19:14-21:15.)

### C.     MCSO's Facilities

In 2020, MCSO operated and housed AICs at two facilities in Portland: (1) MCDC, and (2) the Multnomah County Inverness Jail ("MCIJ," also known as "Inverness," the "Inverness Jail," or "IJ"). (Piucci Decl. ¶¶ 4, 10-11, Ex. V at 1-2, Ex. 45 at 1-3 & Ex. 75 at 1-5; Wheeler Dep. 102:22-107:23; Reese Dep. 53:3-54:10; Dep. Nicholas Jarmer ("Jarmer Dep.") 24:18-27:18, 29:6-47:17, Oct. 25, 2022, ECF No. 42-4 and 106-7; *see also* Gilmore MSJ Decl. ¶ 24 & Ex. 37 at 45, providing a list of common acronyms in the AIC manual and referring only to these facilities).

#### 1.     MCDC

##### a.     Location and Design

MCDC is a maximum-security facility located in downtown Portland and within the Justice Center, a "porous" high-rise building that the MCSO shares with the Portland Police Bureau ("PPB"). (Piucci Decl. ¶ 6 & Ex. K at 1; Alexander Decl. ¶ 6; Decl. Brandon Pedro Supp. Defs.' Reply Supp. Mot. Summ. J. ("Pedro Reply Decl.") ¶ 4, Ex. 1 at 1 & Ex. 2 at 1, ECF No. 140; *see also* Dep. Kevin Hendley ("Hendley Dep.") 130:12-132:3, Mar. 3, 2022, ECF Nos. 42-1, 42-3 and 106-43, stating that "porous" means "cut up in different" ways, such as an underground parking and garage entry and exit on the lower levels, which are open to atmosphere "all the time" and may allow air and "whatever is floating around" to "get sucked in down there").

The Justice Center sits directly to the south and across the street from this district's Mark O. Hatfield U.S. Courthouse (the "federal courthouse"). (Gilmore MSJ Decl. Ex. 1 at 1; Piucci Decl. ¶ 10 & Ex. V at 1; Reese Dep. 24:16-18; *see also* Lundy Decl. ¶ 2, noting some cells face

PAGE 11 – FINDINGS AND RECOMMENDATION

the courthouse). The Justice Center and federal courthouse are both west-facing buildings, which together occupy two city blocks and overlook two city parks (Chapman and Lownsdale Squares, respectively). (*See* Piucci Decl. Ex. V at 1, providing an overhead view of the buildings, which are located between Southwest Third and Second Avenues and Southwest Salmon and Madison Streets).

The MCSO operates MCDC as a "direct, podular design facility" with housing units located on the Justice Center's fourth through eighth floors. (Pedro Reply Decl. Ex. 1 at 1 & Ex. 2 at 1; Piucci Decl. Ex. 45 at 1-3.) Each of these floors consists of "single-cell housing," which are grouped into "Modules" or "Dorms," centered around dayrooms, and identified by a basic sequential numbering system (e.g., the floor number, with a single letter suffix of "A," "B," "C," or "D," or in the fourth floor's case, "A" through "F"). (Pedro Reply Decl. Ex. 1 at 1 & Ex. 2 at 1; Piucci Decl. ¶¶ 4-5, Ex. 4 at 1, Ex. 5 at 1-9, Ex. 16 at 1, Ex. 45 at 2-3 & Ex. 65 at 1-5; Jarmer Dep. 40:1-44:16, Berglund Decl. ¶¶ 2-3; Davis Decl. ¶¶ 2-3, Duhart Decl. ¶¶ 2-3; Lundy Decl. ¶¶ 2-3; *see also* Decl. Mihai Bascuti Supp. Defs.' Reply Supp. Mot. Summ. J. ("Bascuti Reply Decl.") ¶ 5, ECF No. 139, addressing showers in the "A and D modules" and a related policy; Gilmore MSJ Decl. Ex. 6 at 31 & Ex. 37 at 18, referencing housing unit dayrooms and dayroom privileges).

### b.    Housing Floors and Classifications

Consistent with its design, most of the AICs housed at MCDC required "single-cell housing" for various reasons, including, but not limited to: (1) the COVID-19 pandemic necessitated their placement in "quarantine or isolation," (2) the MCSO deemed them "high medical need," "high safety or security issues," or "vulnerable" and "at risk" in an open-dorm setting, (3) they committed "major assaults on staff," or (4) they were "incredibly dangerous" and would "potentially kill" other AICs in an open-dorm setting. (Jarmer Dep. 26:24-27:18,

PAGE 12 – FINDINGS AND RECOMMENDATION

29:13-30:17, 42:19-44:16; Wheeler Dep. 119:10-120:18; Reese Dep. 34:3-35:19, 54:17-22, 56:12-57:4; Piucci Decl. Ex. 45 at 2-3.) The MCSO's AIC housing assignments are based on such reasons or "classifications."[13] (Jarmer Dep. 14:7-15:24, 26:13-27:18, 29:6-30:17, 36:15-20, 40:1-44:16; Piucci Decl. Ex. 45 at 2-3; Decl. Michaelle Cannavino Supp. Defs.' Mot. Summ. J. ("Cannavino Decl.") ¶ 3 & Ex. 1 at 1, ECF No. 93, citing "designated housing" for "severe mental health issues").

The MCSO, for example, designated Module 4A as its "medical unit" and Modules 4B through 4F as "[s]egregation [u]nits." (Davis Decl. ¶ 3; Piucci Decl. Ex. 45 at 2; Jarmer Dep. 42:19-43:11.) The MCSO also designated Module 5B as a "disciplinary unit" and Modules 5A, 5C, 6B, and 6D as "COVID" units. (Jarmer Dep. 42:19-43; Piucci Decl. Ex. 45 at 2; *see also* Decl. Shawn Buckner Supp. Pls.' Mot. Certify Class Action ("Buckner Decl.") ¶¶ 2-3, ECF No. 36, declaring that at some point between mid-April and late July 2020, AICs referred to a fifth floor module other than Modules 5B and 5D as "the hole"; Piucci Decl. ¶ 5 & Ex. 74 at 31, 36, suggesting that before the pandemic, the MCSO housed "disciplinary inmates, administrative segregation inmates and mental health inmates . . . in [Modules] 5B, 5C and other [h]ousing [u]nits").

Additionally, the MCSO designated Module 8A as its female AIC "quarantine" unit and Modules 6A and 7A were closed during summer 2020. (*See* Lundy Decl. ¶¶ 2-4, explaining that

---

[13] MCSO's Classification Unit Captain, Nicholas Jarmer ("Jarmer"), explained that the MCSO's classification decisions are based in part on an initial AIC interview but are often revisited because classification is "very fluid," many factors "come into play," the MCSO does not want AICs "stuck in the same place forever," and the classification unit's "goal" is to place AICs in the "least restrictive housing" assignment possible. (Jarmer Dep. 14:7-15:24, 36:15-20; Piucci Decl. Ex. 45 at 1, reflecting that Jarmer served in the MCSO's "Facilities Services Section"; Wheeler Dep. 119:10-22, confirming that the MCSO "always tr[ies] to classify and move [AICs] to the least restrictive environment that [it] can which most of the time is out to open dorms").

Module 8A was the "'quarantine dorm,' meaning that it was the first stop for all women admitted to the jail"; Piucci Decl. Ex. 45 at 2, noting that Modules 6A and 7A were closed; Jarmer Dep. 34:6-35:7 & Wheeler Dep. 103:2-104:8, 106:25-107:6, 120:19-121:10, listing reasons dorms were closed or unavailable for housing purposes, and the MCSO's efforts to reduce its system-wide AIC population during the COVID-19 pandemic). The MCSO also housed all male or female AIC units in Modules 6C, 7D, 8C, and 8D at different points during the relevant period. (*See* Decl. Prince Brown Supp. Pls.' Mot. Certify Class ("Brown Decl.") ¶¶ 2-3, 7, ECF No. 35, declaring that in late July 2020, the MCSO moved Module 6C's all male unit to Module 8C "because of construction" at MCDC; Buckner Decl. ¶ 7, discussing the "women above" the male AICs "all around" in Module 7D; Davis Decl. ¶¶ 2-4 & Dep. Amy Hay ("Hay Dep.") 50:7-21, July 1, 2022, ECF No. 42-8, suggesting that the MCSO only housed female AICs in Module 8D).

### 2.    MCIJ

Unlike MCDC, MCIJ consists primarily of "dormitory-style" or "open bed" housing where there is an "open area" of bunk beds, "small cubicle loft[s]," and half-walls in each "Dorm." (Wheeler Dep. 119:10-120:18; Jarmer Dep. 26:24-27:18, 29:13-30:17, 40:1-44:16; Reese Dep. 56:12-57:4; Piucci Decl. Ex. 45 at 1-3 & Ex. 75 at 1-5.) The MCSO and AICs consider MCIJ a more "privilege[d]" and "le[ss] restrictive" housing assignment, in large part because AICs are able to walk around more and amongst other AICs, as opposed to being confined to a single cell most of the day. (Wheeler Dep. 119:19-24; *see also* Decl. Michael Seale Supp. Defs.' Mot. Summ. J. ("Seale Decl.") at 67, ECF No. 101, reporting a "difference between being in open dorms at Inverness and being in [a] cell [twenty to twenty-two] hours per day at MCDC").

///

PAGE 14 – FINDINGS AND RECOMMENDATION

Although meaningful differences exist, there are also similarities between the facilities at MCIJ and MCDC. For example, like MCDC's housing modules, Dorms 14, 15, and 17 at MCIJ are single-cell housing units that can respectively accommodate sixty, sixty-eight, and twenty-three AICs, or a combined total of 151 AICs who need their own cell. (Jarmer Dep. 40:1-42:16, 43:14-44:16; Piucci Decl. Ex. 45 at 2.) Further, and similar to MCDC, the MCSO designated Dorms 16 and 18 at MCIJ as disciplinary and medical units. (Jarmer Dep. 42:19-43:11; Piucci Decl. Ex. 45 at 2.)

### 3.    System-Wide and Facility-Specific Capacities

The MCSO reviews daily population reports on its "jail management system" (known by the shorthand of "SWIS") when it needs to "look at a snapshot" of its system-wide or facility-specific housing capacity limits and utilization rates. (Wheeler Dep. 102:22-103:11; Piucci Decl. ¶ 11 & Ex. 75 at 1-5, summarizing the "SWIS Daily Population Reports" from May 29, 2020 through July 31, 2020, and attaching reports dated May 29, June 9, July 1, July 15, and July 31, 2020). The MCSO's SWIS Daily Population Reports also identify the number of AICs that the MCSO currently (1) held on federal charges (i.e., "federal holds") pursuant to its contract with the U.S. Marshals Service ("USMS") or in the pre-admission "reception" or "booking area" at MCDC, and (2) housed in all male or female units and units that were not gender specific. (Piucci Decl. Ex. 75 at 1-5; Wheeler Dep. 102:22-111:5; Jarmer Dep. 35:20-37:24; Reese Dep. 34:18-36:7.)

Between May 29 and July 5, 2020, MCDC and MCIJ were respectively capable of housing 448 and 744 AICs, which meant that the MCSO's system-wide capacity was 1,192 total beds. (Piucci Decl. Ex. 75 at 1-5, listing the MCSO's system-wide and facility-specific capacities as of May 29, June 9, and July 1, 2020; *see also id.* ¶ 11, summarizing the SWIS reports dated May 29 through July 5, 2020; Pedro Reply Decl. Ex. 2 at 6, 37, reflecting that on October 23 and

PAGE 15 – FINDINGS AND RECOMMENDATION

November 8, 2019, the MCSO reported that MCDC housed federal holds on the USMS's behalf

and that the "facility ha[d] a capacity of 448 beds with 80 +/- 30 dedicated female beds" and

"320 +/- 30" dedicated male beds). From July 6 through July 31, 2020, the MCSO's system-wide

capacities ranged from 1,058 to 1,117 beds because MCDC remained capable of housing 448

AICs but MCIJ's capacity dropped initially from 744 to 610 beds before settling at 669 beds.

(*See* Piucci Decl. ¶ 11, listing MCDC's capacity of 448 and MCIJ's capacities of 610 and 669

during this period, except for a typographical error of "488" for MCDC on July 20, 2020; *id.*

Ex. 75 at 4-5, attaching the SWIS reports dated July 15 and July 31, 2020, showing the MCSO's

system-wide capacities of 1,117, MCDC's capacities of 448, and MCIJ's capacities of 669 on

these dates).

Between May 29 and July 31, 2020, MCDC's housing population ranged from 221 (July

31, 2020) to 316 (June 1, 2020), MCIJ's housing population ranged from 364 (June 25, 2020) to

438 (June 1, 2020), and the MCSO's combined housing population ranged from 623 (July 11,

2020) to 754 (June 1, 2020). (*See* Piucci Decl. ¶ 11, listing facility populations and combined

totals). During this sixty-four day period, there were ten days (June 1, July 6 through July 13,

and July 27, 2020) on which the MCSO's facilities' combined population exceeded the capacity

of its larger facility, MCIJ. (*See id.*, noting that counsel highlighted these "ten individual days" in

yellow).

### D.    The Justice Center's HVAC System

#### 1.    System Components

The Justice Center's custom-built HVAC system is connected to a building automation

software and comprised of many physical components, such as a chiller and boiler, heat pumps,

air handlers, multi-zone units ("MZU"), ductwork (piping), dampers, coils, filters, fans, vents,

and terminal boxes or units. (Hendley Dep. 24:1-27:23, 27:25-31:7, 56:7-58:5, 61:14-62:2, 69:2-

PAGE 16 – FINDINGS AND RECOMMENDATION

22; *see also* Decl. Dennis Conser Supp. Defs.' Mot. Summ. J. ("Conser Decl.") ¶ 7 & Ex. 1 at 1-

6, ECF Nos. 94 and 94-1, providing an overview of the HVAC system and "focusing on the

housing dorms on floors [four] through [eight]"; Decl. Stanley Jaworski Supp. Pls.' Resp. Defs.'

Mot. Summ. J. ("Jaworski Decl.") ¶ 4(a), ECF No. 119, agreeing generally on the HVAC system

overview).

     As their names suggest, the chiller and boiler are refrigeration and heating units that

distribute cold and hot water to the air handlers, MZUs, and terminal boxes. (Hendley Dep. 29:6-

25.) The Justice Center's heat pumps are internal water-based (as opposed to external air-based)

systems that are connected to a thermostat and heat and cool the building. (*Id.* 24:1-27:23, 30:14-

31:7.)

     Air handlers are essentially boxes that utilize return and supply fans and a series of

dampers (adjustable plates that regulate airflow) to supply "one temperature of air" to the zones

or areas that they serve within the Justice Center. (*Id.* 30:1-7; *see also* Conser Decl. Ex. at 1 at 1,

noting that air handler components are "contained within [its] cabinet"; *cf.* Piucci Decl. ¶ 4

& Ex. 3 at 3-4, depicting the outside air intake dampers in open and closed positions). MZUs are

also air handlers but they are capable of supplying hot or cold air to their service zones. (Hendley

Dep. 30:8-13.)

     In addition to these components, the Justice Center's HVAC system includes several

types of "terminal" or "variable volume" boxes. (*Id.* 29:6-25, 56:7-58:5.) For example, most of

the Justice Center's floors include either (1) "variable air volume" or "VAV" boxes, which

utilize internal dampers, reside in the ceiling, connect to ductwork, vents, and thermostats in their

coverage zones, and regulate air supply, temperature, and fan speeds by opening (or closing)

their dampers, and (2) "variable volume with reheat" or "VVR" boxes, which operate the same

PAGE 17 – FINDINGS AND RECOMMENDATION

way but are also capable of heating by running water through their internal heating coils. (*See id.* 56:7-58:5, noting as much and that some versions include both internal "heating and cooling coil[s]"; Conser Decl. Ex. 1 at 5, addressing one of the Justice Center's air handler's "terminal units," which are "devices in the duct between the air handler and the spaces serviced . . . [that] have automated dampers that control the amount of air to the space to maintain the space temperature").

### 2.    Service Zones and Modes of Operation

There are three MVUs that provide HVAC to the MCSO's AIC housing floors at MCDC, all of which are located on the Justice Center's fourth through eighth floors: (1) "MZU-01," (2) "MZU-02," and (3) supply fan three ("SF-03"). (Conser Decl. Ex. 1 at 1; Hendley Dep. 53:5-56:3; Piucci Decl. ¶¶ 4-5, Ex. 4 at 1, Ex. 5 at 1-9, & Ex. 64 at 1; Dep. Aaron Drabandt ("Drabandt Dep.") 21:17-22:25, July 13, 2022, ECF Nos. 42-2, 106-18, and 131-2; Jaworski Decl. ¶ 4.)

With one limited exception, MZU-01 provides HVAC to all of the inward-facing, single-cell housing units that are located around the perimeter of each floor. (*See* Conser Decl. Ex. 1 at 1-3, depicting overhead, three-layered and colored views of the layouts and noting that MZU-01 services all cells except for "cells in the Northwest corner" and "four cells on the East portion" of the fourth floor; Jaworski Decl. ¶ 4, agreeing with this general HVAC overview; Hendley Dep. 53:5-56:3 & Piucci Decl. Ex. 4 at 1, agreeing that MZU-01 services all the cells and stating that the layouts are largely the same but there are "a few differences here and there"). By comparison, MZU-02 provides HVAC to the libraries, multi-purposes rooms, and a "small portion" of the east side dayrooms on the fifth through eighth floors, and SF-03 serves all the remaining dayrooms and "interior zones" on the fourth through eighth floors. (Conser Decl. Ex. 1 at 1-3; *see also* Hendley Dep. 53:7-24 & Piucci Decl. Ex. 4 at 1, describing differences in

PAGE 18 – FINDINGS AND RECOMMENDATION

the areas and square footage that SF-03 services but agreeing that it covers core "interior zones" and that air handlers other than MZU-01 service the areas that the cells surround on each housing floor).

Similar to MZU-02 and SF-03, MZU-01 and its eight-foot tall "bank" or "bay" of air filters are located in a "giant open room" on the Justice Center's ninth floor approximately "ten feet" from the outside air dampers. (Hendley Dep. 36:1-21, 38:7-39:22, 66:1-68:12; Piucci Decl. Ex. 2 at 1, Ex. 3 at 3-4 & Ex. 5 at 2; Conser Decl. Ex. 1 at 1; *see also* Piucci Decl. Ex. 11 at 1, discussing the replacement of the "air filter banks" for the "outside air dampers"). MZU-01 has two internal cabinet "supply fans" (only one of which runs at any given time) and return fans located elsewhere on the ninth floor for each of its building service quadrants. (Conser Decl. Ex. 1 at 2-4; Hendley Dep. 71:15-72:22; Piucci Decl. Ex. 4 at 1.) As a "constant volume" air handler with outside air dampers that the HVAC department programmed to remain "100 percent open," MZU-01's supply fan runs continuously at the same speed attempting to "pull" and "force" in the same amount of "air from outside." (Hendley Dep. 55:13-19, 59:8-24, 72:5-73:20; *see also* Conser Decl. Ex. 1 at 3, explaining that "100% outside air" was MZU-01's "normal [default] mode of operation" and MZU-01 did not "operate at less than 100% outside air" absent a "manual[] override," and even in "100% return air" or "full recirculation mode," the "amount of air [running] through" MZU-01 and its building service quadrants would remain "constant and "not vary").

Importantly, MZU-01's outside air dampers "do not seal airtight" and were "never designed to be used as a barrier against [tear] gas." (Piucci Decl. Ex. 15 at 1, ECF No. 43-31.) Thus, even with the "dampers closed," outside air can "mak[e] its way through the system[.]" (*Id.*)

After outside (or recirculated) air passes through MZU-01's filters and other system components, MZU-01 pushes the air down its building service quadrants' vertical "shafts" or "stack[s]" of ductwork where the air proceeds to "branch off" to the same lettered module on each floor (e.g., Module 8A down through Module 4A in the northwest quadrant zone and Modules 8C down through Module 4C in the southeast quadrant zone). (Hendley Dep. 61:14-24, 68:13-69:22, 75:20-24, 83:16-22; Piucci Decl. Ex. 4 at 1 & Ex. 5 at 1, 3-5; Conser Decl. Ex. 1 at 1, 3-4.) MZU-01's air then enters cells through a flat, perforated piece of steel, which is mounted six feet off the ground and to ductwork "behind the secure wall." (Hendley Dep. 74:5-18; Piucci Decl. Ex. 5 at 5.) AICs can attempt to block cell vents but cannot open or close them. (*See* Hendley Dep. 74:19-75:5, confirming there are no "lever[s]" or "mechanical device[s]" to open or close vents).

Having reached its intended destination, MZU-01's ninth floor "return" or "exhaust" fans effectively "pull[]" the cell air (1) back out through a vent on the side of each cell's "stainless steel toilet-sink combo," which consists of the "same size perforated hole[s]" and sits below the six-foot high entry vent, (2) into a "pipe chase," and (3) back up each quadrant's vertical return shaft to the ninth floor, where it typically exits the building via open "exhaust air . . . dampers." (*See id.* 60:13-61:13, 72:1-72:19 & Conser Decl. Ex. 1 at 3-4, describing this process in the "normal mode of operation" or "100% outside air," and that in the alternative "full recirculation mode," the return air follows the same sequence each time that MZU-01 "send[s] it back through the filter for recirculation"; Piucci Decl. Ex. 5 at 5, depicting cells' return vents with solid blue boxes).

### E.     Tear Gas-Related Events

With this background in mind, the Court turns initially to the events of May 29, 2020, which marked the second day of protests in downtown Portland and first instance in which AICs

and the MCSO's staff members at MCDC were exposed to and suffered from the effects of tear

gas exposure.[14] (Duhart Decl. ¶¶ 2-3, 5; Lundy Decl. ¶¶ 2, 5-6; Gilmore MSJ Decl. ¶ 25 &

Ex. 41 at 1-8; Smith Decl. ¶¶ 2-4; *see also* Reese Dep. 17:20-18:10, recalling the first infiltration

of tear gas).

### 1.    Breach of the Justice Center

On the evening of May 29, 2020, the Portland protests turned violent and destructive

when a mob of rioters used an aluminum I-beam, rocks, and other items to "smash through the

massive windows" near the Justice Center's front entrance and breach the building. (Lichatowich

Decl. Ex. 4 at 3; Dep. Aaron Van Houte ("Van Houte Dep.") 20:7-24:25, 28:1-16, June 10, 2022,

---

[14] Courts have referenced May 26 and May 29, 2020 as the start of the Portland protests.
*See Index Newspapers LLC v. City of Portland*, No. 3:20-cv-01035-SI, 2023 WL 2666538, at *4
(D. Or. Mar. 28, 2023) ("From May 26, 2020, to October 31, 2020, protests occurred daily that
were declared unlawful." (quoting *Index Newspapers LLC v. City of Portland*, No. 3:20-cv-
01035-SI, 2022 WL 4466881, at *4 (D. Or. Sept. 26, 2022))); *Don't Shoot Portland v. City of
Portland*, No. 3:20-cv-00917-HZ, 2022 WL 2700307, at *1 (D. Or. July 12, 2022) ("Protests
began in Portland on May 29, 2020, and continued almost daily through November 15, 2020.").
The parties agree that the Portland protests began on May 28, 2020. (Defs.' MSJ at 7; Pls.' MSJ
Resp. at 8.)

Throughout their papers, the parties also cite filings from related cases, including
declarations that Reese, PPB's then-Commander Craig Dobson ("Dobson"), and others filed in
an intradistrict case involving the PPB's use of tear gas against Portland protesters. *See Don't
Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1153 (D. Or. 2020)); (*cf.* Pls.' MSJ
Resp. at 9 n.37, 10-11 nn.39-40, 43 & 46; Defs.' MSJ at 4-5, 7, 17-18, 90; Gilmore MSJ Decl.
¶ 25 & Ex. 41 at 1-8; Decl. Kyle Smith Supp. Defs.' Mot. Summ. J. ("Smith Decl.") ¶¶ 1-4, ECF
No. 103.) Consequently, the Court's opinion refers at times to filings from these cases. *See* Decl.
of Craig Dobson at 2-3, *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917-HZ (D. Or.
filed Nov. 8, 2022), ECF No. 308 (declaring that "[b]eginning on May 28, 2020, . . . there were
nightly protests in Portland," and PPB "deployed tear gas on [and after] May 29"); *see also Est.
of Bolles v. Comm'r Internal Rev.*, No. 22-7019, 2024 WL 1364177, at *2 (9th Cir. Ap. 1, 2024)
(taking judicial notice of documents concerning related cases and noting that the parties referred
to the cases and did not dispute the outcomes); *Martinez v. Astrue*, 256 F. App'x 75, 78-79 & n.2
(9th Cir. 2007) (taking judicial notice of a federal agency's investigative report at summary
judgment and noting that the district court considered the report even though the plaintiff only
made it part of the record on appeal, and the defendant addressed and did not dispute content of
the report at each level); FED. R. EVID. 201(c)(1), (d) (noting that courts "may take judicial
notice on [their] own . . . at any stage of the proceeding").

PAGE 21 – FINDINGS AND RECOMMENDATION

ECF Nos. 42-9, 43-9, 106-10 and 138-5; Alexander Decl. ¶ 7.) The rioters vandalized a records management area and office space, the latter of which they set on fire in an "attempt[] to set fire to the building." (Van Houte Dep. 20:7-21:14; Lichatowich Decl. Ex. 4 at 3; Alexander Decl. ¶ 7; *see also* Reese Dep. 17:20-18:15, 51:12-13, 52:22-23, 53:17-23, describing the "violent mob" that breached the Justice Center on May 29, "attempt[ing] . . . to take over" and "destroy" the building).

Shortly thereafter, PPB, which, along with the MCSO, was protecting the Justice Center's main entrance, deployed tear gas inside the lobby and record management area to "clear out the rioters [who] had broken in the building" and were located by a nearby "threshold." [15] (Van Houte Dep. 21:15-22:6; Reese Dep. 16:23-18:15; Gilmore MSJ Decl. Ex. 41 at 1-2, confirming PPB's initial deployment of unknown amounts of tear gas and identifying many other deployments of "CS Canisters" in and around the Justice Center; Smith Decl. ¶¶ 3-4, relying on experience and video evidence and estimating that at around 9:00 p.m. and midnight, officers deployed "one CS Canister and two CS Triple Chasers" in the lobby). When Sheriff Reese arrived that evening, the lobby was "heavily contaminated" with tear gas. (Reese Dep. 16:23-18:15.)

MCSO Sergeant Aaron Van Houte ("Van Houte"), who was stationed behind glass doors and unable to retrieve a gas mask in advance of PPB's deployment, experienced a "pretty high level" and "substantial" discomfort as a result of his "secondhand exposure" to PPB's use of tear gas. (Van Houte Dep. 23:14-24:5.) Similarly, MCSO Sergeant Shawn Seals ("Seals") reported that when he and other deputies subsequently entered the same area of the lobby, they realized that it was "filled with tear gas," which was "too much" and caused them to leave the area.

---

[15] Tear gas has a "high flammability rating and has been noted to cause some structure fires." (Sloane Decl. Ex. 1 at 5.)

PAGE 22 – FINDINGS AND RECOMMENDATION

(Piucci Decl. ¶ 4 & Ex. 26 at 1-2; Dep. Kraig Stewart Anspach ("Anspach Dep.") 41:1-43:25, Apr. 15, 2022, ECF Nos. 42-7, 43-7 and 138-10.) Seals also reported that the Justice Center's fire alarm made it "hard to communicate," his team "evacuated the nurses" from the fourth floor, the "entire jail smelled of smoke" but he did not believe that any AICs "needed to be evacuated," and he "learned a lot that night," including "how CS gas makes it really hard to breath[e]" and he "wished" that he and the other deputies had "access to [gas] masks that [they] could have [used to] . . . 'clear[]' the entire lobby area without being affected by the [tear] gas." (Piucci Decl. Ex. 26 at 2.)

What unfolded on MCDC's housing floors was similar in some respects but different in others. In Module 8A, for example, Lundy woke up to "what sounded like war" and feeling "terrif[ied]," as the Justice Center's fire alarm sounded, her cell "air was thick with . . . what [she initially] thought was smoke," and she saw "bright lights and big flashes" and that "all of the guards were gone," heard "vehicles that sounded like tanks going by" and a "voice on a loudspeaker," and did not know that protesters breached the building, which she feared was "going to burn down." (Lundy Decl. ¶¶ 4-6; *see also* Dep. Robin Lundy ("Lundy Dep.") 133:24-134:4, 164:17-25, July 12, 2022, ECF No. 106-36, demonstrating that Lundy did not recall "physically see[ing]" what she now knows was tear gas and explained that it felt "really thick" because when she was "breath[ing] it in," she would choke, cough, and experience "shortness of breath").

In Module 5D, Duhart was also "very scar[ed]" and unaware of "what was happening" on the floors below or that "what [he] was smelling and breathing at the time was tear gas." (Duhart Decl. ¶¶ 3, 5; *see also* Van Houte Dep. 28:1-16, reflecting that Van Houte was not sure whether the smell of tear gas on the fifth floor stemmed from his initial exposure on the second floor

lobby area but he "guess[ed] that there was some [tear gas] that got through the vents" on the fifth floor; Decl. Kristyn Barlow Supp. Defs.' Mot. Summ. J. ("Barlow Decl.") ¶¶ 9-10 & Ex. 1 at 1-2, Ex. 2 at 1-2 & Ex. 3 at 1, ECF No. 91, confirming a nurse's and many AICs' exposure to "smoke or tear gas" and adding that many AICs "complained that they could not breath[e]" and there were "so many complaints," the nurse was unable to "enter progress notes for all of [her] encounters").

In the early morning hours of May 30, 2020, the County Facilities and Property Management's HVAC Department received the first of many requests from a building employee to adjust the Justice Center's HVAC system's outside air dampers "for the purpose of preventing tear gas from entering the building."[16] (*See* Piucci Decl. ¶¶ 4, 6, Ex. M at 1-7, Ex. 8 at 1-3, Ex. 22 at 1-3 & Ex. 34 at 2, ECF Nos. 42-13, 42-27, 42-35 and 42-36, attaching the "Facilities Department's Log Sheets" for June 3 through July 21, 2020 and TRIRGA "Log of Requests to Modify HVAC System" for May 30 through July 26, 2020, identifying the department, and refencing "almost nightly requests" and "up to four requests in a single night"; *but cf. id.* Ex. 15 at 1, "These dampers do not seal airtight as they were never designed to be used as a barrier against gas.").

///

---

[16] According to the HVAC department's lead engineer, Aaron Drabandt ("Drabandt"), building employees reported concerns through the County's workplace management software known as "TRIRGA" or contacted facilities dispatch directly on its 24/7 phone line. (Drabandt Dep. 62:11-64:8; *see also* Piucci Decl. Ex. 22 at 1, referencing "Facilities Dispatch" and "TRIRGA" assistance and learning resources). After dispatch and/or the employee entered the information into TRIRGA to "create a new work task," dispatch contacted the weekly on-call HVAC department engineer responsible for "booting up the hardware tool used to control the dampers, accessing the County's network, remoting into the building automation system, and then commanding each of the affected systems generally," all of which took at least twenty minutes to complete. (*See* Drabandt Dep. 62:11-64:8, 69:14-70:6, 75:11-76:24; Piucci Decl. Ex. 34 at 2.)

### 2.    MCSO's Initial Response

#### a.    Physical Security

Almost immediately after rioters breached the Justice Center, the MCSO boarded up the windows with plywood and installed a security fence around the perimeter. (Parks Dep. 31:16-24; Lichatowich Decl. Ex. 4 at 3; Piucci Decl. Ex. K at 1.) The MCSO later added "jersey barriers" to the security fence's footings to help "keep the fence intact" and swapped segments of "constantia wire" and eight-foot chain-link fencing out for "make-shift walls." (Piucci Decl. Ex. 70 at 1; *see also id.* Ex. L at 1, noting that around this time, PPB installed an "outer perimeter fence" on the "blocks surrounding" the federal courthouse, County's courthouse, and Justice Center).

Additionally, Reese spoke to his staff and emphasized the importance of not allowing the Justice Center to be "compromised again." (Lichatowich Decl. Ex. 4 at 3.) Consistent with this guidance, the MCSO's Rapid Response Team ("RRT") decided that they had to "draw a line at the fence" and "could not allow the fence to be comprised," because (1) "violent members of the crowd" outnumbered members of law enforcement by an approximately twenty-to-one ratio, and thus (2) if those crowd members comprised the fence and charged the front entrance, the MCSO's RRT lacked the ability hold them back and the Justice Center's occupants "would be in jeopardy." (*Id.*)

#### b.    MCDC Evacuation Plan

At the same time (i.e., within mere days or weeks), the MCSO's "command staff" and "leadership team" (Reese, Alexander, and Wheeler) also discussed the feasibility of evacuating and relocating MCDC's AICs to MCIJ. (Reese Dep. 33:4-34:17, 36:8-21, 51:3-54:10, 57:8-14, 60:1-20; Wheeler Dep. 76:1-21, 92:2-6, 95:19-96:2, 100:5-102:21, 111:7-113:24, 122:13-24; Alexander Decl. ¶ 12.) The MCSO's leadership team decided that they were unable safely to

PAGE 25 – FINDINGS AND RECOMMENDATION

execute such a plan because (1) transporting and housing AICs in a more densely populated

congregate setting would only increase their exposure to the ongoing (and not yet well

understood) health risks associated with COVID-19, (2) there continued to be "violent protests

that were directed at law enforcement" at the Justice Center, (3) there was a "need for medical

and mental health care facilities that were present [at] MCDC," and (4) there was a "potential for

violence" given the "classification" of AICs at MCDC.[17] (Alexander Decl. ¶ 12; Reese Dep.

33:4-34:13, 55:17-56:1; *see also* Jarmer Dep. 41:25-42:16, stating that classification impacts not

only an AIC's cell types but also "who's in the . . . single cell next to them and next to them, and

so on and so on, because . . . [staff members] could not let [some AICs] out of their cells together

even though they're next door to each other" without "creat[ing] a very difficult working

environment").

The MCSO's leadership team never revisited or reconsidered their decision. (*See* Reese

Dep. 34:10-17, "Q. Okay. Once that . . . determination was made [on evacuation], that option

was not revisited? A. No."; Wheeler Dep. 76:2-18, 92:2-6, 100:5-102:21, 111:7-113:24, relying

on command staff meeting discussions from this time period and denying involvement in any

conversations about a late June 2020 draft plan and that the MCSO considered evacuating AICs

---

[17] Notably, Reese testified that the MCSO's conversations about evacuation in the "subsequent days" or "weeks" after the breach (i.e., late May or the "first week" or "first two weeks of June") were based on the "threat to the facility," not "continuing infiltration of tear gas," because during this time period, "people [were] trying to break into the facility and take it over and . . . destroy it" and thus the "threat to the Justice Center . . . was super high." (Reese Dep. 33:4-24, 51:3-23, 52:6-53:23, "Q. . . . I don't want the jury or the judge to be confused. Those considerations about relocation were in relation to the threat to the facility as opposed to infiltration of tear gas? A. Yes."). Reese also explained that he was present for "most of the events that transpired" at the Justice Center, and that he "never felt personally that the threat of infiltration of tear gas was such a high risk that [the MCSO] needed to evacuate the building." (*Id.* 52:12-21.) Reese further explained that at the time, he was "more concerned about damage from fires or the potential that the building would be taken over by a violent mob." (*Id.* 52:21-23.)

because of tear gas infiltration between July 5 and July 21, 2020 or the "end of July, [on] July 25th"; *see also* Alexander Decl. ¶ 12, citing only "some conversations" at "some point during the summer").

As the Sheriff, Reese believed that he was the only one who was responsible for deciding and possessed the authority to decide whether to evacuate MCDC. (Reese Dep. 36:8-21, 51:24-52:5.) Unlike Reese, Wheeler (and others) believed that he, Reese, and Alexander all had the authority to order a "level [four] evacuation" under the MCDC Safety, Emergency Response and Evacuation Plan (the "MCDC Evacuation Plan").[18] (*See* Wheeler Dep. 95:19-96:23 & Piucci Decl. ¶ 5 & Ex. 74 at 1-46, attaching the applicable "MCDC Evacuation Plan," which the MCSO reviewed annually and last updated in January 2011; Jarmer Dep. 46:23-47:8, believing that MCDC's "evacuation plan . . . says that the sheriff [Reese] or chief [Alexander] or the facility commander [Wheeler] are the only ones that can order [an evacuation]," and that Jarmer could not do so).

The MCDC Evacuation Plan provides, in relevant part, that a level four evacuation is the "process of removing all persons from [MCDC] . . . to another secure area at another site or facility[] . . . whenever a situation occurs requiring the necessary movement of all [AICs] and

---

[18] In Oregon, there are "statutory standards governing local correctional facilities, including MCDC." *State v. Jensen*, 917 P.2d 541, 543 (Or. Ct. App. 1996) (citing OR. REV. STAT. § 169.076). Among these statutory standards is that "[e]ach local correctional facility shall . . . [f]ormulate and publish plans to meet emergencies involving escape, riots, assaults, fires, rebellions and other types of emergencies, and regulations for the operation of the facility. OR. REV. STAT. § 169.076(3). The MCSO's Corrections Division Operational Policy and Procedures Manual recognizes the MCSO's responsibility to, among other things, formulate and publish evacuation plans for each of its correctional facilities, such as the MCDC Evacuation Plan. (*See* Gilmore Decl. ¶ 4 & Ex. 5 at 1-6, citing OR. REV. STAT. § 169.076(3) and stating, among other things, that "[t]o ensure each facility in the Corrections Division has a written Facility Evacuation Plan, approved by the local Fire Marshal, to be used in the event of a fire or a major emergency"; Wheeler Dep. 93:5-94:16, identifying the MCDC Evacuation Plan in effect at this time).

staff away from [MCDC] . . . to another location in order to preserve the lives and safety of all concerned."[19] (*See* Piucci Decl. Ex. 74 at 9-10, 26, detailing level four evacuations after general definitions) (caps omitted). The MCDC Evacuation Plan also provides a nonexhaustive list of "[e]xamples of [l]evel [four] [e]vacuation situations," including "[f]ire/[s]moke affecting the entire [f]acility[.]" (*See* Piucci Decl. Ex. 74 at 26, listing examples and adding that "[i]n any fire/smoke or emergency situation, life safety concerns shall take precedence over security concerns," and that "[st]ill, the highest possible level of safety and security shall always be maintained"). Further, the MCDC Evaluation Plan identifies these "evacuation sites": (1) MCIJ's "processing area" or "recreation yards," and (2) "other county jail facilities, as determined by the Sheriff, the Chief Deputy of the Corrections Division, or their designee." (*Id.* at 26-27) (caps omitted).

### 3.    Worsening Protests and Conditions of Confinement

After the breach, the protests in downtown Portland largely "took a turn" for the worse.[20] (*See* Parks Dep. 13:1-14:20, 20:13-21:4, 31:1-32:6, Reese Dep. 24:12-26:22, & Piucci Decl. Ex. L at 1.) For approximately 100 consecutive nights, there was a "pretty consistent" and "constant theme," where "giant crowds" engaged in peaceful protests and a "core group of agitators" at the rear or side of the crowd would "start throwing things at [other] people . . . [and]

---

[19] Unlike level four, the MCDC Evacuation Plan defines level three evacuations as the MCSO's removal of certain "persons" or evacuation of "multiple areas" of MCDC, as opposed its removal of "all persons" or moving "all [AICs] and staff away" from MCDC. (Piucci Decl. Ex. 74 at 10-11, 25-26.) In Wheeler's view, the MCSO's evacuation of MCDC's AIC housing floors (i.e., "multiple areas") was a level four evacuation, not a level three, because staff would need to "go where the [AICs] are located," which meant that the MCSO would effectively be "evacuating the building." (*See* Wheeler Dep. 98:2-99:18, Q. At that point it would be just a level [four] evacuation[?] A. It would be a level [four evacuation]. We'd be evacuating the building.").

[20] This general trajectory appears to be undisputed. (*See* Pls.' MSJ Resp. at 9-13; Defs.' MSJ at 4-6, 14-19.)

the officers on the [Justice Center's] front porch, and then it would escalate from there." (Parks Dep. 30:21-31:16; *see also* Jacobs Dep. 36:3-37:24, denying any personal awareness or exposure to tear gas and the protests based on a daytime shift and only occasionally staying late to work overtime hours; Reese Dep. 25:2-9, describing events that were "predictable in nature" and under "[c]over of darkness").

For the most part, AICs' conditions of confinement also worsened. (*See* Lundy Decl. ¶¶ 9, 11, stating that "things did not improve" when "May turned to June" and then "got worse"; Brown Decl. ¶¶ 3-4, 6, reporting that the "gassings got worse over time"; Buckner Decl. ¶¶ 3-4, 6, noting that the "gassings got progressively worse"; Decl. Jessica Gaylor Supp. Pls.' Mot. Certify Class Action ("Gaylor Decl.") ¶¶ 4-6, ECF No. 37, stating that the "gassings got worse"; Decl. Justen Hill-Sistrunk Supp. Pls.' Mot. Certify Class Action ("Hill-Sistrunk Decl.") ¶¶ 3-5, ECF No. 38, agreeing that the "gassings got worse"; Decl. Dathan Hall Supp. Pls.' Mot. Certify Class Action ("Hall Decl.") ¶¶ 2-4, ECF No. 38, describing July 4 to August 4, 2020 as the "worst of it").

### a.    May 30 and May 31, 2020

On May 30, 2020, the night after the breach, Lundy suffered from "breathing problems" and a panic attack, as it once "again sounded like a war zone outside." (Lundy Decl. ¶¶ 7-8; *see also* Seale Decl. at 3-4, 64, 83, reviewing medical records for any AIC "seeking treatment for tear gas" during the period at issue, and citing "relevant" May 30 findings from Lundy's and another AIC's treatment notes). That same evening, AIC Justen Hill-Sistrunk ("Hill-Sistrunk") "first noticed a problem" with tear gas in Module 7D, which caused him to file a medical request form (or "MRF") because he continued to smell smoke and feel lightheaded, his eyes were burning, and he rated his posttraumatic stress disorder ("PTSD") as a ten on a ten-point scale. (*See* Hill-Sistrunk Decl. ¶¶ 2-4, 6, & Ex. A at 1, reporting these concerns and identifying an

onset date of May 30, 2020, and recounting that during tear gas exposures, Hill-Sistrunk also

experienced "chest pain," an inability to breathe, and increased anxiety; *see also* Smith Decl.

¶¶ 3-4, confirming a minimum deployment of nine "CS Skat Shells" and one "Instantaneous

Blast Canister").

The next afternoon, May 31, 2020, the Justice Center's entrance "still smelled of smoke

from the [May 29] fire" when the MCSO's RRT set up nearby. (Lichatowich Decl. Ex. 4 at 3.)

Early that night, an estimated crowd of 5,000 people gathered in Chapman and Lownsdale

Squares across from the Justice Center and federal courthouse. (*Id.*; Piucci Decl. Ex. K at 1.) At

8:00 p.m., members of the crowd began throwing projectiles, such as rocks, glass bottles, full

beer cans and water bottles, and "other unidentifiable hard objects," at the law enforcement

agents stationed on the portico. (Lichatowich Ex. 4 at 3; Piucci Decl. Ex. K at 1.) Masked crowd

members, some of whom carried shields, also attempted to dismantle the security fencing.

(Lichatowich Ex. 4 at 3.) A "dangerous and chaotic situation" ensued when the MCSO's RRT

deployed tear gas to stop protesters from dismantling the security fence and masked crowd

members threw the flaming and smoking canisters back onto the portico where the RRT was

located. (*Id.* at 3-4.) Eventually, the RRT's tear gas resulted in most of the crowd's temporary

departure. (*Id.* at 4.)

At 8:30 and 8:40 p.m., Wheeler and the MCSO's facility security officers ("FSOs") were

inside the Justice Center reaching out to the HVAC department about "getting airflow

corrected," because the lobby was "filled with [tear] gas." (*See* Piucci Decl. Ex. 69 at 1-2, noting

as much and that the FSOs were in "good shape" and "[e]yes, noses, and throats [were]

recovering steadily"; Wheeler Dep. 43:5-45:17, 46:2-48:14, reflecting that Wheeler knew about

tear gas infiltration by this date, did not recall or question the accuracy of an HVAC engineer's

email describing their conversation, and stated that he did know any MCSO employee named "Scott Wheeler"; Piucci Decl. Ex. 8 at 1 & Ex. 69 at 2, identifying the requestor incorrectly as "Scott" but using the same work task number as the follow-up email that dispatch forwarded to Wheeler).

Just before midnight, a similar but more intense sequence of events played out at the Justice Center's entrance when "violent agitators," many of whom were donning gas masks, mounted a "second attack" that was comparable to "the first." (*See* Lichatowich Ex. 4 at 4 & Piucci Decl. Ex. K at 1, recounting that the May 31, 2020 "attacks reached a level of intensity" that the MCSCO's RRT had not previously experienced, and the RRT experienced "significant fear for the[ir] safety" as they faced a "barrage of glass bottles and other projectiles being thrown in coordination" and saw "at least one subject in the crowd . . . actively attempting to light what appeared to be a Molotov cocktail"). The RRT's use of tear gas ultimately proved effective and the RRT later "learned that various people had posted on social media that the Justice [Center] was 'the prize' and they were planning to overrun and take the building." (Lichatowich Ex. 4 at 4; *see also* Gilmore Decl. Ex. 41 at 2-4, identifying many other deployments of tear gas on May 31, 2020).

### b.    June 2020

AICs (and staff working at the Justice Center) were also exposed to tear gas during June 2020.

AIC Prince Brown ("Brown"), who at the time resided in Module 6C, "first got tear gassed" on consecutive nights at the beginning of June 2020. (Brown Decl. ¶¶ 3-5.) On the first night, Brown was "jolted awake by the gas in the middle of the night with [his] eyes and nose burning" and learned that "all" of the other AICs housed in Module 6C "experienced the same thing." (*Id.* ¶ 4.) Brown asked an officer for milk, but the kitchen was closed, and on the second

night, Brown was unable to use his COVID-19 face mask because it was "already saturated in gas." (*Id.* ¶ 5.) Brown found it "hard to breathe" and could only get good air from [his cell] sink." (*Id.* ¶ 9.)

Similarly, in Module 5B, AIC Shawn Buckner ("Buckner") "first noticed a problem" with tear gas in early June 2020. (Buckner Decl. ¶¶ 3-4.) During these "terrible" and "painful" exposures, Buckner noticed a progressively worsening smell of "burning plastic or tires" and suffered from exacerbation of his asthma symptoms, "extreme[] difficult[y]" breathing, irritated eyes and nasal passages, a burning sensation on his face, excessive coughing, anxiety, and worry. (*Id.* ¶¶ 3-4, 7-8.)

At the beginning of June 2020, there were also protests outside the Justice Center that devolved into "extreme" "attacks," with crowd members engaging in violent and criminal conduct and pushing the situation at the Justice Center's security fence to a "critical point." (*See* Piucci Decl. Ex. L at 1 & Lichatowich ¶¶ 3, 5, Ex. 6 at 3-4, Ex. 7 at 1-2 & Ex. 8 at 3-4, attaching use of force reports, also known as After Action Reports ("AAR"), for June 2, June 5, and June 6, 2020).

On June 2, 2020, for example, crowd members "violently engaged" law enforcement and repeatedly "attempted to defeat" the Justice Center's security fence "at multiple places." (Piucci Decl. Ex. L at 1.) The MCSO's RRT eventually resorted to the use of tear gas, impact munitions, and diversionary devices to disperse and prevent these crowd members from compromising the fence and picking up and throwing tear gas canisters back toward the building. (Piucci Decl. Ex. L at 1; *see also* Gilmore Decl. Ex. 41 at 4, listing other tear gas deployments on June 2).

After doing so, the MCSO's RRT responded to a nearby distress call from PPB and arrived to find an entire block "envelop[ed]" in a "thick cloud of smoke," "masked people

running in all directions," and "drastically outnumbered" PPB officers "trying to protect themselves from projectiles landing all around [them.]" (Piucci Decl. Ex. L at 2.) The MCSO's RRT and PPB officers were able to restore order and push the crowd away from the Justice Center. (*Id.*)

On June 3, 2020, around 11:45 p.m., Seals contacted facilities dispatch and requested an adjustment to Justice Center's HVAC system because a "dumpster fire" on Second Avenue was "filling the building with smoke" and the HVAC department "advised leaving the dampers open to allow the smoke to dissipate once the fire [was] extinguished." (*Id.* Ex. 8 at 1 & Ex. M at 1) (simplified).

In the late night hours of June 5, 2020, law enforcement once again deployed tear gas in response to an escalating protest. (Lichatowich Decl. Ex. 6 at 3-4.) Although the two previous evenings (June 3 and June 4, 2020) "drew seemingly larger crowds" and were "predominantly peaceful events" that did not require the MCSO's "use of crowd control agents/munitions," June 5's estimated crowd of 1,200 to 2,000 protestors was "much more animated and hostile toward[] law enforcement," exhibited a "tinderbox-like demeanor," utilized "laser-casting devices" and "bright strobe lights" to "disorient and provoke" officers, threw a high volume and variety of projectiles, including fireworks and "[m]etal signage posts," and attempted to tear down and "surge past" multiple parts of the Justice Center's security fence. (*Id.* Ex. 6 at 3-4 & Ex. 7 at 1-2.) The MCSO continued to "draw[] a line at the integrity" of the Justice Center's security fence and ended up deploying at least twenty canisters of tear gas after lesser means provided ineffective against violent crowd members, several of whom work masks and "protective garments that mitigated the effect of the [RTR's] impact munitions." (*Id.* ¶ 7, Ex. 6 at 3-4 & Ex. 7 at 1-2; *see also* Gilmore Decl. Ex. 41 at 4-5 & Smith Decl. ¶¶ 2-4, confirming that law

enforcement deployed at least twenty tear gas canisters on June 5; Lichatowich Decl. Ex. 4 at 4, noting that protesters previously used "thick heavy clothing to mitigate the effect of impact munitions").

That same night, at 11:52 p.m., an MCSO FSO, Andrew Cash ("Cash"), contacted dispatch and requested that the Justice Center's HVAC system be set to "full air exchange" on all floors. (*See* Piucci Decl. Ex. M at 2 & Ex. 8 at 1, listing the call time as 11:52 p.m., creating a work task at "0:07:36" a.m. on June 6, 2020, reporting the status as complete, and recording the "clear time" as 2:17 a.m.; Wheeler Dep. 43:8-15, identifying the FSO; Lichatowich Decl. Ex. 6 at 3 & Ex. 7 at 1-2, deploying tear gas around 11:20 p.m. and over a thirty-minute period shortly after 11:10 p.m.).

Four floors above the FSO lobby, Berglund spent his first night at MCDC. (Berglund Decl. ¶¶ 1-4, 7; Van Houte Dep. 24:16-18.) During his nine-day stay, Berglund was exposed to tear gas on a nightly basis. (*See* Berglund Decl. ¶¶ 3, 7, 10, stating that exposures also occurred "every day," in that the "gas would linger until the morning" and "still be there" but improve around mid-day). For Berglund, "[s]ome nights were worse than others" but June 5 was "like a slap in the face" and accompanied by all of Module 6A's AICs "beating" on their doors while an AIC was "screaming" at officers that tear gas was entering the cells, and "every night" was "like fireworks" and Berglund would hear "booms" outside before CS arrived and "gassed" him. (*Id.* ¶¶ 4, 7.)

Berglund was unable to sleep because the gassings would "go on for hours" and wake him from a "deep sleep" and caused burning eyes, an uncontrollable cough, sneezing, throat irritation, ringing headaches, impaired breathing, and gasping for air to the point of nearly vomiting. (*Id.* ¶¶ 4, 8-10.) Berglund unsuccessfully attempted to alleviate his symptoms of tear

gas exposure. (*Id.* ¶¶ 5-6, 8.) Having confirmed that there was no way to close the cell vents,

Berglund tried blocking the vent's airflow with wet paper towels, which proved unsuccessful.

(*Id.* ¶ 5.) Berglund then covered his face with a wet shirt but that provided only temporarily relief

because the shirt became saturated with tear gas residue. (*Id.* ¶ 6.) Berglund also lied on the floor

and repeatedly flushed his toilet in hopes that the tear gas would rise, and each flush cycle would

effectively "suction" some of the tear gas out of his cell. (*Id.* ¶¶ 6, 8.) These methods also failed.

(*Id.*)

Like Berglund, Lundy was exposed to tear gas during and after early June 2020. (*See*

Lundy Decl. ¶¶ 2, 4, 9-10, recounting that the situation in Module 8A "did not improve" when

"May turned to June," Lundy's cell "would smell like an electrical fire" every night and Lundy

suffered from "coughing, burning, and trouble breathing" and later learned that the smell was

tear gas). Given that Module 8A was a "quarantine dorm" and the "first stop" for newly admitted

female AICs and Lundy served as Module 8A's "trustee" (a role comparable in some respects to

a college "resident advisor"), Lundy was not only dealing with her own struggles with tear gas

exposure but also those of AICs who had never been exposed to tear gas and/or were "detoxing

or experiencing states of psychosis." (*See id.* ¶¶ 3-8, 10-11, stating as much and describing

Lundy's responses to "hear[ing] a boom" and seeking fresh air from the "crack under the door").

On June 6, 2020, an estimated crowd of 3,000 to 4,000 protesters assembled outside of

the Justice Center. (*See* Lichatowich Decl. Ex. 8 at 3-4, describing the "very large" protest). With

midnight approaching, the situation "became more volatile," a crowd member tried to pull down

the security fence, and law enforcement deployed tear gas, an impact munition, and distraction

devices. (*See id.* at 3, Gilmore Decl. Ex. 41 at 6 & Smith Decl. ¶¶ 2-4, confirming these

deployments).

PAGE 35 – FINDINGS AND RECOMMENDATION

Parks, who at the time served as MCDC's Administrative Lieutenant, contacted facilities dispatch twice that evening.[21] (*See* Piucci Decl. Ex. M at 3, listing calls ten and eleven to "DSP CC" and "DSP KS," times of 21:12 and 23:10 (9:12 and 11:10 p.m.), the statuses as complete, and clear times of 22:12 and 2:31 (10:12 p.m. and 2:31 a.m.), and appearing to list an incorrect task number of "5005718" before "5005729" and after "5005726" and "5005727"; *id.* at 2 & Ex. 8 at 1, assigning task number "5005718" to Cash's June 5 call at 11:52 p.m.). For both calls, the facilities log sheet identifies the "problem" as Parks' request to adjust the Justice Center's HVAC system to "full air exchange due to smoke." (Piucci Decl. Ex. M at 3) (bold and caps omitted).

---

[21] Parks currently serves as MCDC's Facility Commander (i.e., the person "in charge of the Justice Center") but previously served as MCDC's Administrative Lieutenant in 2020 and until the MCSO promoted him in December 2021. (Parks Dep. 14:15-20; *see also* Jacobs Dep. 72:17-25, noting that Parks is "currently facility commander of MCDC" and that "at the time" and on July 26, 2020, Parks served as the "executive lieutenant at MCDC"). Parks testified that as the Administrative Lieutenant, he was "kind of the right hand" of his predecessor and then-MCDC Facility Commander, Wheeler, who now serves as the Facilities Services Commander. (Parks Dep. 14:21-24; Wheeler Dep. 6:17-22, 95:19-23, 112:3-10.) By comparison, Wheeler testified that Sergeant Thomas Jacobs ("Jacobs"), whose "official title was [something] like the west operation sergeant" but Wheeler "call[ed] the[] administrative sergeant," performed "administrative functions for an executive role" and served as "pretty much [Wheeler's] right-hand person" and a "little like a chief of staff," and that the higher ranking lieutenants in Wheeler's "command structure . . . all kn[e]w that" was the case. (Wheeler Dep. 19:10-21:4.) Wheeler also testified that during the protests, he and Jacobs worked at the Justice Center and their offices were "right across the hall" from each other. (*Id.* 21:5-15.) Unlike Wheeler, however, Jacobs testified that he worked almost exclusively during the day, no more than two to four hours of overtime during the protests, and "never long enough to put [himself] into the [nightly] protests or into the smoke tear gas situation." (Jacobs Dep. 36:3-37:9; *cf.* Wheeler Dep. 31:10-25, 46:6-47:17, recounting that Wheeler worked primarily from his MCDC office and "sometimes . . . in the command post" during the protests and occasionally worked during the daytime but worked at the Justice Center "almost every night," "mostly [in the] evening," and "multiple days in a row" after the "initial breach" on May 29, 2020; *see also* Anspach Dep. 44:25-45:24, stating that Wheeler did not "work graveyard" and requested nightly reports because he was not receiving "updates all the time" from the "command post" on "what happened during the night" and wanted to "know if staff got in and out safely" and not "get blindsided"; Piucci Decl. Ex. 12 at 1, listing Jacob's title as "West Operations Sergeant" in his email signature; Hendley Dep. 1172-14, believing Jacobs was the MCSO's only "maintenance sergeant").

The HVAC engineer disposed of Parks' first request by confirming that the Justice

Center's HVAC system's "air exchange [was] set to 100%[.]" (*See id.*, using "ENG SL" to

identify the HVAC engineer; *see also id.* at 2 & Ex. 8 at 1, noting that approximately twenty

hours earlier, the same on-call engineer completed and cleared Cash's June 5 request to adjust

the Justice Center's HVAC system to "full air exchange" on all floors). Several hours after

dispatch received Parks' second call, the same engineer disposed of Parks' second request but

did so instead by setting the "HVAC air intake [to] the minimal setting for all floors."[22]

(*Id.* Ex. M at 3.)

In or around early to mid-June 2020, AICs Melvin Street ("Street") and Jessica Gaylor

("Gaylor") arrived at MCDC and "noticed a problem" with tear gas in their cells. (*See* Decl.

Melvin Street Supp. Pls.' Mot. Certify Class Action ("Street Decl.") ¶¶ 3-4, ECF No. 40, arriving

on June 8, 2020, residing on the same floor as Berglund until June 27, 2020, and "first notic[ing]

tear gas entering [the] cell in June of 2020"; Gaylor Decl. ¶¶ 3-5, arriving on June 14, 2020,

residing on the same floor as Lundy, and "first notic[ing] a problem sometime in June";

Berglund Decl. ¶¶ 3, 7, reporting nightly exposures between June 5 and June 13, 2020; Lundy

Decl. ¶¶ 2-3, 9, stating that Lundy smelled an "electrical fire" on "[e]ach night" in June 2020 and

learned that this was "tear gas"; *see also* Sloane Decl. Ex. 1 at 5, "Because of its insoluble

---

[22] Presumably, the HVAC engineer addressed the same problem by reducing the outside
air intake on all floors because doing the opposite proved ineffective. (*See generally* Conser
Decl. Ex. 1 at 3-6, explaining that MZU-01, MZU-02, and SF-03 were each "designed to operate
anywhere between 100% outside air and 100% return air" but MZU-01's "normal mode of
operation" set to "100% outside air" and SF-03's "[o]utside air varie[d] between 26% and 100%
during normal operation"; Hendley Dep. 54:17-60:3 & Conser Decl. Ex. 1 at 3-6, disagreeing in
some respects about MZU-02 but agreeing that MZU-01 is a constant volume air handler that
operates differently than SF-03, which is a variable volume air handler whose supply fan "varies
to meeting heating and cooling requirements," and which relies on "terminal units" that have
"automated dampers that control the amount of air" each zone receives, i.e., the unit can
automatically "close" the dampers or "go down to their minimum set point" to reduce air
volume).

nature, [CS] decontamination of buildings or other items after exposure can be challenging."; Smith Decl. ¶¶ 2-4, identifying a potential deployment one block away from the Justice Center on June 7, 2020; Barlow Decl. Ex. 1 at 2 & Seale Decl. at 87, noting that an AIC "[r]ecently moved back into [an] old cell that smell[ed] from tear gas and smoke" and "[r]equest[ed] to be moved to another cell that [did] not have this issue," and the "[a]ccompanying deputy agreed to move [the AIC]").

In mid-June 2020, the HVAC department and facilities dispatch also received a report from Parks about a "lighter fluid" smell emanating from the eighth floor's ventilation system and MCSO Lieutenant William Hong's ("Hong") request to set the Justice Center's HVAC system to "100% [outside] air exchange." (*See* Piucci Decl. Ex. 8 at 1, logging Parks' June 12 report and Hong's June 16 request; *see also id.* Ex. M at 4, addressing only Hong's June 16 request) (bold omitted).

The MCSO and PPB did not deploy tear gas again until June 25, 2020.[23] This was due in part to a temporary restraining order that the district court in *Don't Shoot Portland* entered on June 9, 2020. *See* 465 F. Supp. 3d at 1157 (restricting PPB "from using tear gas or its equivalent except as provided by its own rules generally" and providing that tear gas "shall not be used to

---

[23] The parties largely agree on this fact. (*See* Defs.' MSJ at 17, representing that after June 9, 2020, the MCSO and PPB only used tear gas on "limited occasions in the vicinity of the Justice Center"; Pls.' MSJ Resp. at 12-13, citing Berglund's reported exposures on June 5 through June 13, 2020, and stating that "local law enforcement significantly curtailed their use of tear gas" during the "second half" of June 2020; *see also* Gilmore Decl. Ex. 41 at 1-6, Lichatowich Decl. ¶ 7 & Smith Decl. ¶¶ 2-4, confirming that the MCSO and/or PPB deployed tear gas on May 29, May 30, May 31, June 2, June 5, and June 6, 2020 and describing a potential tear gas deployment one block away from the Justice Center on June 7, 2020); *cf.* Decl. of Sergeant Tim Lichatowich at 2, 11, *Wolfe v. City of Portland*, No. 3:20-cv-01882-SI (D. Or. filed Mar. 15, 2021), ECF No. 78 (stating that the MCSO RRT intermittently used CS gas "prior to June 9, 2020" and then "stopped using tear gas except on two occasions—June 25, 2020 and December 21, 2020"); Decl. of Craig Dobson at 2-3, *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917-HZ (D. Or. filed Nov. 8, 2022), ECF No. 308 (declaring that after the same dates in late May and early June, PPB "did not deploy tear gas again until June 25, 2020").

disperse crowds where there is no or little risk of injury" and "shall be limited to situations in which the lives or safety of the public or the police are at risk," such as the "those housed at the Justice Center"). The MCSO's curtailed usage was also due to its attempt to "bunker[] down inside" to "stay out of sight" and "out of mind" and potentially "de-escalate the situation" and "not be a flash point for any protesters" that appeared outside the Justice Center. (Parks Dep. 31:15-24.)

Also on June 25, 2020, at 7:44 p.m., Jarmer, who served as the MCSO's Facilities Services Section's Classification Unit Captain, emailed the MCSO's Corrections Services Division's Chief Deputy, Chad Gaidos ("Gaidos"), and copied his Classification Sergeant, Steve Billesbach ("Billesbach"). (*See* Jarmer Dep. 14:1-15:24, 36:15-20, 46:12-17, Piucci Decl. Ex. 45 at 1 & Ex. 70 at 6, identifying Gaidos and Billesbach's respective roles as Jarmer's supervisor and subordinate, and noting that Billesbach's primary duties consisted of "run[ning] the classification unit," scheduling staffing, and reporting the MCSO's facilities' "daily population numbers"). Under the subject line "Temp[orary] housing at MCIJ per MCDC [e]vac[uation]" and with an attachment titled "Potential Emergency Evacuation of MCDC to MCIJ Temporary Housing Plan," Jarmer's email advised on a potential plan to evacuate all of the AICs housed at MCDC:

> Attached you will find a rough draft of how we could move [AICs] to MCIJ if we had to evacuate everyone at MCDC. This plan takes [into] account that COVID-19 has become one of many secondary concerns. Also[,] it needs to be noted this is a snapshot at a current population on June 25, 2020.
>
> Points to consider:
>
> - We come up [thirty-nine] cells short in overall numbers. Potentially some/all COVID [AICs] could go into an open dorm[;]
>
> - Suicide watches/keep separates/Acute Mental Health will have to be organized at MCIJ after evacuation. Not enough space at MCIJ to house all permanently[;]

PAGE 39 – FINDINGS AND RECOMMENDATION

- Medical/ADA concerns become secondary[;]

- I added Dorm 5 for females[,] and bullet [one] is for male COVID [AICs;]

- Transport[']s plan says they can move all the [AICs] in [six] trips with a full fleet, depending on specials. I find this very optimistic. Certainly the movement of the [fourth] floor [AICs] will be slower, but we will also have Disciplinary [AICs] and multiple Mental Health [AICs] with varying degrees of acuity to move. In general[,] MCDC [AICs] will not be the most easily moved in an emergency[,] perceived or not[;]

- [AICs'] property in their cells will need to be transported also; this takes up room allowing for less [AICs] to actually fit in the [transport] trucks[;] [and]

- Remember all the infrastructure that is built into MCDC[, such as] Courts, Booking, Release, Property, Recog[nizance], etc.[,] will not be readily available.

I'm sure I have missed some things, but this is at least one answer other than "it's a bad idea" answer in regard[] to leaving MCDC. Please add, edit, change as necessary.

(Piucci Decl. Ex. 45 at 1.)

In his two-page attachment, Jarmer described where the MCSO could move MCIJ's AICs to accommodate a transfer of MCDC AICs' to that facility and listed a floor-by-floor breakdown of MCDC's AICs' current housing and potential dorm assignments at MCIJ. (*Id.* Ex. 45 at 2-3; *see also* Jarmer Dep. 24:18-27:18, 29:6-47:14, addressing Jarmer's plan, attachment, process, and related discussions and the MCSO's federal holds and daily population reports; Piucci Decl. ¶ 11 & Ex. 75 at 1-5, summarizing and attaching five of the MCSO's SWIS Daily Population Reports). Jarmer reported that after moving MCIJ's AICs, there would be 151 single cell housing units open at MCIJ: sixty, sixty-eight, and twenty-three cells in Dorms 14, 15, and 17, which included eleven and nine "segregation" cells in Dorms 14 and 15. (*See* Piucci Decl. Ex. 45 at 2 & Jarmer Dep. 40:1-44:16, assigning groups of ten and six AICs to Dorms 14 and 15's segregation units).

PAGE 40 – FINDINGS AND RECOMMENDATION

Jarmer listed sixty of MCDC's AICs as "COVID . . . TBD" and did not assign these AICs to any of MCIJ's housing dorms but reported that the MCSO may be able to house COVID AICs in one of MCIJ's large "open dorms." (*Id.* at 1-2.) Jarmer added that the MCSO could move the remaining 173 AICs to these locations: (1) twenty-two AICs from MCDC's fourth floor (i.e., six medical unit AICs and the above referenced groups of ten and six segregation unit AICs) to MCIJ's medical and segregation units, (2) thirty-five AICs from MCDC's fifth floor (including ten disciplinary unit AICs) to Dorm 15 and the disciplinary unit (Dorm 16) at MCIJ, (3) fourteen AICs from MCDC's sixth floor to Dorm 14 at MCIJ, (4) groups of twenty-one and thirty-one AICs from MCDC's seventh floor to Dorms 14 and 15 at MCIJ, and (5) groups of twenty-six and twenty-four AICs from MCDC's eighth floor to Dorms 8 and 17 at MCIJ. (Piucci Decl. Ex. 45 at 2-3.)

Thus, out of the 151 single cells that he identified as available at MCIJ, Jarmer filled all twenty-three of the single cells in Dorm 17 (and potentially failed to account for the twenty-fourth AIC that he assigned here), forty-five of the sixty single cells in Dorm 14 (ten of the eleven segregation cells, with sixth and seventh floors' groups of fourteen and twenty-one AICs in the remaining forty-nine cells), and sixty-two of the sixty-eight cells in Dorm 15 (six of the nine segregation cells, with fifth and seventh floors' groups of twenty-five and thirty-one AICs in the remaining fifty-nine cells). (*See* Jarmer Dep. 32:2-8, 40:1-44:16; Piucci Decl. Ex. 45 at 2-3.) That left Jarmer with twenty-one unassigned single cells at MCIJ, with MCDC's remaining sixty "COVID" AICs listed as "TBD." (*See* Piucci Decl. Ex. 45 at 1-2, showing that Jarmer reported being thirty-nine "cells short in overall numbers" but "[p]otentially some" or "all COVID could go into an open dorm," i.e., sixty COVID AICs minus the twenty-one unassigned single cells at MCIJ, assuming Jarmer failed to account for the extra AIC that he assigned to

Dorm 17; Jarmer Dep. 32:2-8, noting that Jarmer was unable to recall how he arrived at a thirty-nine cell shortage).

Jarmer was unable to recall who asked him to prepare the June 25 plan or any previous conversations about the MCSO evacuating or temporarily transferring MCDC's AICs to MCIJ, but given that he emailed Gaidos, he assumed that Gaidos asked him to prepare the plan. (*See* Jarmer Dep. 24:18-27:18, 37:12-24.) Jarmer also assumed that he received transportation fleet information from MCSO Captain Stephen Reardon ("Reardon"), because he was in "charge of transports at that time." (*Id.* 37:25-39:18.) Jarmer never received any response from Gaidos or participated in any subsequent conversation regarding his June 25 plan, nor did he receive any requests to revisit or revise the plan at a later date. (*Id.* 44:20-47:14; *see also* Reese Dep. 34:10-17, 36:8-21, 51:24-52:5; Wheeler Dep. 76:2-18, 92:2-6, 100:5-102:21, 111:7-113:24; Alexander Decl. ¶ 12.)

The next day, June 26, 2020, the President of the United States issued Executive Order 13,933, which (1) "stat[ed] that 'over the [preceding five] weeks, there ha[d] been a sustained assault on the life and property of civilians, law enforcement officers, and government property' throughout the country," (2) "attribut[ed] this to 'anarchists and left-wing extremists who ha[d] sought to advance a fringe ideology that paints the United States . . . as fundamentally unjust and have sought to impose that ideology on Americans through violence and mob intimidation,'" and (3) "directed the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security to provide 'personnel to assist with the protection of Federal monuments, memorials, statues, or property.'" *Pettibone v. Russell*, 59 F.4th 449, 451 (9th Cir. 2023) (brackets omitted) (quoting Exec. Order No. 13, 933, §§ 1, 85 Fed. Reg. 40081, 40083 (June 26, 2020), *revoked*,

Exec. Order No. 14,029, 86 Fed. Reg. 27025 (May 14, 2021)).[24] After the President issued

Executive Order 13,933, "[t]he federal government . . . deployed more than 100 law enforcement

officers from Customs and Border Protection, Immigration and Customs Enforcement, and the

United States Marshals Service to Portland, in what officials called 'Operation Diligent Valor.'"

*Id.*; *see also Index Newspapers LLC*, 977 F.3d at 842 n.3 (O'Scannlain, J., dissenting) (quoting

the district court's preliminary injunction, which the majority declined to stay pending appeal

and referred to "all personnel in Portland . . . who [were] part of Operation Diligent Valor . . . or

any equivalent"); *Nw. Ctr. for Alts. to Pesticides v. U.S. Dep't of Homeland Sec.*, No. 21-35751,

2023 WL 332751, at *1 (9th Cir. Jan. 20, 2023) (claiming mootness because "Operation Diligent

Valor [was] over").

### c.    July 2020

The situation inside MCDC deteriorated in July 2020, after federal agencies began

surging large numbers of personnel to Portland in advance of the Independence Day holiday

weekend.[25]

---

[24] The Court notes that Defendants cite this executive order in their summary judgment
motion (*see* Defs.' MSJ at 18), and that executive orders are proper subjects of judicial notice.
*See, e.g.*, *Index Newspapers LLC v. City of Portland*, No. 3:20-cv-01035-SI, 2022 WL 72124, at
*4 & n.2 (D. Or. Jan. 7, 2022) (addressing and quoting Executive Order 13,933 at earlier stages
of proceedings, and reflecting that pursuant to Federal Rules of Evidence 201(c)(1), the district
court took judicial notice on its own of Executive Order 14,029, which revoked Executive Order
13,933).

[25] Defendants' counsel unsuccessfully attempted to obtain information regarding federal
agencies' deployment of tear gas during the relevant time period. (Hr'g Tr. 39:11-13; *see also*
Gilmore Decl. ¶ 1, Ex. 1 at 1-7 & Ex. 2 at 1-3, issuing a subpoena and submitting *Touhy*
requests); *see generally Shah v. Dep't of Just.*, 714 F. App'x 657, 659 n.2 (9th Cir. 2017) (stating
that the U.S. Department of Justice promulgates *Touhy* regulations pursuant to the
Administrative Procedures Act, "set[ting] forth the procedures by which [it] responds to
discovery requests in litigation to which the United States is not a party" (first citing *In re Boeh*,
25 F.3d 761, 763-64 (9th Cir. 1994); and then citing *United States ex rel. Touhy v. Ragen*, 340
U.S. 462 (1951)); *Cabral v. U.S. Dep't of Just.*, 587 F.3d 13, 18 (1st Cir. 2009) (noting that a
"*Touhy* request[]" refers to the Supreme Court case "upholding the authority of agencies to

There is a consensus among the AICs who submitted declarations that July 1, 2020 was the date on which the tear gas in MCDC's housing cells became progressively worse. Many of these AICs were unable to recall any day that they were not exposed to tear gas in July 2020, and attributed the worsening conditions to the arrival of federal law enforcement agents. (*See* Lundy Decl. ¶¶ 9, 11, stating that "things did not improve" when "May turned to June" and "got worse in July" after federal law enforcement agents arrived; Brown Decl. ¶¶ 6-7, representing that the "gassings got worse over time," Brown "cannot remember a day in July that [he was not] exposed to tear gas" around 12:30 a.m. and until federal agents departed Portland, and AICs on Brown's floors were "bombarded with tear gas that [they could not] stop"; Hall Decl. ¶ 4, noting that AIC Dathan Hall ("Hall") was housed at MCDC from July 4 to August 4, 2020, "[w]hen the federal agents were in town," and "through the worst of it," and could not recall "a day in July that [he was not] exposed to tear gas," which was "consistently bad" and he could not only smell but see through his "cell window and from the rec[reation] yard"; *see also* Duhart Decl. ¶ 7, Buckner Decl. ¶ 5, Hill-Sistrunk Decl. ¶ 5, Street Decl. ¶ 8, Davis Decl. ¶ 5 & Gaylor Decl. ¶ 6,

---

promulgate regulations establishing conditions for the disclosure of information" (citing *Touhy*, 340 U.S. at 468)). U.S. Immigration and Customs Enforcement ("ICE") did, however, direct Defendants' counsel to "publicly available sources that would be able to establish if tear gas was used on a particular date by any entity," including the U.S. Government Accountability Office's ("GAO") report titled "Federal Agencies Should Improve Reporting and Review of Less-Lethal Force," which is "available at[] GAO-22-104470, Law Enforcement Agencies Should Improve Reporting and Review of Less-Lethal Force," provides "detail about [federal agencies'] use of chemical munitions," and includes an "entire section regarding the federal response to the civil unrest in Portland, Oregon." (Gilmore Decl. Ex. 2 at 2); *see also* U.S. Gov't Accountability Off., GAO-22-104470, Law Enforcement: Federal Agencies Should Improve Reporting and Review of Less-Lethal Force (2021) (consisting of a cover page, two unnumbered pages of the GAO's "[h]ighlights of GAO-22-104470, a report to congressional requesters," tables of contents and abbreviations on pages "i" to "iv," and the ninety-four page report, which includes an Appendix II addressing the response to the Portland demonstrations), https://perma.cc/S72X-84HD.

agreeing on worsening conditions after July 1, and in most cases, reporting nightly tear gas exposures).

Like the AICs, Van Houte recalled that after federal law enforcement agents arrived in Portland, "it got a little bit spicier inside" and "throughout" the Justice Center "with all the tear gas," that "small doses" of tear gas "found its way . . . into the building" on "most nights" and "whenever" federal agents deployed tear gas, and that it was "kind of telling that there was gas outside the building that made its way in[side]." (Van Houte Dep 39:5-40:23.) Van Houte also recalled that "there were a couple of floor[]" modules (e.g., Modules 5C and 8C) where the "level of . . . spiciness was a little bit different" and caused him to make a "mental note like wow, it's a little bit -- a little bit spicier here than [o]n the other floors -- the other modules." (*Id.* 40:1-19; *cf.* Dep. Rashawd Duhart ("Duhart Dep.") 27:5-13, Feb. 1, 2023, ECF No. 106-26, drawing parallels between tear gas exposure and "spicy foods" and "eating cinnamon mixed with hot peppers").

Similarly, Reese recalled that on July 1, 2020, there were "dramatic[]" and "surpris[ing]" changes in federal law enforcement agents' "tactics" and coordination with the MCSO, insofar as they began deploying "copious amounts of tear" outside the federal courthouse and without "communicating that [they were] going to use tear gas."[26] (Reese Dep. 18:1-13, 24:12-26:22.)

---

[26] There were "[a]t least five" federal agencies that deployed personnel to Portland between June 26 and September 30, 2020, and four of these agencies, Federal Protective Service ("FPS"), U.S. Customs and Border Protection ("CBP"), ICE, and USMS, reported using chemical sprays, chemical munitions, and/or mixed munitions (i.e., sprays and munitions that were composed entirely or in part of OC, CS, pelargonic acid vanillylamide ("PAVA"), or other chemical agents or irritants). *See* GAO-22-104470, *supra*, at iv, 5, 12-13, 84-88 (noting that only FPS did not report using chemical munitions). Notably, however, the GAO's report (1) omits the USMS's reported less-lethal force incidents and the "approximate number of USMS personnel deployed to Portland," because the USMS "deemed this information to be sensitive," (2) fails to "identify the number of less-lethal force incidents for [ICE] because the agency's use of force reports for selected deployments generally did not have sufficient information for the purpose of

Consequently, the MCSO's "issue with CS inside" the Justice Center returned the "first week of July" because federal agents' deployment of tear gas was "clear[ly] . . . impacting the Justice Center[.]" (*See id.* 18:1-13, 24:12-23, 25:14-26:2, stating as much before failing to "recall" the same). Reese "disagreed" with the amount of tear gas that federal agents deployed and believed the lack of coordination with the MCSO "[d]efinitely" made his job more difficult. (*Id.* 26:17-22.)

Notably, Parks, a former military infantryman who has more than twenty years of law enforcement experience and "been around tear gas a lot," recalled that federal law enforcement agents' arrival "escalated" the situation in Portland to a "huge level," and that he had "never seen anything like" the "level of tear gas" that federal law enforcement agents deployed. (Parks Dep. 13:1-14:20, 20:13-21:4, 31:1-32:6.) Parks added that downtown Portland's large buildings "kind of make . . . wind tunnels" that helped disperse tear gas "pretty quickly," but when federal agents would "touch [their] stuff off," there would be "massive clouds" of tear gas that "roll[ed] through" and obscured any view from the Justice Center of Chapman and Lownsdale Squares. (*Id.* 32:1-7-18.)

Also on July 1, 2020, MCSO Sergeant Kraig Anspach ("Anspach"), who recently reported the "[b]est night in a while," recorded the first instance in which federal agents exited the federal courthouse and "took care of some folks and cleared them out." (Piucci Decl. Ex. 72

---

identifying the number of less-lethal force incidents," and (3) counts FPS and CBP's officers' less-lethal force incidents on a day-by-day, officer-by-officer, and type-by-type basis, meaning that an agency's officer could throw "two cannisters of chemical munitions and four diversionary devices throughout the course of a night" and the GAO counted it as "two use of force incidents in [its] analysis—one for the chemical munitions and one for the diversionary devices." *Id.* at 5, 86-87. Thus, the GAO report does not reveal how many chemical sprays, chemical munitions, and mixed munitions federal agencies deployed during this three-month period or between July 1 and July 30, 2020, when collective, non-USMS deployments alone rose from around sixty federal personnel per day to a ninety-day high of approximately 320 federal personnel per day. *Id.* at 80.

at 1, attaching Anspach's post-July 1 report to Wheeler; *see also id.* at Ex. 70 at 11, reflecting

that Anspach described June 28 as the "[b]est night in a while"). That same evening, Street, who

filed out a medical request form at 4:30 p.m. because he was "feeling very light-headed and ill,"

and whose "cell was filled with tear gas," suffered an asthma attack, "fell down and cracked [his]

head, and [laid] bleeding" on the floor.[27] (Street Decl. ¶¶ 6-7 & Ex. A at 1.) Street's floormates

pushed their emergency call buttons and banged on their cell doors and officers eventually

arrived and transported Street to a hospital, where he received "four staples in [his] head."

(*Id.* ¶ 7; Piucci Decl. Ex. 72 at 1, relaying that "Street pass[ed] out and crack[ed] [his] head in his

cell and went on [a two] person transport" and planned to return that morning after "getting [four

staples] in his head").

    Over the next four weeks, AICs at MCDC were exposed to tear gas on a nightly basis.

(*See* Lundy Decl. ¶ 11, waking "up out of a dead sleep every night"; Duhart Decl. ¶ 7, varying

and worsening tear gas exposure "each night"; Brown Decl. ¶¶ 6-7, feeling "bombarded with tear

gas" every night; Buckner Decl. ¶ 5, Hill-Sistrunk Decl. ¶ 5, Hall Decl. ¶ 4 & Street Decl. ¶¶ 8-9,

failing to recall any day in July without exposure to tear gas; *see also* Davis Decl. ¶¶ 5-6 &

Gaylor Decl. ¶ 6, declaring that the tear gas exposures became progressively worse between July

1 and July 21). Though disputed in some respects,[28] AICs' experiences included, but were not

limited to:

---

[27] Michael Seale, M.D. ("Dr. Seale"), who previously and at all relevant times served as
the County Health Department's Corrections Health Division Director and a physician at the
County's facilities, reviewed AICs' medical records and declared that the MCSO sent a total of
thirty-two MCDC AICs to a hospital in June and July 2020 and none of these "send outs,"
including one for a "fall with head trauma," were "related to possible tear gas exposure." (Seale
Decl. ¶ 10.)

[28] MCSO Deputy Amy Hay ("Hay"), for example, responded to questions about multiple
female AICs from Module 8D who reported coughing, screaming, choking, and complaining of
impaired breathing and tear gas on the evening of July 24, 2020, and confirmed that her

- Tear gas "pouring" in through cell vents for "hours," in particular on July 19 through July 25, 2020.[29] (Gaylor Decl. ¶¶ 6, 8, 10-11, 18-22; Davis Decl. ¶¶ 6-7, 10, 13-15; Duhart Decl. ¶¶ 8, 11; Hill-Sistrunk Decl. ¶¶ 7, 9; Buckner Decl. ¶¶ 6, 11.)

- Tear gas reaching the point where (1) AICs could "see it, feel it, and taste it," (2) cell air was "thick" with an "acrid" tasting "fog of tear gas," (3) an AIC "woke up vomiting," (4) AICs developed rashes and suffered from impaired breathing and sleep, blurry vision, nightmares, anxiety, excessive coughing and worry, chest pains, dizziness, lightheadedness, headaches and migraines, exacerbated asthma and mental health symptoms, and irritation and burning of the eyes, face, nose, skin, and throat, (5) an AIC was "coughing and spitting stuff up," and (6) entire modules were screaming, choking, yelling, coughing,

---

testimony would be that this is "simply not true" and these AICs are "making it up[.]" (Hay Dep. 50:7-21, 68:21-69:18.) Unlike Hay, MCSO Sergeant Kendall Clark ("Clark") acknowledged that she experienced tear gas exposure symptoms like watery eyes on the AIC housing floors and "[e]specially on the 21st [of July]," when the tear gas was "everywhere" and her "face felt a little like . . . burning" and more "irritating than . . . painful," and that at least in her view, the tear gas was "nothing in comparison to the OC spray." (Dep. Kendall Olivia Clark ("Clark Dep.") 75:4-23, June 8, 2022, ECF No. 138-9.) MCSO Deputy Jose Palomera ("Palomera") also testified that the "whole facility was exposed to the gas" and all the AICs were "frustrated," "yelling," "asking to see medical," and "asking for [him] to open the [cell door] food ports and stuff to breathe," he believed that he was "inhaling the same air" or at least "the same thing" as the AICs because the gas was "coming in through the whole [seventh floor] module" and his "eyes were watering, too," and he advised AICs that he was unable to "open the food ports" and told an AIC he was not "going to call the nurse at the time" because he did not "believe [there] was a medical emergency." (Dep. Jose Julian Palomera ("Palomera Dep.") 22:1-25, 32:1-25, June 8, 2022, ECF No. 138-8.)

[29] Figure 16 in the GAO report reflects that on July 24, 2020, two days after "Portland City Council passe[d] a resolution banning the [PPB] . . . from assisting federal law enforcement in protecting federal property," federal agencies once again surged personnel to Portland "in response to growing violence and destruction of federal property." GAO-22-104470, *supra*, at 80.

pleading and begging for help, and "pounding" on and kicking their doors. (Gaylor Decl. ¶¶ 6, 8-9, 13, 19, 26; Davis Decl. ¶¶ 5-7, 10, 12, 15, 17, 19; Duhart Decl. ¶¶ 7-8, 12; Hall Decl. ¶¶ 4, 6-7; Brown Decl. ¶¶ 8-9; Hill-Sistrunk Decl. ¶¶ 6-7, 10, 12-13; Street Decl. ¶¶ 9-10; Lundy Decl. ¶ 11; *see also* Buckner Decl. ¶¶ 7-8, reflecting that Buckner described Module 7D's male AICs as "terrified, screaming and kicking the doors," and recalled hearing Module 8D's female AICs on the floor above "screaming, 'I can't breathe!'").

- Waking up terrified and to sounds comparable to a "war zone," "gunshots and mortars," and an "earthquake," failing initially to realize that the building was not shaking, feeling "in shock" and like "gas was stuck in the walls" and they were "having a bad dream," and witnessing and needing to interact with AICs who were "detoxing or having a psychotic break . . . while getting gassed," including an AIC who spent hours screaming that she was "on fire" and "covered in fire ants," hid underneath her mattress and naked under a counter, and urinated on herself. (Davis Decl. ¶¶ 6, 14; Duhart Decl. ¶¶ 8, 11-12; Lundy Decl. ¶¶ 4, 11-15 & Lundy Dep. 139:1-11, addressing Lundy's role as trustee; Piucci Decl. Ex. 37 at 6, ECF No. 42-37, attaching a grievance dated July 25, 2020, in which AIC Katherine Wells stated that she could not sleep, felt helpless, trapped, anxious, "jumpy and unsafe" because she was receiving "no assistance" and she "fe[lt] like [she was] in the middle of a combat zone at night").

///

PAGE 49 – FINDINGS AND RECOMMENDATION

- Certain officers who at times failed to respond to requests for or provide any meaningful assistance, disabled emergency call buttons, refused requests for showers and a change of clothes when AICs' blankets, linens, and clothing were "drenched in tear gas," denied requests for grievance forms, made "jokes about the tear gas," and advised AICs to "suck it up" and "deal with it" because there was "nothing [they could] do." (Gaylor Decl. ¶¶ 8-9, 16, 20-21; Davis Decl. ¶¶ 6-7, 10-11, 14-15; Duhart Decl. ¶¶ 8, 10-12; Brown Decl. ¶¶ 5, 10; Hall Decl. ¶¶ 8-9; Hill-Sistrunk Decl. ¶¶ 7-10; Lundy Decl. ¶¶ 16-21; *see also* Street Decl. ¶¶ 7, 9, 11, reporting that Street feared that he would suffer another severe asthma attack and accident and die because the MCSO "show[ed] up late").

- Filing tear gas-related grievances that disappeared. (*See* Duhart Decl. ¶¶ 10-11; Buckner Decl. ¶ 12; *see also* Duhart Dep. 63:17-24, noting that Duhart filed a grievance that the MCSO was unable to locate and believed that filing more grievances was "a waste of paper" because "it seemed like they [did not] care"; Piucci Decl. Ex. 39 at 1-14 & Ex. 40 at 1-12, attaching numerous AIC grievances that discuss many of the described above issues, including missing grievances).

At the same, the MCSO requested adjustments to the Justice Center's air dampers nearly every night of July 2020:

| Task | Date Created | Requestor |
|------|--------------|-----------|
| **5008469**-B119 1st Fl Turn off air intake for tear gas deployment | 7/2/2020 23:45:53 | William Hong |
| **5008488**-B119 1st Fl - requesting HVAC be set to 100% air exchange | 7/3/2020 22:02:14 | Elias Fernley |

PAGE 50 – FINDINGS AND RECOMMENDATION

| | | |
|---|---|---|
| **5008489**-B119 all floors set building air intake to the minimal setting | 7/4/2020 4:04:14 | City of Portland |
| **5008504**-B119 0% air exchange due to firework smoke | 7/4/2020 22:10:13 | William Hong |
| **5008507**-B119 1st fl full air exchange open all vents | 7/5/2020 0:27:59 | Brian Beardsley |
| **5008508**-B119 1st fl shut off airflow | 7/5/2020 1:52:23 | Kraig Anspach |
| **5008509**-B119 full building return airflow to 100% | 7/5/2020 5:10:29 | Kraig Anspach |
| **5008529**-B119 1st Fl - requesting outside air dampers closed | 7/5/2020 21:57:47 | Brian Beardsley |
| **5008530**-B119 1st floor adjust outside air exchange to 100% | 7/6/2020 3:53:38 | Kraig Anspach |
| **5008934**-B119 Exterior Turn off outside air exchange | 7/10/2020 23:41:51 | William Hong |
| **5008936**-B119 exterior adjust outside air exchange to 100% | 7/11/2020 5:46:40 | Kraig Anspach |
| **5008946**-B119 Exterior set outside air exchange dampers to 0% | 7/11/2020 23:16:54 | Kraig Anspach |
| **5008947**-B119 Exterior adjust outside air exchange dampers to 100% | 7/12/2020 2:35:46 | Kraig Anspach |
| **5008959**-B119 Exterior Turn off outside air exchange | 7/13/2020 1:01:21 | Mihai Bascuti |
| **5008960**-B119 exterior Adjust outside air intake to 100% | 7/13/2020 4:04:59 | Mihai Bascuti |
| **5009471**-B119 Exterior Turn off outside air exchange | 7/15/2020 5:13:15 | Kraig Anspach |
| **5009476**-B119 Turn on outside air exchange | 7/15/2020 6:02:10 | Kraig Anspach |
| **5009766**-B119 1st Fl Close dampers due to protesters | 7/16/2020 23:05:37 | William Hong |
| **5009798**-B119 Exterior turn off outside air exchange | 7/17/2020 22:14:08 | William Hong |
| **5009799**-B119 1st floor adjust outside air exchange to 100% | 7/18/2020 2:31:31 | Kraig Anspach |
| **5009804**-B119 - turn off building air | 7/18/2020 21:38:19 | Matthew Tiffany |
| **5009805**-B119 exterior adjust outside air exchange to 100% | 7/19/2020 3:23:03 | Mihai Bascuti |
| **5009823**-B119 1st Fl Close dampers due to protests | 7/19/2020 21:39:14 | Brian Beardsley |
| **5009824**-B119 Exterior Turn on outside air exchange | 7/19/2020 23:06:50 | Brian Beardsley |
| **5009825**-B119 Exterior Turn off outside air exchange | 7/19/2020 23:54:49 | Kraig Anspach |
| **5009827**-B119 Exterior Turn on outside air exchange | 7/20/2020 5:22:23 | Kraig Anspach |
| **5009914**-B119 Exterior Turn off outside air exchange | 7/21/2020 0:55:36 | Kraig Anspach |

PAGE 51 – FINDINGS AND RECOMMENDATION

| | | |
|---|---|---|
| **5009915-B119 Exterior Turn on outside air exchange** | 7/21/2020 4:06:10 | Kraig Anspach |
| **5010000-B119 Daily release of dampers** | 7/22/2020 6:50:08 | Kevin Hendley |
| **5010072-B119 1st FI - Daily adjustments of outside air intakes** | 7/22/2020 21:14:11 | Sam Loeung |
| **5010198-B119 Exterior keep outside air exchange turned off past 6:00** | 7/26/2020 5:32:27 | Mihai Bascuti |

(Piucci Decl. Ex. 8 at 1-3.[30])

Near the end of this four-week period, the HVAC department's lead engineer, Drabandt,

emailed an MCSO lieutenant and several sergeants and copied facilities dispatch, a city official,

---

[30] The record includes additional and related references to HVAC modification requests (and tear gas deployments) during this timeframe. (*See* Piucci Decl. Ex. 72 at 3, explaining that the USMS "deployed gas" and then "used gas again" in the early morning hours of July 4, 2020, and Anspach called dispatch and requested that the HVAC department "shut off [the] air ASAP" and started "getting angry" because the "air was not shutting off" and he had to "keep calling [dispatch] back" before an "[e]ngineer came to fix [it]"; *id.* Ex. 21 at 1-2, stating that federal agents "deploy[ed] gas once again" at 1:51 a.m. on July 5, 2020, and Anspach "called facilities" and the "air [was] shut down" and returned to "100 [percent] air flow" a few hours later; *id.* Ex. M at 5-7, showing that Hong also contacted dispatch earlier in the evening on July 10, 2020, and requested that the air remain on after 9 p.m.; *id.* Ex. 21 at 3, reporting that the HVAC department turned off the air at 11:30 p.m. on July 10, 2020, because "it got [s]mokey," and that at 1:13 a.m. on July 11, 2020, federal agents deployed tear gas and prevented a breach at the federal courthouse's side entrance; *id.* Ex. 21 at 4, confirming federal agents deployed "gas" on three occasions between 12:25 and 1:55 a.m. on July 12, 2020; *id.* Ex. 21 at 5, requesting that the fire department extinguish a "large fire" around 4:00 a.m. on Jule 13, 2020, because even with the "damper closed," the "smoke was quite strong" and "too strong in [the] building"; *id.* Ex. 21 at 7, noting that around 4:00 a.m. on July 15, 2020, federal agents, some of whom returned to the federal courthouse, "used gas and other less lethal munitions"; *id.* Ex. 21 at 6, recounting that at 3:58 a.m. on July 15, 2020, federal agents deployed gas around the Green-Wyatt Federal Building on the Justice Center's south side and Anspach requested that the HVAC department turn off the air for approximately one hour; *id.* Ex. 21 at 9, advising that federal agents "deployed gas" at 11:05 p.m. on July 16, 2020, and Anspach had the "[a]ir turned off"; *id.* Ex. 21 at 11, describing "[l]ots of activity around the fed[eral] courthouse" on the evening of July 18, 2021, which resulted in federal agents "deploy[ing] gas multiple times"; *id.* Ex. 72 at 10, recounting that around 10:30 p.m. on July 18, 2020, the USMS "gassed the protestors" after PPB denied their request for assistance; *see also* Gilmore Decl. Ex. 41 at 6-8, confirming that PPB and/or federal agents deployed tear gas on July 2, July 3, July 4, July 18, July 21, July 23, and July 24; Piucci Decl. Ex. 72 at 11-12, making a vague, general reference to federal agents "engag[ing] the crowd again" on July 20, and "engag[ing] the crowd" and "using crowd control munitions" on July 21).

PAGE 52 – FINDINGS AND RECOMMENDATION

and multiple County officials. (*See* Piucci Decl. Ex. 22 at 1-3, affixing date and time stamps of

July 21, 2020 and 10:01 a.m.). Under the subject line "Justice Center Outside Air Dampers,"

Drabandt noted that the HVAC department had received a "consistently . . . high volume" and

"up to four requests in a single night" to "open and close" the Justice Center's HVAC system's

outside air dampers. (*Id.* at 1.) Drabandt described these requests as "proactive or reactive

consequences of tear gas and/or fireworks deployed just outside of the building," and noted that

the requests in the "middle of the night" were "often accompanied by a great deal of urgency."

(*Id.* at 1-2.)

Citing inevitable delays associated with remotely accessing the building automation

system software, and to "further [a] proactive approach" and "lighten the load" on these on-call

HVAC engineers, Drabandt announced that the HVAC department decided to implement a new

"procedure" going forward: The HVAC department would close the Justice Center's outside air

dampers every evening at 8:00 p.m. and open them back up at 6:00 a.m. the following morning.

(*Id.*) Thirty minutes later, dispatch forwarded the email to Jacobs, who responded, "Excellent

solution!" (*Id.*)

On the morning of July 23, 2020, Jacobs emailed Drabandt and asked whether the HVAC

department had "start[ed] shutting off the outside air yet," noting that the MCSO's control room

on the fourth floor reported that they were "greatly [a]ffected by tear gas last night." (*Id.* Ex. 12

at 1.) Drabandt responded that the HVAC department began its new procedure at 8:00 p.m. on

July 21 but he would verify that the outside air dampers were working. (*See id.*; *see also id.*

Ex. 34 at 1-2, emailing Alexander, Jacobs, and others thirty minutes later because a local

newspaper and website sought information on the preemptive closure of the outside air dampers

"as it relate[d] to the safety of the building[']s occupants against Covid-19 safety requirements,"

and reiterating that this new "routine practice" was due in part to "almost nightly" and often time-sensitive requests related to "preventing tear gas from entering the building," and how it was "not uncommon for tear gas to make its way into the building before [staff could] have everything shut down"; Hendley Dep. 121:6-124:5 & Ex. 15 at 1, ECF No. 42-31, noting that on or about July 27, Hendley "personally verified" that the outside air dampers were "working correctly").

Around 7:00 a.m. on July 25, 2020, MCSO Sergeant Mihai Bascuti ("Bascuti") blind carbon copied Parks and Anspach on an email to Wheeler stating that federal agents began "gass[ing] the rioters" at 11:15 p.m. the previous evening and "continued on and off until about" 4:30 a.m. that morning. (Piucci Decl. Ex. 21 at 12.) Bascuti added that "[g]as permeated inside MCDC even with [the] dampers closed" and a "[f]ew more [AICs] complained of tear gas in their cells." (*Id.*) Twelve hours later, Hong advised Jacobs that although the HVAC department closed the outside air dampers at 8:00 p.m. the previous evening, all of the AIC housing floors (i.e., the fourth through eighth floors) "were reporting the effects of CS." (*Id.* Ex. 13 at 1, ECF No. 42-30.)

The next morning, Bascuti blind carbon copied Parks and Anspach on an email to Wheeler stating that around 1:30 a.m., federal agents joined the PPB in dispersing and pushing back a large, aggressive crowd of rioters and continued doing so after the PPB "cleared and left the area" and until about 6:15 a.m., and as a result, he requested that facilities keep the outside air dampers closed beyond 6:00 a.m. because federal agents "were still gassing." (*Id.* Ex. 21 at 13.)

///

///

Also on July 26, 2020, the MCSO moved all of the female AICs in Module 8D to MCIJ. (Gaylor Decl. ¶¶ 4, 25; Davis Decl. ¶ 16; *see also* Seale Decl. at 23, 41, listing the same move dates).

At 6:30 a.m. on July 27, 2020, Bascuti blind carbon copied Parks and Anspach on a third email to Wheeler, noting that were three shootings, a robbery, and looting incident in the Portland area and preceding twelve hours, federal agents "came out and gassed the rioters" who "started to mess with the fence again" and were "very aggressive and destructive" despite being a "smaller crowd," and federal agents "kept it up until about" 4:30 a.m. that morning. (Piucci Decl. Ex. 21 at 14.)

Also on July 27, 2020, at 8:30 a.m., Jacobs emailed dispatch about six grievances from female AICs in Module 8D (i.e., AICs who moved to MCIJ on July 26) "claim[ing] they had tear gas in their cells," noting that the "reports" cited a date and time of July 24 at 11:45 p.m., and seeking verification that the outside air dampers were "working in that area[.]" (*Id.* Ex. 15 at 2.) Dispatch immediately forwarded Jacobs' email to the HVAC department's personnel. (*Id.*) Two hours later, Jacobs added the following: "Actually[,] I have complaints jail wide. The [MCSO's officer in charge] says that all housing floors were [a]ffected." (*Id.*) Over the next hour, Drabandt advised that the HVAC department had verified that the dampers were "working correctly" but they "do not seal airtight" because they "were never designed to be used as a barrier against gas" and the "next step to preventing the intrusion of tear gas" would likely be an "expensive" replacement project involving dampers that "fully seal when [closed]," and Jacobs forwarded Drabandt's email to Wheeler, with an "FYI[:] Apparently we cannot stop the gas from entering." (*Id.* at 1.)

///

PAGE 55 – FINDINGS AND RECOMMENDATION

In the days that followed, Anspach emailed nightly reports to Wheeler stating that in both the early morning hours of July 28 and July 29, 2020, federal agents deployed tear gas multiple times because rioters were breaching, tagging, and starting fires inside of the federal agents' fence line, threw a Molotov cocktail at the federal courthouse's entrance, and shot federal agents with fireworks when they were putting out a fire. (*Id.* Ex. 21 at 15-16.) MCSO Sergeant Bradley Harrington ("Harrington") also emailed Wheeler a nightly report advising that in the late night hours of July 29, 2020, federal agents "were out in force . . . and [deployed] a lot of tear gas," the Justice Center's "lobby had a lot of tear gas in the air," and even "[w]ith the dampers shut, tear gas was still getting into the housing units, [albeit] just not as heavy as before."[31] (*Id.* Ex. 21 at 17.)

## LEGAL STANDARDS

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc) (quoting FED. R. CIV. P. 56(a)). "[T]he mere existence of *some* alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v.*

---

[31] The following day, Oregon's then-Governor Kate Brown deployed Oregon State Police to Portland to "assist in protecting federal properties." *See* GAO-22-104470, *supra*, at 80. Over 120 personnel remained deployed in Portland through September 30, 2020. *Id.* Like the MCSO, federal law enforcement agents reported that crowd members "threw dangerous objects" at them. *Id.* at 78. When it was all said and done, four agencies, FPS, CBP, ICE, and USMS, "reported over 350 injuries to officers from June 26, 2020, through September 30, 2020, including injuries from contact with chemicals, heavy objects, fireworks, and lasers," and FPS officials reported "extensive damage to federal facilities and assets," with the General Services Administration "assess[ing] the damages to federal facilities in Oregon from May 2020 through February 2021 to be $2.3 million, including $1.6 million in damages to the Hatfield U.S. Courthouse alone." *Id.* at 78-79.

*Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

"A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law." *Simmons v. G. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022) (citing *Nat'l Am. Ins. Co. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529, 533 (9th Cir. 1996)); *see also Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) ("A fact is 'material' only if it might affect the outcome of the case[.]" (quoting *Anderson*, 477 U.S. at 248)). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (en banc) (quoting *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020)); *see also Fresno*, 771 F.3d at 1125 ("[A] dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." (quoting *Anderson*, 477 U.S. at 248)).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to, and draw all justifiable inferences in favor of, the nonmoving party. *See McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019) (per curiam) ("The court views 'evidence in the light most favorable to the nonmoving party,' to determine 'whether genuine issues of material fact exist.'" (quoting *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014))); *Brown*, 82 F.4th at 874 ("When determining whether a genuine issue of material fact exists, [a court] 'must draw all justifiable inferences in favor of the nonmoving party.'" (quoting *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1189 (9th Cir. 2021))). In doing so, a court "may not judge credibility, weigh the evidence, or resolve factual

disputes[.]" *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 437 (9th Cir. 2023) (citing *Anderson*, 477 U.S. at 255).

## DISCUSSION

Defendants move for summary judgment on Plaintiffs' failure-to-protect claims under the Eighth and Fourteenth Amendments, *Monell* claims, and negligence claims under Oregon law. (Defs.' MSJ at 37-43.) Defendants also move to strike portions of Plaintiffs' summary judgment response and expert reports. (Defs.' Mot. Strike at 1-6, 14, 16, ECF No. 142.) Plaintiffs similarly move to strike three sources that Defendants cite in their motion for summary judgment. (Pls.' MSJ Resp. at 69-70.) The Court begins by addressing the parties' motions to strike.

## I.    DEFENDANTS' MOTION TO STRIKE

Defendants move under Rule 12(f) to strike portions of Plaintiffs' summary judgment response and expert reports.[32] (Defs.' Mot. Strike at 1-6, 14, 16.) Plaintiffs argue that the Court should deny Defendants' motion on several grounds, including the threshold ground that they failed to comply with Local Rules ("LR") 7-1(a) and 56-1(b). (Pls.' Second Resp. at 2 & 4 nn.1-2.)

### A.    Threshold Grounds

#### 1.    Applicable Law

LR 56-1(b), which applies to motions for summary judgment, provides that "[r]ather than filing a motion to strike, a party must assert any evidentiary objections in its response or reply

---

[32] As discussed below, Defendants' motion to strike challenges the admissibility of Plaintiffs' expert reports under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence ("FRE") 702. (*See* Pls.' Resp. Defs.' Mot. Strike ("Pls.' Second Resp.") at 7-19, ECF No. 147, responding to Defendants' "FRE 702 motions"; Defs.' Reply Pls.' Resp. Defs.' Mot. Strike ("Defs.' Second Reply") at 3-5, ECF No. 150, providing Defendants' response to Plaintiffs' arguments regarding Defendants' FRE "702 challenges").

memorandum," and that "[e]videntiary objections in a response or reply memorandum are subject to the certification requirement of LR 7-1(a)." LR 56-1(b). Subject to exceptions not relevant here, the certification requirement of LR 7-1(a) provides that "the first paragraph of every motion must certify that . . . [i]n compliance with this Rule, the parties made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so; or . . . [t]he opposing party willfully refused to confer[.]" LR 7-1(a)(A)-(B). A district court "may deny any motion that fails to meet [LR 7-1(a)'s] certification requirement." LR 7-1(a)(3).

In some situations, district courts have exercised their discretion to excuse a litigant's noncompliance with LR 56-1(b). For example, in *Old Navy, LLC v. Center Developments Oregon, LLC*, No. 3:11-cv-00472-KI, 2012 WL 2192284, at *3 (D. Or. June 13, 2012), the plaintiff's "counsel did not confer with [the defendant] before filing [the plaintiff's] objections, and did not include a statement in the first paragraph of his brief certifying his good faith efforts to resolve the dispute, as required by LR 56-1(b), [and] LR 7-1(a)." *Id.* The district court explained that "[i]n the interest of deciding these motions [for summary judgment] quickly, and recognizing that the rules were recently amended to clarify a conferral requirement in the context of evidentiary objections, [the district court] forg[a]ve [the plaintiff's] noncompliance with the rule." *Id.* The district court added that the plaintiff's counsel "also report[ed] that he discussed the objections with [the defendant's] counsel after he learned of the conferral requirement," and then denied as moot the plaintiff's objections because it did not need to address the objected-to declarations. *Id.*

Similarly, in *DeWalt Productions, Inc. v. City of Portland*, No. 3:14-cv-01017-AC, 2019 WL 4045659, at *2 (D. Or. Aug. 26, 2019), the district court recognized that LR 7-1(a)(3)

"afford[ed] the [district] court discretion in addressing a party's failure to meet the certification requirement" and the plaintiffs' "response to the [defendants'] evidentiary objections ma[de] clear [that] conferral would . . . not have resolved the identified disputes," the district court concluded that it was inappropriate to deny the defendants' objections for failure to confer. *Id.*

### 2. Analysis

Defendants' motion to strike does not include a statement in the first paragraph certifying their counsel's good faith efforts to resolve the evidentiary objections, as LR 7-1(a) and LR 56-1(b) require. (*See* Defs.' Mot. Strike at 1.) Nor does it otherwise reflect that the parties conferred. (*Id.*)

The Court has previously overruled a party's evidentiary objections where, as here, it failed to comply with LR 7-1(a)'s and 56-1(b)'s requirements. *See, e.g.*, *OTRA, LLC v. Am. Safety Indem. Co.*, No. 3:20-cv-01063-SB, 2020 WL 6828738, at *6 (D. Or. Nov. 20, 2020) (overruling the movant's evidentiary objections because it failed to confer with the non-movant, as LR 56-1(b) required). Overruling evidentiary objections on this ground is consistent with a district court's "considerable latitude" and "broad discretion" to manage the parties' motion practice and enforce its own local rules. *See Castellanos v. City of Reno*, No. 23-15692, 2023 WL 7871601, at *1 (9th Cir. Nov. 16, 2023) (observing that "[d]istrict courts have discretion to reject filings that fail to comply with their local rules," a "district court has considerable latitude in managing the parties' motion practice and enforcing local rules," and "[o]nly in rare cases will [the Ninth Circuit] question the exercise of discretion in connection with the application of local rules" (first quoting *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002); and then quoting *United States v. Warren*, 601 F.2d 471, 474 (9th Cir. 1979))); *Cantran Grp., Inc. v. Cups, LLC*, 792 F. App'x 550, 550 (9th Cir. 2020) (recognizing that "district courts have broad

discretion to enforce local rules" (citing *Delange v. Dutra Constr. Co.*, 183 F.3d 916, 919 n.2 (9th Cir. 1999) (per curiam))).

When excusing a party's non-compliance with LR 56-1(b) and LR 7-1(a)'s requirements, judges in this district often focus on whether the non-movant received a meaningful opportunity to be heard and whether conferral would have preserved judicial resources by avoiding unnecessary court intervention. That was the case in *Clear Skies Nevada, LLC v. Kainu*, No. 3:16-cv-00811-AC, 2017 WL 4021121, at *2-3 (D. Or. Aug. 21, 2017), *findings and recommendation adopted*, 2017 WL 4012960, at *1 (D. Or. Sept. 12, 2017). In *Clear Skies*, the district court noted that "[t]he purpose of [LR] 7-1 is to encourage parties to confer and resolve disputes amicably whenever possible, thus preserving judicial resources for only those disputes that truly require court intervention," and the plaintiff "technically [was] in violation of LR 7-1." 2017 WL 4021121, at *2-3 (simplified). Nevertheless, the district court rejected the defendant's "request to deny the evidentiary objections based on solely procedural grounds" because "it appear[ed] consultation would not have resolved the issues raised in the evidentiary objections," the defendant's response "addressed the merits," and the plaintiff had "not conceded any issue." *Id.*

The district court took a similar approach in *Arnold v. Pfizer, Inc.*, 970 F. Supp. 2d 1106, 1128 (D. Or. 2013). In that case, the defendant "object[ed] to [the plaintiff's] evidentiary objection as a motion filed without the proper conferral" under LR 56-1(b), and the district court stated that "[a]lthough separate conferral may not have occurred on this particular issue, the [district] court [would] excuse it in th[at] limited instance." *Id.* The district court explained that it would "entertain the objection in the absence of conferral" because "[t]he admissibility of an [Equal Employment Opportunity Commission] or [Bureau of Labor and Industries] report or

finding [was] typically a disputed issue that the parties do not resolve between them in advance

of a motion to strike" and thus "conferral on th[at] specific question would have been of limited

utility." *Id.*

Plaintiffs argue that as a threshold matter, the Court should deny Defendants' motion to

strike because they failed to comply with LR 7-1(a)'s and LR 56-1(b)'s requirements.

(Pls.' Second Resp. at 2-3; *see also* Decl. Nadia Dahab Supp. Pls.' Resp. Defs.' Mot. Strike

("Second Dahab Decl.") ¶¶ 2-3, ECF No. 148, noting that Defendants conferred with Plaintiffs

on their request to exceed the page limitation on their concurrently filed summary judgment

reply, and Plaintiffs' counsel did not oppose that request and states that she would have made

herself available to confer on Defendants' evidentiary objections, but they never attempted to do

so). Plaintiffs rely in part on the Court's decision in *Bond v. Shriners Hosps. for Child.*,

No. 3:20-cv-01943-SB, 2024 WL 5443171, at *13 (D. Or. Nov. 22, 2024), *findings and*

*recommendation adopted*, 2025 WL 868640, at *1-4 (D. Or. Mar. 20, 2025). (Pls.' Second Resp.

at 3.)

In *Bond*, the defendant moved for summary judgment on all claims and asserted

evidentiary objections in its reply but failed to confer with the plaintiff in accordance with LR 7-

1(a) and LR 56-1(b). 2024 WL 5443171, at *1, *12-13. The Court explained that its review of

the defendant's evidentiary objections, the plaintiff's surreply, and the summary judgment record

demonstrated that meaningful conferral would or should have resolved several disputes that the

defendant identified in its reply. *Id.* at *13. The Court also explained that although the plaintiff

received an opportunity to be heard at oral argument, the plaintiff's briefing and highlighting of

certain issues (and the Court's subsequent opinion doing the same) was avoidable. *Id.* Thus, to

the extent conferral would have preserved judicial resources by avoiding unnecessary court

intervention, the Court overruled the defendant's evidentiary objections because it failed to confer with the plaintiff in accordance with LR 7-1(a) and LR 56-1(b). *Id.*

Like *Bond*, this is a non-consent case at summary judgment and the Court agrees that a similar but not identical approach is warranted here. Consistent with its approach in *Bond*, the Court will address Defendants' evidentiary objections on the merits to the extent that the record and the parties' briefs and oral arguments demonstrated that conferral would not have resolved the parties' dispute. *See id.* at *13-19 (identifying and overruling the avoidable evidentiary objections at issue). The Court will also address and dispose of the parts of Defendants' motion to strike that they withdrew at oral argument and which Plaintiffs do not oppose.[33] (*See* Pls.' Second Resp. at 3, stating that Plaintiffs do not oppose certain objections; *see also* Hr'g Tr. 6:19-18:13, setting forth the relevant portion of the parties' arguments at the hearing).

### B.    Plaintiffs' Summary Judgment Response

Defendants move to strike the following portions of Plaintiffs' summary judgment response:

- Plaintiffs' citations and statements regarding "newspaper[s] . . . and periodicals" from *The New York Times*, *The Atlantic*, *ProPublica*, and *The Nation*;

- Plaintiffs' citation and statement concerning the Convention on the Prohibition of the Development, Production, Stockpiling, and Use of

---

[33] Typically, replies are not permitted in this context. *See* LR 56-1(b) ("If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum pursuant to this subparagraph within seven days addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection."). The Court considers Defendants' reply (ECF No. 150) because it is only five pages, Plaintiffs' counsel had an opportunity to respond at oral argument, and the parties narrowed the scope of their disputes.

Chemical Weapons and on Their Destruction (the "Chemical Weapons Convention"), a treaty about chemical warfare and terrorism;[34]

- Protest video recordings that Plaintiffs originally filed in support of their motion to certify a class action, incorporated by reference into their summary judgment response, and used to create two of the still images that they included into their summary judgment response (i.e., "Image 4" and "Image 5"); and

- Plaintiffs' citations and statements about the CDC's and a defense technology manufacturer's tear gas-related warnings.

(*See* Defs.' Mot. Strike at 2-6; Pls.' MSJ Resp. at 11 & n.51, 15 & n.65, 27-28 & nn.140-42, 144, 146-48; *see also* Piucci Decl. ¶ 8 & Exs. O-P, filing conventionally the video recordings at issue).

The Court recommends that the district judge grant in part and deny in part Defendants' motion to strike portions of Plaintiffs' summary judgment response. As to the first category, Plaintiffs do not oppose Defendants' motion to strike citations and statements about "newspapers and periodicals" from *The New York Times*, *The Atlantic*, *ProPublica*, and *The Nation*. (*See* Pls.' Second Resp. at 3-4, so stating; Hr'g Tr. 7:8-24 & Defs.' Second Reply at 2-3, noting that the parties "agreed" on the "newspapers and periodicals," and asking the Court not to consider them). As such, the Court recommends that the district judge grant Defendants' motion to strike on this ground.

---

[34] The Chemical Weapons Convention Implementation Act of 1998 implements the Chemical Weapons Convention, which the Supreme Court has "describe[d] as 'a treaty about chemical warfare and terrorism[.]'" *United States v. Le*, 902 F.3d 104, 111 & n.4 (2d Cir. 2018) (simplified) (quoting *Bond v. United States*, 572 U.S. 844, 860 (2014)).

With respect to the second category, the Court finds it unnecessary to rely on Plaintiffs'

citation and statement concerning the Chemical Weapons Convention. (*See* Defs.' Mot. Strike at

3-4; Pls.' MSJ Resp. at 28 & n.144, noting only that the Chemical Weapons Convention "bans

tear gas entirely"). Thus, the Court recommends that the district judge deny as moot Defendants'

motion to strike the second category. *See Cruz-Silva v. Installed Bldg. Prods.-Portland, LLC,*

*No. 3:18-cv-01137-SB, 2020 WL 1677976, at \*7 (D. Or. Feb. 5, 2020)* (overruling as moot

"evidentiary objections because the Court did not need to rely on the objected-to evidence in

ruling on [the defendant's] motion for summary judgment"), *findings and recommendation*

*adopted*, 2020 WL 1674347, at \*1 (D. Or. Apr. 6, 2020); *Munger v. Cascade Steel Rolling Mills,*

*Inc.*, 544 F. Supp. 3d 1078, 1091 n.9 (D. Or. 2021) (noting that the "parties raised evidentiary

objections in response to the motions for summary judgment" and the defendant "move[d] to

strike [a] declaration," and explaining that "[b]ecause the Court [did] not rely on this evidence

herein, the Court denie[d] the objections as moot"); *see also Perez-Denison v. Kaiser Found.*

*Health Plan*, 868 F. Supp. 2d 1065, 1088-89 (D. Or. 2012) ("[A]ny necessary rulings on [the

defendant's] evidentiary objections should be denied as moot, because the evidence moved

against [did] not change the recommendation that [the defendant's] motions . . . should be

granted.").

With respect to the third category, Plaintiffs' counsel filed a supplemental declaration

from Garrison Davis, who "personally filmed" or has personal knowledge of the events captured

in the challenged video recordings, which Plaintiffs used to create the still images in their

summary judgment response. (*See* Decl. Garrison Davis Supp. Pls.' Resp. Defs.' Mot. Strike

("Davis Decl.") ¶¶ 1-9, ECF No. 149; *see also* Pls.' Second Resp. at 3, 5-6, noting that Plaintiffs'

counsel informed Defendants' counsel that she would (and did) submit a declaration addressing

his concerns). In their reply and at oral argument, Defendants withdrew and never renewed their objection to category (3). (*See* Defs.' Second Reply at 3, withdrawing Defendants' objection to the video recordings; Hr'g Tr. 8:19-23, agreeing on the "videos" and "withdraw[ing] that" because Plaintiffs' counsel indicated that she "either provided a declaration or will provide a declaration," and adding that the Court and parties could further explore the videos "if an issue comes up today"). For these reasons, the Court recommends that the district judge deny as moot Defendants' motion to strike, to the extent that they seek exclusion of the above-cited video recordings.

With respect to the fourth category, Defendants withdrew their motion to strike Plaintiffs' citation and statement concerning the CDC's tear gas-related warning. (*See* Defs.' Second Reply at 3, withdrawing Defendants' "objection to the reference to the [CDC] . . . website"; Hr'g Tr. 9:14-18, withdrawing Defendants' "argument that the CDC website is not admissible" and noting that Defendants "relied on it, too," and were "not going to say one thing and do another"; *see also* Defs.' Mot. Strike at 6; Pls.' MSJ Resp. at 27-28 & n.142, citing and addressing the CDC). Thus, the Court recommends that the district judge deny as moot Defendants' motion to strike, to the extent that it seeks exclusion of Plaintiffs' citation and statement about the CDC warning.

The remaining dispute concerns the defense technology manufacturer's warning to consumers about its tear gas-containing products. (*Compare* Defs.' Mot. Strike at 5, *and* Defs.' MSJ Reply at 5, *with* Pls.' MSJ Resp. at 27 & n.141, reflecting that Defendants challenge and quote the warning and the paraphrased version from Plaintiffs' response; *see also* Pls.' Second Resp. at 6-7 & Defs.' Second Reply at 3, addressing this warning and citing Pls.' MSJ Resp. at 27 & n.141, i.e., ECF No. 130 at 34-35). The manufacturer's warning states: "This product can

expose you to chemicals including Lead Salts, Methylene Chloride and Hexavalent Chromium, which are known to the State of California to cause cancer and Lead Salts, which are known to the State of California to cause birth defects or other reproductive harm." (Defs.' Mot. Strike at 5; *see also* Pls.' MSJ Resp. at 27 & n.141, identifying the same known causes and sources and omitting reference to California). The parties do not dispute that this statement stems from the manufacturer's compliance with the "warning requirement" of California Proposition 65's ("Prop 65"), "also known as the Safe Drinking Water and Toxic Enforcement Act[.]" *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1266 (9th Cir. 2023) (citation omitted); (*see also* Defs.' Second Reply at 3 & Hr'g Tr. 8:24-9:13, 12:24-13:15, addressing Defendants' objection to the warning and suggesting that the parties do not dispute that it is a California "proposition 65 warning").

At oral argument, Defendants' counsel characterized his remaining objection as one concerning "Material Safety Data Sheets" (also known as "MSDS"), which he said were Prop 65 warnings. (*See* Hr'g Tr. 8:24-9:13, objecting to "Material Safety Data Sheets" that are known by an "acronym," and explaining that "what they are is a Proposition 65 warning that comes out of the [S]tate of California for the use of certain munitions, and in this case, some of the munitions that were deployed, including tear gas"). As the Court discusses further below, Defendants move to strike portions of a report from one of Plaintiffs' expert witnesses, Samuel Freedman, M.D. ("Dr. Freedman"), on the grounds that Dr. Freedman's opinions are "speculative and outside of his [s]cope of expertise." (*See* Defs.' Mot. Strike at 6 & Ex. 1 at 1-11, attaching a courtesy copy of Dr. Freedman's report with strikethrough font identifying the specific portions of the report that Defendants challenge and ask the Court to exclude). Notably, Dr. Freedman's report appears to be the source of all record references to "Material Safety Data Sheets" and the acronym

"MSDS." (*See* Defs.' Mot. Strike at 12; Pls.' Second Resp. at 14 & Pls.' MSJ Resp. at 28-29 &
n.149, referring to "MSDS lists," "MSDS sheets," and "Material Safety Data Sheets" and citing
or quoting pages four and five of Dr. Freedman's report, which use these terms; Freedman Decl.
¶ 3 & Ex. 2 at 1-11, reflecting that Dr. Freedman uses these terms or the acronym on pages four
and five and footnote one in the report and refers generally to "safety data sheets" and "products
sheets").

     Dr. Freedman's report indicates that Material Safety Data Sheets include information
beyond the challenged Prop 65 warning about cancer and birth defects or other reproductive
harm. (*See* Freedman Decl. Ex. 2 at 4-5, citing, among other things, sections that provide
information for doctors). Further, Defendants' courtesy copy of Dr. Freedman's report reflects
that Defendants do not object to all of the Material Safety Data Sheets that Dr. Freedman cited as
bases for his opinions. (*See id.* at 2-4, citing the materials that Dr. Freedman reviewed and upon
which Dr. Freedman based his opinions, and striking through only one of the manufacturer's six
listed MSDSs).

     The Court also notes that the internet sources that Defendants challenge (and Plaintiffs
reference)—i.e., the "Sell Sheet" for the "Skat Shell 40mm Multiple Projectile Round, OC" and
"Technical Specifications" for the "Triple-Chaser Separating Canister, CS" (*see* Defs.' Mot.
Strike at 5, quoting Pls.' MSJ Resp. at 27 n.141)—are portable document format ("PDF") files
that are accessible via links under the "Resources" section of the cited product pages. *See Skat
Shell 40mm Multiple Projectile Round, OC,* Defense Technology, https://perma.cc/9YPN-
KL4D; *Sell Sheet,* Defense Technology, https://perma.cc/BY6L-RWYB; *Triple-Chaser
Separating Canister, CS,* Defense Technology, https://perma.cc/366M-QCEW; *Technical
Specifications,* Defense Technology, https://perma.cc/JW93-5CBJ. The "Sell Sheet" and

"Technical Specifications" PDFs devote only a small section to the Prop 65 warning that Defendants challenge. The wording is also accessible via a "Prop 65 Warning" link on each product page.

Given these facts, the Court recommends that the district judge deny Defendants' motion to strike the fourth category, insofar as Defendants suggest that this objection encompasses the entirety of any Material Safety Data Sheets or "MSDS." The Court agrees with Plaintiffs' counsel that category (4) does not encompass the "entirety" of any "MSDS safety sheets." (Hr'g Tr. 12:24-13:2.) Rather, Defendants' objection to the fourth category is limited only to a "specific statement," namely the quoted Prop 65 warning on cancer and birth defects or other reproductive harm. (*See id.* 13:3-15, presenting this argument and correctly stating that Plaintiffs did not receive an opportunity to brief this issue and "would request one"; *cf.* Defs.' Mot. Strike at 5-6; Defs.' Second Reply at 3, limiting Defendants' objection to the quoted Prop 65 warning). Thus, the Court recommends that the district judge deny Defendants' motion to strike on this ground.

With respect to the wording related to cancer and birth defects or other reproductive harm, the Court did not rely on this Prop 65 warning in resolving Defendants' motions, nor would the Prop 65 warning change the Court's findings and recommendations to the district judge. Accordingly, the Court recommends that the district judge deny as moot Defendants' motion to strike on this ground. *See Cruz-Silva*, 2020 WL 1677976, at *7 (overruling as moot a party's "evidentiary objections because the Court did not need to rely on the objected-to evidence in ruling on [the defendant's] motion for summary judgment"); *Munger*, 544 F. Supp. 3d at 1091 n.9 (noting that the parties lodged evidentiary objections at summary judgment and the defendant sought to exclude a declaration, and denying the objections as moot because the

court found it unnecessary to rely on the evidence); *see also Perez-Denison*, 868 F. Supp. 2d at 1088-89 (finding that objections were moot because the challenged evidence would not alter the court's decision).

In sum, the Court recommends that the district judge grant in part and deny in part Defendants' motion to strike portions of Plaintiffs' response to Defendants' motion for summary judgment.

### C.      Plaintiffs' Experts' Reports

Defendants' motion to strike challenges the admissibility of portions of Plaintiffs' experts' reports under *Daubert* and FRE 702. (*See* Pls.' Second Resp. at 7-19 & Defs.' Second Reply at 3-5, addressing Defendants' "FRE 702 motions" and FRE "702 challenges"). Specifically, Defendants challenge the admissibility of portions of Dr. Freedman's, Phil Stanley's ("Stanley"), and Martin Rose's ("Rose") reports. (*See* Defs.' Mot. Strike at 6-17, Ex. 1 at 1-11 & Ex. 2 at 1-12, attaching Dr. Freedman's and Stanley's reports and striking through the portions that Defendants allege are inadmissible; Dahab MSJ Decl. Ex. 4 at 1-15, attaching a copy of Rose's report).

#### 1.      Applicable Law

##### a.      Gatekeeping Role and Function

FRE 702 governs the admission of expert testimony in federal court.[35] *See Engilis*, 2025 WL 2315898, at *3-4 (stating that the parties agreed that FRE 702 "controlled," and the Supreme Court has held that FRE 702 "governs" the "admissibility of expert testimony" (first citing *Elosu*

---

[35] The Court applies the current version of FRE 702 because the 2023 amendment went into effect on December 1, 2023. *See Engilis v. Monsanto Co.*, No. 23-4201, --- F.4th ---- , 2025 WL 2315898, at *6 n.9 (9th Cir. Aug. 12, 2025) (applying the previous version because the district court issued its decision "two weeks before the 2023 amendment went into effect on December 1, 2023").

*v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1023 (9th Cir. 2022); and then citing *Daubert*, 509 U.S. at 597); *see also Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc) ("[FRE 702] governs admission of expert testimony in the federal courts[.]"), *overruled in part on other grounds by United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020) (en banc).

Proponents of expert testimony must satisfy four admissibility requirements:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702; *see also Engilis*, 2025 WL 2315898, at *5-6 (noting that the 2023 amendment to FRE 702 "expressly require[s] a proponent of expert testimony to 'demonstrate[] to the court that it is more likely than not that' the four admissibility requirements are satisfied," and "confirm[ing] that a proponent . . . must always establish the admissibility criteria of [FRE] 702 by a preponderance of the evidence and that there is no presumption in favor of admission") (simplified).

In *Daubert*, the Supreme Court addressed the "standard for admitting expert scientific testimony in a federal trial." 509 U.S. at 582. Effecting "a sea change in the way that courts consider admission of expert testimony," *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017), the Supreme Court in *Daubert* determined that the Federal Rules of Evidence (in particular, FRE 702) "impose a 'gatekeeping' duty on the district court, requiring the court to 'screen[]' the proffered evidence to 'ensure that any and all scientific testimony or evidence

admitted is not only relevant, but reliable.'" *United States v. Alatorre*, 222 F.3d 1098, 1100-01 & n.4 (9th Cir. 2000) (quoting *Daubert*, 509 U.S. at 596-97). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting FED. R. EVID. 702); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-46 (1997) (refining the interpretation of FRE 702 two years earlier).

To satisfy *Daubert* and FRE 702, a district court must perform its "gatekeeping role" of ensuring that expert testimony is both "relevant" and "reliable" before admitting it into evidence.[36] *United States v. Valencia-Lopez*, 971 F.3d 891, 897-98 (9th Cir. 2020) (simplified); *see also Bacon*, 979 F.3d at 767 (stating that a "trial judge must perform [this] gatekeeping function" (quoting *United States v. Redlightning*, 624 F.3d 1090, 1111 (9th Cir. 2010))); *Elosu,*

---

[36] To codify the holdings of the "*Daubert* trilogy" (i.e., *Daubert*, *Joiner*, and *Kumho*) and resolve conflicts that arose thereunder, the 2000 amendment of FRE 702 "added three reliability-based requirements, now found in subsections (b), (c), and (d)." *Engilis*, 2025 WL 2315898, at *5. *Daubert* explained that the "requirement that opinion testimony 'assist the trier of fact' [i.e., now found in subsection (a)] 'goes primarily to relevance,' and the [associated] reference to scientific 'knowledge' demands a showing of reliability." *Id.* at *4 (quoting *Daubert*, 509 U.S. at 590-91). The 2000 amendment failed to "eliminate confusion and establish uniformity," which prompted the 2023 amendment. *Id.* at *5 (simplified). In a recent Ninth Circuit decision, the "parties dispute[d] the significance of the 2023 amendment to [FRE] 702 and the effect of that amendment on . . . . existing precedent." *Id.* at *4. Declining to "undertake an exhaustive examination of the effects, if any, of the 2023 amendment on [its] caselaw," the Ninth Circuit "confirm[ed] that a proponent of expert testimony must always establish the admissibility criteria of [FRE] 702 by a preponderance of the evidence and that there is no presumption in favor of admission." *Id.* at *6. The Ninth Circuit added that its "precedent has long recognized the burden-of-proof principles that the amendment sought to clarify" and "expressly held that the 'preliminary questions' of [FRE] 702 'must be established by a preponderance of proof,'" which was "unsurprising, as *Daubert* itself held that the requirements of relevance and reliability must be 'established by a preponderance of proof' pursuant to [FRE] 104(a)." *Id.* (first quoting *United States v. Rincon*, 28 F.3d 921, 923 (9th Cir. 1994); and then quoting *Daubert*, 509 U.S. at 592 n.10); *see also Maney v. Oregon*, No. 6:20-cv-00570-SB, 2024 WL 1695083, at *2 (D. Or. Apr. 19, 2024) (observing that the 2023 amendment of FRE 702 did not change or materially alter the standard).

PAGE 72 – FINDINGS AND RECOMMENDATION

26 F.4th at 1024 (relying on *Daubert*'s construal of FRE 702); *Est. of Barabin*, 740 F.3d at 463 (citing this circuit's interpretation of FRE 702); *Hardeman v. Monsanto Co.*, 997 F.3d 941, 953 (9th Cir. 2021) (finding expert opinions "relevant and reliable" and thus "satisfying [FRE] 702 and *Daubert*"); *United States v. Redlightning*, 624 F.3d 1090, 1111 (9th Cir. 2010) (referring to FRE 702 and *Daubert* as the "correct legal standard for determining the admissibility of expert testimony"). In discharging this duty, a district court "prevent[s] unfounded or unreliable opinions from contaminating a jury trial." *Elosu*, 26 F.4th at 1020 (citing *Daubert*, 509 U.S. at 586).

The Ninth Circuit has "cautioned" that a "court is 'a gatekeeper, not a fact finder.'" *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010)); *see also City of Pomona v. SQM N. Am. Corp. (Pomona I)*, 750 F.3d 1036, 1044 (9th Cir. 2014) (explaining that "[c]hallenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge"). The Ninth Circuit, however, has also emphasized that expert testimony must satisfy the threshold requirements of relevance and reliability before a jury may assess its credibility, because a court is unable to abdicate (or delegate to a jury) its gatekeeping function. *See Engilis*, 2025 WL 2315898, at *6 (first citing *Elosu*, 26 F.4th at 1024; and then citing *Hardeman*, 997 F.3d at 960 n.11); *Elosu*, 26 F.4th at 1024 ("If the proposed testimony meets the thresholds of relevance and reliability, its proponent is 'entitled to have the jury decide upon [its] credibility, rather than the judge.'" (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006))).

**b.    Relevance and Reliability**

Courts have "broad discretion" in rendering evidentiary rulings on whether proffered expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir. 2024) (first quoting *City of Pomona v. SQM*

*N. Am. Corp. (Pomona II)*, 866 F.3d 1060, 1065 (9th Cir. 2017); and then quoting *Elosu*, 26 F.4th at 1024).

"Relevancy simply requires that 'the [expert opinion] evidence logically advance a material aspect of the party's case.'" *Est. of Barabin*, 740 F.3d at 463 (simplified) (quoting *Cooper v. Brown*, 510 F.3d 879, 942 (9th Cir. 2007)); *see also United States v. Yetisen*, No. 23-3892, 2025 WL 2028310, at *1 (9th Cir. July 21, 2025) (describing relevancy the same way (citing *Ruvalcaba-Garcia*, 923 F.3d at 1188)). In other words, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Elosu*, 26 F.4th at 1024 (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)).

Reliability, on the other hand, is a "flexible" inquiry and the "lynchpin" of a court's gatekeeping function. *See Engilis*, 2025 WL 2315898, at *10 (invoking the "flexibility of the reliability inquiry"); *Hardeman*, 997 F.3d at 960 (stating that the reliability "inquiry is flexible") (simplified); *Valencia-Lopez*, 971 F.3d at 898 (explaining that the "Supreme Court made it abundantly clear that reliability is the lynchpin" (citing *Kumho Tire*, 526 U.S. at 149)). "The issue here is . . . whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Est. of Barabin*, 740 F.3d at 463 (quoting *Kumho Tire, 526 U.S. at 149*).

"To evaluate reliability, the district court 'must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *Elosu*, 26 F.4th at 1024 (quoting *Pomona I*, 750 F.3d at 1044). Courts in this circuit have also considered "whether experts are testifying 'about matters growing naturally' out of their own independent research, or

if 'they have developed their opinions expressly for purposes of testifying.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1316 (9th Cir. 1995)). Considering that these criteria are "nonexclusive, . . . 'the trial court has discretion to decide how to test an expert's reliability . . . based on the particular circumstances of the particular case.'" *Elosu*, 26 F.4th at 1024 (quoting *Pomona I*, 750 F.3d at 1044); *see also Murray*, 870 F.3d at 922 (making clear that a court's "reliability analysis remains a malleable one tied to the facts of each case" (citing *Daubert*, 509 U.S. at 591)). At bottom, a "court's 'task . . . is to analyze not what the experts say, but what basis they have for saying it.'" *Wendell*, 858 F.3d at 1232 (quoting *Daubert II*, 43 F.3d at 1316).

### 2. Analysis

Defendants seek partial exclusion of the reports that three of Plaintiffs' experts (Dr. Freedman, Stanley, and Rose) submitted in support of Plaintiffs' summary judgment response. (*See* Defs.' Mot. Strike at 6-17). The Court begins by addressing Dr. Freedman's report.

### a. Dr. Freedman's Report

Dr. Freedman submitted a four-part report to Plaintiffs' counsel on August 21, 2024, in which he addresses his qualifications, his recent history serving as an expert witness, the case materials and documents that he reviewed, and his analysis and opinions. (*See* Freedman Decl. ¶¶ 1-3, Ex. 1 at 1-2 & Ex. 2 at 1-11, attaching Dr. Freedman's curriculum vitae and report as exhibits one and two). Dr. Freedman also sat for a deposition on September 27, 2024. (Dep. Samuel Freedman ("Freedman Dep.") 1:18-25, 4:1-18, Sept. 27, 2024, ECF Nos. 138-2 and 145 at 3-25.)

///

PAGE 75 – FINDINGS AND RECOMMENDATION

Dr. Freedman received a bachelor's degree from Yale University in 1970, and a medical degree from Jefferson Medical College in 1974. (Freedman Decl. ¶¶ 1-3, Ex. 1 at 1-2 & Ex. 2 at 1-2.) Dr. Freedman has been practicing as a licensed physician specializing in emergency medicine for thirty-six years. (*Id.* Ex. 1 at 1 & Ex. 2 at 1.) Dr. Freedman served as Washington County's director of emergency medical services for twenty years, and the director of Tuality Hospital's emergency department for eleven years. (*Id.*) In the former role, Dr. Freedman was the physician in charge of all ambulance care and directed and oversaw the clinical care of ninety emergency medical technicians and paramedics. (*Id.*) Dr. Freedman has also co-authored a review of the Washington County Jail's provision of health care and related policies and, in the past five years, provided expert testimony in three lawsuits, including two in this district. (*Id.* Ex. 2 at 2.)

Plaintiffs' counsel requested that Dr. Freedman address law enforcement's use of "tear gas" and other riot control agents from May 29, 2020 through July 29, 2020, particularly with respect to the "effects of such [agents] on the [AICs] . . . within the [MCDC] . . . during this period." (*Id.* Ex. 2 at 1.) In doing so, Dr. Freedman reviewed the Named Plaintiffs' medical records, a significant portion of the summary judgment record, including other AICs' declarations, deposition transcripts, Dr. Seale's summary of AICs' medical records, and tear gas materials (fact and MSDS sheets, etc.) from, among others, the CDC and a defense technology manufacturer. (*Id.* Ex. 2 at 2-4.) Based on his review, Dr. Freedman opined to a reasonable medical probability that the Named Plaintiffs sustained these injuries because of tear gas exposure:

- All of the Named Plaintiffs' injuries include acute reactive airway disease
  (i.e., respiratory distress such as shortness of breath, coughing or

"uncontrolled coughing" in Davis' case, and burning nasal passages or, in

Lundy's case, "burning of nasal passages[] and bloody nose"), acute contact

dermatitis (i.e., skin inflammation), and acute chemical conjunctivitis (i.e., eye

inflammation).

- Davis' other injuries were partial dehiscence of a surgical wound (i.e., partial
  reopening of an umbilical hernia repair surgery wound), PTSD, and
  exacerbation of a pre-existing adjustment disorder with anxiety.

- Duhart's other injuries were acute, "spontaneous vomiting," acute headache,
  and exacerbation of chronic and preexisting PTSD and sleep disorder.

- Lundy's other injuries were exacerbation of a chronic and preexisting panic
  disorder and exacerbation of preexisting PTSD.

- Berglund's other injury was chronic reactive airway disease.

(*Id.* Ex. 2 at 6-9; *see also* Davis Decl. ¶¶ 3, 8, reflecting that Davis described a "shooting pain"

around her "hernia incision" when she coughed and reported that she reopened the incision

shortly thereafter).

In addition to addressing the Named Plaintiffs' injuries, Dr. Freedman provided other

"general comments and conclusions." (*Id.* Ex. 2 at 9-11) (simplified). Dr. Freedman's comments

and conclusions included that he "fully agree[d]" with portions of the report from Defendants'

expert witness, Christian Sloane, M.D. ("Dr. Sloane"), an emergency care physician who serves

as a Clinical Professor of Emergency Medicine at the University of California, San Diego

("UCSD"), practices at UCSD Medical Center, and conducted a "literature review" regarding

current known "health effects from exposure to tear gas[.]" (*Id.* Ex. 2 at 10-11; *see also* Sloane

Decl. ¶¶ 1-2, 7-8 & Ex. 1 at 1, describing Dr. Sloane's qualifications, review, and report and

agreed-upon "salient points" in subsections (d), (g), and (j) of paragraph eight of his declaration and bullets four, seven, and ten on page one of his report). Dr. Freedman, for example, agreed with Dr. Sloane's observations that "[p]sychological effects such as fear, anxiety, PTSD, [and] acute stress reactions could be experienced [in tear gas exposure cases], as in all cases of exposure to emotional or physical stressors." (Freedman Decl. Ex. 2 at 11; Sloane Decl. ¶ 8 & Ex. 1 at 1.)

Relatedly, Dr. Freedman opined that the "stress and anxiety caused by [AICs'] nightly exposure and feelings of powerlessness and isolation from outside help in the midst of chaos and difficulty breathing will have longer lasting effects" and "long after the exposures ceased," and this was "even more likely" in the case of AICs who suffered from "preexisting mental health conditions." (*Id.* Ex. 2 at 11; *see also id.* Ex. 2 at 10, making an analogous observation about "mental anxiety and fear" being "far more long lasting" in individuals with "preexisting mental health conditions"). Additionally, Dr. Freedman determined that (1) it was "reasonable to believe that many of the injuries sustained are permanent," especially "mental health conditions" like PTSD and anxiety that "gain[ed] further traction in the AICs who experienced the events in question," and (2) based on his "extensive review of the materials" cited, there is a "reasonable medical probability" that "every [AIC] in [MCDC] during the period suffered from significant respiratory effects nightly without respite," and with the exception of AICs who suffered from asthma, chronic obstructive pulmonary disease ("COPD"), and "other preexisting conditions," these respiratory effects "may have been relieved" once AICs were no longer exposed to tear gas. (*Id.* at Ex. 2 at 10-11; relying on statements from AICs' declarations, depositions, and grievances).

///

PAGE 78 – FINDINGS AND RECOMMENDATION

Defendants challenge Dr. Freedman's opinions on several grounds. (*See* Defs.' Mot. Strike at 6-14.) Before addressing these evidentiary challenges, the Court briefly addresses Dr. Freedman's qualifications to serve as an expert witness and the relevance of Dr. Freedman's opinions.

"The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Dallas Buyers Club, LLC v. Huszar*, No. 3:15-cv-00907-AC, 2019 WL 5856460, at *8 (D. Or. Sept. 3, 2019) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). At oral argument, Defendants' counsel conceded that Dr. Freedman is qualified to provide expert medical testimony regarding the effects of tear gas on AICs like the Named Plaintiffs, who were housed at MCDC and exposed to tear gas during the relevant period. (*See* Hr'g Tr. 9:19-11:17, stating that to the extent Dr. Freedman reviewed the Named Plaintiffs' medical records and "makes a diagnosis," Defendants are "not objecting to that," and instead challenging only Dr. Freedman's mental health diagnoses and opinions). Defendants also stated that they "do not object" to Dr. Freedman's opinions about AICs "whose medical records were reviewed or [who] provided statements of their symptoms by deposition or otherwise[.]" (Defs.' Second Reply at 3.) This is particularly significant because Dr. Freedman considered not only AICs' deposition transcripts, declarations, and grievances, but also Dr. Seale's summary of more than fifty AICs' "relevant notes" related to "treatment for tear gas." (*See* Seale Decl. at 1-904; Freedman Decl. Ex. 2 at 3.) In sum, the Court concludes that Dr. Freedman is qualified to serve as an expert in this case. (*See* Freedman Decl. Ex. 2 at 1, seeking opinions on the effects of AICs' tear gas exposure).

///

In addition to acknowledging that Dr. Freedman is qualified to testify about these matters, Defendants fail explicitly to object to Dr. Freedman's opinion on relevancy grounds. (*See* Defs.' Mot. Strike at 12-13, 15 seeking partial exclusion of only Stanley's report on the ground that it is "irrelevant" and otherwise referring to relevance generally and in describing the standard). The Court concludes that Dr. Freedman's opinions are relevant because they "logically advance a material aspect of the [Named Plaintiffs'] case," *Est. of Barabin*, 740 F.3d at 463 (quoting *Cooper*, 510 F.3d at 942), and the "knowledge underlying [them] has a valid connection to the pertinent inquiry." *Elosu*, 26 F.4th at 1024 (quoting *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969). Accordingly, Dr. Freedman is a qualified expert whose opinions are relevant to the task at hand.

The question, then, is whether Dr. Freedman's opinions are reliable. *See Wendell*, 858 F.3d at 1232 ("Defendants do not contest that the [two doctors'] opinions . . . are relevant; the only question, therefore, is whether they are reliable."); *Archie v. Pop Warner Little Scholars, Inc.*, No. 20-55081, 2021 WL 4130082, at *1 (9th Cir. 2021) ("Only the reliability prong is at issue.").

Defendants initially argue that the Court should exclude Dr. Freedman's statement that it is "clear from the declaration, depositions and grievances" of AICs other than the Named Plaintiffs that "all" the AICs at "MCDC during the period [at issue] would be similarly exposed to tear gas and/or chemical agents and sustain near identical signs and symptoms." (Defs.' Mot. Strike at 6-7, quoting Freedman Decl. Ex. 2 at 1.) In Defendants' view, this statement is overly broad, speculative, "inherently unreliable," and "outside the scope of Dr. Freedman's expertise," because he has "no expertise" in the characteristics, dissipation, and filtration of tear gas and "impact of airflows inside the building." (*Id.* at 7.) Defendants add that Dr. Freedman failed to

"employ any recognized scientific method within the field of medicine" or account for

"individual and varying degrees of exposure" and related factors, such as the lengths of AICs'

stays and the HVAC service quadrants in which AICs resided. (*Id.*) Defendants also note that

Dr. Freedman "appear[ed] to refute" this statement at his deposition, insofar as he testified that

he lacked knowledge about whether AICs "suffered similar symptoms between different areas

that were served by different parts of the HVAC system[.]" (*Id.* at 7-8, quoting Freedman

Dep. 100:21-25.)

The Court finds Defendants' arguments unpersuasive. FRE "702 requires that expert

testimony be 'based on sufficient facts or data.'" *Hyer*, 118 F.4th at 1056 (quoting FED. R. EVID.

702). The Ninth Circuit has "recognized that '[FRE] 702's sufficient facts or data element

requires foundation, not corroboration.'" *Id.* (quoting *Elosu*, 26 F.4th at 1020). That is to say,

"the key inquiry . . . is 'whether an expert had sufficient factual grounds on which to draw

conclusions,' not whether the expert's 'hypothesis is correct' or 'corroborated by other evidence

on the record." *Id.* (quoting *Elosu*, 26 F.4th at 1025-26). "For that inquiry, what matters is the

evidence [the expert] actually considered and the conclusions he actually drew from that

evidence in the process of forming his opinion as disclosed in his expert report." *Engilis*, 2025

WL 2315898, at *8; *see also Wendell*, 858 F.3d at 1232 ("[T]he court's 'task . . . is to analyze

not what the experts say, but what basis they have for saying it.'" (quoting *Daubert II*, 43 F.3d at

1316)).

Plaintiffs have established by a preponderance of the evidence that Dr. Freedman's

opinion was based on sufficient facts or data. *See Engilis*, 2025 WL 2315898, at *8 (noting that a

proponent of expert testimony must demonstrate as much). Contrary to Defendants' arguments,

Dr. Freedman accounted for individual and varying degrees of tear gas exposure and symptom
severity.

For example, Dr. Freedman cited AICs' reports that their tear gas "exposure significantly
worsened after the federal agents began deploying munitions," and that exposure incidents were
"terrifying, [even] more so once [they] had been experienced." (Freedman Decl. Ex. 2 at 4-5.)
Furthermore, Dr. Freedman opined that the Named Plaintiffs' injuries overlapped in some
unsurprising ways (i.e., shortness of breath, coughing, burning nasal passages, and skin and eye
inflammation) but also varied in each case (i.e., "uncontrolled" coughing and partial reopening of
an umbilical hernia repair surgery wound (Davis), acute, "spontaneous vomiting" and acute
headache (Duhart), "bloody nose" (Lundy), and chronic reactive airway disease (Berglund)).
(*Id.* at 6-9.)

It is true that Dr. Freedman also opined that "all [AICs] who were housed within MCDC
during the period [at issue] would be similarly exposed to tear gas and/or chemical agents and
sustain near identical signs and symptoms," because "chemical irritants were coming through the
vents, and everyone breathing this air[] [while housed] in locked, nearly sealed rooms[] would be
forced to endure some or all of the symptoms of lungs burning, skin and eyes burning, irresistible
cough, trouble breathing, and vomiting," which is "precisely what other AICs" described in their
"declarations and depositions [in this case]." (*Id.* at 10.) Defendants' arguments demonstrate that
these "opinions are contested, and a jury may well reject them." *Hyer*, 118 F.4th at 1058 (citing
*United States v. Finley*, 301 F.3d 1000, 1015-16 (9th Cir. 2002)). However, in evaluating
whether there is "too great an analytical gap" between what Dr. Freedman actually considered
and the conclusions that he drew, FRE 702 "does not license" the Court to "engage in freeform
factfinding, to select between competing versions of the evidence, or to determine the veracity of

the expert's conclusions at the admissibility stage." *Id.* (quoting *Elosu*, 26 F.4th at 1026). Where a district "court 'fixat[es] on evidence not offered in support of the experts' opinions while simultaneously ignoring the evidence advanced on their behalf' and decide[s] for itself whether the experts' conclusions were right or wrong, the [district] court's analysis 'exceed[s] the scope of the [FRE] 702 inquiry.'" *Id.* (simplified) (quoting *Elosu*, 26 F.4th at 1026).

Consistent with the scope of its FRE 702 inquiry, the Court takes into consideration that Dr. Freedman qualified his statements. Dr. Freedman did so by noting that (1) AICs "endur[ed] some" but not necessarily "all" of the common "symptoms of lungs burning, skin and eyes burning, irresistible cough, trouble breathing, and vomiting," and "respiratory system [exposure], from nose to throat to lung, and eyes," (2) AICs with "respiratory illnesses" (COPD or asthma, in particular) "sustained an increased frequency of attacks," (3) AICs with "a mental illness would predictably suffer longer lasting effects," (4) AICs with COPD, asthma, and "other preexisting conditions," such as "preexisting mental health conditions," may not have experienced the same relief and duration of effects, and (5) it is reasonable to believe that AICs with "mental health conditions" like PTSD and anxiety suffered permanent injuries. (Freedman Decl. Ex. 2 at 6-11; *see also* Duhart Decl. ¶ 12 & Duhart Dep. 27:5-13, providing an example of an AIC whose exposure resulted in both impaired breathing and vomiting and comparing breathing the air to "spicy foods" or "eating cinnamon mixed with hot peppers"; Van Houte Dep. 39:5-40:23, 41:1-19, stating that "it got a little bit spicier inside" and "throughout" the building, it was "telling" that at least "small doses" of tear gas "found its way" inside on "most nights" and "whenever" federal agents deployed tear gas, and there was a "little bit different" level of tear gas in some modules, leading to "mental note[s] like wow, it's a little bit . . . spicier here than [o]n . . . other modules"; Parks Dep. 20:19-22:23, drawing on extensive experience with tear gas and

explaining that Parks has "seen people vomit" after being exposed to tear gas and "kind of [react and not] panic, but you can tell . . . [from] their eyes," "everyone reacts differently to any type of chemical irritants," tear gas may "not affect [some] at all," does not "truly affect [Parks] that much," and "makes [Parks] sneeze a lot" and Parks' "nose run," and the "most concentrated forms" cause Parks to "sneeze" and Parks' "nose to instantly just start draining like crazy" but he can "see, function," and "decontaminate from it very quickly"; Gall Decl. Ex. 1 at 26, listing references from the report of Defendants' expert, Elliott Gall, Ph.D. ("Dr. Gall"), including a study leveraging adaption effects that occur when individuals are exposed to gradual and low concentrations of tear gas).

In addition, the Court may not inflate the perceived "analytical gap" between Dr. Freedman's opinions and his bases for so opining (or the extent to which he did or did not extrapolate projections based on other AICs' contemporaneous reports, testimony, declarations, etc.) by ignoring evidence that he considered and Defendants fail to address. That includes, but is not limited to, Dr. Seale's purported summary of all "relevant notes" from more than fifty AICs' medical records. (*See* Defs.' Mot. Strike at 7 & Freedman Decl. Ex. 2 at 3, claiming that Dr. Freedman "did not review the numerous medical records of the AICs," even though he reviewed Dr. Seale's ninety-two-page summary of all "relevant notes"; Hr'g Tr. 9:19-12:17, 15:15-18:12, objecting to Dr. Freedman extrapolating projections from existing facts or data, treating the Named Plaintiffs' medical records as the facts or data because Dr. Freedman has not "looked at anyone's medical records," and failing to address, among other things, Dr. Seale's summary).

Equally significant, the Court considers the "salient points" upon which Dr. Freedman and Defendants' medical expert (Dr. Sloane) agree, and Defendants fail to address. To those

ends, Drs. Freedman and Sloane agree that as with any "exposure to emotional or physical stress," AICs exposed to tear gas may have experienced (and in Dr. Freedman's view, did experience) "[p]sychological effects such as fear, anxiety, PTSD, [and] acute stress reactions," and that "[m]any symptoms are subjective and cannot be proven nor disproven other than what the subjects might report." (Freedman Decl. Ex. 2 at 10-11, quoting Sloane Decl. ¶ 8 & Ex. 1 at 1.)

These agreed-upon points reflect that Dr. Freedman's opinions are necessarily derived in part from subjective methodology, and appropriately so. "The mere fact that an expert's opinion is derived from subjective methodology does not render it unreliable." *United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1120 (D. Nev. 2019) (simplified); *see also Cleveland v. Behemoth*, No. 3:19-cv-00672, 2022 WL 5312217, at *3 (S.D. Cal. Oct. 6, 2022) ("[A]n expert may consider subjective testimony when examining an individual's mental health." (citing *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017))). Where expert opinions are "not necessarily scientific in nature," such as medical professionals' "subjective opinions" in the mental health context, which courts have "wide discretion to admit," the experts' experience, knowledge, and training take precedence over the more traditional "testability [inquiry courts] use[] to judge purely scientific evidence." *Empire Fire & Marine Ins. Co. v. Patton*, No. 17-cv-02159, 2019 WL 11544461, at *6 (D. Ariz. Aug. 26, 2019) (simplified); *see also Sandoval-Mendoza*, 472 F.3d at 655 ("Because medical expert testimony 'is based on specialized as distinguished from scientific knowledge, the *Daubert* factors are not intended to be exhaustive or unduly restrictive.'" (quoting *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 834 (9th Cir. 2004))).

Given this understanding, most of Defendants' remaining "concerns sound in weight, not foundation." *Hyer*, 118 F.4th at 1058. Those concerns are (1) Dr. Freedman's lack of expertise in

the characteristics, dissipation, and filtration of tear gas and impact of indoor airflows,

(2) Dr. Freedman's knowledge about AICs housed in "different areas" of MCDC's housing

floors *and* "different parts" of the HVAC system's service zones (i.e., not within the Justice

Center's same vertical stack or service quadrant) and whether such AICs suffered from "similar

symptoms" (subject to Dr. Freedman's qualifications), (4) the amount of time that has passed

since Dr. Freedman, a physician specializing in emergency medicine, last diagnosed a patient

with PTSD, (5) Dr. Freedman's recall or utilization of the Diagnostic and Statistical Manual of

Mental Disorders, Fifth Edition's ("DSM" or "DSM-V") diagnostic criteria for PTSD, and

(6) Dr. Freedman's lack of experience diagnosing "anyone exposed to tear gas with PTSD" and

"providing post-emergency care for mental illness" (i.e., "ongoing and therapeutic care over the

long run," as opposed to "therapeutic care in the moment" and "episodic interactions" involving

"acute or chronic mental health problems," which "flood the emergency departments" and often

include four PTSD patients in an eight-hour shift). (*See* Defs.' Mot. Strike at 7-9; Defs.' Second

Reply at 3-4; Freedman Dep. 14:7-16:19, 17:3-20:21, 100:21-25; *see also* Freedman Decl. Ex. 2

at 4, basing opinions on a review of declarations from Defendants' HVAC and indoor air quality

experts, Dennis Conser ("Conser") and Dr. Gall; *but cf.* Defs.' Mot. Strike at 7, suggesting

otherwise).

  "The Ninth Circuit has found, in a case discussing the diagnosis of PTSD . . . , that 'a

variance from the DSM's diagnostic criteria will not automatically result in an unreliable

diagnosis.'" *Roe v. Nevada*, 621 F. Supp. 2d 1039, 1050 (D. Nev. 2007) (quoting *S.M. v. J.K.*,

262 F.3d 914, 921 (9th Cir. 2001)). The Ninth Circuit has also explained that "the proper venue

for airing out [evidentiary] challenges [that sound in weight] is cross-examination at trial." *Hyer*,

118 F.4th at 1058 (quoting *Primiano*, 598 F.3d 564-65); *see also Empire Fire & Marine Ins. Co.*,

2019 WL 11544461, at *1, *6 (denying the defendant's motion in limine but making clear that the defendant remained "free to question" the plaintiff's medical expert about the "documents [the medical expert] used in formulating her opinion and any competing interpretations borne of those documents that [the defendant] believe[d] more likely than [the medical expert's] conclusions").

Ultimately, for purposes of the Court's gatekeeping function, the question is not whether every AIC housed at MCDC during the relevant period actually suffered from Dr. Freedman's qualified versions of "near identical signs and symptoms," "precisely what other AICs" described, or "nightly gas exposure to the respiratory system, from nose to throat to lungs, and eyes." (Freedman Decl. Ex. 2 at 10.) Rather, the question is whether Plaintiffs proved by a preponderance of the evidence that Dr. Freedman's opinions (and qualified statements) are based on sufficient facts or data. *See Engilis*, 2025 WL 2315898, at *8. The Court finds that Plaintiffs have met their burden.

Defendants next argue that Dr. Freedman's opinions on mental health symptoms and diagnoses are subject to exclusion because he is an emergency medicine physician, "not a mental health professional[.]" (Defs.' Mot. Strike at 8.) The Court disagrees for two reasons.

First, even if Defendants advance legitimate concerns that sound in weight, Dr. Freedman possesses relevant knowledge, education, and experience treating and diagnosing mental health symptoms and disorders, including PTSD. (*See* Freedman Dep. 14:7-16:19, 17:3-20:21, 100:21-25.)

Second, that a "physician is not a specialist in the field in which he or she is giving opinion testimony does not affect the opinion's *admissibility*, but rather the weight the jury may place on it." *Smith v. Nw. Permanente, P.C.*, No. 3:12-cv-00259-HZ, 2013 WL 3973818, at *5

(D. Or. July 30, 2013) (quoting Hon. Robert E. Jones et al., *Rutter Group Practice Guide: Federal Civil Trials and Evidence* § 8:1545 (2011)). Addressing "a witness who has general expertise in a broad subject but is not a specialist in the specific aspect of that subject that is pertinent in the case," a leading treatise notes that "most courts conclude that general knowledge can be sufficient in such a case to qualify the witness as an expert" because the FRE 702 inquiry is "not whether a specialist would be preferable," and thus a "physician who is a general practitioner usually may testify as to medical problems that a specialist might treat in a clinical setting." 29 Charles Alan Wright et al., *Federal Practice and Procedure* § 6264.2 (2d ed. updated May 21, 2025).

Many decisions are in accord. For example, in *Bordelon v. Airgas USA, LLC*, 603 F. Supp. 3d 946, 954 (D. Or. 2022), the defendants sought to exclude the opinions of an emergency room physician with "substantial experience" and relevant treatment history because he was "not a neurologist, cardiologist, sleep specialist, or any type of specialist in a relevant medical field[.]" *Id.* (simplified). The district court disagreed and explained that the physician's lack of "a speciali[zation] in a certain field goes to weight, not admissibility, and . . . '[did] not make his [opinion] per se inadmissible at summary judgment.'" *Id.* (quoting *Smith*, 2013 WL 3973818, at *5).

Other courts have taken a similar approach to physicians who are not specialists in a particular field:

> In counsel's terms, [the proffered expert] is "an orthopedic surgeon testifying about cardiology." But "there is no requirement that an expert be a specialist in a given field, and . . . any lack of particularized expertise goes to the weight accorded [to her testimony], not to the admissibility of her opinion as an expert." *Marshall v. RS 2018 Float, LLC*, No. 22-35899, 2024 WL 637487, at *1 (9th Cir. Feb. 15, 2024) (cleaned up). The same goes for doctors: "[T]he fact that [a] physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it."

*Mitchell v. United States*, 141 F.3d 8, 15 (1st Cir. 1998) (quoting *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985)).

*Chavez v. S.F. Bay Area Rapid Transit Dist.*, 22-cv-06119, 2024 WL 3092153, at *3 (N.D. Cal. June 21, 2024).

For these reasons, the Court rejects Defendants' argument that Dr. Freedman's mental health-related opinions are subject to exclusion because he is not a mental health specialist.

*Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("[C]ourts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats.") (simplified).

Defendants' third challenge concerns Dr. Freedman's statement that AICs attempted to "follow procedures" by filing tear gas-related medical request forms and grievances, which "achieved nothing" and the MCSO failed to "acknowledge[]" or "act[] upon[.]" (Defs.' Mot. Strike at 10, quoting Freedman Decl. Ex. 2 at 10.) Citing *Thomsen v. NaphCare, Inc.*, No. 3:19-cv-00969-AR, 2023 WL 8701971, at *9 (D. Or. 15, 2023), *overruled in part on other grounds by* 2024 WL 551426, at *1-4 (D. Or. Feb. 12, 2024), Defendants argue that exclusion is warranted because as the district court determined in *Thomsen*, Dr. Freedman lacks "expertise in administration of healthcare in correctional facilities," and Dr. Freedman's statement about AICs following applicable procedures is outside the scope of his expertise and lacks foundation. (Defs.' Mot. Strike at 10.)

The Court finds *Thomsen* distinguishable. In *Thomsen*, the district court concluded that Dr. Freedman "lack[ed] expertise in administration of healthcare in correctional facilities." 2023 WL 8701971, at *9. For this reason, the district court excluded Dr. Freedman's statements about (1) "systemic shortcomings and deficiencies in training, policy, and action both before and after [an AIC's] death," (2) a company's contract to handle medical care at the Washington County

Jail, (3) the necessity of training jail staff on alcohol withdrawal, (4) whether the defendants failed properly to respond to an auditor's report, (5) "deficient policies, substandard staffing, and resource deployment at the jail," (6) whether use of an intravenous medication was a "jail procedure," and (7) whether the company "took appropriate actions following [the AIC's] death." *Id.*

Dr. Freedman's opinions here are not comparable to those in *Thomsen*. Dr. Freedman refers to AICs' attempts to "follow procedures" and grieve or seek medical care for tear gas exposure. (*See* Freedman Decl. Ex. 2 at 10.) But AICs' procedural compliance does not appear to be his focus. Rather, Dr. Freedman's statement appears related to his medical opinions about AICs suffering from "respiratory effects . . . without respite" and "longer lasting effects," whether certain experiences may have resulted in conditions like PTSD and anxiety "gain[ing] further traction," and the cumulative effects of tear gas exposure and "starting point[s]" or "baseline[s]" when "prior inflammation" was "not relieved," had "not receded" or "totally resolved," or "return[ed]" to "normal" before the "next round of inflammation" and "cumulative exposure." (*Id.* at 10-11.)

Defendants suggest that they agree with this observation by disputing related factual matters. (*See* Defs.' Second Reply at 4, maintaining that Defendants "provided care in response to every medical request form" and that "at best," Dr. Freedman's statement about MCSO's handling of AICs' tear gas grievances is a "misstatement of the facts"; Defs.' Mot. Strike at 10, stating incorrectly that Dr. Freedman's challenged statement is based on a "single reference" to Gaylor and that Dr. Freedman "[o]ddly" relied solely on Gaylor, even though he never reviewed materials that she submitted; Freedman Decl. Ex. 2 at 2-3, stating that Dr. Freedman's "opinions are based on" Gaylor's declaration and all the other listed AICs' declarations and deposition

transcripts). These factual disputes are also relevant to the issue of whether and to what extent Dr. Freedman extrapolated any projections from existing facts or data or may have done so out of necessity.

At bottom, a court abuses its discretion when it "exclude[s] [a] report for lacking sufficient facts or data" and "overlook[s] the data actually relied upon . . . in rendering [the] opinion." *Hyer*, 118 F.4th at 1056 (citing *Elosu*, 26 F.4th at 1025). Here, the record reflects that Defendants fail to address the data on which Dr. Freedman based his opinions. (*See* Duhart Decl. ¶¶ 10-11 & Buckner Decl. ¶ 12, disappearing grievances; Duhart Dep. 63:17-24, referencing a grievance that the MCSO was unable to locate; Piucci Decl. Ex. 39 at 1-14 & Ex. 40 at 1-12, missing grievances; Gaylor Decl. ¶¶ 8-9, 16, 20-21; Davis Decl. ¶¶ 6-7, 10-11, 14-15; Duhart Decl. ¶¶ 8, 10-12; Brown Decl. ¶¶ 5, 10; Hall Decl. ¶¶ 8-9; Hill-Sistrunk Decl. ¶¶ 7-10; Lundy Decl. ¶¶ 16-21, failing to respond to requests for or provide any meaningful assistance, disabling emergency call buttons, refusing requests for showers and a change of clothes when AICs' blankets, linens, and clothing were "drenched in tear gas," denying requests for grievance forms, making "jokes about the tear gas," and advising AICs to "suck it up" and "deal with it"; Street Decl. ¶¶ 7, 9, 11, reporting Street's fear of a second severe asthma attack and accident and dying because the MCSO "show[ed] up late").

For these reasons, the Court declines to exclude Dr. Freedman's third challenged statement.

Defendants' fourth challenge concerns (1) Dr. Freedman's qualified statement about all AICs suffering from "nightly gas exposure to the respiratory system, from nose to throat to lungs, and eyes," (2) AICs' reports and descriptions of relief available when tear gas entered their cells, (3) the cumulative inflammatory effects of inadequately resolved exposure, and

(4) decontamination of AICs' cells, bodies, and clothing. (Defs.' Mot Strike at 11, quoting
Freedman Decl. Ex. 2 at 10-11; see also Freedman Decl. Ex. 2 at 10, qualifying statements by
noting, among other things, that the same group of AICs suffered from "some or all of the
symptoms of lungs burning, skin and eyes burning, irresistible cough, trouble breathing, or
vomiting"; Sloane Decl. Ex. 1 at 5, recognizing that "[b]ecause of its insoluble nature, [CS]
decontamination of buildings or other items after exposure can be challenging"). In seeking
exclusion of Dr. Freedman's statements, Defendants emphasize that Dr. Freedman lacks
expertise in the "chemical properties" and "dynamic" indoor "flow" of tear gas and failed to rely
on any "expert in the field of air quality or HVAC," account for potentially inconsistent facts
(i.e., AICs who "present for a short period of time and possibly on days where tear gas was either
minimal or nonexistent"), and "cite any credible medical science" despite the "absence of any
review of the medical records or any independent medical examination." (Defs.' Mot. Strike at
11.)

　　　　Defendants' fourth challenge fails for the reasons described above and addressed briefly
below. "[T]he proper venue for airing out these challenges is cross-examination at trial." *Hyer*,
118 F.4th at 1058 (quoting *Primiano*, 598 F.3d at 564-65). Most of Defendants' arguments sound
in weight and fail adequately to address, among other things, Dr. Freedman's qualification of his
statements and case materials and documents that his "opinions are based on[.]" (*Cf.* Freedman
Decl. Ex. 2 at 2-4.) Furthermore, if, as Defendants "seem[] to suspect, [an] assertion of fact is
untrue and underlies one of [Plaintiffs' expert]'s opinions, [they] may make that point on cross-
examination." *Animal Legal Def. Fund v. Olympic Game Farm, Inc.*, No. 3:18-cv-06025, 2023
WL 3304264, at *4 n.4 (W.D. Wash. May 8, 2023); *see also Wesco Ins. Co. v. Smart Indus.
Corp.*, No. 2:16-cv-01206, 2022 WL 3214693, at *3 (D. Nev. Aug. 8, 2022) (addressing the

defendant's argument that the plaintiff's expert's opinion was "not supported by sufficient documentation," and explaining that the defendant's "recourse [was] to cross-examine [the plaintiff's expert] and present contrary evidence at trial," not exclusion of his opinions under *Daubert*).

For these reasons, the Court declines to exclude Dr. Freedman's above-described statements.

Defendants next seek to exclude Dr. Freedman's citation and related reference to an MSDS note on the acute effects of "CN gas," arguing that the record fails to reflect that law enforcement used such gas. (Defs.' Mot. Strike at 12, quoting Freedman Decl. Ex. 2 at 5.) The chemical irritant known as "alpha-chloroacetophenone," "CN gas," or "mace" is a "form of tear gas" that is "typically available only to law enforcement or the military" and "more potent" than the pepper spray bearing the same trade name of "Mace." *United States v. Maiden*, 606 F.3d 337, 338 n.1 (7th Cir. 2010) (simplified); *see also Boyle v. Turnage*, 798 F.2d 549, 551 n.2 (1st Cir. 1986) ("Mace, or alpha-chloroacetophenone (CN), is a chemical irritant which will immediately incapacitate if sprayed in someone's face. It produces tearing of the eyes, reflex closure of the eyelids, and a burning sensation on the skin and in the upper respiratory tract."). Plaintiffs do not oppose exclusion of the CN gas citation, and do not argue that the record includes any evidence demonstrating that law enforcement used CN gas in this case. (*See* Defs.' Mot. Strike at 12, quoting Freedman Decl. Ex. 2 at 5; Pls.' Second Resp. at 14-15; Defs.' Second Reply at 4.) Accordingly, the Court recommends that the district judge grant Defendants' motion to strike on this ground.

Defendants' sixth and final challenge concerns Dr. Freedman's report's citation to a peer-reviewed, cross-sectional survey and an online news article. (*See* Pls.' Second Resp. at 15-16,

describing the sources; Defs.' Mot. Strike at 12-14, seeking exclusion of these "non-scientific sources") (bold and italics omitted). Plaintiffs argue that striking Dr. Freedman's report's citation to these materials that he reviewed before issuing his opinion would be inappropriate because Rule 26(a)(2)(b) compelled his disclosure of such sources. (Pls.' Second Resp. at 15.) Plaintiffs also suggest that Dr. Freedman testified that "at least as to the newspaper article, it is not a source he relied on." (Pls.' Second Resp. at 15, citing, *inter alia*, Freedman Dep. 34:5-8, 35:11-14.)

Given Plaintiffs' response, Defendants elected to "withdraw[]" their sixth and final challenge regarding Defendants' "sources[.]" (Defs.' Second Reply at 4) (bold omitted). Thus, the Court recommends that the district judge deny as moot Defendants' motion to strike on this ground.

### b.    Rose's Report

Defendants initially moved to strike portions of the report from Plaintiffs' industrial hygienist expert, Rose. (*See* Defs.' Mot. Strike at 16-17; Pls.' Second Resp. at 19-20; Dahab MSJ Decl. Ex. 3 at 1-6 & Ex. 4 at 1-15, attaching Rose's curriculum vitae and fifteen-page report dated January 29, 2025). Considering Plaintiffs' acknowledgment that they did not intend to offer Rose's "opinion on the appropriate medical response to tear gas in the jail setting" and lack of opposition to exclusion of such an opinion, Defendants have elected to "withdraw this objection." (Defs.' Second Reply at 5, quoting Pls.' Second Resp. at 19.) Accordingly, the Court recommends that the district judge deny as moot Defendants' motion to strike with respect to Rose.

### c.    Stanley's Report

The remaining question is whether the Court should exclude portions of Stanley's report on admissibility grounds. (*See* Defs.' Mot. Strike at 16-18 & Ex. 2 at 1-12, moving to exclude

portions of Stanley's report and attaching a copy striking through the parts to which Defendants object).

Stanley has over five decades' experience in the field of corrections. (*See* Decl. Phil Stanley Supp. Pls.' Resp. Defs.' Mot. Summ. J. ("Stanley Decl.") ¶¶ 2-3, 7, Ex. A at 1-2 & Ex. B at 1-3, attaching a copy of Stanley's resume and Jarmer's June 25, 2020 email and draft evacuation plan as Exhibits A and B to Stanley's twelve-page report). Stanley spent the first thirty years of his career with the Washington Department of Corrections ("WDOC"). (*Id.* ¶¶ 2-3.) During that time, Stanley performed roles "at all levels" within the WDOC, served as the superintendent or "[w]arden" of three prisons and primarily at a prison for mentally ill AICs known as the "Special Offender Center," and worked for three years as a regional administrator overseeing three prisons, which together accounted for about thirty-three percent of the state's AIC population. (*Id.*)

More recently, Stanley worked for approximately eight years as the governor-appointed commissioner of the New Hampshire Department of Corrections ("NHDOC"). (*Id.* ¶ 3.) In that capacity, Stanley served two governors and oversaw all of the NHDOC's prisons and parole programs. (*Id.*) Stanley then returned to Washington and spent five years as the director of Chelan County Regional Justice Center, a 380-bed jail in Chelan and Douglas Counties. (*Id.*) Over the last nine years, Stanley has served as the court-appointed federal monitor of settlement agreements in two conditions of confinement cases from the U.S. District Court for the Eastern District of Washington and consulted as a jail expert, on behalf of both plaintiffs and defendants, in thirteen states across the country (i.e., Arkansas, California, Illinois, Iowa, New Mexico, New York, Michigan, Mississippi, Oregon, Texas, Virginia, Washington, and Wisconsin). (*Id.* ¶ 5.)

///

PAGE 95 – FINDINGS AND RECOMMENDATION

Stanley's correctional experience includes time developing prison and jail policies on emergencies, including emergency evacuation of facilities, authorizing correctional staff to follow facility evacuation policies, and planning for and "[o]n numerous occasions . . . drill[ing] actual evacuations of [AICs] from prison buildings or jail buildings." (*Id.* ¶ 4.) During his time serving as a WDOC superintendent, NHDOC director, and director in Chelan County, Stanley also revised existing emergency policies and required "dissemination of tear gas or [OC] to manage disruptive inmates" and "participated in [OC] drills . . . , including personal exposure." (*Id.*)

In formulating his opinions, Stanley reviewed nearly all of the summary judgment record, including the Named Plaintiffs' and other AICs' declarations, deposition transcripts, and grievances, the Individual Defendants and other MCSO commanders, deputies, and mid-level staff's deposition transcripts, the HVAC department employees' deposition transcripts, an intergovernmental agreement between the USMS and MCSO, and numerous exhibits, including the MCSO's emails and reports about the Portland protests and tear gas infiltrating MCDC's housing floors and documents detailing the layout at the Justice Center and operation of the Justice Center's HVAC system. (*Id.* at 4-6.) Based on his review, Stanley reached five primary conclusions:

- MCSO "failed to protect" AICs at MCDC from "exposure to tear gas and other chemical agents from May 30, 2020, through July 30, 2020";

- "MCSO failed to evacuate AICs from MCDC, thus failing to protect them from exposure to tear gas and other chemical agents";

- "Evacuation of AICs from MCDC to Inverness Jail was feasible";

- "MCSO failed to strategically plan for emergencies"; and

- Reese, Alexander, and Wheeler are each "individually responsible for the failure to evacuate MCDC."

(*Id.* at 6-12) (bold omitted).

Defendants seek exclusion of two portions of Stanley's report. The Court addresses each in turn.

First, Defendants seek to exclude Stanley's reliance on the "Emergency Preparedness Self-Audit Checklist for Larger Jails" (the "self-audit checklist"), a "set of recommendations" included in the National Institute of Correction's ("NIC," an agency within the Federal Bureau of Prisons) "Guide to Preparing for and Responding to Jail Emergencies." (*See* Defs.' Mot. Strike at 14-15 & Ex. 2 at 9-11, attaching a copy and striking through the portion of Stanley's report at issue). In support of his fourth primary conclusion that MCSO failed strategically to plan for emergencies, Stanley opined that the MCDC Evacuation Plan does not meet any of the self-audit checklist's criteria and would therefore "fail an NIC audit," and that the MCSO's failure to "meet basic standards for emergency preparedness carried substantial risks that, in the event of an emergency, MCSO . . . would fail to carry out its obligation to protect AICs in its care." (Stanley Decl. at 10.)

In seeking exclusion of Stanley's testimony concerning Defendants' satisfaction of the self-audit checklist, Defendants invoke the "wide-ranging deference" that "should be accorded [to officials] in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security[.]'" *Shorter v. Baca*, 895 F.3d 1176, 1183 (9th Cir. 2018) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Such "deference must be set aside where 'the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.'"

*Id.* (quoting *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 323 (2012)).

Defendants also cite the district court's application of these principles in *Cunningham v. Multnomah County*, No. 3:12-cv-01718-MO, 2016 WL 8731436 (D. Or. Mar. 18, 2016), *aff'd*, 737 F. App'x 814, 816-17 (9th Cir. 2018), a class action concerning the county defendants' "blanket strip search policy pertaining to inmates who are coming off kitchen duty" and whether the defendants' policy violated AICs' Fourth and Eighth Amendment rights. *Id.* at *2, *4-5. In granting the defendants' motion for summary judgment, the district court relied on *Bell* and *Florence* and held that the named plaintiff "failed to meet his burden of producing 'substantial evidence' the prison's policy is unjustified." *Id.* at *4. In so holding, the district court observed that the "substantial deference to prison officials," coupled with the "vanishingly small threshold for empirical evidence of actual contraband" necessary to justify a prison's policy, "raise[d] the question of when, if ever, a plaintiff challenging a prison policy can overcome a motion for summary judgment after the prison has declared there is a risk of contraband." *Id.* at *5. At oral argument, the defendants stated that "a plaintiff would need to offer, for example, an affidavit from an expert in prison administration outlining how and why the prison's strip search policy [was] not necessary to deal with the purported threat of contraband." *Id.*

Responding to this statement, the district court observed that "even the opinion of an expert may not be enough." *Id.* To that end, the district court quoted a passage from the *Florence* dissent on various professional bodies' requests that the Supreme Court forbid suspicionless strip searches:

> The American Correctional Association (ACA)—an association that informs our view of ["]what is obtainable and what is acceptable in corrections philosophy,["] *Brown v. Plata*, 563 U.S. 493, 540 (2011)]—has promulgated a standard that forbids suspicionless strip searches. And [the ACA] has done so after consultation

> with the American Jail Association, National Sheriff's Association, National Institute of Corrections of the Department of Justice, and Federal Bureau of Prisons . . . . [and] [a] standard desk reference for general information about sound correctional practices advises against suspicionless strip searches.

*Id.* (quoting *Florence*, 566 U.S. at 350 (Breyer, J., dissenting, jointed by Ginsburg, Sotomayor, and Kagan, JJ.)).

Immediately thereafter, the district court noted that "following the recommendations of these groups [like the NIC] could theoretically satisfy the necessary 'deference to prison officials,' [but] the *Florence* majority was unpersuaded and found the opinion of nationwide experts to be insufficient evidence to overcome local prison officials' justification." *Id.* The district court, however, explained that because the plaintiff in *Cunningham* did not rely on any expert, let alone a prison administration expert like the defendants described at oral argument, the district court necessarily deferred to prison officials: "In any event, [p]laintiff . . . offered no such evidence, expert or otherwise, so [the court] must defer to the justification provided by the prison officials." *Id.*

In addition to *Florence* and *Cunningham*, Defendants argue that in Oregon, "the jail standards with regard to emergencies are expressly set forth under ORS 169.076(3)[.]" (Defs.' Mot. Strike at 15.) That provision states: "Each local correctional facility shall . . . [f]ormulate and publish plans to meet emergencies involving escape, riots, assaults, fires, rebellions and other types of emergencies, and regulations for the operation of the facility. OR. REV. STAT. § 169.076(3).

Defendants emphasize that ORS § 169.076(3) served as the basis for the Oregon State Sheriff's Association's ("OSSA") most recent inspections of MCDC and determinations that Defendants had complied with Oregon law. (*Id.*, citing Pedro Reply Decl. ¶ 4, Ex. 1 at 1-35 & Ex. 2 at 1-38.) Defendants also argue that the NIC's self-audit checklist is "more restrictive" than

Oregon's standard and simply "not a standard of care that applies to Oregon jails and prisons." (*Id.*)

Plaintiffs disagree. (Pls.' Second Resp. at 17.) Plaintiffs argue that NIC's self-audit checklist is informative and provides part of the foundation for Stanley's opinion on the pertinent question in this case—namely, "whether the County's actions and inactions gave rise to a substantial risk of serious harm to Plaintiffs and members of the class and whether the County took or failed to take reasonable available measures to abate that risk." (*Id.*) Plaintiffs add that *Florence* does not compel a different result and at least one other district court decision addressed concerns similar to Defendants with a limiting instruction. (*Id.*, citing *Andrews v. County of Sangamon*, No. 18-cv-01100, 2022 WL 22893296, at *4-5 (C.D. Ill. Jan. 5, 2022)).

In *Andrews*, the defendants moved to exclude a medical expert's testimony, arguing that the expert "improperly relie[d] on standards" that the National Commission on Correctional Health Care ("NCCHC") "espoused," which were neither "mandatory" nor the "constitutional standard of care." 2022 WL 22893296, at *4. The district court recognized that the defendants were "correct" that the NCCHC's standards were not mandatory or the applicable standard but explained that the NCCHC's "standards could still be relevant to the objective reasonableness of [the] [d]efendants' actions and to rebut [the] [d]efendants' evidence that jails simply [did] not or cannot offer the kind of mental health care [the] [p]laintiff maintain[ed] jails must offer." *Id.* Denying the defendants' motion to exclude, the district court explained that the defendants' experts were "free to make their point at trial that NCCHC's standards [were] aspirational and not widely adopted or disseminated," and the defendants "could propose a limiting instruction [like the Seventh Circuit's] explaining that the NCCHC standards [did] not set the standard of care." *Id.*

The Court finds that Defendants' arguments are unpersuasive. Neither *Cunningham* nor *Florence* foreclose Stanley's reliance on the NIC's self-audit checklist. The question here is much different than the ones in *Florence* and *Cunningham*. Plaintiffs are not claiming that a policy was an unnecessary or unjustified response to a problem at MCDC. *Cf. Florence*, 566 U.S. at 322 ("This case presents the question of what rules, or limitations, the Constitution imposes on searches of arrested persons who are to be held in jail while their cases are being processed."); *Cunningham*, 2016 WL 8731436, at *3 & n.1, *4-5 (deferring to the justification that the prison officials provided and explaining that the prison officials "justif[ied] the [strip] search [policy] by claiming it [was] required to keep[] out weapons and contraband [that AICs were] exposed to as part of their work detail and thus the [strip] searches [were] necessary to maintain security in the prison").

Relying on a partial quote from *Cunningham*, Defendants argue that "nationwide guidelines are 'insufficient evidence to overcome local prison officials' justifications.'" (Defs.' Second Reply at 5, quoting *Cunningham*, 2016 WL 8731436, at *5.) This passage from *Cunningham*, however, makes clear that the holding in *Florence* neither forecloses nor precludes an expert's reliance on nationwide *recommendations* like the self-audit checklist: "While following the recommendations of these groups could theoretically satisfy the necessary 'deference to prison officials,' the *Florence* majority was unpersuaded and found the opinion of nationwide experts to be insufficient evidence to overcome local prison officials' justification." *Cunningham*, 2016 WL 8731436, at *5. It evident that the *Florence* majority was focused on prisons officials' justification in that specific case and the evidence offered in an attempt to overcome it. It also evident that *Cunningham* involved "no such [nationwide] evidence, expert or otherwise[.]" *Id.*

PAGE 101 – FINDINGS AND RECOMMENDATION

Defendants summarily dismiss Plaintiffs' reliance on *Andrews* as an "out of circuit case discussing relevance" but fail to address or explain why the NIC's self-audit checklist's recommendations are not relevant to the opinions Stanley wishes to offer here. (Defs.' Second Reply at 5.) Defendants acknowledge that Stanley may "opine on whether the decisions in this case were reasonable[.]" (*Id.*) If Stanley can do so, it is appropriate (if not preferable) that Stanley bases such opinions in part on his experience with or knowledge regarding a national self-audit checklist that is "designed to help prison officials determine whether their facility is prepared to handle diverse emergencies" and "expose flaws in emergency preparedness." Ira P. Robbins, *Lessons from Hurricane Katrina: Prison Emergency Preparedness as a Constitutional Imperative*, 42 U. MICH. J. L. REFORM 1, 31 (2008); *see also* Smith v. Ozmint, No. 9:04-cv-01819, 2010 WL 1071388, at *2 (D.S.C. Jan. 25, 2010) (noting like the article above that the NIC "provides training and technical assistance to Federal, State, and local correction agencies"); (Pls.' Second Reply at 18 n.6, citing the County's reliance on the NIC recommendation in a different context).

For these reasons, the Court declines to recommend exclusion of the portion of Stanley's opinion referencing the NIC's self-audit checklist and instead recommends that the district judge deny Defendants' motion to strike without prejudice and with leave to file a pre-trial motion addressing a limiting instruction or limits on the manner in which Stanley may address the NIC's "criteria." *See* Nelson v. Costco Wholesale Corp., No. 20-cv-00250-PHX-MTL, 2022 WL 1638838, at *3 (D. Ariz. May 24, 2022) (denying motion to exclude expert testimony without prejudice).

Second, Defendants seek exclusion of the portion of Stanley's report in which he opines that although "COVID complicated [AIC classification and staffing] issues in June 2020," these

issues "were solvable problems in the face of the emergency presented at MCDC." (Defs.' Mot.
Strike at 14-15 & Ex. 2 at 8.) Stanley offers this opinion in support of his third primary
conclusion that it was feasible for MCSO to evacuate MCDC's AICs to MCIJ. (Stanley Decl. Ex.
2 at 8.)

Defendants challenge the opinion on three grounds: (1) Stanley has "never operated a jail
or consulted about jail operations regarding how to manage COVID," (2) Stanley did not review
"materials relating to COVID," such as "guidance" that the CDC "promulgated," and (3) Stanley
"admitted" at his deposition that he does not "know whether an evacuation would increase the
risks of COVID." (Defs.' Mot. Strike at 15-16, citing Dep. Philip Stanley ("Stanley Dep.") 73:6-
15, 101:20-102:10, Sept. 26, 2024, ECF No. 138-3; *see also* Stanley Dep. 104:11-19, noting that
Stanley addressed his challenged opinion on the feasibility of evacuation by stating, "Again, not
being a COVID expert, I . . . don't know whether there would have been a higher [AIC]
incidence of COVID in [the MCIJ] facilit[y] that they're moved to or not, . . . maybe it was
going to be a safer environment"; Hr'g Tr. 11:22-12:17, 15:15-18:10, presenting Defendants'
arguments and quote of the excerpt on being a "COVID expert").

The context in which Stanley discussed his opinion on the feasibility of evacuation
reflects that he acknowledged the COVID-19 pandemic complicated the evacuation calculus, but
he focused more on logistical considerations like moving AICs with a variety of classifications
and correctional staffing at MCIJ:

> Yes, full evacuation of a jail facility is difficult and raises issues with
> [AIC] classification and staffing. Yes, COVID complicated these issues in June
> 2020. However, these were solvable problems in the face of the emergency
> presented at MCDC. Inverness, while primarily being a dormitory-style jail, has
> individual cells capable of housing 151 AICs. It also has additional dorms that
> were not currently open and staffed, but most MCDC staff would be available to
> work at Inverness, including medical staff. Inverness was big enough to
> accommodate all AICs from MCDC, it was simply incumbent on MCSO to work

out the logistics. Their failure to do so, in the face of the ongoing risk to AICs at
MCDC, was inexcusable.

(Stanley Decl. at 8; *see also* Defs.' Mot. Strike Ex. 2 at 8, seeking exclusion of sentences two
and three).

Like Stanley, MCSO's Classification Unit Captain, Jarmer, focused on "operational and
logistical considerations" in preparing the June 25, 2020 draft evacuation plan and attempting to
optimize the MCSO's usage of the 151 single-cell housing units at MCIJ. (*See* Jarmer Dep.
39:19-44:16, confirming that the bullet points in his June 25 email were "operational and
logistical considerations" that he needed to "think through and address in coming up with the
plan to move everyone from [MCDC to MCIJ] . . . a nontraditional way," and Jarmer's "process"
revolved largely around managing multiple AIC classifications and related impacts on staff). At
the same time, however, it is inescapable that Jarmer, who invoked no experience in public
health practice or epidemiology or reliance on any guidance from those who did, similarly
evaluated COVID-related issues. (*See* Piucci Decl. Ex. 45, identifying points to consider and
noting that "[p]otentially some/all COVID [AICs] could go into an open dorm"; *see also* Jarmer
Dep. 24:18-27:18, 31:21-32:8, reflecting that Jarmer addressed AIC classifications and took
"COVID concerns out of the question" and later returned to his inability to recall how he arrived
at "39 cells short in overall numbers" and suggestion that "all COVID [AICs] could go into an
open dorm" at MCIJ).

Further, Stanley reviewed record evidence, including deposition testimony from Reese
and Wheeler and Alexander's declaration, detailing the manner in which the MCSO was electing
to handle COVID at MCDC and the MCSO's reasons for finding MCIJ unsuitable for COVID
purposes. Stanley does not need to be an expert in COVID to draw on his correctional expertise
to evaluate MCSO's decision not to evacuate MCDC. Thus, the Court finds that Defendants'

challenges to Stanley's opinion on the feasibility of evacuation are matters ripe for cross-examination, not exclusion, and recommends that the district judge deny Defendants' motion to strike on this ground. *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." (citing *Daubert*, 509 U.S. at 596)); *Palmer v. Cognizant Tech. Sols. Corp.*, No. 17-cv-6848, 2023 WL 4155403, at *12 (C.D. Cal. June 1, 2023) ("[The medical expert] relied on a substantial number of relevant [defense] documents. To the extent [the expert] could have consulted different documents to reach a different conclusion, that is a proper basis for cross-examination, not exclusion.").

### D.    Conclusion

For all of these reasons, the Court recommends that the district judge grant in part and deny in part Defendants' motion to strike portions of Plaintiffs' summary judgment response and expert reports.

## II.    PLAINTIFFS' MOTION TO STRIKE

Plaintiffs raised evidentiary objections in their response and in accordance with LR 56-1(a) and (b), and requested orders striking three sources that Defendants cited in their motion for summary judgment. (*See* Pls.' MSJ Resp. at 69-70, reporting that conferral did not lead to resolution of the parties' disputes); *see also* LR 56-1(b) ("If an evidentiary objection is raised in the non-moving party's response memorandum, the moving party may address the objection in its reply memorandum; the non-moving party may not file further briefing on its evidentiary objection.").

The challenged sources consist of Wikipedia pages and what Defendants describe as a report that Independent Monitor, LLC recently issued on officials' handling of the Portland protests. (Pls.' MSJ Resp. at 69-70; *see also* Defs.' MSJ at 6-7, 90, citing and quoting these

sources). Although Defendants do not appear to oppose or address Plaintiffs' objections in their reply, the Court did not rely on or cite the challenged sources. For these reasons, the Court denies as moot Plaintiffs' evidentiary objections. *See Cruz-Silva*, 2020 WL 1677976, at *7 (overruling as moot on the same ground); *Munger*, 544 F. Supp. 3d at 1091 n.9 (same); *see also McCormick v. Aerovias De Mexico S.A. de C.V.*, No. 3:18-cv-01628-SB, 2019 WL 1552498, at *1 n.2 (D. Or. Feb. 27, 2019) (declining to consider a "Wikipedia page printout" and noting that Wikipedia pages are "inherently unreliable given the fact that any person may anonymously edit any page at any time" (quoting *Hudson v. Babilonia*, 192 F. Supp. 3d 274, 295 (D. Conn. 2016))).

## III.    MOTION FOR SUMMARY JUDGMENT

Having resolved the parties' evidentiary disputes, the Court turns to Defendants' Rule 56 motion. Defendants argue that they are entitled to summary judgment on Plaintiffs' failure-to-protect claims under the Eighth and Fourteenth Amendments, municipal liability claims under *Monell*, and negligence claims under Oregon law. (Defs.' MSJ at 1, 37-43; Defs.' MSJ Reply at 44.)

### A.    Constitutional Claims

#### 1.    Applicable Law

"To recover damages under 42 U.S.C. § 1983, a plaintiff must prove that the defendant deprived him of a 'constitutional right while acting under color of state law.'" *Herrera v. L.A Unified Sch. Dist.*, 18 F.4th 1156, 1160-61 (9th Cir. 2021) (quoting *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006)); *see also Vera v. Pfiffer*, No. 22-56150, 2024 WL 4970030, at *1 (9th Cir. 2024) (explaining that for a plaintiff "[t]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal [constitutional] right" (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985))). Section 1983's "'under color of law' requirement . . . is the same as the

Fourteenth Amendment's 'state action' requirement." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011) (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 928 (1983)).

Plaintiffs assert Eighth and Fourteenth Amendment failure-to-protect claims against Defendants based on their exposure to tear gas. (*See* FAC at 26-29, styling Plaintiffs' first claim for relief as Eighth and Fourteenth Amendment failure-to-protect claims based on Plaintiffs' tear gas exposure). Defendants do not dispute that the Individual Defendants acted under color of state law at all relevant times and the County was required to provide for the "health and safety" of MCDC's AICs. (*Compare* FAC ¶¶ 10-12, *and* Defs.' Answer & Affirmative Defs. ¶¶ 8-9; *see also* Wheeler Dep. 21:21-23:13, Alexander Decl. ¶ 6, Pedro MSJ Decl. Ex. 1 at 1, & Parks Dep. 29:13-30:19, reflecting that each of the Individual Defendants and Parks confirmed or stated as much). Instead, Defendants dispute whether they violated Plaintiffs' constitutional rights. (*See* Defs.' MSJ at 42, 74, relying on Defendants' argument that "there is no underlying constitutional violation").

### a.    Eighth Amendment

The "Eighth Amendment's Cruel and Unusual Punishments Clause, made applicable to the States by the Due Process Clause of the Fourteenth Amendment," *Graham v. Florida*, 560 U.S. 48, 53 (2010) (citing *Robinson v. California*, 370 U.S. 660, 666 (1962)), "imposes duties on prison officials to provide 'humane conditions of confinement.'" *Hampton v. California*, 83 F.4th 754, 765 & n.6 (9th Cir. 2023) (first citing *McDonald v. City of Chicago*, 561 U.S. 742, 764 n.12 (2010); and then quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)), *cert. denied*, *Diaz v. Polanco*, 144 S. Ct. 2520 (2024). "This duty stems from the relationship between the State and those in its custody." *Id.* at 765. The rationale underlying this duty is "simple":

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well[-]being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment.

*Helling v. McKinney*, 509 U.S. 25, 32 (1993).

"Under the Eighth Amendment, then, prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Hampton*, 83 F.4th at 766 (quoting *Farmer*, 511 U.S. at 832). The Eighth "Amendment's protections [also] extend to 'conditions of confinement that are sure or very likely to cause serious illness and needless suffering' in the future." *Id.* (simplified) (quoting *Helling*, 509 U.S. at 33). The Supreme Court, for example, has "held that involuntarily exposing an inmate to secondhand tobacco smoke by requiring him to bunk with a cellmate who smokes continuously can form the basis of an Eighth Amendment claim." *Id.* (citing *Helling*, 509 U.S. at 33, 35).

However, "an individual imprisoned upon conviction cannot succeed by showing only that a condition of confinement put him at substantial risk of suffering serious harm[.]" *Smith v. Washington*, 781 F. App'x 595, 598 (9th Cir. 2019), *reh'g denied* (Aug. 1, 2019) (first citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); and then citing *Helling*, 509 U.S. at 32-33). Rather, "under the Eighth Amendment's Cruel and Unusual Punishment Clause, applicable to such individuals, the condition of confinement must cause 'suffering . . . inconsistent with contemporary standards of decency.'" *Id.* (first quoting *Estelle*, 429 U.S. at 103; and then citing *Helling*, 509 U.S. at 32-33).

///

PAGE 108 – FINDINGS AND RECOMMENDATION

### b.    Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause was "intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)). "The Fourteenth Amendment's mandate that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law' confers both procedural and substantive rights." *Polanco v. Diaz*, 76 F.4th 918, 928 n.7 (9th Cir. 2023) (quoting *DeShaney*, 489 U.S. at 194-95), *cert denied*, 144 S. Ct. 2519 (2024). The Clause's "substantive component . . . protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Id.* (quoting *Collins*, 503 U.S. at 125).

"Due [p]rocess . . . requires that conditions of confinement satisfy certain minimal standards for pretrial detainees[.]" *Collins*, 503 U.S. at 127 (citing *Bell*, 441 U.S. at 535 n.16). "Due process [also] requires that a pretrial detainee not be punished[, unlike] [a] sentenced inmate, [who] . . . may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment." *Vazquez v. County of Kern*, 949 F.3d 1153, 1163 (9th Cir. 2020) (quoting *Bell*, 441 U.S. at 537 n.16); *see also Kinglsey v. Hendrickson*, 576 U.S. 389, 400-01 (2015) ("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 & n.40 (1977))).

"A pre-trial detainee bringing a Fourteenth Amendment conditions of confinement claim must show that the conditions under which that detainee was confined 'put the plaintiff at substantial risk of suffering serious harm.'" *Smith*, 781 F. App'x at 597-98 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). In the pretrial detainee

context, the Eighth Amendment's "'contemporary standards of decency standard' does not apply to the plaintiffs' claim." *Id.* at 598. That is so because "[t]he applicable Fourteenth Amendment standard is more generous: A condition of confinement may not violate our contemporary standards of decency, yet still create a substantial risk of causing a plaintiff to suffer serious harm." *Id.* (citing *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1983)); *see also Norbert v. City & Cnty. of S.F.*, 10 F.4th 918, 928 (9th Cir 2021) (recognizing that "[p]recedent teaches that 'the Fourteenth Amendment is more protective than the Eighth Amendment 'because the Fourteenth Amendment prohibits *all* punishment of *pretrial detainees*'" (quoting *Vazquez*, 949 F.3d at 1163)).

### c.    Status of Detainees

Under the Ninth Circuit's "case law, 'the status of detainees determines the appropriate standard for evaluating [the detainees'] conditions of confinement." *Norbert*, 10 F.4th at 927-28 (simplified) (quoting *Vazquez*, 949 F.3d at 1163). As discussed above, detainees "who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause." *Castro*, 833 F.3d at 1067-71 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

The Named Plaintiffs were either pretrial or post-conviction detainees at MCDC. More specifically, the parties agree that at all relevant times, Davis, Duhart, and Lundy were pretrial detainees, and Berglund was a post-conviction detainee serving a custodial sentence. (*See* Defs.' MSJ at 45, stating that "three of the four [p]laintiffs," Davis, Duhart, and Lundy, "were pretrial at the time of the conduct at issue"; Pls.' MSJ Resp. at 34, agreeing that Davis, Duhart, and Lundy were "pretrial detainees" and "Berglund was an inmate serving a custodial sentence after a conviction").

///

Given that Berglund was a post-conviction detainee serving a custodial sentence, the Court must evaluate Berglund's failure-to-protect claim under the Eighth Amendment. *See Norbet*, 10 F.4th at 927 ("For plaintiff Armando Carlos, who is convicted and awaiting sentencing, the Eighth Amendment supplies the relevant standard." (simplified) (citing *Vazquez*, 949 F.3d at 1163-64)); *see also D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 768-69 (9th Cir. 2025) ("For persons convicted of a criminal offense and imprisoned, the right is sourced to the Eighth Amendment." (first citing *Estelle*, 429 U.S. at 102; and then citing *Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021))). By contrast, the Court must evaluate Davis, Duhart, and Lundy's failure-to-protect claims under the Fourteenth Amendment, not the Eighth Amendment, because unlike Berglund, they were pretrial detainees who had not been convicted of a criminal offense. *See Norbet*, 10 F.4th at 928 (explaining that "[t]he claims of the remaining plaintiffs, who [we]re pretrial detainees, 'are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment'" (quoting *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998))); *see also D'Braunstein*, 131 F.4th at 768 ("In the case of pretrial detainees who have not been convicted of a criminal offense, the right is sourced to the Fourteenth Amendment." (first citing *Bell*, 441 U.S. at 535 n.16; and then citing *Sandoval*, 985 F.3d at 669).

### 2. Analysis

Defendants move for summary judgment on the Named Plaintiffs' failure-to-protect claims under the Eighth and Fourteenth Amendment, which the parties agree are evaluated under different standards and thus separately addressed. (*See* Defs.' MSJ at 45-62, Pls.' MSJ Resp. at 35-44, Defs.' & MSJ Reply at 4-25, analyzing Berglund's Eighth Amendment claim separately but analyzing Davis, Duhart, and Lundy's Fourteenth Amendment claims together). The Court agrees that it should evaluate Berglund's Eighth Amendment claim under a different standard

than Davis, Duhart, and Lundy's Fourteenth Amendment claims. *See Vazquez*, 949 F.3d at 1163

(addressing a pretrial detainee's right to be free from punishment and holding that the district

court "erred in its conclusion that it should evaluate the Fourteenth Amendment claim under 'the

same standards' as an Eighth Amendment claim").

Before proceeding to the merits, the Court notes that like most cases, "[t]he witnesses on

both sides come to this case with their own perceptions, recollections, and even potential biases."

*Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (per curiam). For this reason and others, "genuine

disputes [of material fact] are generally resolved by juries in our adversarial system." *Id.* A

related "fundamental principle" at summary judgment is that courts may not "weigh[] the

evidence and reach[] factual inferences contrary to [the nonmoving party's] competent

evidence," because courts must draw "reasonable inferences . . . in favor of the nonmoving

party." *Id.* Adhering to that principle means that where, as here, "nothing in the record blatantly

contradicts" Plaintiffs' "account of the events in question," the Court is "not permitted" to credit

Defendants' "version of the facts" and "assume that a jury would resolve factual disputes in

[their] favor."[37] *Orn v. City of Tacoma*, 949 F.3d 1167, 1172 (9th Cir. 2020) (declining the

---

[37] An illustrative example is Harrington's testimony. At least on the record before the
Court, Harrington appears to be the only officer who testified about entering a cell for the
purpose of evaluating whether AICs' cell conditions differed from the officers' areas. (Dep.
Bradley Riccardo Harrington ("Harrington Dep.") 44:15-45:2, June 8, 2022, ECF No. 138-7.)
Harrington acknowledged that the cell was "uncomfortable" but also believed and maintained
that he informed AICs that it was actually "worse out" in the housing floor's internal dayrooms.
(*Id.* 45:2-4.) Harrington also recalled that he eventually authorized the opening of food ports
because AICs were "advocating for [him to do so] . . . so they [could] get fresh air," and that
"after about [forty-five] minutes," "most, if not all, the [AICs] requested to have their food ports
closed because they felt like . . . the dayroom air was actually worse, which is what [he] had
thought, than the air going into their cells." (*Id.* 45:4-23; *but cf.* Gaylor Decl. ¶¶ 9-12, appearing
to discuss the food port opening involving Harrington and stating only that "opening [the] food
ports" did not "help that much because there was just too much gas" inside the cells).

defendant's invitation to "credit *his* version of the facts" at "several key junctures") (simplified). Thus, the narrative below (and above) resolves all conflicts in Plaintiffs' favor.

### a.    Fourteenth Amendment Claims

The Court finds that Defendants are not entitled to summary judgment on Davis, Duhart, and Lundy's failure-to-protect claims under the Fourteenth Amendment. The Court therefore recommends that the district judge deny Defendants' motion for summary judgment on this ground.

There are four "elements [to] a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer:"

(1)    The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(2)    Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3)    The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4)    By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071.

With respect to the third element or "deliberate indifference inquiry," *Herrera*, 18 F.4th at 1159, "the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Castro*, 833 F.3d at 1071 (quoting *Kingsley*, 576 U.S. at 397). Given that "'mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment[,]' . . . the plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Gordon v. County of Orange*, 888 F.3d 1118, 1120, 1123-25 (9th Cir. 2018)

(quoting *Castro*, 833 F.3d at 1071); *see also Castro*, 833 F.3d at 1072 (noting that "'reckless disregard' may be shown by an objective standard under which an individual 'is held to the realization of the aggravated risk which a reasonable [person] in his place would have, although he does not himself have it'" (quoting RESTATEMENT (SECOND) OF TORTS § 500 cmt. a (AM. L. INST. 2016))).

Defendants argue that the record evidence is insufficient to create a genuine issue of material fact as to the first three elements of Plaintiffs' Fourteenth Amendment failure-to-protect claims. (Defs.' MSJ at 46-58.) The Court addresses all four elements but notes that in substance, Defendants focus on deliberate indifference. (*See id.* at 46-58, Defendants stated that they "evaluate each [element] separately" but the "analysis often overlaps," proceeded to "reckless disregard" under the first element, referenced their "reasonable efforts" to abate any risk and suggested there was no high degree of risk under the second element, and do not included a fourth subsection addressing the fourth element of Plaintiffs' Fourteenth Amendment claim); *see also Fraihat v. ICE*, 16 F.4th 613, 636 (9th Cir. 2021) (making an analogous observation).

Viewing the evidence in the light most favorable to Plaintiffs, as it must at this stage, the Court finds that genuine issues of material fact exist for each element of Plaintiffs' Fourteenth Amendment claims. *See Traverse Therapy Servs., PLLC v. Sadler-Bridges Wellness Grp., PLLC*, No. 24-3931, 2025 WL 2017467, at *1 (9th Cir. July 18, 2025) (finding as much in a different context).

The parties agree that either an "affirmative act" or a "failure to act" may constitute an "intentional decision with respect to the conditions under which the plaintiff was confined." (Defs.' MSJ at 45-46 & Pls.' MSJ Resp. at 35-36, reflecting that Defendants and Plaintiffs quote *Castro*, 833 F.3d at 1071, and then cite *Castro*, 833 F.3d at 1085); *see also Herrera*, 18 F.4th at

1159 (recognizing that "excessive force claims, unlike failure-to-protect claims [like the one in *Castro*], require an affirmative act"). Plaintiffs raise a genuine issue of material fact with respect to this first element. *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (noting that "[a]n issue of material fact is genuine 'if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party'" (quoting *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006))).

Plaintiffs present evidence suggesting that Defendants made several "intentional decision[s]" with respect to the conditions under which AICs were confined at MCDC between May 29 and July 29, 2020. *See generally Salzman v. County of Los Angeles*, No. 22-56088, 2024 WL 977663, at *1-2 (9th Cir. Mar. 7, 2024) (applying the *Castro* elements in a Fourteenth Amendment case arising from a pretrial detainee's death at the hands of his cellmate, "who also suffered mental health issues," and "consider[ing] the actions and omissions of each defendant in turn"); *Herrera*, 18 F.4th at 1160 (explaining that *Castro* "continued to require a pretrial detainee's failure-to-act claim to establish that the state defendant made an intentional decision regarding conditions of confinement" and that "[t]he objective standard applied only to the deliberate indifference prong," namely, "whether the defendant's decision to bring about (or allow) those conditions was objectively unreasonable in light of the risk to the pretrial detainee").[38]

The parties' disputes revolve largely around the Individual Defendants' decisions about and alleged failure adequately to respond to the conditions under which AICs were confined, which included ongoing and repeated exposure to tear gas. (*See* Defs.' MSJ at 41-42, arguing

---

[38] This case concerns the MCSO's leadership team and command staff's actions and omissions. Thus, the Court (and parties) analyze Plaintiffs' claims against the Individual Defendants together.

that the "decisions made by the named individuals in this case are entitled to qualified immunity," there is no "evidence the named individuals failed to act in response to ongoing violations by subordinates," and various "decision[s]" are subject to statutory defenses). The record reflects that the Individual Defendants (1) discussed the possibility of evacuating MCDC at some point between "late May" 2020 and the "middle of June" 2020 (i.e., mere days or weeks after rioters breached the Justice Center on May 29), and (2) each had the authority to order an evacuation. (*See* Reese Dep. 33:4-34:17, 51:3-23, 52:6-54:10, 57:8-14, 60:1-20; Wheeler Dep. 76:1-21, 92:2-6, 95:19-96:2, 100:5-102:21, 111:7-113:24, 122:13-24; Alexander Decl. ¶ 12, addressing the Individuals Defendants' discussion of the possibility of evacuation; *see also* Jarmer Dep. 46:23-47:8, believing that the MCDC Evacuation Plan provided that only Reese, Alexander, or Wheeler could order an evacuation and that Jarmer could not do so; Piucci Decl. Ex. 74 at 45, reflecting that the MCDC Evacuation Plan provides that "[o]nly" Reese, Alexander, "or" Wheeler "shall direct an evacuation"; *but cf.* Defs.' MSJ at 12, 82, stating that "Reese did not order an evacuation" and later "described his thinking at the time" he made that decision and that "Reese ha[d] the sole authority to evacuate the MCDC during an emergency"; Reese Dep. 36:8-21, 51:24-52:5, expressing Reese's view that he was the individual with authority to order an evacuation).

After the Individual Defendants considered and decided that evacuation was not "safe" in late May to mid-June 2020, the Individual Defendants never revisited or reconsidered their decision:

> Q.    All right. So I take it there was never any reason to consider evacuation or transfer from [MCDC] because of tear gas infiltration?
>
> A.    We considered evacuating the building early on because of the violent nature[] of the protests and the very credible threat that the building would be catastrophically damaged with the [AICs] inside it.

Q.    Okay. And I assume that [that discussion] would have been after the May 29 break-in and fire?

A.    Yes. In the subsequent days and weeks.

Q.    Yeah.

A.    We -- I asked the leadership team was it feasible to evacuate everyone out of the Justice Center to Inverness Jail, and the short answer was no. It wasn't safe.

      . . . .

Q.    That discussion with leadership team was within that time period late May to middle of June approximately?

A.    Yes.

Q.    Okay. Once that was completed, that discussion, that [group] determination was made [on evacuation], that option was not revisited?

A.    No.

(Reese Dep. 33:4-34:17.)

Reese testified that the MCSO's conversations about evacuation in late May or the "first week" or "first two weeks of June" were based on the "threat to the facility," not "continuing infiltration of tear gas," because during this time period, "people [were] trying to break into the facility and take it over and . . . destroy it" and thus the "threat to the Justice Center . . . was super high." (*Id.* 51:3-23, 52:6-53:23.) Reese, however, also explained that he was present for "most of the events that transpired" at the Justice Center, and that he "never felt personally that the threat of infiltration of tear gas was such a high risk that [the MCSO] needed to evacuate the building." (*Id.* 52:12-21.) Reese further explained that at the time, he was "more concerned about damage from fires or the potential that the building would be taken over by a violent mob." (*Id.* 52:21-23.)

In addition to the foregoing, the record demonstrates that on June 25, 2020—one day before the President issued Executive Order 13,933 and federal agencies began surging

personnel to Portland and less than a week before the situation inside MCDC rapidly devolved—the MCSO's Facilities Services Section's Classification Unit Captain (Jarmer) emailed a draft evacuation plan to the MCSO's Corrections Services Division's Chief Deputy (Gaidos) and copied his Classification Sergeant (Billesbach). (*See* Jarmer Dep. 14:1-15:24, 36:15-20, 46:12-17, Piucci Decl. Ex. 45 at 1 & Ex. 70 at 6, identifying Gaidos and Billesbach's roles as Jarmer's supervisor and subordinate, and noting that Billesbach's duties consisted of "run[ning] the classification unit," scheduling staffing, and reporting the MCSO's facilities' "daily population numbers").

Under the subject line "Temp[orary] housing at MCIJ per MCDC [e]vac[uation]" and with an attachment titled "Potential Emergency Evacuation of MCDC to MCIJ Temporary Housing Plan," Jarmer's email advised on a potential plan to evacuate all of the AICs housed at MCDC:

> Attached you will find a rough draft of how we could move [AICs] to MCIJ if we had to evacuate everyone at MCDC. This plan takes [into] account that COVID-19 has become one of many secondary concerns. Also[,] it needs to be noted this is a snapshot at a current population on June 25, 2020.
>
> Points to consider:
>
> - We come up [thirty-nine] cells short in overall numbers. Potentially some/all COVID [AICs] could go into an open dorm[;]
>
> - Suicide watches/keep separates/Acute Mental Health will have to be organized at MCIJ after evacuation. Not enough space at MCIJ to house all permanently[;]
>
> - Medical/ADA concerns become secondary[;]
>
> - I added Dorm 5 for females[,] and bullet [one] is for male COVID [AICs;]
>
> - Transport[']s plan says they can move all the [AICs] in [six] trips with a full fleet, depending on specials. I find this very optimistic. Certainly the movement of the [fourth] floor [AICs] will be slower, but we will also have Disciplinary [AICs] and multiple Mental Health [AICs] with varying

degrees of acuity to move. In general[,] MCDC [AICs] will not be the most easily moved in an emergency[,] perceived or not[;]

- [AICs'] property in their cells will need to be transported also; this takes up room allowing for less [AICs] to actually fit in the [transport] trucks[;] [and]

- Remember all the infrastructure that is built into MCDC[, such as] Courts, Booking, Release, Property, Recog[nizance], etc.[,] will not be readily available.

I'm sure I have missed some things, but this is at least one answer other than "it's a bad idea" answer in regard[] to leaving MCDC. Please add, edit, change as necessary.

(Piucci Decl. Ex. 45 at 1.)

In his two-page attachment, Jarmer described where the MCSO could move MCIJ's AICs to accommodate a transfer of MCDC AICs to that facility and listed a floor-by-floor breakdown of MCDC's AICs' current housing and potential dorm assignments at MCIJ. (*Id.* Ex. 45 at 2-3; *see also* Jarmer Dep. 24:18-27:18, 29:6-47:14, addressing Jarmer's plan, attachment, process, and related discussions and the MCSO's federal holds and daily population reports; Piucci Decl. ¶ 11 & Ex. 75 at 1-5, summarizing and attaching five of the MCSO's SWIS Daily Population Reports). Jarmer reported that after moving MCIJ's AICs, there would be 151 single cell housing units open at MCIJ: sixty, sixty-eight, and twenty-three cells in Dorms 14, 15, and 17, which included eleven and nine "segregation" cells in Dorms 14 and 15. (*See* Piucci Decl. Ex. 45 at 2 & Jarmer Dep. 40:1-44:16, assigning groups of ten and six AICs to Dorms 14 and 15's segregation units).

Jarmer listed sixty of MCDC's AICs as "COVID . . . TBD" and did not assign these AICs to any of MCIJ's housing dorms but reported that the MCSO may be able to house COVID AICs in one of MCIJ's large "open dorms." (*Id.* at 1-2.) Jarmer added that the MCSO could move the remaining 173 AICs to these locations: (1) twenty-two AICs from MCDC's fourth floor (i.e., six

PAGE 119 – FINDINGS AND RECOMMENDATION

medical unit AICs and the above referenced groups of ten and six segregation unit AICs) to MCIJ's medical and segregation units, (2) thirty-five AICs from MCDC's fifth floor (including ten disciplinary unit AICs) to Dorm 15 and the disciplinary unit (Dorm 16) at MCIJ, (3) fourteen AICs from MCDC's sixth floor to Dorm 14 at MCIJ, (4) groups of twenty-one and thirty-one AICs from MCDC's seventh floor to Dorms 14 and 15 at MCIJ, and (5) groups of twenty-six and twenty-four AICs from MCDC's eighth floor to Dorms 8 and 17 at MCIJ. (Piucci Decl. Ex. 45 at 2-3.)

       Thus, out of the 151 single cells that he identified as available at MCIJ, Jarmer filled all twenty-three of the single cells in Dorm 17 (and potentially failed to account for the twenty-fourth AIC that he assigned here), forty-five of the sixty single cells in Dorm 14 (ten of the eleven segregation cells, with sixth and seventh floors' groups of fourteen and twenty-one AICs in the remaining forty-nine cells), and sixty-two of the sixty-eight cells in Dorm 15 (six of the nine segregation cells, with fifth and seventh floors' groups of twenty-five and thirty-one AICs in the remaining fifty-nine cells). (*See* Jarmer Dep. 32:2-8, 40:1-44:16; Piucci Decl. Ex. 45 at 2-3.) That left Jarmer with twenty-one unassigned single cells at MCIJ, with MCDC's remaining sixty "COVID" AICs listed as "TBD." (*See* Piucci Decl. Ex. 45 at 1-2, showing that Jarmer reported being thirty-nine "cells short in overall numbers" but "[p]otentially some" or "all COVID could go into an open dorm," i.e., sixty COVID AICs minus the twenty-one unassigned single cells at MCIJ, assuming Jarmer failed to account for the extra AIC that he assigned to Dorm 17; Jarmer Dep. 32:2-8, noting that Jarmer was unable to recall how he arrived at a thirty-nine cell shortage).

       At this time, there were still "additional dorms [at MCIJ] that were not currently open and staffed" but available to the MCSO and "big enough to accommodate all AICs from MCDC[.]"

(Stanley Decl. at 8.) Furthermore, MCIJ was not the "only option for evacuation" because there were "other jails in the greater Portland area, within one hour's drive of the MCDC," and in Stanley's over fifty years' of experience, such facilities are "always ready to work with and help another jail, especially in times of crisis." (*Id.*) Additionally, the MCSO's intergovernmental agreement with the USMS included a termination provision requiring thirty days' notice, "unless an emergency situation require[d] immediate relocation of [f]ederal detainees." (*Id.* at 9.) Federal detainees accounted for approximately "12% to 16.5% of the [MCDC] population at the time[.]" (*Id.*)

Jarmer was unable to recall who asked him to prepare the June 25 evacuation plan or any previous conversations about evacuating or temporarily transferring MCDC's AICs to MCIJ, but given that he emailed Gaidos, he assumed that Gaidos asked him to prepare the plan. (*See* Jarmer Dep. 24:18-27:18, 37:12-24.) Jarmer also assumed that he received transportation fleet information from an MCSO Captain, Reardon, because he was in "charge of transports at that time." (*Id.* 37:25-39:18.) Significantly, Jarmer never received any response from Gaidos or participated in any subsequent conversation regarding his June 25 plan, nor did he receive any requests to revisit or revise the plan at a later date. (*Id.* 44:20-47:14; *see also* Reese Dep. 34:10-17, 36:8-21, 51:24-52:5; Wheeler Dep. 76:2-18, 92:2-6, 100:5-102:21, 111:7-113:24; Alexander Decl. ¶ 12.)

Given this evidence, Plaintiffs raise a genuine issue of material facts on the first element of their Fourteenth Amendment claim—namely, that Defendants "made an intentional decision with respect to the conditions under which the plaintiff was confined[.]" *Castro,* 833 F.3d at 1071.

///

Defendants also dispute whether Plaintiffs raise a genuine issue of material fact on the second element of their failure-to-protect claim. (Defs.' MSJ at 49-55.) The second element requires that the "conditions put the plaintiff[s] at substantial risk of suffering serious harm[.]" *Castro*, 833 F.3d at 1071.

Defendants argue that the record "does not support a 'substantial risk of serious harm.'" (Defs.' MSJ at 49.) Defendants rely on the following "facts," which they view as "not reasonably in dispute": (1) "[a]t times it seem[ed] reasonably clear that tear gas drifted away from, rather than towards, the Justice Center," (2) Dr. Seale, who previously and at all relevant times served as the Director of the County Health Department's Corrections Health Division and physician at the County's facilities, reported that only two AICs visited the "hospital during the relevant time period" but "not related to tear gas," (3) there is "no scientific data indicating that tear gas is carcinogenic," (4) according to Defendants' medical expert, Dr. Sloane, "[t]here is nothing in the scientific literature demonstrating [that tear gas] exposure represents a serious risk of harm," (5) "nothing in the medical records demonstrat[e] a serious risk of harm other than short term symptoms consistent with the guidelines from the [CDC]," (6) the "scientific evidence"—i.e., Dr. Gall's air quality model—demonstrates that tear gas did not reach "unsafe levels," and (7) AICs' medical records are "consistent with" Dr. Gall's "indoor air quality model." (*Id.* at 49, 51-52, 55.)

Defendants' arguments ignore the Court's obligation to resolve all factual conflicts in Plaintiffs' favor. It is undisputed that tear gas did not always drift away from the Justice Center. (*See* Defs.' MSJ at 22, noting that tear gas entered the Justice Center's outside air intake). In fact, AICs in this case declare under penalty of perjury that tear gas occasionally "pour[ed] in through" their vents for "hours." (Gaylor Decl. ¶¶ 6, 8, 10-11, 18-22; Davis Decl. ¶¶ 6-7, 10, 13-

15; Duhart Decl. ¶¶ 8, 11; Hill-Sistrunk Decl. ¶¶ 7, 9; Buckner Decl. ¶¶ 6, 11.) AICs also

describe times when the tear gas infiltration reached the point that they could "see it, feel it, and

taste it," their cell air was "thick" with an "acrid" tasting "fog of tear gas," an AIC "woke up

vomiting," AICs developed rashes and suffered from impaired breathing and sleep, blurry vision,

nightmares, anxiety, excessive coughing and worry, chest pains, dizziness, lightheadedness,

headaches and migraines, exacerbated asthma and mental health symptoms, and irritation and

burning of the eyes, face, nose, skin, and throat, an AIC was "coughing and spitting stuff up,"

and entire AIC housing floor modules were screaming, choking, yelling, coughing, pleading and

begging for help, and "pounding" on and kicking their cell doors. (Gaylor Decl. ¶¶ 6, 8-9, 13, 19,

26; Davis Decl. ¶¶ 5-7, 10, 12, 15, 17, 19; Duhart Decl. ¶¶ 7-8, 12; Hall Decl. ¶¶ 4, 6-7; Brown

Decl. ¶¶ 8-9; Hill-Sistrunk Decl. ¶¶ 6-7, 10, 12-13; Street Decl. ¶¶ 9-10; Lundy Decl. ¶ 11; *see

also* Buckner Decl. ¶¶ 7-8, reflecting that Buckner described Module 7D's male AICs as

"terrified, screaming and kicking the doors," and recalled that at the same time, he heard Module

8D's female AICs on the floor above "screaming, 'I can't breathe!'").

     Parks, a former military infantryman who has more than twenty years of law enforcement

experience and "been around tear gas a lot," also recalled that he had "never seen anything like"

the "level of tear gas" that federal law enforcement agents deployed. (Parks Dep. 13:1-14:20,

20:13-21:4, 31:1-32:6.) Although he added that downtown Portland's large buildings "kind of

make . . . wind tunnels" that helped disperse tear gas "pretty quickly," Parks never defined that

term within the context of the "massive clouds" of tear gas that he witnessed "rolling through"

and obscuring any view from the Justice Center of Chapman and Lownsdale Squares. (*Id.* 32:1-

7-18.)

///

Defendants' reliance on Dr. Seale's statement is equally problematic. Defendants cite subsection (b) of paragraph ten in Dr. Seale's declaration, but this subsection pertains only to Dr. Seale's reference to two AICs that the MCSO "sent to an emergency room for evaluation of conditions that required resources beyond the capacity of the jail[.]" (*See* Defs.' MSJ at 55, arguing that none of the AICs that the MCSO "sent to the hospital during the relevant time period were related to tear gas," and citing Seale Decl. ¶ 10(b) in support). Dr. Seale's declaration, however, also addresses "hospital send outs," noting that "ten individuals were sent from MCDC to a hospital in June" 2020, and "twenty-two individuals were sent from MCDC to a hospital in July" 2020, including an AIC suffering from a "fall with head trauma." (Seale Decl. ¶ 10(j).) Dr. Seale represents that none of these "send outs related to possible tear gas exposure." (*Id.*)

The Court cannot credit Dr. Seale's version of events when the record includes a declaration from AIC Street, who declares under penalty of perjury that on the evening of July 1, 2020, and after reporting "feeling very-light headed and ill," he suffered an asthma attack when his "cell was filled with tear gas," "fell down and cracked [his] head," and was "bleeding all over the floor" while his floormates were attempting to "push the call button and banging on the doors" for "what seemed like over half an hour." (Street Decl. ¶¶ 6-7 & Ex. A at 1.) It is unclear if Street is the AIC to whom Dr. Seale refers as the July 2020 "send out" for a "fall with head trauma" but that appears to be the most likely explanation. If that is the case, between Dr. Seale's report is inconsistent with the relevant medical records.

Contrary to Defendants' framing of the argument, the relevant question here is whether Plaintiffs' conditions of confinement placed them in "substantial risk of suffering serious harm[.]" *Castro*, 833 F.3d at 1071. The query is not whether "tear gas is carcinogenic" (Defs.'

MSJ at 55), nor whether Plaintiff confronted potentially life-threatening conditions of confinement at MCDC. *Cf. Sandoval*, 985 F.3d at 680 ("If it is a constitutional violation to delay treatment for four hours for inmates exposed to pepper spray, . . . or to fail to promptly set a fractured thumb, . . . neither of which are potentially life-threatening conditions[,] the same must be true for failing to provide any meaningful treatment to an inmate who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated." (first citing *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002); and then citing *Jett v. Penner*, 439 F.3d 1091, 1097-98 (9th Cir. 2006))).

For example, in *Smith*, the plaintiffs were civil detainees who alleged that their exposure to tobacco smoke ("ETS") violated their constitutional "rights under either the Eighth or Fourteenth Amendment." 781 F. App'x at 597. Reversing the district court's grant of summary judgment, the Ninth Circuit explained that "[a] pre-trial detainee bringing a Fourteenth Amendment conditions of confinement claim must show that the conditions under which that detainee was confined 'put the plaintiff at substantial risk of suffering serious harm,'" and the plaintiffs were "entitled to at least this level of protection" because "[p]re-commitment detainees are 'entitled to protections at least as great as those afforded to civilly committed individuals and at least as great as those afforded to individuals accused but not convicted of a crime." *Id.* at 597-98 (simplified) (first quoting *Castro*, 833 F.3d at 1071; and then quoting *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004)). The Ninth Circuit also explained that the Fourteenth Amendment's more generous standard applied, not the Eighth Amendment standard, and thus the district court erred in applying the "contemporary standards of decency" standard to Fourteenth Amendment claims:

> Relying on a line of Eighth Amendment cases related to environmental tobacco smoke, including *Helling*, the district court here held that the plaintiffs'

Fourteenth Amendment claim failed because the plaintiffs "have not demonstrated that they are being forced to endure an amount of ETS that violates contemporary standards of decency." But, as just explained, the "contemporary standards of decency standard" does not apply to the plaintiffs' claim. The applicable Fourteenth Amendment standard is more generous: A condition of confinement may not violate our contemporary standards of decency, yet still create a substantial risk of causing a plaintiff to suffer serious harm. *See Youngberg*, 457 U.S. at 321-22. Thus, the district court erred in applying the contemporary standards of decency standard to the plaintiffs' Fourteenth Amendment claim.

*Id.* at 598.

Similarly, in *Russell v. Lumitap*, 31 F.4th 729, 739-40 (9th Cir. 2022), the Ninth Circuit addressed the "substantial risk of serious harm" element in the "inadequate-medical-care-context" and explained that "even assuming [it] limited the scope" of its inquiry to the plaintiff pretrial detainee's pre-death symptoms, the second element was satisfied because the plaintiff's "symptoms . . . includ[ed] hyperventilation, vomiting, dry heaving, difficulty breathing, severe chest pain radiating to his arm and jaw, numbness in his hands and feet, and tachycardia[.]" *Id.*; *see also Eastwood ex rel. M.E. v. Yamhill County*, No. 21-35331, 2022 WL 15523099, at *1-2 (9th Cir. Oct. 27, 2022) (analyzing the juvenile detainee plaintiff's "Fourteenth Amendment claims of unconstitutional conditions of confinement claims" under *Castro*'s "objective deliberate indifference test" and before turning to the "claims alleging deficient medical care," which the Ninth Circuit "treat[s] . . . 'substantially the same as other conditions of confinement violations,' applying the objective deliberate indifference test'" (quoting *Gordon*, 888 F.3d at 1124-25)).

The district court's decision in *Pitcher v. Garrett*, No. 3:20-cv-00869-SI, 2021 WL 1255179, at *3-4 (D. Or. Apr. 5, 2021), supplies another example, albeit from the pleading stage. In that case, the district court held that the plaintiff "alleged sufficient facts to meet the second prong" of *Castro*'s "failure-to-protect standard." *Id.* at *3-4 (citing *Castro*, 833 F.3d at 1071). In

support of this holding, the Ninth Circuit explained that "[w]ithout the ability to catch himself

with his legs or hands due to the use of restraints, without assistance stepping down, with a trip

hazard present, and with some indication that [the deputy] had prior knowledge of the trip

hazard, [the] [p]laintiff encountered a substantial risk of serious harm." *Id.* at *4; *see also*

*Eastwood ex rel. M.E. v. Yamhill County*, No. 3:18-cv-00293-YY, 2021 WL 1237111, at *1-2 &

n.1 (D. Or. Apr. 2, 2021) (Simon, J.) (citing *Smith* in overruling objections and explaining that

the *Castro* "framework for objective deliberate indifference" was the "correct" standard, not a

"some harm" standard related to a "legitimate penological purpose"), *aff'd*, 2022 WL 15523099,

at *1-2 (9th Cir. Oct. 27, 2022).

By comparison, Defendants cite *Russell* as an example of "substantial risk of serious

harm," and *Eastwood* as an example of a case reaching the opposite conclusion. (Defs.' MSJ at

53-54.) Defendants attempt to distinguish *Russell*'s discussion of the decedent's symptoms by

noting that such symptoms fell "within the scope of urgent care that would require a send out to a

hospital." (*Id.* at 53.) Defendants, however, fail to address the many comparable symptoms of

which AICs complained (or Street's hospital visit, for that matter), and the Court describes

below.

Defendants also distinguish the Ninth Circuit's decision in *Clement*, which they describe

as an "Eighth Amendment case that address[ed] secondary exposure to OC spray" and

"purposefully ignoring exposure by refusing to provide medical care," which was "enough to

[survive] summary judgment." (*Id.* at 54, 93, citing *Clement*, 298 F.3d at 904.) In Defendants'

view, this case "falls outside of *Clement* and into the safe harbor created by" the Ninth Circuit's

unpublished decision in *Allen v. Bosley*, 253 F. App'x 658, 660 (9th Cir. 2007), an Eighth

Amendment case holding that the "transitory effects of OC spray was not a serious medical need[.]" (Defs.' MSJ at 54.)

The Ninth Circuit has described *Clement* in a different manner that is more favorable to Plaintiffs. *See Sandoval*, 985 F.3d at 680 ("If it is a constitutional violation to delay treatment for four hours for inmates exposed to pepper spray, . . . which [was not a] potentially life-threatening condition[,] the same must be true for failing to provide any meaningful treatment to an inmate who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated." (citing *Clement*, 298 F.3d at 905)). Even if the more generous Fourteenth Amendment standard did not apply here, Plaintiffs' evidence of repeated tear gas exposure appears easily to satisfy what *Clement* deemed sufficient to survive summary judgment:

> In this case, the prisoners may be able to show that the defendants were subjectively aware of the risk of serious injury when they denied showers and medical attention for the inmates for the [four] hour period. It is alleged that the officers took turns stepping outside for fresh air. In addition, the prisoners claim that they heard the officers coughing and gagging in the hall. Finally, the prisoners themselves allegedly made repeated requests for attention, complaining of breathing problems, pain, and asthma attacks. Some were coughing, gagging, or choking. The officers' decision to open the yard door and place an industrial fan in the doorway suggests that the pepper spray did not entirely dissipate at once and that the officers may have been aware of this condition.

298 F.3d at 905.

By comparison, Berglund recalled that tear gas "would wake [him] up out of a deep sleep and go on for hours," the tear gas arrived "like a slap in the face" and made him feel "sick like [he] wanted to vomit," and during these incidents, he was unable to sleep or "get[] comfortable" and he "could only take half a breath in before [his] lungs would fill up with gas and just stop."[39] (Berglund Decl. ¶ 9; *see also supra* p. 129, identifying several AICs who were unable to recall a

---

[39] The Eighth Amendment governs Berglund's claim, but this evidence remains relevant in this class context involving other AICs who were housed in or around the same area as Berglund.

July 2020 day on which they were not exposed to tear gas). Similarly, Gaylor described how tear gas would be "literally pouring in through the vents," she would wake up "choking on the gas," she "could see [the tear gas], feel it, and taste it," her "eyes would be burning and [she] would have snot in [her] nose," and during one of the evenings in question, the tear "gas kept pouring in for hours . . . just [like] three nights" earlier and the MCSO's deputy responded by telling the AICs to "deal with it" and there was "nothing [the MCSO] can do" and then "turned off the emergency call button, and walked out of the unit," and the new deputy who arrived the next morning "exclaimed how strong the smell of gas still" seemed inside the module. (Gaylor Decl. ¶¶ 5-6, 8, 18-23; *see also* Parks Dep. 20:19-22:23, drawing on extensive experience with tear gas and explaining that Parks has "seen people vomit" after being exposed to tear gas; Piucci Decl. ¶ 4 & Ex. 26 at 1-2, reporting that deputies, who were not wearing gas masks, entered the Justice Center's lobby area when it was "filled with tear gas" and left because it was "too much" and "CS gas ma[de] it really hard to breath[e]" and made them "wish[]" masks were available to clear the area).

Defendants' reliance on *Allen* and the "transitory effects of . . . pepper spray" is unavailing. (*See* Defs.' MSJ at 54, quoting *Allen*, 253 F. App'x at 660.) The defendants in *Allen* "used pepper spray while extracting another inmate from a nearby cell." 253 F. App'x at 659. Proceeding on the assumption that the pepper spray caused the plaintiff to "cough, choke, and gag, and caused burning in his eyes, and that defendants ignored his pleas for decontamination," the Ninth Circuit held that the plaintiff failed to "establish that [the] defendants acted with deliberate indifference to his serious medical needs," because the plaintiff "presented no evidence that [the] defendants' actions caused any actual injury, other than the transitory effects

PAGE 129 – FINDINGS AND RECOMMENDATION

of the pepper spray, or that any delay in responding to his requests caused further injury." *Id.* (simplified).

Unlike *Allen*, this case does not concern limited exposure to pepper spray. It concerns, among other things, an entire month during which AICs were unable to recall "any day" they were not "exposed to tear gas." (Buckner Decl. ¶ 5, Hill-Sistrunk Decl. ¶ 5, Hall Decl. ¶ 4; Brown Decl. ¶¶ 6-7 & Street Decl. ¶¶ 8-9; *see also* Lundy Decl. ¶ 11, waking "up out of a dead sleep every night"; Duhart Decl. ¶ 7, varying and worsening tear gas exposure "each night"; Brown Decl. ¶¶ 6-7, feeling "bombarded with tear gas" every night; *see also* Davis Decl. ¶¶ 5-6 & Gaylor Decl. ¶ 6, declaring that the tear gas exposures became progressively worse between July 1 and July 21, 2020). Also unlike *Allen*, this case includes evidence suggesting that some AICs' continued exposure to tear gas may have caused further injury. (*See* Freedman Decl. Ex. 2 at 6-11 & Sloane Decl. ¶ 8 & Ex. 1 at 1, reflecting that Drs. Freedman and Sloane agree that psychological effects such as fear, anxiety, PTSD, [and] acute stress reactions could be experienced [in tear gas exposure cases], as in all cases of exposure to emotional or physical stressors, and that Dr. Freedman opined that some AICs suffered exacerbation of preexisting mental health conditions, PTSD and anxiety likely "gain[ed] further traction in the AICs who experienced the events in questions," and AICs developed "cumulative injury" because of repeat exposures).

At this stage, Defendants place too much emphasis on Dr. Gall's indoor air quality model and opinions, which, in their view, support that tear gas never reached "unsafe levels." (Defs.' MSJ at 51-52.) Notably, Defendants' own medical expert, Dr. Sloane, highlighted several "salient points" suggesting that a jury should decide how much weight to assign Dr. Gall's model and opinions: (1) "[t]he extent of poisoning caused by riot control agents depends on the type

and amount of riot control agent to which a person was exposed, the location (indoors versus

outdoors), how the person was exposed, and the length of time of the exposure," (2) "[r]eal

world conditions in which an agent was used can make it difficult to ascertain the exposure

concentration and duration among exposed individuals," because "[t]here are often no measured

values of the agents used in the areas in which the subjects were exposed," and (3) "[t]he

concentration of agents will be variable outdoors, in different areas of an enclosed space, and

even within a given room," because the "exposure will vary depending on air flow, temperature,

and location in the room" and "individuals [will also] have varied responses to a given agent."

(*See* Sloane Decl. ¶¶ 7-8, summarizing the "salient points" from Dr. Sloane's "literature

review").

Plaintiffs' industrial hygienist expert, Rose, also identified "several serious limitations" in

Dr. Gall's tear gas modeling report. (Dahab MSJ Decl. Ex. 4 at 2-5.) According to Rose, these

limitations include, but are not limited to, overestimating the effectiveness of filters, failing to

"estimate exposures from a large federal response reported to take place in early July 2020," and

"appear[ing] to ignore ground level infiltration into the building due to the stack effect, including

during th[e] potentially very high street level concentrations."[40] (*Id.* at 4-5.) In short, Rose opines

that Dr. Gall "underestimated how much tear gas MCDC [AICs] could have been exposed to."

(*Id.* at 5.)

///

---

[40] In his report, Rose explains that "[t]he 'stack effect' or 'chimney effect' is a widely
accepted phenomenon which describes the movement of air vertically through buildings,
primarily driven by temperature differences and building height." (Dahab MSJ Decl. Ex. 4 at 6.)
Rose further explains that "given the temperature differences, the [Justice Center's] [sixteen]-
story height, entrances at street level and within the parking garage, the stack effect was likely
responsible for drawing in significant quantities of street-level tear gas concentrations into the
building, where it could travel to [AICs'] cells on [housing floor] [l]evels [four through eight]."
(*Id.*)

PAGE 131 – FINDINGS AND RECOMMENDATION

Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether their conditions of confinement placed them at substantial risk of suffering serious harm. Similar to the cases above evaluating "substantial risks of serious harm," Plaintiffs and other AICs reported pleading and begging for help because of ongoing tear gas exposure, which resulted in rashes, impaired breathing and sleep, blurry vision, nightmares, anxiety, excessive coughing and worry, chest pains, dizziness, lightheadedness, headaches, migraines, exacerbated asthma and mental health symptoms, irritation and burning of the eyes, face, nose, skin, and throat, "coughing and spitting stuff up," waking up vomiting, and an asthma attack leading to a fall, "cracked . . . head," and wound requiring a hospital visit and four staples. (Gaylor Decl. ¶¶ 6, 8-9, 13, 19, 26; Davis Decl. ¶¶ 5-7, 10, 12, 15, 17, 19; Duhart Decl. ¶¶ 7-8, 12; Hall Decl. ¶¶ 4, 6-7; Brown Decl. ¶¶ 8-9; Hill-Sistrunk Decl. ¶¶ 6-7, 10, 12-13; Street Decl. ¶¶ 7-10; Lundy Decl. ¶ 11; *see also* Piucci Decl. Ex. 37 at 6, Ex. 39 at 1-14 & Ex. 40 at 1-12, Duhart Decl. ¶¶ 10-11; Buckner Decl. ¶ 12 & Duhart Dep. 63:17-24, attaching grievances complaining of comparable issues, such as an inability to sleep and feeling helpless, trapped, anxious, "jumpy and unsafe," receiving "no assistance" and comparing the evening to the "middle of a combat zone," and reflecting that some AICs claimed that their grievances were missing or disappeared).

Further, in her capacity as Module 8A's "trustee," Lundy witnessed and interacted with AICs who were "detoxing or having a psychotic break . . . while getting gassed," including an AIC who spent hours screaming she was "on fire" and "covered in fire ants," hid underneath her mattress and naked under a counter, and urinated on herself. (Lundy Decl. ¶¶ 4, 11-15 & Lundy Dep. 139:1-11.) Other AICs also reported that certain officers failed to respond to requests for or provide any meaningful assistance, disabled emergency call buttons, refused requests for showers and a change of clothes when AICs' blankets, linens, and clothing were "drenched in

tear gas," denied requests for grievance forms, made "jokes about the tear gas," and advised AICs to "suck it up" and "deal with it" because there was "nothing [they could] do." (Gaylor Decl. ¶¶ 8-9, 16, 20-21; Davis Decl. ¶¶ 6-7, 10-11, 14-15; Duhart Decl. ¶¶ 8, 10-12; Brown Decl. ¶¶ 5, 10; Hall Decl. ¶¶ 8-9; Hill-Sistrunk Decl. ¶¶ 7-10; Lundy Decl. ¶¶ 16-21; *see also* Street Decl. ¶¶ 7, 9, 11, fearing another severe asthma attack and death because the MCSO "show[ed] up late").

For all of these reasons, the Court concludes that Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether their conditions of confinement at MCDC "put [them] . . . at substantial risk of suffering serious harm." *Castro*, 833 F.3d at 1071.

The Court must next address the "deliberate indifference inquiry," which "in this context is set out in the third [element]." *Herrera*, 18 F.4th at 1159 (citing *Castro*, 833 F.3d at 1071). Under the third element, the defendant must have failed to "take reasonable available measures to abate" the substantial risk of suffering serious harm, "even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious[.]" *Castro*, 833 F.3d at 1071. "To satisfy the third element, the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Sandoval*, 985 F.3d at 669 (quoting *Gordon*, 888 F.3d at 1125).

Viewing the evidence in the light most favorable to Plaintiffs, a jury could find that the manner in which Defendants responded to AICs' worsening and protracted exposure to tear gas was "akin to reckless disregard." *Sandoval*, 985 F.3d at 670 ("A jury could . . . conclude that [the

defendant nurse's] actions toward [the pretrial detainee]—which were limited to administering a quick blood test and then ignoring [the detainee] for the remaining six hours of his shift—were 'akin to reckless disregard.' . . . Th[e] evidence is [also] more than sufficient to allow a jury to find that [the other nurses'] failure to summon paramedics was objectively unreasonable."); *Herrera*, 18 F.4th at 1160 (noting that the "objective standard applied" under the "deliberate indifference prong" concerns "whether the defendant's decision to bring about (or allow) those conditions was objectively unreasonable in light of the risk to the pretrial detainee").

There is no dispute that Defendants knew that when law enforcement deployed tear gas around and inside the lobby of the Justice Center on May 29, 2020, the tear gas infiltrated the housing floors at MCDC. When Sheriff Reese arrived, the lobby was "heavily contaminated" with tear gas. (Reese Dep. 16:23-18:15.) A County nurse and many AICs confirmed that they were exposed to "smoke or tear gas" that evening and during the early morning hours of May 30, 2020, when the nurse was unable to "enter progress notes for all of [her] encounters" because there were "so many complaints" from AICs who said that "they could not breath[e]." (Barlow Decl. ¶ 9.)

Van Houte similarly reported that tear gas reached the housing floors at MCDC. (*See* Van Houte Dep. 28:1-16, showing that Van Houte was not sure whether the tear gas that he smelled on the fifth floor stemmed from his initial exposure on the second floor but he "guess[ed] that there was some [tear gas] that got through the vents" on the fifth floor). The same can be said about Seals. After departing the lobby because it was "filled with tear gas," which was "too much" and made it "really hard to breath[e]" without a gas mask, Seals and other deputies headed to the fourth housing floor, where they "evacuated the nurses" but decided that AICs did

not "need[] to be evacuated," even though the "entire jail smelled of smoke." (Piucci Decl. Ex. 26 at 1-2.)

Also in the early morning hours of May 30, 2020, the County Facilities and Property Management's HVAC Department received the first of many requests from a building employee to adjust the Justice Center's HVAC system's outside air dampers "for the purpose of preventing tear gas from entering the building." (*See* Piucci Decl. Ex. M at 1-7, Ex. 8 at 1-3, Ex. 22 at 1-3 & Ex. 34 at 2.) Significantly, however, the Justice Center's outside air dampers "do not seal airtight as they were never designed to be used as a barrier against [tear] gas." (*Id.* Ex. 15 at 1.)

Defendants eventually adopted the opening and closing of the Justice Center's outside air dampers as part of an official "procedure" intended to prevent tear gas from entering the building. (*See* Piucci Decl. Ex. 22 at 1-3, adopting this new "procedure" on July 21, 2020, and noting that on-call HVAC engineers were receiving a "consistently . . . high volume" and "up to four requests in a single night" from the MCSO and dispatch to "open and close" the Justice Center's HVAC system's outside air dampers, the requests were "often accompanied by a great deal of urgency, and Jacobs expressed his view that this new procedure was an "Excellent Solution!"). Within a week, however, the MCSO realized what seemed to be apparent all along: "Apparently we cannot stop the gas from entering." (*Id.* Ex. 15 at 1; *see also id.* Ex. 15 at 2, "I have [six] grievances from [AICs] in [Module] 8D that claim they had tear gas in their cells. The reports state [this occurred three days ago, on July 24, 2020,] at [11:45 p.m.] . . . Actually[,] I have complaints jail wide. The [MCSO's officer in charge] says that all housing floors were [a]ffected."; *see also* Gaylor Decl. ¶¶ 4, 25, Davis Decl. ¶¶ 3, 16, & Seale Decl. at 23, 41 noting that the MCSO moved all of the female AICs in Module 8D to MCIJ the previous day, July 26, 2020).

Despite these facts and others discussed herein, the Individual Defendants never revisited whether it was feasible or necessary to evacuate AICs from MCDC to MCIJ because of tear gas infiltration. (*See* Reese Dep. 33:4-34:17, 51:3-23, 52:6-54:10, 57:8-14, 60:1-20; Wheeler Dep. 76:1-21, 92:2-6, 95:19-96:2, 100:5-102:21, 111:7-113:24, 122:13-24; Alexander Decl. ¶ 12.) Significantly, Reese testified that he continues to believe that opening and closing the outside air dampers was effective in combating tear gas infiltration throughout the Justice Center, including on MCDC's housing floors. (*See id.* Reese Dep. 18:19-22, 20:2-24, Q. . . . Did it work? A. I believe so."). Reese also explained that the MSCO leadership team's discussion about evacuation was based on the "threat to the facility," not "continuing infiltration of tear gas," because during this time period, "people [were] trying to break into the facility and take it over and . . . destroy it" and thus the "threat to the Justice Center . . . was super high." (*See id*. 33:4-24, 51:3-23, 52:6-53:23, "Q. . . . I don't want the jury or the judge to be confused. Those considerations about relocation were in relation to the threat to the facility as opposed to infiltration of tear gas? A. Yes."). Reese further explained that he was present for "most of the events that transpired" at the Justice Center during the relevant period, and that he "never felt personally that the threat of infiltration of tear gas was such a high risk that [the MCSO] needed to evacuate the building." (*Id.* 52:12-21.) At the time, Reese was "more concerned about damage from fires or the potential that the building would be taken over by a violent mob." (*Id.* 52:21-23.)

The record evidence also demonstrates that there is a consensus among the AICs that July 1, 2020 was the date on which the tear gas in MCDC's housing cells became progressively worse. Many of these AICs were unable to recall any day that they were not exposed to tear gas in July 2020, and like some of the MCSO's officers, attributed the worsening conditions to the surge of federal law enforcement personnel to Portland. (*See* Buckner Decl. ¶ 5, representing that

the "gassings got progressively worse" after July 1, 2020, and that Bucker was unable to recall a day that he was not exposed to tear gas in July 2020; Hill-Sistrunk Decl. ¶ 5, stating the same; Street Decl. ¶¶ 7-9, reporting a severe asthma attack and fall resulting in head staples on July 1, 2020, the "gassings continued over the month of July," Street cannot "remember a day in July that [he was not] exposed to tear gas," and Street was "terrified" "[e]ach night [he] was exposed to tear gas"; Hall Decl. ¶ 4, failing to recall a day without tear gas exposure in July 2020 and describing the July 18 to August 2020 period when "federal agents were in town" as being "there through the worst of it"; Lundy Decl. ¶¶ 9, 11, stating that "things did not improve" when "May turned to June" and "got worse in July" after federal law enforcement agents arrived; Brown Decl. ¶¶ 6-7, declaring that the "gassings got worse over time," Brown "cannot remember a day in July that [he was not] exposed to tear gas" around 12:30 a.m. and until federal agents left Portland, and AICs on Brown's floors were "bombarded with tear gas that [they could not] stop"; Duhart Decl. ¶ 7, Davis Decl. ¶ 5 & Gaylor Decl. ¶ 6, agreeing on worsening conditions after July 1, 2020).

Reese recalled that on July 1, 2020, there were "dramatic[]" and "surpris[ing]" changes in federal agents' "tactics" and coordination with the MCSO, insofar as they began deploying "copious amounts of tear gas" outside the federal courthouse and without "communicating that [they were] going to use tear gas." (Reese Dep. 18:1-13, 24:12-26:22.) As result, the MCSO's "issue with CS inside" the Justice Center returned the "first week of July" because federal agents' deployment of tear gas was "clear[ly] . . . impacting the Justice Center[.]" (*See id.* 18:1-13, 24:12-23, 25:14-26:2, stating as much before failing to "recall" the same). Van Houte also recalled that it "got a little bit spicier inside" and "throughout" the Justice Center "with all the tear gas," which "found its way . . . into the building" on "most nights" and "whenever" federal

agents deployed tear gas, made it "kind of telling that there was gas outside the building that made its way in[side]," and resulted in "mental note[s] like wow, it's a little bit -- a little bit spicier here than [o]n the other floors -- the other [AIC housing] modules." (Van Houte Dep. 39:5-40:23; *see also* Parks Dep. 32:1-7-18, describing unprecedented deployments obscuring entire cite blocks).

Although disputed in some respects, AICs' experiences during this time included, but were not limited to:

- Tear gas "pouring" in through cell vents for "hours," in particular on July 19 through July 25, 2020. (Gaylor Decl. ¶¶ 6, 8, 10-11, 18-22; Davis Decl. ¶¶ 6-7, 10, 13-15; Duhart Decl. ¶¶ 8, 11; Hill-Sistrunk Decl. ¶¶ 7, 9; Buckner Decl. ¶¶ 6, 11.)

- Tear gas reaching the point where (1) AICs could "see it, feel it, and taste it," (2) cell air was "thick" with an "acrid" tasting "fog of tear gas," (3) an AIC "woke up vomiting," (4) AICs developed rashes and suffered from impaired breathing and sleep, blurry vision, nightmares, anxiety, excessive coughing and worry, chest pains, dizziness, lightheadedness, headaches and migraines, exacerbated asthma and mental health symptoms, and irritation and burning of the eyes, face, nose, skin, and throat, (5) an AIC was "coughing and spitting stuff up," and (6) entire modules were screaming, choking, yelling, coughing, pleading and begging for help, and "pounding" on and kicking their doors. (Gaylor Decl. ¶¶ 6, 8-9, 13, 19, 26; Davis Decl. ¶¶ 5-7, 10, 12, 15, 17, 19; Duhart Decl. ¶¶ 7-8, 12; Hall Decl. ¶¶ 4, 6-7; Brown Decl. ¶¶ 8-9; Hill-Sistrunk Decl. ¶¶ 6-7, 10, 12-13; Street Decl. ¶¶ 9-10; Lundy Decl. ¶ 11; *see*

*also* Buckner Decl. ¶¶ 7-8, reflecting that Buckner described Module 7D's male AICs as "terrified, screaming and kicking the doors," and recalled hearing Module 8D's female AICs on the floor above "screaming, 'I can't breathe!'").

- Waking up terrified and to sounds comparable to a "war zone," "gunshots and mortars," and an "earthquake," failing initially to realize that the building was not shaking, feeling "in shock" and like "gas was stuck in the walls" and they were "having a bad dream," and witnessing and needing to interact with AICs who were "detoxing or having a psychotic break . . . while getting gassed," including an AIC who spent hours screaming that she was "on fire" and "covered in fire ants," hid underneath her mattress and naked under a counter, and urinated on herself. (Davis Decl. ¶¶ 6, 14; Duhart Decl. ¶¶ 8, 11-12; Lundy Decl. ¶¶ 4, 11-15 & Lundy Dep. 139:1-11, addressing Lundy's role as trustee; Piucci Decl. Ex. 37 at 6, ECF No. 42-37, attaching a grievance dated July 25, 2020, in which AIC Katherine Wells stated that she could not sleep, felt helpless, trapped, anxious, "jumpy and unsafe" because she was receiving "no assistance" and she "fe[lt] like [she was] in the middle of a combat zone at night").

- Certain officers who at times failed to respond to requests for or provide any meaningful assistance, disabled emergency call buttons, refused requests for showers and a change of clothes when AICs' blankets, linens, and clothing were "drenched in tear gas," denied requests for grievance forms, made "jokes about the tear gas," and advised AICs to "suck it up" and "deal with it"

because there was "nothing [they could] do." (Gaylor Decl. ¶¶ 8-9, 16, 20-21; Davis Decl. ¶¶ 6-7, 10-11, 14-15; Duhart Decl. ¶¶ 8, 10-12; Brown Decl. ¶¶ 5, 10; Hall Decl. ¶¶ 8-9; Hill-Sistrunk Decl. ¶¶ 7-10; Lundy Decl. ¶¶ 16-21; *see also* Street Decl. ¶¶ 7, 9, 11, reporting that Street feared that he would suffer another severe asthma attack and accident and die because the MCSO "show[ed] up late").

- Filing tear gas-related grievances that disappeared. (*See* Duhart Decl. ¶¶ 10-11; Buckner Decl. ¶ 12; *see also* Duhart Dep. 63:17-24, noting that Duhart filed a grievance that the MCSO was unable to locate and believed that filing more grievances was "a waste of paper" because "it seemed like they [did not] care"; Piucci Decl. Ex. 39 at 1-14 & Ex. 40 at 1-12, attaching numerous AIC grievances that discuss many of the issues described above, including missing grievances).

At the same time, the MCSO requested adjustments to the Justice Center's air dampers nearly every night, which reflects both tear gas infiltration at an unacceptable level and knowledge thereof:

| Task | Date Created | Requestor |
|------|------|------|
| **5008469-B119 1st Fl Turn off air intake for tear gas deployment** | 7/2/2020 23:45:53 | William Hong |
| **5008488-B119 1st Fl - requesting HVAC be set to 100% air exchange** | 7/3/2020 22:02:14 | Elias Fernley |
| **5008489-B119 all floors set building air intake to the minimal setting** | 7/4/2020 4:04:14 | City of Portland |
| **5008504-B119 0% air exchange due to firework smoke** | 7/4/2020 22:10:13 | William Hong |
| **5008507-B119 1st fl full air exchange open all vents** | 7/5/2020 0:27:59 | Brian Beardsley |
| **5008508-B119 1st fl shut off airflow** | 7/5/2020 1:52:23 | Kraig Anspach |
| **5008509-B119 full building return airflow to 100%** | 7/5/2020 5:10:29 | Kraig Anspach |

| | | |
|---|---|---|
| **5008529**-B119 1st Fl - requesting outside air dampers closed | 7/5/2020 21:57:47 | Brian Beardsley |
| **5008530**-B119 1st floor adjust outside air exchange to 100% | 7/6/2020 3:53:38 | Kraig Anspach |
| **5008934**-B119 Exterior Turn off outside air exchange | 7/10/2020 23:41:51 | William Hong |
| **5008936**-B119 exterior adjust outside air exchange to 100% | 7/11/2020 5:46:40 | Kraig Anspach |
| **5008946**-B119 Exterior set outside air exchange dampers to 0% | 7/11/2020 23:16:54 | Kraig Anspach |
| **5008947**-B119 Exterior adjust outside air exchange dampers to 100% | 7/12/2020 2:35:46 | Kraig Anspach |
| **5008959**-B119 Exterior Turn off outside air exchange | 7/13/2020 1:01:21 | Mihai Bascuti |
| **5008960**-B119 exterior Adjust outside air intake to 100% | 7/13/2020 4:04:59 | Mihai Bascuti |
| **5009471**-B119 Exterior Turn off outside air exchange | 7/15/2020 5:13:15 | Kraig Anspach |
| **5009476**-B119 Turn on outside air exchange | 7/15/2020 6:02:10 | Kraig Anspach |
| **5009766**-B119 1st Fl Close dampers due to protesters | 7/16/2020 23:05:37 | William Hong |
| **5009798**-B119 Exterior turn off outside air exchange | 7/17/2020 22:14:08 | William Hong |
| **5009799**-B119 1st floor adjust outside air exchange to 100% | 7/18/2020 2:31:31 | Kraig Anspach |
| **5009804**-B119 - turn off building air | 7/18/2020 21:38:19 | Matthew Tiffany |
| **5009805**-B119 exterior adjust outside air exchange to 100% | 7/19/2020 3:23:03 | Mihai Bascuti |
| **5009823**-B119 1st Fl Close dampers due to protests | 7/19/2020 21:39:14 | Brian Beardsley |
| **5009824**-B119 Exterior Turn on outside air exchange | 7/19/2020 23:06:50 | Brian Beardsley |
| **5009825**-B119 Exterior Turn off outside air exchange | 7/19/2020 23:54:49 | Kraig Anspach |
| **5009827**-B119 Exterior Turn on outside air exchange | 7/20/2020 5:22:23 | Kraig Anspach |
| **5009914**-B119 Exterior Turn off outside air exchange | 7/21/2020 0:55:36 | Kraig Anspach |
| **5009915**-B119 Exterior Turn on outside air exchange | 7/21/2020 4:06:10 | Kraig Anspach |
| **5010000**-B119 Daily release of dampers | 7/22/2020 6:50:08 | Kevin Hendley |
| **5010072**-B119 1st Fl - Daily adjustments of outside air intakes | 7/22/2020 21:14:11 | Sam Loeung |
| **5010198**-B119 Exterior keep outside air exchange turned off past 6:00 | 7/26/2020 5:32:27 | Mihai Bascuti |

(Piucci Decl. Ex. 8 at 1-3.)

PAGE 141 – FINDINGS AND RECOMMENDATION

Crediting Dr. Freedman, Rose, and Stanley's opinions and taking the Named Plaintiffs' and other AICs' accounts as true, a jury could find that the MCSO leadership's team's decision to allow AICs to be remain housed at MCDC and exposed repeatedly to tear gas was "akin to reckless disregard." *Sandoval*, 985 F.3d at 671 (holding that nurses were "not entitled to summary judgment on liability" because a jury could find that one nurse's "actions toward [the pretrial detainee]—which were limited [in certain respects] . . . —were 'akin to reckless disregard,'" and that the other nurses' " failure to promptly call paramedics was objectively unreasonable," and in doing so, crediting the plaintiff's expert's opinion and a deputy's favorable "account").

Defendants dismiss as "speculative" the record evidence suggesting that closing the outside air dampers was not effective and may have been an objectively unreasonable mitigation effort. (Defs.' MSJ at 56.) Defendants also credit their experts' reports and fail to account for evidence undermining their claims about the adequacy of filters, necessity of certain MCDC housing units at MCDC, and AICs' reports on the availability, timing, and adequacy of the staff who responded to their complaints about tear gas. (*See* Defs.' MSJ at 55-58, reflecting as much and relying on Conser and Dr. Gall's reports and the presence of jail and medical staff and indoor air filters). In doing so, Defendants disregard Plaintiffs' expert reports in arguing that ongoing protests, safety considerations, and COVID-19 were "significant barriers prevent[ing] evacuation of the building[.]" (*Id.* at 57.) Relatedly, a jury may credit the testimony of MCSO officers like Jacobs, who said that he worked almost exclusively during the day, no more than two to four overtime hours, and thus "never long enough to put [himself] into the [nightly] protests or into the smoke tear gas situation." (Jacobs Dep. 36:3-37:9.) This testimony contradicts, among other genuine issues of material fact, Defendants' suggestion that evacuation

PAGE 142 – FINDINGS AND RECOMMENDATION

was not feasible due to the violent protests outside MCDC at all times. (*Compare id.*, *with* Reese Dep. 52:3-23, reflecting that Reese was "more concerned" about, among other things, the "potential that the building would be taken over by a violent mob" and "never felt personally that the threat of infiltration of tear gas was such a high risk that [the MCSO] needed to evacuate," *and* Alexander Decl. ¶ 12, representing that an evacuation was "not feasible" in part because of "ongoing violent protests that directed at law enforcement" at the Justice Center).

For these reasons, there remains a genuine issue of material fact with respect to the "reckless disregard" standard. *See generally Fraihat*, 16 F.4th at 636 (describing the "reckless disregard" standard as a "formidable one" and "high standard," under which a "plaintiff must show that the defendant 'disregard[ed] an excessive risk' to the plaintiff's health and safety by failing to take 'reasonable and available measures' that could have eliminated that risk" (first quoting *Roman v. Wolf*, 977 F.3d 935, 947 (9th Cir. 2020) (per curiam) (Miller, J., concurring in part and concurring in judgment); and then quoting *Castro*, 833 F.3d at 1070-71)). The Court therefore recommends that the district judge deny Defendants' motion for summary judgment on this ground.

"To satisfy the fourth element, a plaintiff need only prove a 'sufficiently imminent danger,' because a remedy for unsafe conditions need not await a tragic event." *Roman*, 977 F.3d at 943 (simplified). The Supreme Court has held the "health risk posed by [an AIC's] involuntary exposure to second-hand smoke could form the basis of a claim that the government was violating his right to reasonable safety[.]" *Roman*, 977 F.3d at 944 (citing *Helling*, 509 U.S. at 35).

Defendants do not dispute that Plaintiffs raise a genuine issue of material fact with respect to the fourth element of their claim. (*See* Defs.' MSJ at 46-58, devoting subsections to

only three of the four elements under *Castro*). Accordingly, the Court recommends that the district judge deny Defendants' motion for summary judgment with respect to the fourth element.

For all of these reasons, the Court recommends that the district judge deny Defendants' motion for summary judgment on Davis, Duhart, and Lundy's Fourteenth Amendment failure-to-protect claim.

### b. Eighth Amendment Claim

Genuine issues of material fact also preclude summary judgment on Plaintiffs' Eighth Amendment claim.

"Claims brought by convicted prisoners under the Eighth Amendment are governed by what [the Ninth Circuit] ha[s] called a 'subjective deliberate indifference' standard." *Sandoval*, 985 F.3d at 667 (citing *Gordon*, 888 F.3d at 1122). The Ninth Circuit described this standard in *Castro*:

> The standard under the Eighth Amendment to prove deliberate indifference for individual defendants is well established. A prison official cannot be found liable . . . for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "In other words, the official must demonstrate a *subjective awareness* of the risk of harm." *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010), *cert. granted and judgment vacated*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).

*Castro*, 833 F.3d at 1068 (simplified); *Herrera*, 18 F.4th at 1159 (detailing "*Farmer*'s subjective test"); *Sandoval*, 985 F.3d at 667-68 (describing the "subjective deliberate indifference" standard).

"To establish [an] Eighth Amendment conditions of confinement claim, [then, a plaintiff] must demonstrate (1) an 'objectively, sufficiently serious' deprivation, and (2) that [the

defendant] acted 'subjectively, with deliberate indifference' to this deprivation." *Maney v. Oregon*, No. 24-2715, 2025 WL 1794110, at *1 (9th Cir. June 30, 2025) (quoting *Hampton*, 83 F.4th at 766). Under the subjective deliberative indifference standard, "a prison official who 'should have been aware' of a [health or safety] related risk to an inmate, but in fact was not [aware of it], 'has not violated the Eighth Amendment, no matter how severe the risk.'" *Sandoval*, 985 F.3d at 668 (quoting *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc)).

The parties agree that Berglund is the only named plaintiff whose failure-to-protect claim is subject to the Eighth Amendment's "subjective deliberate indifference" standard. (*See* Defs.' MSJ at 58-62; Pls.' MSJ Resp. at 34, 41-44; Defs.' MSJ Reply at 20-25.) The parties recognize that Berglund represents a class of similarly situated AICs, and thus frame the relevant question as whether Defendants are entitled to summary judgment with respect to the class as a whole. (*See* Defs.' MSJ at 58-62, arguing, among other things, that there is "no objective deliberate indifference in this case sufficient to support a claim under the Eighth Amendment as it relates to . . . Berglund or the class as a whole" and the Individual Defendants lacked subjective awareness of the risk throughout the summer of 2020; Pls.' MSJ Resp. at 41-44, responding in kind).

As an initial matter, Defendants argue that they are entitled to summary judgment on Plaintiffs' Eighth Amendment claims because the record evidence fails to "demonstrate that Plaintiffs were subject to a substantial risk of serious harm." (Defs.' MSJ at 37-39, 59.) On this issue, Defendants "rely on the same arguments set forth above with regard to the absence of a serious risk of substantial harm. (*Id.* at 59.) The Court rejects Defendants' arguments for the same reasons.

The Court also notes in the context of conditions of confinement claims based on exposure to a hazard, the Eighth Amendment's objective component requires a plaintiff to prove "that it is 'contrary to current standards of decency for anyone to be . . . exposed against his will' to the relevant hazard." *Hampton*, 83 F.4th at 766 (quoting *Helling*, 509 U.S. at 35). Courts have found that the involuntary exposure to chemical irritants satisfies the Eighth Amendment's objective prong. *Cf. Clement*, 298 F.3d at 904-05 (holding that the plaintiffs "satisfied" the "objective component" in part because their "submissions document[ed] the painful effects of pepper spray," and noting that the plaintiffs' claim was based on their allegations regarding the "harmful effects of the pepper spray" and the "inadequacy of their ventilation methods" and ability to decontaminate); *Walsh v. Gower*, No. 2:18-cv-00098-HZ, 2020 WL 1149912, at *5 (D. Or. Mar. 9, 2020) (finding the plaintiff satisfied the objective component and noting that the "[p]laintiff submit[ted] evidence that both he and another [AIC] experienced pain and breathing problems along with choking, gagging, burning, and itching throughout the night" (citing *Clement*, 298 F.3d at 904)).

Consistent with *Clement*, *Walsh*, and its findings above, the Court concludes that Plaintiffs satisfy the objective component of their Eighth Amendment claim and recommends that the district judge deny Defendants' motion for to summary judgment to the extent they argue otherwise. (*See* Defs.' MSJ at 59-60.)

Turning to the subjective component, the "Eighth Amendment claim requires a plaintiff to allege that officials 'kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" *Hampton*, 83 F.4th at 767 (quoting *Farmer*, 511 U.S. at 837). "It is well settled that '[d]eliberate indifference occurs when [an] official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (quoting *Solis v.*

*County of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008)); *see also Hampton*, 83 F.4th at 767

(explaining that "an Eighth Amendment claimant need not show that a prison official acted or

failed to act believing that harm actually would befall an [AIC]; it is enough that the official

acted or failed to act despite his knowledge of a substantial risk of serious harm" (quoting

*Farmer*, 511 U.S. at 842)). "[V]iolations of the Eighth Amendment may occur as a result of

either "a prison official's act or *omission*." *Clem*, 566 F.3d at 1182 (quoting *Farmer*, 511 U.S. at

834).

  The evidence above demonstrates that there are genuine issues of material fact as to

whether Defendants consciously disregarded the substantial risk of harm that tear gas exposure

posed to Plaintiffs and other AICs. It is important to consider that "[a] fact-finder may infer

subjective awareness from circumstantial evidence." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th

Cir. 2020) (citing *Farmer*, 511 U.S. at 842); *see also Hope*, 536 U.S. at 738 (noting that courts

"may infer the existence of this subjective state of mind from the fact that the risk of harm is

obvious"). The Court also highlights the following evidence regarding the Individual

Defendants:

- When he arrived at the Justice Center on the evening of May 29, 2020, Reese
  recalled that the lobby was "heavily contaminated" with tear gas. (Reese Dep.
  16:23-18:15.)

- Reese recalled that on July 1, 2020, there were "dramatic[]" and "surpris[ing]"
  changes in federal agents' "tactics" and coordination with the MCSO, insofar
  as they began deploying "copious amounts of tear gas" outside the federal
  courthouse and without "communicating that [they were] going to use tear
  gas." (Reese Dep. 18:1-13, 24:12-26:22.) Reese added that the "issue with CS

inside" the Justice Center returned the "first week of July" because federal

agents' tear gas was "clear[ly] . . . impacting the Justice Center[.]" (*See id.*

18:1-13, 24:12-23, 25:14-26:2, stating as much before failing to "recall" the

same).

- Wheeler knew about the tear gas infiltration on or before the evening of May

   31, 2020, when he personally requested adjustment to the outside air dampers.

   (*See* Piucci Decl. Ex. 69 at 1-2, copying Wheeler on a report about the

   MCSO's FSOs being in "good shape" and their "[e]yes, noses, and throats

   [were] recovering steadily" and showing that an HVAC engineer contacted

   Wheeler to ensure that he "knew what [Wheeler] wanted to accomplish" and

   then set the "second and third floors" outside air dampers to "100%" air

   exchange; Wheeler Dep. 43:5-45:17, 46:2-48:14, confirming Wheeler knew

   about tear gas infiltration by this date, did not question the accuracy of the

   HVAC engineer's email regarding their conversation, and stated that he did

   know any MCSO employee named "Scott Wheeler"; Piucci Decl. Ex. 8 at 1

   & Ex. 69 at 2, identifying the requestor incorrectly as "Scott" but using the

   same work task number as the follow-up email that Wheeler received; Stanley

   Decl. at 11, noting that Wheeler knew about tear gas infiltration "as early as

   May 31, 2020").

- Wheeler also received nightly reports detailing tear gas-related events,

   including Anspach's July 2 report on USMS going "out for a bit and [taking]

   care of some business for some folks and clear[ing] them out," and Street

   "pass[ing] out and crack[ing] [his] head in his cell" before he "went on [a two]

person transport" and received four "scalpels [sic] in his head[.]" (Piucci Decl. Ex. 72 at 1.)

- In late May 2020 and the "month of June" 2020, Alexander was "physically present" "each night" at the Justice Center, "[p]eriodically" visited MCDC's housing floors, and recalled "a smell of smoke and possibly tear gas present in the building at times." (Alexander Decl. ¶¶ 7-8.) Alexander, however, states that "concentration was not significant enough to warrant *medical* care for [him]self, the employees or the AICs [who lived there]." (*Id.*) (emphasis added).

- By comparison, Alexander was only present two to three times a week "[d]uring the month of July" when the situation inside MCDC progressively worsened, and "does not recall based on [his] physical presence and reports from jail staff that there was a need for *urgent* care for employees or AICs because of the presence of tear gas in the building." (*Id.* ¶ 9) (emphasis added).

- The Individual Defendants were the only three MCSO officials who oversaw and possessed the authority to order a complete or partial evacuation of MCDC.

In the Court's view, a reasonable jury could reach conclusions similar to those described in the Ninth Circuit's *Wilk* decision:

> [The] first [issue is] whether defendants were aware that there was a substantial risk of serious harm to [plaintiff]. . . . [The caseworker] contends . . . [that she] was correct in perceiving that [plaintiff's fellow AIC] no longer posed a substantial risk of serious harm. [The caseworker's] contention is inconsistent with [plaintiff's] evidence. . . . At [the] time, nothing about [plaintiff's] circumstances had changed. There was no reason to believe that [the

AIC] no longer wished to attack [plaintiff], and [the caseworker] knew that [the housing units] shared the same yard. A reasonable juror could find that [the caseworker] was subjectively aware of the substantial risk of serious harm to [plaintiff].

. . . According to [plaintiff], [the associate warden] was present at the [classification] meeting, either in person or through a representative. The sole purpose of that meeting was for [plaintiff] to report [the other AIC's] threat and to express his fear of [the AIC]. . . .[A] reasonable jury could conclude that [the associate warden] was either present at the meeting or received a report from the meeting, and that she was therefore subjectively aware of the risk [the AIC] posed to [plaintiff].

. . . . According to [plaintiff, the warden was [also] present at the [classification] meeting, either in person or through a representative. . . . [A] reasonable jury could conclude that [the warden] knew what happened at the meeting. Moreover, [the warden] supervised the processing of requests to add someone to an inmate's enemy list. According to defendants' own evidence, caseworkers could not, on their own, add individuals to an enemy list. The warden or his designee was required to review and approve such requests. [Plaintiff] submitted the request to add [the AIC] to his enemies list . . . and the attack did not occur until . . . over three months later. . . . [A] reasonable fact-finder could conclude that [the warden] was personally aware of the risk posed by [the AIC] because of his role in supervising the enemy list revision process.

[The] next [issue is] whether defendants responded reasonably to the known substantial risk that [the AIC] posed to [plaintiff].

Taking [plaintiff's] evidence as true and viewing it in the light most favorable to him, [the caseworker's] response was not reasonable. [The caseworker] knew that inmates in [the housing units] sometimes interacted. He nonetheless placed [plaintiff] in [the unit], knowing that [the AIC] was in [the unit directly across from it] and would have an opportunity to attack [plaintiff]. Further, a reasonable jury could find that [the caseworker] was responsible for submitting [plaintiff's] request to add [the AIC] to his enemy list and that he failed to do so. [The caseworker] has never stated that he processed [plaintiff's] form. . . .

According to [plaintiff's] evidence, [the associate warden] either attended or sent a representative to the . . . meeting that determined where [plaintiff] would be housed. Thus, a reasonable jury could find that [the associate warden] either participated firsthand in the dangerous housing assignment or knew about the assignment and did nothing to alleviate the risk. . . . [A] reasonable jury could conclude that [the associate warden] was at least partially responsible for the failure to update [plaintiff's] enemy list because she acted immediately after the attack to update the list, which suggests that she had the authority to update the list all along.

PAGE 150 – FINDINGS AND RECOMMENDATION

. . . [The warden similarly] either attended the [relevant] housing meeting or sent a representative. . . . Further, because [the warden] oversaw the process of updating inmates' enemy lists, a jury could find that [the warden] had the power to process [plaintiff's] request but failed to do so.

956 F.3d at 1149-50.

For many similar reasons, the Court finds that there are genuine issues of material fact as to whether Defendants consciously disregarded the substantial risk of serious harm that tear gas exposure posed to Plaintiffs and other AICs. *Cf. Clement*, 298 F.3d at 905 (noting that "officers took turns stepping outside for fresh air," AICs "heard the officers coughing and gagging," AICs "made repeated requests for attention, complaining of breathing problems, pain, and asthma attacks," AICs were "coughing, gagging, or choking," and officers "place[d] an industrial fan in the doorway suggest[ing] that the pepper spray did not entirely dissipate at once and that the officers may have been aware of this condition"); *Walsh*, 2020 WL 1149912, at *5 (relying on *Clement* ); *Garcia v. Pope*, No. 2:18-cv-01573-MC, 2020 WL 1068239, at *2 (D. Or. Mar. 5, 2020) (noting that *Clement* "held that the failure to provide an inmate with prompt decontamination procedures after the use of pepper spray can establish a claim for deliberate indifference"). Accordingly, the Court recommends that the district judge deny Defendants' motion for summary judgment with respect to Plaintiffs' failure-to-protect claim under the Eighth Amendment. *See Sernas Cantrell*, No. 23-1379, 2024 WL 4891019, at *1 (9th Cir. Nov. 26, 2024) (reversing the district court's grant of the defendants' motion for summary judgment on the AICs' Eighth Amendment failure-to-protect claim and observing that the AIC "'suffer[ed] precisely the type of harm' [that] he gave [the] [d]efendants reason to foresee" (quoting *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1080 (9th Cir. 2013))); *see also Lemire*, 726 F.3d at 1078 ("[F]act-intensive [inquiries] typically should not be resolved at the summary judgment stage[.]").

### c.     Supervisory Liability

Defendants seek summary judgment on Plaintiffs' supervisory liability claims, arguing that the Individual Defendants "did not participate or direct the. . . staff who responded in the moment to the conditions" in which the MCSO confined AICs, nor did the Individual Defendants "fail[] to act in response to ongoing violations by subordinates." (Defs.' MSJ at 41.) The Court disagrees.

"A defendant may be held liable as a supervisor under [Section] 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). For supervisory liability claims, a plaintiff must demonstrate the "requisite causal connection," which can be "'can be established by setting in motion a series of acts by others,' or by 'knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury[.]'" *Id.* at 1207-08 (simplified) (quoting *Dubner v. City & Cnty. of S.F.*, 266 F.3d 959, 968 (9th Cir. 2001)). "A supervisor can [also] be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

Consistent with the discussion above, there are genuine issues of fact as to whether the Individual Defendants were the individuals answerable for AICs' safety and well-being at MCDC, the Individual Defendants' actions and inactions caused AICs' injury, and the Individual Defendants authorized the actions and inactions and were therefore deliberately indifferent to the

PAGE 152 – FINDINGS AND RECOMMENDATION

risks they created. *See id.* ("Starr's allegations that the actions or inactions of the person

'answerable for the prisoner's safe-keeping' caused his injury are therefore sufficient to state a

claim of supervisory liability for deliberate indifference."); *Lemire,* 726 F.3d at 1079 ("Th[e]

[record] is sufficient to create a disputed question of fact as to whether [the superior] authorized

these particular staff meetings and whether he was, therefore, deliberately indifferent to the risks

they created."). Accordingly, the Court recommends that the district judge deny Defendants'

motion for summary judgment on Plaintiffs' supervisory liability claim against the Individual

Defendants.

### d.    Qualified Immunity

The Court turns to whether the Individual Defendants are entitled to qualified

immunity.[41]

"Qualified immunity shields government officials from civil liability if 'their actions

could reasonably have been thought consistent with the rights they are alleged to have violated.'"

*Wright v. Beck*, 981 F.3d 719, 726 (9th Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635,

638 (1987)). The defense "attaches when an official's conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Id.* (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)); *see also Sandoval*, 985

F.3d at 671 ("Qualified immunity balances two important interests—the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officials

from harassment, distraction, and liability when they perform their duties reasonably." (quoting

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009))). "The reasonableness of the officer's conduct is

---

[41] As the Ninth Circuit has explained, "municipalities sued under [Section] 1983, unlike individuals, are not entitled to immunity, qualified or otherwise, and so, unlike individuals, can never be immune from trial." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019).

'judged against the backdrop of the law at the time of the conduct.'" *Wright*, 981 F.3d at 726

(quoting *Kisela*, 584 U.S. at 104); *see also Wilk*, 956 F.3d at 1148 (asking "whether the

applicable law was 'clearly established at the time of the incident'" (quoting *Pearson*, 555 U.S.

at 231)).

      In evaluating "qualified immunity in the context of summary judgment, [courts] consider

(1) whether the evidence viewed in the light most favorable to the plaintiff is sufficient to show a

violation of a constitutional right and (2) whether that right was 'clearly established at the time of

the violation.'" *Sandoval*, 985 F.3d at 671 (quoting *Horton*, 915 F.3d at 603). For the reasons

discussed above, Plaintiffs raise a genuine issue of material fact as to whether Defendants

violated their constitutional rights. The question, then, is whether Plaintiffs' Eighth and

Fourteenth Amendment rights were clearly established at the time of the alleged violations. *See*

*Bogle v. Clackamas County*, No. 3:15-cv-0013-SI, 2017 WL 5490870, at *14 (D. Or. Nov. 15,

2017) (finding the same); *see also Wilk*, 956 F.3d at 1148 (noting that the Ninth Circuit has

"appl[ied] Eighth Amendment standards to a pretrial detainee's case because . . . pretrial

detainees are entitled to at least as much protection as post-conviction inmate" (citing *Castro*,

833 F.3d at 1067)).

      "Officials are subject to suit only for actions that they knew or should have known

violated the law." *Wilk*, 956 F.3d at 1148 (citing *Hope*, 536 U.S. at 741). The Supreme Court has

explained that the "[l]aw is 'clearly established' for the purposes of qualified immunity if 'every

reasonable official would have understood that what he is doing violates the right' at issue." *Id.*

(simplified) (quoting *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (per curiam)). The Supreme

Court, however, has also explained that prison "'[o]fficials can still be on notice that their

conduct violates established law even in novel factual circumstances'—i.e., even without a prior

case that had 'fundamentally similar' or 'materially similar' facts." *Id.* (quoting *Hope*, 536 U.S. at 741).

In *Wilk*, the Ninth Circuit recognized as much in "address[ing] clearly established Eighth Amendment law with respect to failure-to-protect claims[:] 'The Supreme Court need not catalogue every way in which one inmate can harm another for us to conclude that a reasonable official would understand that his actions violated [the Eighth Amendment].'" *Id.* (quoting *Castro*, 833 F.3d at 1067). The Ninth Circuit added that "[o]nce an official is subjectively aware of a substantial risk of serious harm, 'clearly established' law requires 'only that the [official] take reasonable measures to mitigate the substantial risk.'" *Id.* at 1148-49 (quoting *Castro*, 833 F.3d at 1067).

Many cases, including several from this district, have addressed AICs' exposure to chemical irritants. In *Garcia*, for example, the AIC alleged that the "defendants exhibited deliberate indifference to his health and safety by exposing him to a warm shower after pepper spray was used against him." 2020 WL 1068239, at *1. In addressing qualified immunity, the district court noted that "the Ninth Circuit has held that the failure to provide an [AIC] with prompt decontamination procedures after the use of pepper spray can establish a claim for deliberate indifference." 2020 WL 1068239, at *2 (citing *Clement*, 298 F.3d at 905). The district court further noted that "most courts . . . rejected claims of deliberate indifference arising [solely] from a warm or hot decontamination shower," and that in the cases where courts "den[ied] qualified immunity, the [AICs] were subjected to additional conditions that exacerbated their pain and discomfort." *Id.* (simplified). In support of the latter finding, the district court cited examples where AICs asserted not only "claims of deliberate indifference arising from a warm or hot decontamination shower," but also asserted that they were "subjected to additional conditions

that exacerbated their pain and discomfort," such as (1) being placed "fully clothed" in a "scalding hot shower," moved to "solitary confinement," and forced to wait until the next day for "fresh clothing, bedding, or a mattress," and (2) receiving "only excessively hot water" for decontamination purposes and waiting for "hours" for any "medical assistance." *Id.* at *2-3 (simplified) (first quoting *Murray v. Lilly*, 426 F. Supp. 3d 245, 250 (S.D. W.Va. Sept. 26, 2019); and then quoting *Washington v. Gustafson*, No. 2:14-cv-00628, 2017 WL 947278, at *10-11 (E.D. Cal. Mar. 9, 2017), *report and recommendation adopted*, 2017 WL 1198656, at *1 (E.D. Cal. Mar. 31, 2017))).

Ultimately, the district court in *Garcia* held that "it was not clearly established that [the] plaintiff's Eighth Amendment rights would be violated by exposure to a warm decontamination shower in these circumstances, and [the] defendants are entitled to qualified immunity." *Id.* at *3. The Ninth Circuit affirmed on appeal. *See Garcia v. Pope*, 841 F. App'x 28, 29 (9th Cir. 2021) ("The district court properly granted summary judgment for defendants on Garcia's deliberate indifference claim on the basis of qualified immunity because defendants' conduct in providing Garcia with a warm/hot shower as part of decontamination procedures after he was pepper sprayed did not violate clearly established law." (citing *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014))); *see also Plumhoff*, 572 U.S. at 778-79 ("[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.").

Less than a week after the district issued its decision in *Garcia*, the district court issued its decision in *Walsh*, denying summary judgment on the basis of qualified immunity. 2020 WL 1149912, at *5. In *Walsh*, the plaintiff presented evidence demonstrating that the defendant prison officials personally "experienced the effects of the OC spray" and declined to assist or

ignored the plaintiff's reports of "pain or possible medical need," being unable to breathe, and needing to decontaminate "as a result of secondary exposure to OC spray." *Id.* at *4-5. The plaintiff also "submit[ted] evidence that both he and another [AIC] experienced pain and breathing problems along with choking, gagging, burning, and itching throughout the night." *Id.* at *5. The district court held that the plaintiff's "rights were clearly established," and thus held that the defendant officers were "not entitled to qualified immunity." *Id.* In support of this holding, the district court relied on *Clement* because in that case, the Ninth "Circuit found that very similar circumstances may have established a violation of the Eighth Amendment." *Id.* (citing *Clement*, 298 F.3d at 905). Specifically, *Clement* found that "when officers were coughing and gagging and opening the door to circulate air, and the [AICs] were repeatedly complaining to officers of breathing problems and pain, the [AICs] 'may be able to show that the defendants were subjectively aware of the risk of serious injury when they denied showers and medical attention for the inmates for the [four] hour period.'" *Id.* (quoting *Clement*, 298 F.3d at 905).

Later that same year, the same district court issued its opinion in *Rudolph v. Peters*, No. 2:18-cv-00607-HZ, 2020 WL 7318130, at *6 (D. Or. Dec. 4, 2020), in which it determined that the defendants were not entitled to summary judgment on the basis of qualified immunity, and distinguished *Garcia* on the ground that it was limited to the temperature of the decontamination shower:

> [U]nlike in *Garcia*, Plaintiff's Eighth Amendment claim against Defendants King and Turner is not solely based on the temperature of the water in the [disciplinary segregation unit (DSU)]. Rather, Plaintiff also alleges that Defendants knew that the inmates in the DSU . . . had been indirectly exposed to chemical agents and delayed in providing them any relief. When viewed in the light most favorable to Plaintiff, the record shows that Defendants Turner and King had notice of the issues with the ventilation system during the first extraction but failed to turn off the ventilation system and clear the air until all three extractions were complete.

> They also failed to provide Plaintiff with an opportunity to shower until over four hours after they had notice of Plaintiff's exposure. At the time of this incident, it was clearly established that a delay in providing relief after exposure to chemical agents may constitute an Eighth Amendment violation. . . . Accordingly, Defendants are not entitled to qualified immunity.

*Id.* (citing *Clement*, 298 F.3d at 904); *see also Rodriguez v. King*, No. 3:19-cv-00441-AR, 2023 WL 6931115, at *10 (D. Or. Sept. 26, 2023) ("Put differently, a reasonable jury could find that the defendants were 'deliberately indifferent' to the AICs' serious medical need for prompt decontamination procedures and supplies. Thus, the court held that the defendants were not entitled to qualified immunity because 'it was clearly established that the officers could not *intentionally* deny or delay access to medical care.'" (quoting *Clement*, 298 F.3d at 906)), *findings and recommendation adopted*, 2023 WL 6930861, at *1 (D. Or. Oct. 19, 2023).

Consistent with *Clement* and the district court decisions referenced above, the Court recommends that the district judge deny the Individual Defendants' motion for summary judgment on the basis of qualified immunity. (*See* Defs.' MSJ at 91-93; Defs.' MSJ Reply at 36-43.)

In *Clement*, the Ninth Circuit held that the district court "properly denied" summary judgment because the AIC's evidence suggested that the officials may have been "aware of the harmful effects of the pepper spray and of the inadequacy of their ventilation methods and yet purposefully refused to provide showers, medical care, or combative instructions or to develop an adequate policy to address obvious risks." 298 F.3d at 904. The Ninth Circuit explained that the AICs "may be able to show that the defendants were subjectively aware of the risk of serious injury when they denied showers [i.e., a decontamination procedure] and medical attention for the [AICs] for [a four] hour period," that a "jury might conclude that the officers were deliberately indifferent to such needs during the four-hour period after the incident," and that "[v]arious supervisory officials may also have been deliberately indifferent to obvious risks of

injury." *Id.* at 905-06. The Ninth Circuit held that "[u]nder such circumstances, the officials' actions [were] not protected by qualified immunity." *Id.* at 906; *see also Burghardt v. Borges*, No. 21-15736, 2023 WL 2570344, at *1 (9th Cir. Mar. 20, 2023) (noting that *Clement* addresses "Eighth Amendment excessive force and medical deliberate indifference claims" and prison officials who "knew of and disregarded an excessive risk to [an AIC's] health and safety in providing medical treatment and decontamination procedures" (citing *Clement*, 298 F.3d at 903-04)).

In arguing that they are entitled to qualified immunity, the Individual Defendants claim that this case is one of "first impression" because (1) law enforcement deployed tear gas "outside of the building," (2) the AICs' exposure "took place during the COVID pandemic," and (3) the "100 day continuous protesting was unprecedented." (Defs.' MSJ at 92.) Defendants argue that these "three facts cannot be excluded from identifying a case on point under qualified immunity." (*Id.*) Relatedly, and with respect to the "clearly established law" requirement, Defendants argue that *Clement* is "not helpful" because it involved "deployment of a chemical irritant *inside* of the jail that was under the control of the prison officials," the "spread of that contaminant into the next cell was the result of that intentional choice," the "ability to mitigate the harm was available precisely because the entire building was not contaminated by tear gas, i.e., there were other areas of the building that were not affected," the prison officials "looked on from a position of safety," and the COVID-19 pandemic was not a "barrier[] with regard to relocating the AIC" in *Clement*. (*Id.* at 93.)

Defendants' arguments are unpersuasive. As an initial matter, the MCSO was among the law enforcement agencies that deployed tear gas. But even if the MCSO was not the source of the tear gas each night, Defendants controlled and made decisions with respect to the Justice

Center's HVAC system, which was the conduit through which tear gas reached MCDC's housing cells.

Further, Defendants' suggestions that the entire building was always contaminated with tear gas and MCSO staff were never in a "position of safety" fare no better. Standing alone, Jacobs' testimony contradicts both assertions. He acknowledged that because he worked the day shift, he never "put [himself] into the [nightly] protests or into the smoke tear gas situation." (*See* Jacobs Dep. 36:3-37:9, "There was no smoke during my shift. There was no tear gas smell when I reported to work.").

Also noteworthy is that Defendants fail adequately to address the extent to which MCSO staff disregarded Plaintiffs' and other AICs' complaints that they were unable to breathe and suffering from painful tear gas exposure symptoms and denied various decontamination-related requests. For example, Defendants' evidence on showers and clothing supports that the MCSO was unable to provide clean clothes or showers to the AICs following each exposure, and Defendants fail to address bed linens. (*See* Bascuti Reply Decl. ¶¶ 5-6, stating that the MCSO provided "clean clothing twice a week" and required "shower[s] twice a week" but the "number of staff on duty during the summer of 2020 was not sufficient to provide daily exchanges and distribution of clothing for all AICs" and the "number of showers and the number of AICs in custody limit[ed] the ability to provide daily showers as a decontamination method to all AICs"; *see also* Stanley Decl. at 11, opining that the MCSO "should have authorized additional showers for [AICs] to wash away the contaminants" and "should have authorized additional changes of clothing and bed linens for [AICs] whose clothing was contaminated"; Sloane Decl. Ex. 1 at 5, according to Defendants' expert, "[b]ecause of its insoluble nature, [CS] decontamination of buildings or other items after exposure can be challenging").

PAGE 160 – FINDINGS AND RECOMMENDATION

Defendants are "not entitled to qualified immunity simply because 'the very action in question has [not] previously been held unlawful.'" *Sandoval*, 985 F.3d at 680 (quoting *Hope*, 536 U.S. at 739). As the Court explained above, "[s]tate officials can still be on notice that their conduct violates established law even in novel factual circumstances—i.e., even without a prior case that had fundamentally similar or materially similar facts." *Id.* (simplified) (quoting *Wilk*, 956 F.3d at 1147). In fact, that is what occurred in *Sandoval*. *See id.* (holding that "summary judgment on qualified immunity should not have been awarded to [the] defendant nurses," even though the Ninth Circuit had "never before addressed the specific factual circumstances" presented in that case). In *Sandoval*, the Ninth Circuit used *Clement* as a comparator case:

> If it [was] a constitutional violation to delay treatment for four hours for inmates exposed to pepper spray, *Clement*, 298 F.3d at 905, . . . which [was not a] potentially life-threatening condition[,] the same must be true for [the defendant nurses, who] fail[ed] to provide any meaningful treatment to an [AIC] who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated."

*Id.* Similarly here, if the four-hour delay in addressing pepper spray exposure in *Clement* was a constitutional violation, the "same must be true" for failing to address near-daily tear gas exposure here.

The Ninth Circuit has "recently and explicitly held that it is clearly established that prison officials must 'take reasonable measures to mitigate the [known] substantial risk[s]' to a prisoner." *Wilk*, 956 F.3d at 1150 (quoting *Castro*, 833 F.3d at 1067). Plaintiffs' "case does not involve the sort of 'novel factual circumstances' contemplated by [Supreme Court precedent;] [r]ather, the facts are 'materially similar' to previous cases." *Id.* (quoting *Hope*, 536 U.S. at 741). Like the present action, *Clement* involved similar "competing tensions" and disputes about "constraints" that prison officials faced:

> We note that the constraints facing the officials in this case differ from most cases involving the deprivation of medical needs. . . . The four-hour delay in

PAGE 161 – FINDINGS AND RECOMMENDATION

> this case followed a violent prison fight, which may have necessitated restrictions on inmate movement in the pod. In his affidavit, the control booth officer stated that due to the potential for violence, inmates housed in the security housing unit must be escorted in and out of the unit by two officers. In addition, after a disturbance, it is customary to restrict all inmate movement in a pod until the incident has been attended to. These competing tensions—the prisoners' need for medical attention and the government's need to maintain order and discipline—may be important to the resolution of whether the officials had the requisite subjective intent.

298 F.3d at 905 n.5; *see also id.* at 905-06 ("[I]t was also clearly established that the officers could not intentionally deny or delay access to medical care." (citing *Estelle*, 429 U.S. at 104-05)).

Despite the constraints that prison officials found in *Clement*, the Ninth Circuit made clear—in 2002—that prison officials' failure to address an AIC's exposure to chemical irritants can establish a claim for deliberate indifference. For all of these reasons, the Court concludes that the available law was clearly established with respect to the unreasonableness of the Individual Defendants' conduct here. *See Sandoval*, 985 F.3d at 674-75, 678-80 (making the analogous findings and explaining that qualified immunity "turns on the objective legal reasonableness of the official's acts," "even when the constitutional claim at issue involves subjective elements" (first quoting *Ziglar v. Abbasi*, 582 U.S. 129, 151 (2017); and then citing *Crawford-El v. Britton*, 523 U.S. 574, 588-89 (1998))). Accordingly, the Court recommends that the district judge deny summary judgment on the basis of qualified immunity.

### B.    Municipal Liability

Having found that the Individual Defendants are not entitled to summary judgment on Plaintiffs' Eighth and Fourteenth Amendment claims, the Court turns to Plaintiffs' claims against the County.

In *Monell*, the "Supreme Court held that a municipality may not be held liable for a [Section] 1983 violation under a theory of respondeat superior for the actions of its

PAGE 162 – FINDINGS AND RECOMMENDATION

subordinates." *Castro*, 833 F.3d at 1073 (citing *Monell*, 436 U.S. at 691). "To impose *Monell* liability on a municipality under Section 1983, [a] plaintiff must prove: (1) [the plaintiff] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) 'the policy is the moving force behind the [municipality's] constitutional violation.'" *Gordon*, 6 F.4th at 973 (quoting *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)).

"Official nonfeasance can constitute a *Monell* violation when the municipality in effect 'has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.'" *Scanlon v. County of Los Angeles*, 92 F.4th 781, 812 (9th Cir. 2024) (quoting *Mortimer v. Baca*, 594 F.3d 714, 722 (9th Cir. 2010)). "To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) [the county's] customs or policies were the moving force behind the employee's violation of constitutional rights." *Long*, 442 F.3d at 1185 (citation omitted); *see also Tobias Partners, L.P. v. City of Los Angeles*, 712 F. App'x 686, 687 (9th Cir. 2018) (noting the same and that "[a] 'lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the [municipality] has other general policies in place'" (quoting *Long*, 442 F.3d at 1189)).

Defendants first argue that they are entitled to summary judgment on Plaintiffs' *Monell* claim because there was "no underlying constitutional violation and as a result there can be no *Monell* claim in this case" (Defs.' MSJ at 74.) For the reasons explained above, Court disagrees and recommends that the district judge deny Defendants' motion for summary judgment on this ground.

Defendants next argue that they are entitled to summary judgment because "there was no custom or policy at all with regard to the initial use of tear gas or any pattern during the month of June," the "federal involvement in early July was without any notice," and "[i]f any pattern or policy existed in this case it would be in later July when Defendants intentionally closed the air dampers on a regular basis." (Defs.' MSJ at 75.) The Court disagrees.

The "practice or custom" here was the County's continued use of MCDC's housing floors—despite in-cell conditions that largely worsened over a two-month period—without adequate safeguards in place to ensure that AICs were breathing clean air, or receiving the showers and changes of clothes and bed linens necessary to avoid needless pain and suffering. *Cf. Sandoval*, 985 F.3d at 681 (identifying the "practice or custom" as the "use of . . . a 'mixed use' cell—sometimes used to hold inmates requiring medical care and other times used as a general holding cell—without adequate safeguards in place to ensure that jail staff were made aware when an individual was placed in [the cell] for medical, rather than correctional, reasons").

Reese testified that the MCSO leadership team's conversations about evacuation in late May or the "first week" or "first two weeks of June" were based on the "threat to the facility," not "continuing infiltration of tear gas," because at the time, "people [were] trying to break into the facility and take it over and . . . destroy it" and thus the "threat to the Justice Center . . . was super high." (*Id.* 51:3-23, 52:6-53:23.) Reese, however, also explained that he was present for "most of the events that transpired" at the Justice Center, and that he "never felt personally that the threat of infiltration of tear gas was such a high risk that [the MCSO] needed to evacuate the building." (*Id.* 52:12-21.) Reese further explained that at the time, he was "more concerned about

PAGE 164 – FINDINGS AND RECOMMENDATION

damage from fires or the potential that the building would be taken over by a violent mob." (*Id.* 52:21-23.)

As discussed, the record suggests that each of the Individual Defendants could have ordered complete (or partial) evacuations of MCDC's housing floors and knew that tear gas continued to infiltrate the building. Yet, the Individuals Defendants failed to act or deviate from or revisit their initial consideration of such matters or account for the AICs' basic needs and deteriorating living conditions. Plaintiffs present sufficient evidence to allow a jury to find that the County had an established practice of using MCDC's housing floors without adequate and necessary safeguards in place. *See Sandoval*, 985 F.3d at 681 (holding that the "evidence [was] sufficient to allow a jury to find that the County had an established practice of using [the cell] as a mixed-use cell without the safeguards necessary to ensure that the jail's medical staff knew when an inmate held there required medical treatment or observation").

"The next question is whether there is a 'direct causal link' between the County's practice with regard to [MCDC] and [Plaintiffs' and other AICs'] injuries." *Id.* (quoting *Castro*, 833 F.3d at 1075). The record evidence, including, but not limited to, Dr. Freedland's opinions and various contemporaneous reports on tear gas infiltration and the inadequacy and clear shortcomings of mitigation efforts, is sufficient to create a genuine issue of material as to whether the County's practice was the cause of Plaintiffs' and other AICs' injuries. *See id.* at 683 (holding that the district court "should not have . . . granted" "summary judgment . . . on the [c]ounty's liability under *Monell*" because the plaintiff presented "sufficient circumstantial evidence of the [c]ounty's knowledge such that a reasonable jury could find deliberate indifference").

///

Finally, "[i]t is not sufficient for a plaintiff to identify a custom or policy, attributable to the municipality, that caused his injury." *Castro*, 833 F.3d at 1076. Rather, "[a] plaintiff must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [the jail's] inhabitants.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

For the same reasons discussed above, Plaintiffs have created a material issue of fact regarding "objective deliberate indifference on the party of the County and have demonstrated that the "facts available to the County put it on 'actual or constructive notice' that its practices with regard to [MCDC] were 'substantially certain to result in the violation of the constitutional rights of [its AICs].'" *Sandoval*, 985 F.3d at 682 (citing *Castro*, 833 F.3d at 1076). Thus, the Court finds that the County is not entitled to summary judgment on Plaintiffs' *Monell* claim, and recommends that the district judge deny Defendants' motion for summary judgment on this ground.

## C.    Negligence Claims

Defendants move for summary judgment on Plaintiffs' negligence claims, arguing that they are immune from liability under provisions of the Oregon Tort Claims Act ("OTCA"), OR. REV. STAT. § 30.265, and that Plaintiffs' injuries were not legally foreseeable. (Defs.' MSJ at 42-43, 79-91.)

### 1.    OTCA Limitations

#### a.    Applicable Law

Before addressing Defendants' claims of immunity under the OTCA, the Court "briefly describe[s] the relevant legal landscape." *Turner v. State*, 375 P.3d 508, 513 (Or. 2016). "The OTCA waives the immunity to which public bodies are otherwise entitled and makes 'every public body . . . subject to civil action for its torts and those of its officers, employees and agents

acting within the scope of their employment or duties.'" *Sherman v. Dep't of Hum. Servs.*, 492 P.3d 31, 34 (Or. 2021) (quoting OR. REV. STAT. § 30.265(1)). The OTCA, however, "also provides limitations on tort actions against public bodies . . . [by] mak[ing] actions under the OTCA '[s]ubject to the limitations of ORS 30.260 to 30.300.'" *Id.* (quoting OR. REV. STAT. § 30.265(1); *see also Busch v. McInnis Waste Sys., Inc.*, 468 P.3d 419,425 n.5 (Or. 2020) (noting that the OTCA "waives the state's sovereign immunity" and is "codified at ORS 30.260 to 30.300").

The OTCA's limitations include the "so-called 'discretionary function' exception, set out at ORS 30.265(6)(c)." *Turner*, 375 P.3d at 513; *see also Clardy v. Gangitano*, 556 P.3d 642, 646 (Or. Ct. App. 2024) (describing "discretionary immunity" as a "defense" and "statutory doctrine embodied"). ORS § 30.265(6)(c) provides that "[e]very public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for . . . [a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." OR. REV. STAT. § 30.265(6)(c).

The OTCA's limitations also includes a "riot, civil commotion or mob action" exception, which is set out at ORS § 30.265(6)(e) (formerly numbered ORS § 30.265(3)(e)). *See Cox v. City of Portland*, No. 3:21-cv-00984-HZ, 2022 WL 16552077, at *2, *4-5 (D. Or. Oct. 26, 2022) (discussing the "'riot, civil commotion or mob action' . . . basis of immunity under [ORS] § 30.265(6)(e)," which was "formerly numbered [ORS] § 30.265(3)(e)"); *Opbroek v. City of Portland*, No. 3:22-cv-00610-JR, 2023 WL 4424758, at *2-5 (D. Or. Apr. 26, 2023) (doing the same), *findings and recommendation adopted*, 2023 WL 4234048, at *1-3 (D. Or. June 28, 2023); *see also Carillo v. City of Portland*, No. 3:21-cv-01340-YY, 2022 WL 4243460, at *8 (D.

PAGE 167 – FINDINGS AND RECOMMENDATION

Or. June 3, 2022) (referencing "so-called 'civil commotion' immunity under ORS 30.265(6)(e)"), *findings and recommendation adopted as supplemented*, 2022 WL 3715227, at *1-3 (D. Or. Aug. 29, 2022). Under this provision, "[e]very public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for . . . [a]ny claim arising out of riot, civil commotion or mob action or out of any act or omission in connection with the prevention of . . . [such action]." OR. REV. STAT. § 30.265(6)(e).

Further, the OTCA's limitations include an "apparent authority" exception, which is set out at ORS § 30.265(6)(f) (formerly numbered ORS § 30.265(3)(f)). *See Cruz v. Multnomah County*, 381 P.3d 856, 857-66 & n.1 (Or. Ct. App. 2016) (addressing the plaintiff's claims "based on his detention in the Multnomah County Jail" and this exception's former numbering, and affirming the trial court's holding that the defendants were entitled to "apparent-authority immunity under ORS 30.265(6)(f)," also known as the "apparent-authority immunity provision of the OTCA"). This exception addresses "act[s] done or omitted" under "apparent authority" of the "law":

> Every public body and its officers, employees and agents acting within the scope of their employment or duties, . . . are immune from liability for . . . [a]ny claim arising out of an act done or omitted under apparent authority of a law, resolution, rule or regulation that is unconstitutional, invalid or inapplicable except to the extent that they would have been liable had the law, resolution, rule or regulation been constitutional, valid and applicable, unless such act was done or omitted in bad faith or with malice.

OR. REV. STAT. § 30.265(6)(f); *see also Cruz*, 381 P.3d at 857 n.2 (referring to "[e]very public body and its officers, employees and agents" as "'public actors,' and . . . to 'a law, resolution, rule or regulation' as a 'law,' or, collectively, as 'laws[,]'" for "brevity" and "where the context allow[ed]").

///

PAGE 168 – FINDINGS AND RECOMMENDATION

b.    **Analysis**

Defendants argue that they are entitled to (1) discretionary immunity under ORS

§ 30.265(c), (2) "riot" immunity under ORS § 30.265(e), and (3) apparent authority immunity

under ORS § 30.265(f). (*See* Defs.' MSJ at 42-43, 84-86, invoking each of these OTCA

immunity provisions). The Court begins by addressing Defendants' discretionary immunity

defense.

Defendants fail to demonstrate that they are entitled to discretionary immunity. The

"discretionary immunity" exception is set out at ORS § 30.265(6)(c). *See Turner*, 375 P.3d at

513 (describing "discretionary immunity," also known as the "so-called 'discretionary function'

exception, set out at ORS 30.265(6)(c)") (simplified). Under this provision, "[e]very public body

and its officers, employees and agents acting within the scope of their employment or

duties . . . are immune from liability for . . . [a]ny claim based upon the performance of or the

failure to exercise or perform a discretionary function or duty, whether or not the discretion is

abused." OR. REV. STAT. § 30.265(6)(c); *see also Verardo v. Or. Dep't of Transp.*, 510 P.3d 983,

985 (Or. Ct. App. 2022) (noting that the provision "immunizes governmental entities from tort

liability").

The Oregon Supreme Court has explained that "[i]n a nutshell, governmental conduct

amounts to performance of a 'discretionary function or duty' if it 'is the result of a choice among

competing policy considerations, made at the appropriate level of government.'" *Turner*, 375

P.3d at 513 (quoting *Garrison v. Deschutes County*, 48 P.3d 807, 812 (Or. 2002)). Importantly,

"not all decisions by governmental actors involve such policy choices." *Id.* By way of example,

"discretionary-function immunity does not extend to 'routine decisions made by employees in

the course of their day-to-day activities, even though the decision involves a choice among two

or more courses of action.'" *Id.* (quoting *Lowrimore v. Dimmitt*, 797 P.2d 1027, 1030 (Or. 1990)).

To be entitled to the "affirmative defense" of discretionary immunity, a defendant "bear[s] the burden" of proving that "three criteria" are satisfied.[42] *Verado*, 510 P.3d at 987; *see also Gazitt v. City of Portland*, 341 Or. App. 407, 411 (Or. Ct. App. 2025) ("Because discretionary immunity is an affirmative defense on which [a defendant] would have the burden of proof at trial, summary judgment is appropriate only if the defendant establishes all of the elements of the defense as a matter of law.") (simplified). Specifically, a defendant must demonstrate that the decision was (1) "the result of a choice involving the exercise of judgment," (2) "involve[d] public policy as opposed to the routine day-to-day decision-making of public officials," and (3) "exercised by a body or person that has the responsibility or authority to make it." *Verado*, 510 P.3d at 987 (first citing *Turner*, 375 P.3d at 513; and then citing *Lowrimore*, 797 P.2d at 1030).

Defendants fail to demonstrate that all three criteria are satisfied here. A defendant is not entitled to discretionary immunity if there is a genuine issue of material fact as to a finding on which the defendant's defense depends. *See Turner*, 375 P.3d at 520 ("[T]he bottom line is that . . . a genuine issue of material fact exists as to whether sites that are not ranked in the top five percent of the [safety] index or are not considered 'high accident sites' are excluded from [Oregon Department of Transportation (ODOT)] highway safety funding, either through the [state program] or other highway safety funds. ODOT's claim of discretionary-function immunity depended on such a finding, and the trial court erred in granting summary judgment to it based on that claim of immunity."). Such is the case here.

---

[42] The parties agree that Defendants must satisfy these criteria. (*See* Defs.' MSJ Reply at 31; Pls.' MSJ Resp. at 53-54.)

Defendants' motion for summary judgment frames their discretionary immunity defense as dependent on several findings. Those findings include that Reese had the "sole authority to evacuate the MCDC during an emergency," Reese weighed various risks and "chose to defend in place" when confronted with the "threat of violence and potential takeover," and "[t]ear gas was a consideration" that Reese weighed in making this late May to mid-June 2020 decision. (Defs.' MSJ at 82-83.)

The record reflects that Reese believed that as the Sheriff, he was the only person who was responsible for deciding and possessed the authority to decide whether to evacuate MCDC. (Reese Dep. 36:8-21, 51:24-52:5.) Unlike Reese, Wheeler and Jarmer testified that Wheeler, Reese, and Alexander all had the authority to order an evacuation. (*See* Wheeler Dep. 95:19-96:23; Jarmer Dep. 46:23-47:8, recalling that the MCDC Evacuation Plan provided that only Reese, Alexander, or Wheeler could order an evacuation, and Jarmer could not do so; Piucci Decl. Ex. 74 at 45, noting that the MCDC Evacuation Plan states that "[o]nly" Reese, Alexander, "or" Wheeler "shall direct an evacuation").

With respect to the consideration of tear gas in deciding not to evacuate MCDC, Reese testified that the MSCO leadership team's discussion about evacuation was based on the "threat to the facility," not "continuing infiltration of tear gas," because at the time, "people [were] trying to break into the facility and take it over and . . . destroy it" and thus the "threat to the Justice Center . . . was super high." (*See* Reese Dep. 33:4-24, 51:3-23, 52:6-53:23, "Q. . . . I don't want the jury or the judge to be confused. Those considerations about relocation were in relation to the threat to the facility as opposed to infiltration of tear gas? A. Yes."). Reese also explained that he was present for "most of the events that transpired" at the Justice Center during the relevant period, and that he "never felt personally that the threat of infiltration of tear gas was

such a high risk that [the MCSO] needed to evacuate the building." (*Id.* 52:12-21.) At the time, Reese was "more concerned about damage from fires or the potential that the building would be taken over by a violent mob." (*Id.* 52:21-23.)

Defendants have not met their burden of demonstrating that they are entitled to summary judgment on their discretionary immunity defense. Defendants fail adequately to address Plaintiffs' argument about Reese's testimony that he did not to consider tear gas in making his decision. Defendants treat this as a "different point of view about the severity of the problem," and assert that Plaintiffs are "second-guessing . . . a discretionary policy choice" and suggesting that a "different approach should have been taken [and] weigh[ed] . . . tear gas as the greater threat." (*See* Defs.' MSJ Reply at 30-32; *but cf.* Defs.' MSJ at 83, stating that "[t]ear gas was a consideration" and citing Reese Dep. 52:12-23, and adding that Reese "considered the risks associated with exposure to tear gas" as "a result [of] the balancing of priorities"). Defendants also fail adequately to address Stanley's opinions on available options and what impact, if any, they would have had on their COVID protocols and objectives. (*See* Stanley Decl. at 8-9, citing options that would have "significantly abated the risk to AICs").

Given these genuine issues of material fact, the Court concludes that Defendants have failed to meet their burden of demonstrating that all three discretionary immunity criteria are satisfied. *See Turner,* 375 P.3d at 520 (noting that the defendant's "claim of discretionary-function immunity depended on [a certain] finding" and the "bottom line [was] that, on th[at] record, a genuine issue of material fact exist[ed]" on the finding and thus the "trial court erred in granting summary judgment to it based on that claim of immunity"). Accordingly, the Court recommends that the district judge deny Defendants' motion for summary judgment on this ground.

Defendants also assert a riot immunity defense. (Defs.' MSJ at 84; Defs.' MSJ Reply at 34-35.) As discussed, ORS § 30.265(6)(e) provides that "[e]very public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for . . . [a]ny claim arising out of riot, civil commotion or mob action or out of any act or omission in connection with the prevention of any of the foregoing." OR. REV. STAT. § 30.265(6)(e).

The district court's decision in *Opbroek* is instructive here. In *Opbroek*, the plaintiff attended a Floyd demonstration and suffered injuries when the PPB, which "made six unlawful assembly announcements," deployed "a flashbang grenade or other explosive device . . . [that] exploded on or near her body." *Opbroek*, 2023 WL 4424758, at *1. As a result, the plaintiff sued several PPB officers and the City of Portland, asserting excessive force and retaliation claims under Section 1983, and negligence, assault, and battery claims under Oregon law. *Id.* at *2. In recommending denial of defendants' motion to dismiss for lack of subject matter jurisdiction, the magistrate judge explained that ORS § 30.265(6)(e) "has not been thoroughly analyzed in either federal or state caselaw," and its "text, context, and legislative history . . . [did not suggest that] the intent of the [Oregon] legislature in passing [ORS] § 30.265(6)(e) was to immunize tortious or unconstitutional behavior conducted by police officers in the course of such events." *Id.* at *3-4.

In adopting and reviewing de novo the portions of the findings and recommendation ("F&R") to which the defendants objected, the district judge agreed with the magistrate judge's statutory interpretation:

> The F&R begins with a statutory interpretation of ORS § 30.265(6)(e). This section provides an exception to the [OTCA's] . . . waiver of immunity—that is, this section preserves immunity—for "[a]ny claim arising out of riot, civil commotion or mob action or out of any act or omission in connection with the

prevention of any of the foregoing." [Or. Rev. Stat. § 30.265(6)(e).] Neither
federal nor state courts have thoroughly analyzed this statutory provision. This
provision determines whether sovereign immunity shields the City from
Opbroek's state law claims in this case. The City argues that ORS § 30.265(6)(e)
offers expansive protection against liability in circumstances of civil
disobedience. According to the City, this immunity protects against any claim
either arising out of a riot, civil commotion, or mob action, or based on any act or
omission that the City undertook to prevent the same. . . .

 The F&R, however, agrees with Opbroek that the text, context, and
legislative history of ORS § 30.265(6)(e) suggest . . . [that] the Oregon state
legislature intended this provision to help public bodies get liability insurance by
providing immunity when third parties suffer damages as a result of a riot, civil
commotion, or mob action that the public body allegedly causes or fails to
prevent. *See* H.B. 1515, 1969 Leg., House Judiciary Comm. Minutes (Or. 1969)
("[This section] does not bar claims for torts committed by public employees
during the course of civil disturbances but would preclude claims based on a
theory that a public body caused or failed to prevent a civil disturbance. Liability
insurance policies commonly exclude coverage of this risk."); *see also Municipal
Liability for Riot Damage*, 81 Harv. L. Rev. 653 (Jan. 1968) (reviewing
contemporary state statutes holding municipalities liable for losses resulting from
mob violence). The F&R also notes that "[a]t common law, prior to the enactment
of the OTCA in 1968, police officers were not immune from liability for tortious
conduct committed within the scope of employment. So far as we can tell from
the history of this state, police officers have never enjoyed such an immunity."
ECF 84 at 7 n.4 (quoting *Rogers v. Saylor*, 760 P.2d 232, 236 (Or. 1988)).

 The City raises several objections . . . concerning the proper statutory
interpretation of ORS § 30.265(6)(e), including the weight afforded to legislative
history and to what degree [federal district court decisions] can aid that
interpretation. The Court has reviewed de novo the portions of the F&R that
address these arguments, as well as the parties' motion [papers
and] . . . objections. The Court agrees with the reasoning in the F&R as to these
objections.

2023 WL 4234048, at *1-2 (Simon, J.).

 Addressing the defendants' attack on subject matter jurisdiction, the district judge also

explained that ORS § 30.265(6)(e)'s preservation of sovereign immunity did not apply under the

circumstances:

 According to the City, the sole determination for jurisdiction is whether
Opbroek's state law claims arise out of a "riot, civil commotion or mob action or
out of any act or omission in connection with the prevention of any of the
foregoing." [Or. Rev. Stat.] § 30.265(6)(e). The F&R mistakenly broadens this

PAGE 174 – FINDINGS AND RECOMMENDATION

inquiry, the City argues, by considering the reasonableness or excessive danger of each actor's conduct within the protests at the time generally. The City contends that such considerations are beside the point where ORS § 30.265(6)(e) is concerned, and therefore irrelevant to the question of the Court's subject matter jurisdiction.

This argument fails under either party's interpretation of ORS § 30.265(6)(e). Under Opbroek's interpretation, with which the F&R agrees and the Court adopts, no intertwining analysis is necessary. The Court need not make any factual determinations because the statutory provision immunizes the City only from tort claims based on a theory that the City caused or failed to prevent a riot, civil disturbance, or mob action, and that the resulting riot, civil disturbance, or mob action caused damage to a third party. Thus, this exception to the OTCA's waiver of sovereign immunity does not apply to these circumstances. Subject matter jurisdiction, therefore, would not be in dispute.

*Id.* at *2.

Similar to *Opbroek*, Defendants have not met their burden of demonstrating that ORS § 30.265(6)(e)'s preservation of sovereign immunity applies here. Defendants distinguish *Opbroek* on the ground that it "concern[s] the use of force by individual [officers] during a riot," whereas Reese "decid[ed] how to respond to the riot," which, in Defendants' view, "benefits from" ORS § 30.265(6)(e)'s preservation of "immunity." (Defs.' MSJ Reply at 34.) Defendants emphasize that Reese's "decision to defend against the riots by protecting in place falls within the scope of this [provision]," the Court "need only consider the attempts by protestors to set the entire building on fire on May 29, 202[0]," and Reese's decision to "defend in place . . . also includes any acts taken by MCSO and other law enforcement agencies with regard to deployment of tear gas in response to the ongoing riots." (Defs.' MSJ at 42, 84; Defs.' MSJ Reply at 34.)

Significantly, Defendants fail to address the district judge's determination in *Opbroek* that ORS § 30.265(6)(e) "immunize[d] [the defendant] only from tort claims based on a theory that the [defendant]s caused or failed to prevent a riot, civil disturbance, or mob action, and that the resulting riot, civil disturbance, or mob action caused damage to a third party." 2023 WL

PAGE 175 – FINDINGS AND RECOMMENDATION

4234048, at *2 (finding the provision inapplicable). That is significant because Defendants bear

the burden of demonstrating their entitlement to an affirmative defense, and because Plaintiffs do

not appear to advance such a tort theory of liability here. Without more, the Court must (and

does) recommend that the district judge deny Defendants' motion for summary judgment on this

ground.

Finally, Defendants assert that they are entitled to "apparent authority" immunity.[43]

(Defs.' MSJ at 84-86; Defs.' MSJ Reply at 33.) Defendants, however, failed to plead the defense

of "apparent authority" immunity in their answer. (*See* Defs.' Answer & Affirmative Defs.'

¶¶ 68-82.)

Plaintiffs argue that Defendants cannot raise this affirmative defense for the first time at

summary judgment because allowing Defendants to do so would prejudice Plaintiffs, who were

deprived of an opportunity to "pursue discovery of the defense[.]" (Pls.' MSJ Resp. at 59.)

Defendants dismiss Plaintiffs' claim of prejudice as "conclusory" and "without any explanation,"

arguing that this is "not sufficient to deny Defendants' . . . right to assert this defense at summary

judgment" because a "party must point to a tangible way in which it was prejudiced by the

delay." (Defs.' MSJ Reply at 33, citing *Garcia v. Salvation Army*, 918 F.3d 997, 1008 (9th Cir.

2019).)

In *Garcia*, the Ninth Circuit explained that the "only prejudice" that the plaintiff asserted

was that "she was denied discovery to test the Salvation Army's defense," and that "[a]s a former

---

[43] As noted above, ORS § 30.265(6)(f) provides that "[e]very public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for . . . [a]ny claim arising out of an act done or omitted under apparent authority of a law, resolution, rule or regulation that is unconstitutional, invalid or inapplicable except to the extent that they would have been liable had the [authority] . . . been constitutional, valid and applicable, unless such act was done or omitted in bad faith or with malice." OR. REV. STAT. § 30.265(6)(f).

member of the Salvation Army's congregation, [the plaintiff] was intimately familiar with its religious focus and mission." 918 F.3d at 1009. The Ninth Circuit also explained that other matters relevant to the defense were "public" information. *Id.* Accordingly, the Ninth Circuit held that "[a]bsent prejudice, the [defendant] permissibly invoked [a religious organization exemption defense] at summary judgment, and it applie[d] to foreclose [the plaintiff's] Title VII claims." *Id.*

Defendants do not argue that Plaintiffs are "intimately familiar" with the facts underlying Defendants' apparent authority defense or could have obtained such information from public records, nor do Defendants provide any explanation for their delay in asserting this defense. (*See* Defs.' MSJ Reply at 33-34.) Absent any explanation or dispute about Plaintiffs' purported need for discovery, Defendants may not assert the affirmative defense of apparent authority immunity for the first time at summary judgment. *Cf. Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 764 (9th Cir. 2017) ("[Defendants] argue that . . . no additional discovery would be required. Whether or not this is true, Defendants provide no explanation at all for their delay. The 'reason for the delay' factor of excusable neglect has thus not been addressed at all. Absent any explanation for the delay, the district court acted within its discretion in concluding that Defendants' neglect was not excusable and thus in denying the motion to extend the deadline."). Accordingly, the Court recommends that the district judge deny Defendants' motion on this ground.

For these reasons, the Court concludes that Defendants failed to meet their burden of demonstrating that they are entitled to discretionary, riot, or apparent authority immunity under the OTCA.

///

PAGE 177 – FINDINGS AND RECOMMENDATION

### 2.    Foreseeability

The remaining issue to address is foreseeability. (Defs.' MSJ at 43, 88-91; Defs.' MSJ Reply at 35.) Defendants argue that they are entitled to summary judgment on Plaintiffs' negligence claims because the risk of harm was not foreseeable. (Defs.' MSJ at 43.) The Court disagrees.

"Although . . . [Oregon courts] generally analyze a defendant's liability for harm that the defendant's conduct causes another in terms of the concept of reasonable [foreseeability], rather than the more traditional duty of care, if the plaintiff invokes a special status, relationship, or standard of conduct, then that relationship may create, define, or limit the defendant's duty to the plaintiff[.]" *Stewart v. Kids Inc. of Dallas, Or.*, 261 P.3d 1272, 1277 (Or. 2011) (simplified). "However, even 'when a plaintiff alleges a special relationship as the basis for the defendant's duty, the scope of that particular duty may be defined or limited by common-law principles such as foreseeability.'" *Id.* (quoting *Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83 P.3d 322, 329 (Or. 2004)). Oregon courts have recognized that the Restatements provide "useful guidance regarding the duty imposed as the result of a special relationship or status[.]" *Id.* at 1279 (collecting cases).

"The Second Restatement of Torts provides, '[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to' 'protect them against unreasonable risk of physical harm[.]'" *Maney v. Oregon*, 729 F. Supp. 3d 1087, 1156 (D. Or. 2024) (quoting Restatement (Second) of Torts § 314A (Am. L. Inst. 1965)), *aff'd*, 2025 WL 1794110, at *1-2. "The comments provide that '[t]he duty . . . is only one to exercise reasonable care under the circumstances[,]' and the custodian 'is not required to take any action beyond that which is reasonable under the circumstances.'" *Id.* (citation omitted). Notably, "[p]rison officials are also

PAGE 178 – FINDINGS AND RECOMMENDATION

under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to [the AIC], if the actor (a) knows or has reason to know that [the actor] has the ability to control the conduct of the third persons, and (b) knows or should know of the necessity and opportunity for exercising such control." *Id.* (simplified). An individual "who has taken custody of another may not only be required to exercise reasonable care for the other's protection when the actor knows or has reason to know that the other is in immediate need of it, but also to make careful preparations to enable [the actor] to give effective protection when the need arises, and to exercise reasonable vigilance to ascertain the need of giving it." *Id.* at 1156-57 (simplified).

The Court concludes that Defendants had a special relationship to Plaintiffs and other AICs housed at MCDC. *See Crane v. United States*, No. 3:10-cv-00068-AC, 2013 WL 1453166, at *5 (D. Or. Mar. 21, 2013) ("In summary, the court concludes Oregon law imposes a special relationship which here required the USMS deputies to care for the [AICs] in their custody and generally protect them from harm."), *findings and recommendation adopted*, 2013 WL 1437816 (D. Or. Apr. 9, 2013). For the reasons discussed above, Plaintiffs raise a genuine issue of material fact with respect to whether Defendants failed to exercise reasonable care to protect AICs from the harm of tear gas exposure. Accordingly, the Court recommends that the district judge deny Defendants' motion for summary judgment on Plaintiffs' negligence claims under Oregon law.

///

///

///

**CONCLUSION**

For the reasons stated, the Court recommends that the district judge GRANT IN PART and DENY IN PART Defendants' motion for summary judgment (ECF No. 89) and GRANT IN PART and DENY IN PART Defendants' motion to strike (ECF No. 142).[44]

**SCHEDULING ORDER**

The Court will refer its Findings and Recommendation to a district judge. Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 5th day of September, 2025.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[44] The Court denies as moot Defendants' implicit request for judicial notice because the Court did not need to rely on the report at issue. (*See* Defs.' MSJ at 22, citing and noting that the Court may take notice of a house subcommittee report on risks posed by law enforcements' use of tear gas).

PAGE 180 – FINDINGS AND RECOMMENDATION