IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| THERESA DAVIS, RASHAWD DUHART, ROBIN LUNDY, and SEAN BERGLUND, individually and on behalf of all similarly situated individuals, | Case No. 3:20-cv-02041-SB |
| Plaintiffs, | OPINION AND ORDER ADOPTING FINDINGS & RECOMMENDATIONS IN PART |
| v. | |
| MULTNOMAH COUNTY, a political subdivision of the state of Oregon, MICHAEL REESE, STEVEN ALEXANDER, JEFFERY WHEELER, and JOHN DOES 1-50, acting in concert and their individual capacities, | |
| Defendants. | |

Christopher A. Larsen, Pickett Dummigan McCall LLP, 210 SW Morrison Street, Suite 400, Portland, OR 97204. David F. Sugerman & Nadia H. Dahab, Sugerman Dahab, 101 SW Main Street, Suite 910, Portland, OR 97204. Erious Johnson, Jr., Harmon Johnson LLC, University Station Executive Suites, 698 12th Street SE, Suite 240/No. 4, Salem, OR 97301. Gabriel Michael Chase, Chase Law, PC, 2014 NE Broadway Street, Portland, OR 97232. Michelle R. Burrows, Michelle R. Burrows PC, 16869 SW 65th Ave, Suite 367, Lake Oswego, OR 97035. David D. Park, David D. Park, Attorney at Law, 1500 SW 1st Avenue, Suite 1000, Portland, OR 97201. Joseph E. Piucci, Piucci Law, 900 SW 13th Avenue, Suite 200, Portland, OR 97205. Attorneys for Plaintiffs.

Christopher A. Gilmore, Multnomah County, County Attorney, 501 SE Hawthorne Street, Suite 500, Portland, OR 97214. Attorney for Defendants.

**IMMERGUT, District Judge.**

Plaintiffs are former adults in custody ("AICs") who were exposed to tear gas and other chemical agents at the Multnomah County Detention Center ("MCDC"), which housed approximately 221 to 316 AICs in downtown Portland, between May 29, 2020, and July 29, 2020. Class Certification Order, ECF 60 at 2; Findings and Recommendations ("F&R"), ECF 154 at 1–2, 16. During these early months of the COVID-19 global pandemic, prior to the availability of any vaccine for the virus, nightly riots occurred outside of the MCDC in the aftermath of the killing of George Floyd. F&R, ECF 154 at 1–2, 5–8. In response to these riots, state and federal law enforcement agents deployed tear gas[1] almost nightly to disperse the rioters. *Id.* at 2. This tear gas infiltrated the Multnomah County Justice Center ("Justice Center"), which houses the MCDC, through its heating, ventilation, and air conditioning ("HVAC") system, exposing Plaintiffs—and jail staff—to tear gas. *Id.* at 2. The Justice Center is a "porous" building, which means that it is "constantly infiltrated by outside air." Plaintiffs' Amended Response in Opposition to Defendants' Motion for Summary Judgment ("Response"), ECF 130 at 13; *see* F&R, ECF 154 at 17–19. Therefore, even when the HVAC system's "dampers," i.e. "adjustable plates that regulate airflow," are fully closed, they "do not seal airtight" and "outside air can make its way through the system." F&R, ECF 154 at 17, 19 (citation modified).

The ambient tear gas that infiltrated the MCDC during the night dissipated during the daytime, to the point that one jail employee who worked the day shift testified that "[t]here was no tear gas smell when I reported to work." *Id.* at 160 (quoting Jacobs Dep. 36:7–8, Gilmore Decl. Ex. 11, ECF 138-11 at 5). During the night, however, Plaintiffs experienced various

---

[1] Following the parties' convention, this Court uses "tear gas" as an "umbrella term" to refer to various chemical agents, including tear gas and pepper spray. F&R, ECF 154 at 2 n.3.

symptoms due to their exposure to tear gas entering the MCDC from outside the jail. *Id.* at 132. These symptoms included "exacerbated asthma and mental health symptoms," and "irritation and burning of the eyes, face, nose, skin, and throat," as well as other symptoms. *Id.* (citation modified). But during this time, the tear gas caused only a single hospitalization, when an AIC fell after an asthma attack and wounded his head, which required four staples to treat. *Id.*

In November 2020, Plaintiffs brought this class action against defendants Multnomah County; Multnomah County Sheriff Michael Reese; Chief Deputy of Corrections for the Multnomah County Sheriff's Office ("MCSO") Steven Alexander; and MCSO Captain and MCDC Facility Commander Jeffery Wheeler (collectively, "Defendants"), alleging that Defendants violated their federal constitutional rights by failing to protect them from tear gas. Complaint, ECF 1 ¶¶ 8–11, 96–123. In November 2022, Plaintiffs filed the operative First Amended Complaint ("FAC"), bringing five claims against Defendants: (1) violation of the Eighth and Fourteenth Amendments against all Defendants for failure to protect Plaintiffs, ECF 44 ¶¶ 91–98; (2) violation of the Eighth and Fourteenth Amendments against all Defendants for delay and denial of essential medical care, *id.* ¶¶ 99–104; (3) violation of the Eighth and Fourteenth Amendments against Multnomah County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for failure to protect, *id.* ¶¶ 105–09; (4) violation of the Eighth and Fourteenth Amendments against the individual Defendants for failure to supervise, *id.* ¶¶ 110–18; and (5) negligence claims against all Defendants, *id.* ¶¶ 119–23.

In April 2024, Defendants moved for summary judgment on all claims, *see* Defendants' Motion for Summary Judgment ("MSJ"), ECF 89; Response, ECF 130, and in April 2025, Defendants moved to strike portions of Plaintiffs' expert reports and other evidence cited in Plaintiffs' response brief, *see* Defendants' Motion to Strike, ECF 142. In September 2025,

Magistrate Judge Stacie F. Beckerman issued her Findings and Recommendations, recommending that this Court (1) grant in part and deny in part Defendants' motion for summary judgment and (2) grant in part and deny in part Defendants' motion to strike. F&R, ECF 154 at 3. Defendants filed objections to the F&R ("Objections"), ECF 156, and Plaintiffs filed a response to the Objections ("Response to Objections"), ECF 161.

This Court has reviewed the F&R and ADOPTS IN PART AND DECLINES TO ADOPT IN PART the magistrate judge's F&R. This Court declines to adopt the F&R's conclusion that the individual Defendants are not entitled to qualified immunity. F&R ECF 154 at 153–62. This Court finds that because the unlawfulness of the individual Defendants' conduct was not clearly established, they are entitled to qualified immunity on Plaintiffs' federal constitutional claims. Therefore, this Court need not reach whether there are genuine disputes of material fact as to whether the individual Defendants violated Plaintiffs' Eighth and Fourteenth Amendment rights. This Court thus declines to adopt the F&R's conclusion that a reasonable jury could find that Defendants violated Plaintiffs' Eighth and Fourteenth Amendments by not evacuating the maximum-security MCDC in response to nightly ambient tear gas infiltration from outside the jail, while jail employees continued to work inside the jail and during the early months of the COVID-19 pandemic. *See id.* at 106–53. This Court also declines to adopt the F&R's analysis and conclusion denying Plaintiffs' state negligence claims, *id.* at 166–79, because this Court finds that Defendants are entitled to discretionary immunity under the Oregon Tort Claims Act ("OTCA"). This Court ADOPTS the remainder of the magistrate judge's F&R.

More precisely, this Court adopts the following sections of the F&R. First, this Court adopts the F&R's introduction, "Background," and "Legal Standards" sections. *Id.* at 1–58. As noted in the F&R's introduction, Plaintiffs "are no longer pursuing their claims for inadequate

medical care under the Eighth and Fourteenth Amendments," and therefore, this Court adopts the magistrate judge's recommendation to grant summary judgment to Defendants on those claims. F&R, ECF 154 at 3 n.5; *see* FAC, ECF 44 ¶¶ 99–104. Second, this Court agrees with the magistrate judge's resolution of (1) Defendants' motion to strike portions of Plaintiffs' summary judgment response and expert reports and (2) Plaintiffs' motion to strike certain sources cited in Defendants' motion for summary judgment. *Id.* at 58–106. Third, Defendants have not objected to the magistrate judge's recommendation to deny summary judgment on Plaintiffs' *Monell* claim, and this Court adopts the magistrate judge's recommendation. *Id.* at 162–65.

Therefore, Defendants' Motion to Strike, ECF 142, is GRANTED IN PART AND DENIED IN PART in accordance with the F&R, ECF 154 at 58–106, and Defendants' Motion for Summary Judgment, ECF 89, is GRANTED IN PART AND DENIED IN PART as follows. This Court GRANTS summary judgment to (1) the individual Defendants on Plaintiffs' Eighth Amendment and Fourteenth Amendment claims based on failure to protect and failure to supervise (Claims 1 and 4 in the FAC, ECF 44 ¶¶ 91–98, 110–18); (2) all Defendants on Plaintiffs' Eighth Amendment and Fourteenth Amendment claims based on delay and denial of essential medical care (Claim 2 in the FAC, *id.* ¶¶ 99–104); and (3) all Defendants on Plaintiffs' negligence claims (Claim 5 in the FAC, *id.* ¶¶ 119–23). This Court DENIES summary judgment to Multnomah County on Plaintiffs' Eighth and Fourteenth Amendment claims based on the County's failure to protect Plaintiffs under *Monell* (Claim 3 in the FAC, *id.* ¶¶ 105–09).

## STANDARDS

Under the Federal Magistrates Act ("Act"), the court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). If a party objects to a magistrate judge's F&R, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations

PAGE 5 – OPINION AND ORDER ADOPTING FINDINGS & RECOMMENDATIONS IN PART

to which objection is made." *Id.* But the court is not required to review, de novo or under any other standard, the factual or legal conclusions of the F&R to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 149–50 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). Nevertheless, the Act "does not preclude further review by the district judge, *sua sponte*" whether de novo or under another standard. *Thomas*, 474 U.S. at 154.

The court grants summary judgment "when, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to judgment as a matter of law." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (quoting *Grenning v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014)).

## DISCUSSION

This Court grants summary judgment to the individual Defendants on Plaintiffs' federal constitutional claims and to all Defendants on Plaintiffs' state negligence claims. As to the federal constitutional claims under the Eighth and Fourteenth Amendments, Defendants Reese, Alexander, and Wheeler are entitled to qualified immunity because the unlawfulness of their conduct was not clearly established at the time they failed to evacuate the MCDC or to take other remedial measures proposed by Plaintiffs in response to the infiltration of tear gas from outside the MCDC. As to the state negligence claims, all Defendants are entitled to discretionary immunity under the OTCA because the decision not to evacuate the MCDC weighed policy considerations and was made by Sheriff Reese, who had the authority to make the decision.

### A. Qualified Immunity

"Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

PAGE 6 – OPINION AND ORDER ADOPTING FINDINGS & RECOMMENDATIONS IN PART

"To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Id.* at 1066–67. "This familiar conjunctive test allows [the court] to approach the qualified immunity question using either prong as [the] starting point." *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023). A court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Because this Court concludes that Defendants did not violate Plaintiffs' clearly established rights, this Court "do[es] not reach the constitutional violation prong." *DeFrancesco v. Robbins*, 136 F.4th 933, 939 (9th Cir. 2025) (per curiam). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 771 (9th Cir. 2025) (citation modified) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Hopson*, 71 F.4th at 708 (citation modified) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

"Although 'a case directly on point' is not necessarily required, a rule is only clearly established if it has been 'settled' by 'controlling authority' or 'a robust consensus of cases of persuasive authority' that 'clearly prohibits the officer's conduct in the particular circumstances,' with 'a high degree of specificity.'" *Id.* (quoting *Wesby*, 583 U.S. at 63–64 (citation modified)).

PAGE 7 – OPINION AND ORDER ADOPTING FINDINGS & RECOMMENDATIONS IN PART

This "objective" test "compares the factual circumstances faced by the defendant to the factual circumstances of prior cases to determine whether the decisions in the earlier cases would have made clear to the defendant that his conduct violated the law." *Sandoval v. County of San Diego*, 985 F.3d 657, 674 (9th Cir. 2021). The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 583 U.S. at 63–64 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

"While a case addressing general principles may clearly establish a right 'in an obvious case,' such obvious cases are 'rare.'" *Waid v. County of Lyon*, 87 F.4th 383, 388 (9th Cir. 2023) (first quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam); and then quoting *Wesby*, 583 U.S. at 64)). To satisfy this rare exception, Plaintiffs must "explain why their case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations." *Id.* Either way, the plaintiff "bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (citation modified).

In this case, the individual Defendants are entitled to qualified immunity because Plaintiffs have not identified "cases that control or reflect a consensus of non-binding authorities in similar situations." *Id.* Plaintiffs first cite *Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979), for the proposition that "[s]ince 1979, the Ninth Circuit has held that the use of tear gas *can* be a violation of the Eighth Amendment." Response, ECF 130 at 65 (emphasis added). But of course, whether the use of tear gas *can* violate the Eighth Amendment and whether it *clearly does so* in a particular case are entirely different questions. The "clearly established law inquiry" addresses the latter, not the former. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 600

PAGE 8 – OPINION AND ORDER ADOPTING FINDINGS & RECOMMENDATIONS IN PART

(9th Cir. 2019) ("[T]he qualified immunity inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009))).

A brief review of *Spain* demonstrates that its narrow prohibition on the use of tear gas has little bearing on the clearly established law inquiry in this case. In *Spain*, six AICs in a California state prison brought a lawsuit challenging various "conditions of their confinement and certain practices directed against them by prison guards" that the plaintiffs alleged violated their Eighth Amendment rights. 600 F.2d at 191–92. Among other things, "[t]he plaintiffs sought to prohibit prison personnel from using tear gas against them," which "was used to remove recalcitrant prisoners from their cells," resulting in "anguish to prisoners in adjacent cells." *Id.* at 193. "The district court enjoined state prison officials from using tear gas" except under three narrow circumstances after concluding that "tear gas and other chemical agents are dangerous, inflict pain, and can cause permanent injury and even death." *Id.* at 194 (citation modified).

The Ninth Circuit vacated the district court's injunction and remanded for the court to narrow the scope of the injunction. *Id.* at 194–96. The Ninth Circuit agreed that to the extent that "the defendants made *unwarranted use* of this painful and dangerous substance as a matter of practice," the defendants violated the Eighth Amendment. *Id.* at 195 (emphasis added). But to the extent that the defendants did not use "dangerous quantities" of tear gas, the Ninth Circuit held that "use of the substance in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." *Id.* As the Court explained, "where there are safeguards to [e]nsure that tear gas is not used in dangerous quantities we think its use can be justified in situations which are reasonably likely to result in injury to persons or a substantial

amount of valuable property." *Id.* at 196. The Ninth Circuit "therefore remand[ed] to the district court for determination of appropriate standards concerning dosage level and manner of use to delineate between dangerous and nondangerous use of the chemical." *Id.* Moreover, the Ninth Circuit remanded for the district court "to formulate a standard consistent with this opinion so that tear gas may be used in nondangerous quantities if no more convenient or safe control method is available and if feasible steps are taken to protect nonrecalcitrant inmates." *Id.*

Therefore, *Spain* established that prison guards' usage of (1) "nondangerous quantities" of tear gas is permissible "if no more convenient or safe control method is available and if feasible steps are taken to protect nonrecalcitrant inmates" and (2) "potentially dangerous quantities" of tear gas is permissible under certain narrowly defined circumstances.[2] *Id.* at 196. In this case, Plaintiffs are not claiming that the individual Defendants used tear gas against them, let alone that Defendants used tear gas against them in "potentially dangerous quantities" or in situations not authorized by *Spain. Id.* Rather, Plaintiffs challenge Defendants' failure to adequately respond to infiltration of tear gas used against *rioters* outside of the MCDC. *Spain*'s holding that unwarranted use of tear gas against *AICs* violates the Eighth Amendment in the above carefully delineated circumstances does not "clearly prohibit" Defendants' failure to evacuate the MCDC in the face of building-wide tear gas contamination. *Wesby*, 583 U.S. at 63.

Indeed, when considered in context, *Spain* cannot put the individual Defendants in this case on "fair notice" that their conduct was unlawful. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation modified). The plaintiffs in *Spain* challenged prison guards' deliberate use of

---

[2] The Ninth Circuit agreed with the district court that usage of potentially dangerous quantities of tear gas was justified when there is an: (1) "actual or imminent threat of death or bodily harm or escape"; (2) "actual or imminent threat of serious damage to a substantial amount of valuable property"; or (3) "actual or incipient riot involving a large number of unconfined inmates." *Id.* at 194, 196 (quoting *Spain v. Procunier*, 408 F. Supp. 534, 547 (N.D. Cal. 1976)).

tear gas "to remove recalcitrant prisoners from their cells," 600 F.2d at 193, and it was this deliberate use of tear gas by the prison guards themselves that formed the basis of the constitutional violation. It is "in light of th[is] specific context," *Horton*, 915 F.3d at 600, that the Ninth Circuit held that prison guards *may* use "nondangerous quantities" of tear gas (1) "if no more convenient or safe control method is available" and (2) "if feasible steps are taken to protect nonrecalcitrant inmates." *Spain*, 600 F.2d at 196. Regarding the former, when prison guards are not the ones using tear gas against AICs—as is the case here—they are not attempting to "control" anyone and thus do not even consider whether there is a "more convenient or safe control method." *Id.* Regarding the latter, there is no difference between the "feasible steps" available to protect recalcitrant and nonrecalcitrant AICs when tear gas pervades an entire building, which is the case here, as opposed to when tear gas is used within a specific jail cell against specifically targeted recalcitrant AICs. In short, *Spain* does not clearly establish the unlawfulness of the individual Defendants' conduct.

Plaintiffs next turn to the Ninth Circuit's decision in *Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002). But in arguing that "prisoners have a right to be free from harmful irritants in their cells that pose a present or future risk of harm," Response, ECF 130 at 73, Plaintiffs characterize *Clement* "at much too high a level of generality," *Nicholson v. City of Los Angeles*, 935 F.3d 685, 695 (9th Cir. 2019). By "compar[ing] the factual circumstances" between *Clement* and this case, as required, it becomes apparent that *Clement* does not clearly establish the unlawfulness of the individual Defendants' conduct in this case. *Sandoval*, 985 F.3d at 674.

In *Clement*, three AICs alleged that when prison officials "used pepper spray to quell a fight between two other prisoners, . . . the pepper spray vapors drifted into the plaintiff inmates' cells." *Clement*, 298 F.3d at 901. The plaintiffs brought an Eighth Amendment claim that the

defendants "were deliberately indifferent to the medical needs of the neighboring inmates who allegedly suffered harmful effects from migrating pepper spray vapors." *Id.* After the defendants finished using pepper spray to break up the fight, "[t]he fighting prisoners were escorted out of the cell and attended to shortly." *Id.* at 902. However, it was not until four hours later that "officials finally escorted the bystander inmates out of their cells for showers." *Id.* During those four hours, at least two bystander AICs "suffered asthma attacks or difficulty in breathing," and several AICs "call[ed] out to prison officials for medical attention and to be taken from their cells and allowed to shower." *Id.*

The Ninth Circuit affirmed the district court's denial of summary judgment to the defendants on the plaintiffs' Eighth Amendment claim for deliberate indifference to medical needs. *Id.* at 904–06. The Ninth Circuit found a genuine dispute of material fact whether the defendants "were aware of the harmful effects of the pepper spray and of the inadequacy of their ventilation methods and yet purposefully refused to provide showers, medical care, or combative instructions or to develop an adequate policy to address obvious risks." *Id.* at 904. Therefore, if the plaintiffs proved these facts to be true at trial, then the defendants "may have been deliberately indifferent to the prisoners' serious medical needs" in violation of the Eighth Amendment. *Id.*

Like *Spain*, *Clement* "concerns the deployment of a chemical irritant *inside* of the jail that was under the control of the prison officials." MSJ, ECF 89 at 101. As Defendants point out, critically, in *Clement*, "[t]he ability to mitigate harm was available precisely because the entire building was not contaminated by tear gas, i.e. there were other areas of the building that were not affected." *Id.* In contrast, here, tear gas infiltrated the entire building, limiting what measures other than total evacuation of the MCDC would have prevented, or even reduced, Plaintiffs'

exposure to tear gas. *Clement* does not support the conclusion that "every reasonable official would have understood" that failure to evacuate the MCDC would violate Plaintiffs' constitutional rights. *Horton*, 915 F.3d at 599 (quoting *Isayeva*, 872 F.3d at 946).

Neither does *Clement* clearly establish the unlawfulness of the individual Defendants' conduct under a theory of supervisory liability. *See* F&R, ECF 154 at 152–53. In *Clement*, the Ninth Circuit denied the defendants summary judgment on the plaintiffs' "claim that the supervisory officials failed to institute adequate prison policies for minimizing the effects of pepper spray *on bystander inmates*." 298 F.3d at 905 (emphasis added). This makes sense given that under *Spain*, clearly established Ninth Circuit law imposed certain obligations on prison officials with respect to protecting bystander AICs when deploying tear gas against other AICs, as discussed above. *See Spain*, 600 F.2d at 196 (permitting tear gas deployment against "recalcitrant" AICs "if feasible steps are taken to protect nonrecalcitrant inmates").

But *Clement* did not recognize anything akin to the broader theory of supervisory liability that Plaintiffs advance in this case, that "[t]he supervisors have a constitutional duty to protect" Plaintiffs' "right to be free from repeated exposure to tear gas either ambiently or through the ventilation system." FAC, ECF 44 ¶ 111. Neither *Clement* nor *Spain* supports such a generalized right. Indeed, such a right would conflict with *Spain*, in which the Ninth Circuit authorized tear gas usage—both in dangerous and nondangerous quantities—in certain circumstances, acknowledging that "[u]se of tear gas has been sanctioned by other courts." 600 F.2d at 195. The Ninth Circuit recently recognized a much narrower limitation on the usage of chemical irritants based on both *Clement* and *Spain*. *See Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013). In *Furnace*, the Ninth Circuit held that "it is a violation of the Eighth Amendment for prison officials *to use* mace, tear gas or other chemical agents *in quantities greater than necessary or*

*for the sole purpose of infliction of pain.*" *Id.* (emphasis added) (citation modified). This case does not involve any use of tear gas or other chemical agents against AICs, let alone use of such agents in quantities greater than necessary or for the sole purpose of infliction of pain.

Plaintiffs also rely in passing on two Supreme Court cases to argue that, along with *Spain* and *Clement*, "[t]hese cases together make clear that prisoners have a right to be free from harmful irritants in their cells that pose a present or future risk of harm." Response, ECF 130 at 73. But once again, Plaintiffs divorce the language of these cases' holdings from their facts. In *Hudson v. McMillian*, 503 U.S. 1, 4 (1992), after an argument between the plaintiff AIC and the defendant prison guard, the prison guard "punched [the plaintiff] in the mouth, eyes, chest, and stomach while [another guard] held the inmate in place and kicked and punched him from behind." *Id.* The beating resulted in "minor bruises and swelling of his face, mouth, and lip," "loosened . . . teeth," and a "cracked . . . partial dental plate." *Id.* It was within this factual context that the Supreme Court held that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment," *id.* at *5 (citation modified), which Plaintiffs quote in support of their qualified immunity argument, Response, ECF 130 at 73. As evident from its facts, *Hudson* has no bearing on the clearly established law inquiry here.

Likewise, Plaintiffs cite *Helling v. McKinney*, 509 U.S. 25 (1993), which held that "the health risk posed by involuntary exposure of a prison inmate to environmental tobacco smoke (ETS) can form the basis of a claim for relief under the Eighth Amendment." *Id.* at 27–28. The plaintiff in *Helling* "was assigned to a cell with another inmate who smoked five packs of cigarettes a day." *Id.* at 28. Even setting aside "the obvious distinction that tobacco smoke and tear gas are not equivalents," Plaintiffs ignore that *Helling* "involve[d] a controlled environment

where something as simple as a no smoking policy could prevent a serious and deadly harm." Defendants' Reply in Support of Motion for Summary Judgment ("Reply"), ECF 137 at 46–47. The Supreme Court in *Helling* made this exact point when it noted that due to the Nevada state prison system's recent adoption of "a formal smoking policy," which "restricts smoking . . . to specifically designated areas," on remand, the policy may "make it impossible for [the plaintiff] to prove that he will be exposed to unreasonable risk," thereby defeating his Eighth Amendment claim. *Helling*, 509 U.S. at 36. In contrast, Defendants here could not adopt a similar policy to prevent or limit Plaintiffs' exposure to tear gas by restricting its usage to designated areas in the MCDC, given that the tear gas originated outside the building and permeated the entire building.

Plaintiffs argue that "a reasonable officer" would have known that AICs' "repeated exposures necessitated a full evacuation." Response, ECF 130 at 46. But for purposes of the clearly established prong of qualified immunity, the question is whether *every* reasonable officer would have understood this based on legal precedent, *Horton*, 915 F.3d at 599. This case involves "factual circumstances" too different from the "the factual circumstances of prior cases" to conclude that every reasonable official would have known that failure to evacuate the MCDC would violate Plaintiffs' Eighth and Fourteenth Amendment rights. *Sandoval*, 985 F.3d at 674.

Plaintiffs also briefly argue that "Defendants did not even take *minimal* steps to allow AICs temporary relief from the tear gas exposure," Response, ECF 130 at 46, but Plaintiffs did not have clearly established constitutional rights to mandate such steps under the circumstances as they existed between May 29, 2020 and July 29, 2020. As to Plaintiffs' requests for "additional showers to wash away contaminants," *id.*, it is true that in *Clement*, failure "to provide showers" formed in part the basis for a viable Eighth Amendment claim for deliberate indifference to medical needs, 298 F.3d at 904. But in addition to the factual differences already

discussed, *Clement* did not involve any practical constraints on the availability of showers, as is the case here, with only six showers for over a hundred AICs exposed to tear gas. Reply, ECF 137 at 16, 19. Defendants already provide showers to AICs at least twice a week, MSJ, ECF 89 at 35, and Plaintiffs do not provide any evidence to support their argument that providing additional showers was feasible. As to Plaintiffs' request for additional "changes of clothing and bed linens," Response, ECF 130 at 46, Defendants likewise provide Plaintiffs clean clothing at least twice a week, MSJ, ECF 89 at 35, and again, Plaintiffs do not provide any evidence to rebut Defendants' evidence that "[w]ashing all AICs['] clothing on a daily basis [was] not feasible based on the number of staff available during the summer of 2020." Reply, ECF 137 at 19. Regardless, Plaintiffs do not explain how additional showers or changes of clothing and bed linens would have prevented their exposure to tear gas given the nightly, building-wide infiltration of tear gas. Presumably, tear gas infiltrated the MCDC showers as well.[3]

Thus, Plaintiffs have not satisfied their burden that their "right to be free from repeated exposure to tear gas," in the specific context of this case, FAC, ECF 44 ¶ 111, was "clearly established by controlling authority or a robust consensus of cases of persuasive authority." *DeFrancesco*, 136 F.4th at 939 (quoting *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019)). In reaching a contrary conclusion, the F&R makes the same fundamental error as Plaintiffs: characterizing various cases "at much too high a level of generality to clearly establish a rule of conduct" in the particular factual circumstances of this case. *Nicholson*, 935 F.3d at 695.

---

[3] As to Plaintiffs' passing argument that Defendants "could have[] directed food service staff to bring more water to AICs to ensure adequate hydration," Response, ECF 130 at 46, Plaintiffs do not point to any evidence that Defendants ever denied an AIC's request for water, or even any evidence that an AIC ever requested more water in response to tear gas exposure.

*First*, the F&R overgeneralizes *Clement* when it reasons that "if the four-hour delay in addressing pepper spray exposure in *Clement* was a constitutional violation, the 'same must be true' for failing to address near-daily tear gas exposure here." F&R, ECF 154 at 161 (quoting *Sandoval*, 986 F.3d at 680). But the clearly established law inquiry demands a more exacting analysis that considers the similarities and differences of the surrounding circumstances. For example, the F&R's reasoning would allow a court to conclude that because in *D'Braunstein v. Cal. Highway Patrol*, 131 F.4th 764, 771 (9th Cir. 2025), the Ninth Circuit found that the failure to provide medical care for "over three and a half hours" was a Fourteenth Amendment violation, 131 F.4th at 767, an officer always violates the Fourteenth Amendment if it takes longer than three-and-a-half hours to provide medical care. This reasoning does not consider "the specific context of the case." *Horton*, 915 F.3d at 600 (citation modified). Rather, the magistrate judge should have "compare[d] the factual circumstances faced by [Defendants] to the factual circumstances of prior cases to determine whether the decisions in the earlier cases would have made clear to [Defendants] that [their] conduct violated the law." *Sandoval*, 985 F.3d at 674.

Defendants point out several meaningful factual differences between *Clement* and this case, which the F&R acknowledges but does not properly credit. Defendants argue that unlike in this case, in *Clement*, (1) the "deployment of a chemical irritant *inside* of the jail . . . was under the control of the prison officials," (2) the "spread of that contaminant into the next cell was the result of that intentional choice," (3) the "ability to mitigate the harm was available precisely because the entire building was not contaminated by tear gas," (4) the prison officials "looked on from a position of safety," and (5) the COVID-19 pandemic was not a factor "with regard to relocating" AICs. F&R, ECF 154 at 159 (quoting MSJ, ECF 89 at 101). The F&R concludes that

these distinguishing features "are unpersuasive," *id.*, but fails to provide compelling reasons for overlooking these important factual differences in its clearly established law analysis.

As to arguments (1) and (2), the F&R reasons that the Multnomah County Sherriff's Office ("MCSO") "was among the law enforcement agencies that deployed tear gas" during the riots. F&R, ECF 154 at 159. Even setting aside that the MCSO did not deploy any tear gas outside the MCDC after June 2020, *see* MSJ, ECF 89 at 25–26, there are relevant differences between *Clement* and this case. In *Clement*, prison guards deployed tear gas *against AICs* inside a jail cell, which exposed AICs in neighboring cells to tear gas. Whereas in this case, law enforcement officers, not prison guards, deployed tear gas *against rioters* outside the MCDC, which exposed AICs in the jail to tear gas through diffusion into the Justice Center through the building's HVAC system. As discussed in detail above, *Clement* does not put "every reasonable official" on notice that because the former situation violates AICs' Eighth Amendment rights, the latter situation also violates AICs' Eighth and Fourteenth Amendment rights. *Horton*, 915 F.3d at 599 (quoting *Isayeva*, 872 F.3d at 946).

The F&R next reasons that "even if the MCSO was not the source of tear gas each night, Defendants controlled and made decisions with respect to the Justice Center's HVAC system, which was the conduit through which tear gas reached MCDC's housing cells." F&R, ECF 154 at 159–60. But this is a reason that *supports* finding qualified immunity in this case, not a reason that detracts from such a finding. There was no question in *Clement* that the plaintiffs could escape exposure from tear gas by simply being let out of their cells and allowed to shower. 298 F.3d at 902. *Clement* had nothing to do with the reasonableness of either housing AICs within a "porous" building that would always allow the infiltration of outside air contaminants or failing to evacuate the building when such infiltration occurred. F&R, ECF 154 at 11. Defendants'

PAGE 18 – OPINION AND ORDER ADOPTING FINDINGS & RECOMMENDATIONS IN PART

liability hinges on resolving these issues, and *Clement* did not resolve either of them. *See Wesby*, 583 U.S. at 64 ("A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established." (citation modified)).

As to the "ability to mitigate the harm," the F&R does not discuss that in *Clement*, "there were other areas of the building that were not affected." MSJ, ECF 89 at 101. This difference is highly relevant to whether "every reasonable official would have understood" that failure to evacuate the MCDC or take other protective measures would violate Plaintiffs' constitutional rights. *Horton*, 915 F.3d at 599 (quoting *Isayeva*, 872 F.3d at 946). For Plaintiffs' "Fourteenth Amendment failure-to-protect claim . . . the critical question is whether the defendant failed to *take reasonable measures* to abate a serious risk of harm to an inmate." *Sandoval*, 985 F.3d 669 (emphasis added). Similarly, for Plaintiffs' Eighth Amendment claim, Plaintiffs must show that Defendants were not only "subjectively aware of a substantial risk of serious harm to an inmate" but also "disregard[ed] that risk by failing to *respond reasonably*." *Wilk*, 956 F.3d at 1147 (emphasis added). Therefore, Plaintiffs' constitutional claims require assessing the reasonableness of the measures that Defendants "took, and failed to take," *Wilk*, 956 F.3d at 1150, which certainly depends on whether tear gas affected the entire jail or just part of the jail. Once again, in *Clement*, there was no dispute that the defendants could have ended the plaintiffs' four-hour exposure to tear gas by taking them out of their cells. It requires too great of a generalization to find that under *Clement*, every reasonable official would have known that failure to evacuate over 200 AICs from a maximum-security jail amidst nightly, building-wide, contamination of tear gas, coming from outside the building, would violate the Constitution.

This is especially true in light of the several steps that Defendants *did* take in an attempt to reduce Plaintiffs' exposure to tear gas. Facing jail-wide tear gas contamination, Defendants

placed portable air filters throughout the MCDC "in areas where there were vulnerable AICs and where tear gas was concentrated." MSJ, ECF 89 at 25–26, 65. And while there are genuine disputes of material fact regarding the efficacy of "opening and closing" the HVAC system's outside air dampers, Defendants indisputably "intended to prevent tear gas from entering the building" by strategically operating the building's HVAC system. F&R, ECF 154 at 135. *Clement* did not give Defendants "fair notice" that taking these measures in lieu of evacuating the MCDC would be unreasonable under clearly established law. *Kisela*, 584 U.S. at 104.

Furthermore, unlike in *Clement*, where prison guards "looked on from a position of safety," Defendants correctly point out that "in this case the opposite is true." MSJ, ECF 89 at 101. Plaintiffs do not dispute that "jail and medical staff continued to work in the same space on their regular shifts throughout the entire summer." *Id.* at 46. Indeed, prison guards and nurses who worked during the night shift when tear gas infiltrated the MCDC experienced symptoms such as "mild discomfort," "a tickle in my throat," "a pungent smell," and stinging eyes due to tear gas exposure. Takahashi Decl. ¶ 7, ECF 104 at 3; Barlow Decl. ¶ 7, ECF 91 at 3; Hay Dep. 49:18, Piucci Decl. Ex. H, ECF 42-8 at 6; Harrington Dep. 29:6–7, Gilmore Decl. Ex. 7, ECF 138-7 at 6. The F&R acknowledges that one prison guard even entered an AIC's cell "for the purpose of evaluating whether AICs' cell conditions differed from the officers' areas" and determined that the tear gas was worse *outside* of the cells. F&R, ECF 154 at 112 n.37; *see* Harrington Dep. 44:15–45:6, Gilmore Decl. Ex. 7, ECF 138-7 at 7–8. But to rebut the undisputed fact that jail employees were exposed to tear gas in the MCDC, the F&R cites the testimony of one MCSO staff member who stated that because "he worked the day shift, he never 'put [himself] into the [nightly] protests or into the smoke tear gas situation.'" F&R, ECF 154 at 160

(brackets in original) (quoting Jacobs Dep. 37:6–7, Gilmore Decl. Ex. 11, ECF 138-11 at 6). But of course, this MCDC employee was not exposed to tear gas because he worked the day shift.

Lastly, as to Defendants' concerns relating to the COVID-19 virus, the F&R completely ignores the COVID-19 pandemic in its analysis, despite its recognition that "[i]n March 2020, the United States confronted a threat unlike any in recent times: the COVID-19 pandemic." F&R, ECF 154 at 4–5 (quoting *Seaplane Adventures, LLC v. County of Marin*, 71 F.4th 724, 726 (9th Cir. 2023)). As Plaintiffs themselves admit, an evacuation of the MCDC "would raise challenges with inmate classification and staffing, and COVID-19 complicated these issues at the time" during the summer of 2020.[4] Response, ECF 130 at 47. In fact, when jail employees weighed whether to evacuate MCDC AICs to the Multnomah County Inverness Jail ("MCIJ") in northeast Portland, they noted that "COVID-19 has become one of many secondary concerns" and evaluated the MCIJ's capacity to house MCDC AICs in light of the number of MCDC AICs infected with the COVID-19 virus. F&R, ECF 154 at 118–19 (quoting Piucci Decl. Ex. 45, ECF 42-40 at 1). Moreover, at the time, the CDC "included specific guidance on limiting transfers to other facilities to prevent the spread of COVID-19." MSJ, ECF 89 at 9–10. And in the summer of 2020, "vaccines were not yet available, and public health policy then in effect for the United States called for physical distancing and limiting large gatherings." F&R, ECF 154 at 5 (citation modified) (quoting *Tinius v. Choi*, 77 F.4th 691, 701 (D.C. Cir. 2023)).

The F&R fails to acknowledge the importance of several factual differences between *Clement* and this case in reaching its conclusion that "the available law was clearly established

---

[4] As Defendants explain, classification of AICs "is an essential part of determining the correct housing" because "[t]he intent is to place inmates in the least restrictive housing." MSJ, ECF 89 at 13–14. The classification process considers, among other factors, "the potential for violence, vulnerability to violence, and the potential for being disruptive or a management problem," including "an inmate's charges, criminal history, and history of violence." *Id.* at 14.

with respect to the unreasonableness of the Individual Defendants' conduct here." F&R, ECF 154 at 162. The F&R claims that "*Clement* involved similar 'competing tensions' and disputes about 'constraints' that prison officials faced." *Id.* at 161 (quoting *Clement*, 298 F.3d at 905 n.4). This Court respectfully disagrees with the F&R's conclusion. Other than the fact that prison officials in both cases faced constraints, these constraints were of an entirely different nature, as discussed above. "The four-hour delay in [*Clement*] followed a violent prison fight." *Id.* at 161–62 (quoting *Clement*, 298 F.3d at 905 n.4). Here, months of nightly tear gas exposure followed from nightly riots outside of the MCDC. In *Clement*, "the government's need to maintain order and discipline" delayed prison guards' response. *Id.* at 162 (quoting *Clement*, 298 F.3d at 905 n.4). Here, the safety constraints of evacuating an entire 200-to-300 maximum-security jail population during a global pandemic limited the remedial measures available to Defendants. In sum, neither *Clement*—nor any other binding precedent—clearly established the unconstitutionality of the individual Defendants' conduct in this case.

*Second*, to the extent that the magistrate judge relies on three unpublished opinions from this district to support its conclusion that Plaintiffs' rights were clearly established, these three cases do not "reflect a consensus of non-binding authorities in similar situations" to this case. *Waid*, 87 F.4th at 388. As an initial matter, it is doubtful that three unpublished decisions from the same district court could form "a robust consensus of cases of persuasive authority" for qualified immunity purposes. *DeFrancesco*, 136 F.4th at 939 (quoting *Tuuamalemalo*, 946 F.3d at 477). When "[t]here is no binding precedent . . . governing the issue at stake," "courts in this circuit may look to other decisional law, 'including relevant decisions of other circuits, state courts, and district courts.'" *DeFrancesco*, 136 F.4th at 939 (quoting *Moonin v. Tice*, 868 F.3d 853, 868 (9th Cir. 2017)). But as the Ninth Circuit has explained, courts "have been somewhat

PAGE 22 – OPINION AND ORDER ADOPTING FINDINGS & RECOMMENDATIONS IN PART

hesitant to rely on district court decisions" because they "do not necessarily settle constitutional standards." *Id.* (quoting *Evans v. Skolnik*, 997 F.3d 1060, 1067 (9th Cir. 2021)). In a similar vein, "rarely" has the Ninth Circuit concluded that "absent any published opinions on point or overwhelming obviousness of illegality," "the law was clearly established on the basis of unpublished decisions only." *Id.* (quoting *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002)).

But even assuming that three unpublished decisions from the same district could provide "a robust consensus of cases of persuasive authority," *DeFrancesco*, 136 F.4th at 939 (quoting *Tuuamalemalo*, 946 F.3d at 477), all three cases "are too factually dissimilar" from this case "to clearly establish a constitutional violation" here. *Nicholson*, 935 F.3d at 695.

In *Garcia v. Pope*, No. 18-cv-01573, 2020 WL 1068239 (D. Or. Mar. 5, 2020), the plaintiff AIC alleged that the defendant prison guards "exhibited deliberate indifference to his health and safety by exposing him to a warm shower after pepper spray was used against him." *Id.* at *1. The district court cited *Clement* but noted that "no controlling or even persuasive authority has held that warm-water decontamination showers constitute deliberate indifference." *Id.* at *2. The court concluded that the "plaintiff's right to a cold decontamination shower was not clearly established at the time of the incident" and thus granted summary judgment to the defendants without reaching the issue of whether there was a constitutional violation. *Id.* at *1.

In *Walsh v. Gower*, No. 18-cv-00098, 2020 WL 1149912 (D. Or. Mar. 9, 2020), the plaintiff AIC alleged that the defendant prison officials "violated his Eighth Amendment rights by failing to allow [him] an opportunity to decontaminate after secondary exposure to OC," i.e. pepper, "spray." *Id.* at *1. The district court recognized that this case involved "very similar circumstances" to those in *Clement*. *Id.* at *5. Like in *Clement*, the plaintiff in *Walsh* was exposed to pepper spray after prison guards deployed tear gas against another AIC in a

neighboring cell. *Id.* at *1. Also, like in *Clement*, the defendant prison guards in *Walsh* denied him a decontamination shower despite his requests for one and "left the [contaminated] unit to get fresh air." *Id.* at *1–2. The district court found both that there was a triable issue on the Eighth Amendment violation and that the plaintiff's rights were clearly established. *Id.* at *4–5.

Similarly, in *Rudolph v. Peters*, No. 18-cv-00607, 2020 WL 7318130 (D. Or. Dec. 4, 2020), the plaintiff brought an Eighth Amendment claim based on deliberate indifference to his serious medical needs after "he was secondarily exposed" to OC/CS spray. *Id.* at *1. The plaintiff testified that it was not until "over four hours after [he] says he was first exposed and alerted prison staff to his exposure" that he "was finally offered a decontamination shower." *Id.* As in *Walsh*, the district court held that there was a triable issue on whether the defendants were "deliberately indifferent to Plaintiff's serious medical needs." *Id.* at *3. And again, the district court cited *Clement* to conclude that the defendants' failure to "to provide Plaintiff with an opportunity to shower until over four hours after they had notice of Plaintiff's exposure" violated his clearly established Eighth Amendment rights. *Id.* at *6 (citing *Clement*, 298 F.3d at 904).

While these cases share factual similarities with *Clement*, they share the same factual differences between *Clement* and this case that made *Clement* "too factually dissimilar to clearly establish a constitutional violation" in this case. *Nicholson*, 935 F.3d at 695. First off, in *Garcia*, the district court did not even consider whether there was a triable issue on the plaintiff's Eighth Amendment claim because such a violation would not be clearly established. 2020 WL 1068239, at *1. And on appeal, the Ninth Circuit affirmed the district court's determination "on the basis of qualified immunity because defendants' conduct . . . did not violate clearly established law." *Garcia v. Pope*, 841 F. App'x 28, 29 (9th Cir. 2021). Therefore, *Garcia* does not clearly

establish *any* law regarding the unconstitutionality of tear gas exposure, let alone the unconstitutionality of tear gas exposure in the particular factual circumstances of this case.

More broadly, neither *Walsh* nor *Rudolph* support finding a clearly established violation in this case. As in *Clement*, both *Walsh* and *Rudolph* involved secondary exposure to bystander AICs following prison guards' usage of tear gas against other AICs. As in *Clement*, in both cases, there was no dispute that the defendants were able to mitigate the plaintiffs' tear gas exposure "because the entire building was not contaminated by tear gas." MSJ, ECF 89 at 101. In short, *Walsh* and *Rudolph* found that the plaintiffs' Eighth Amendment rights were clearly established because "[i]n *Clement*, the Ninth Circuit found that very similar circumstances may have established a violation of the Eighth Amendment." *Walsh*, 2020 WL 1149912, at *5. Therefore, these two district court cases do not "reflect a consensus of non-binding authorities in similar situations" to this case, any more than *Clement* provides binding precedent that "control[s]" in this case. *Waid*, 87 F.4th at 388.

*Third*, in support of its conclusion that qualified immunity does not apply, the F&R relies on the general proposition that "it is clearly established that prison officials must take reasonable measures to mitigate the known substantial risks to a prisoner." F&R, ECF 154 at 161 (citation modified) (quoting *Wilk*, 956 F.3d at 1150). But the F&R fails to mention the immediately preceding sentences in *Wilk*, which delineate *in which cases* this general principle is clearly established: "None of the defendants can claim ignorance to a prisoner's right to be protected from *violence at the hands of other inmates*. That right has been clearly established since the Supreme Court's decision in *Farmer v. Brennan*[, 511 U.S 825 (1994),] in 1994." *Wilk*, 956 F.3d at 1150 (emphasis added); *see also Castro*, 833 F.3d at 1067 (citing the same general principle in the context of a plaintiff's clearly established "right to be free from violence at the hands of other

inmates"). This case does not involve any "violence at the hands of other inmates," *id.*, as in *Wilk*, *Castro*, and *Farmer*. And the Ninth Circuit has explicitly rejected the F&R's logic that this general rule governs failure-to-protect cases that do not involve violence between AICs: "it is not sufficient that *Farmer* clearly states the general rule that prison officials cannot deliberately disregard a substantial risk of serious harm to an inmate." *Hampton v. California*, 83 F.4th 754, 769 (9th Cir. 2023) (citation modified).

Indeed, the Ninth Circuit's clearly established law analysis in *Hampton* is instructive. *Hampton* involved an Eighth Amendment claim based on an AIC's death from COVID-19 after the prison official defendants transferred AICs infected with COVID-19 from a different prison to the prison where the AIC was housed. *Id.* at 758–60. The Ninth Circuit affirmed the district court's denial of qualified immunity because "an inmate's right to be free from exposure to a *serious disease*" was clearly established. *Id.* at 769–70 (emphasis added). The Ninth Circuit did not simply rely on the general rule that "prison officials must take reasonable measures to mitigate the known substantial risks to a prisoner," F&R, ECF 154 at 161 (citation modified), which collapses the clearly established prong into the constitutional violation prong. Rather, the Ninth Circuit cited cases involving "exposure to a serious disease." *Hampton*, 83 F.4th at 769.[5]

_____

[5] To the extent the magistrate judge relies in part on the "rare" exception that this "case is obvious under existing general principles," *Waid*, 87 F.4th at 388, such reliance would be erroneous. "Those few cases in which courts have found obvious constitutional violations are instructive." *Id.* In the paradigmatic case of *Hope v. Pelzer*, 536 U.S. 730, 734–35 (2002), "a prison inmate[] was chained to a 'hitching post' for seven hours as punishment, during which he was forced to be shirtless in the hot sun, given water only 'once or twice,' and provided no bathroom breaks." *Waid*, 87 F.4th at 388 (quoting *Hope*, 536 U.S. at 734–35). In another case, the Ninth Circuit held that "officers obviously violated the constitutional rights of a sixth-grade student when they arrested him even though the child was 'compliant and calm,' committed no known wrongdoing, posed no 'threat to himself or others,' and 'engage[d] in no act of resistance.'" *Id.* at 389 (brackets in original) (quoting *C.B. v. City of Sonora*, 769 F.3d 1005, 1027 (9th Cir. 2014)). In stark contrast to these "obvious" constitutional violations, this case concerns prison officials' failure to evacuate a maximum-security jail in response to nightly

For all of the above reasons, this Courts grants summary judgment to the individual Defendants on Plaintiffs' constitutional claims for failure to protect and failure to supervise based on qualified immunity.[6]

## B. Discretionary Immunity

Defendants are entitled to summary judgment on Plaintiffs' state negligence claims because Defendants are immune from liability under the Oregon Tort Claims Act for any tort claim based on their failure to evacuate the MCDC. Under the OTCA, "[e]very public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for . . . [a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." *Turner v. State*, 359 Or. 644, 652 (2016) (en banc) (quoting Or. Rev. Stat. § 30.265(6)(c)). "In a nutshell, governmental conduct amounts to performance of a 'discretionary function or duty' if it 'is the result of a choice among competing policy considerations, made at the appropriate level of government.'" *Id.* (quoting *Garrison v. Deschutes County*, 334 Or. 264, 273 (2002)).

---

ambient tear gas infiltration from outside the jail—while jail employees continued to work inside the building—during the early months of the COVID-19 pandemic. In other words, this is a quintessential example of a case in which a constitutional violation, if any, would *not* be obvious.

[6] Although the individual Defendants are entitled to qualified immunity on Plaintiffs' constitutional claims based on a failure to protect, Defendant Multnomah County is not entitled to summary judgment on these claims. *See Horton*, 915 F.3d at 602–05. "[M]unicipalities sued under § 1983, unlike individuals, are not entitled immunity, qualified or otherwise, and so, unlike individuals, can never be immune from trial." *Id.* at 603. "To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). For the reasons stated in the F&R, there are genuine disputes of material fact as to each of these elements that preclude summary judgment to Defendants. *See* F&R, ECF 154 at 162–66. Defendants do not object to the magistrate judge's denial of summary judgment on Plaintiffs' *Monell* liability claim, and this Court does not revisit the F&R's analysis as to that claim.

"The range of permissible choice does not, however, include the choice of not exercising care." *Mosley v. Portland Sch. Dist. No. 1J*, 315 Or. 85, 92 (1992) (en banc); *see Garrison*, 334 Or. at 274 ("In other words, the decision *whether* to protect the public by taking preventive measures, or by warning of a danger, if legally required, is not discretionary; however, the government's choice of *means* for fulfilling that requirement may be discretionary."). Moreover, the immunity does not insulate "routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action." *Turner*, 359 Or. at 652 (quoting *Lowrimore v. Dimmitt*, 310 Or. 291, 296 (1990)).

As the parties agree, discretionary immunity applies to a decision only if it was (1) "the result of a choice involving the exercise of judgment," (2) "involve[d] public policy as opposed to the routine day-to-day decision-making of public officials," and (3) "exercised by a body or person that has the responsibility or authority to make it." *Verardo v. Or. Dep't of Transp.*, 319 Or. App. 442, 447 (2022); *see* Objections, ECF 156 at 24; Response to Objections, ECF 161 at 10. "Discretionary immunity is an affirmative defense and the burden to prove that it applies is on the public body." *Rush v. Corvallis Sch. Dist. 509J*, 291 Or. App. 252, 256 (2018).

Here, Defendants have demonstrated that all three requirements are met with respect to Defendant Multnomah County Sheriff Reese's decision not to evacuate the MCDC, and therefore, Defendants are immune from liability on Plaintiffs' negligence claims under state law. As to the first requirement, Reese made "a choice involving the exercise of judgment" when he decided not to evacuate the MCDC in response to nightly tear gas infiltration. *Verado*, 319 Or. App. at 447. Reese specifically testified: "I never felt personally that the threat of infiltration of tear gas was such a high risk that we needed to evacuate the building." Reese Dep. 52:19–21, Dahab Decl. Ex. 1, ECF 131-1 at 11. Despite this clear statement demonstrating that Sheriff

Reese considered whether evacuating the building was warranted, Plaintiffs argue there is a triable issue as to whether Reese ever considered the tear gas contamination when deciding not to evacuate. Response to Objections, ECF 161 at 11. In support of this argument, Plaintiffs point to the immediately preceding question in which Plaintiffs' counsel asked, "Those considerations about relocation were in relation to the threat to the facility as opposed to infiltration of tear gas?" *Id.* 52:8–10. Reese responded, "Yes." *Id.* 52:11.

Plaintiffs' argument, which the F&R credits, F&R, ECF 154 at 171–72, fails for two reasons. First, as a factual matter, Reese's response to Plaintiffs' counsel's very next question clarifies that he *did* consider the tear gas contamination when deciding not to evacuate the MCDC. Plaintiffs' counsel asked: "You didn't have any information about continuing infiltration of tear gas that led you to consider relocation?" Reese Dep. 52:12–14, ECF 131-1 at 11. Reese replied:

> As I said, I was there at the Justice Center for most of the events that transpired. I never felt personally that the threat of infiltration of tear gas was such a high risk that we needed to evacuate the building. I was *more concerned* about damage from fires or the potential that the building would be taken over by a violent mob.

*Id.* 52:17–23 (emphasis added). The fact that Reese was "more concerned" about damage from "the threat to the facility as opposed to infiltration of tear gas," *id.* 52:9–10, does not mean that he never considered the latter. Rather, it confirms that he made "a choice involving the exercise of judgment," *Verardo*, 319 Or. App. at 447, after judging that the "the threat of infiltration of tear gas" was simply not "a high risk." Reese Dep. 52:19–20, ECF 131-1 at 11; *see* Reply, ECF 137 at 37 ("This prioritization of threats is the very discretion that is protected under state law.").

Second, even accepting Plaintiffs' and the F&R's reading of Reese's deposition testimony, Plaintiffs' argument fails as a legal matter because there is no dispute that Reese and other Defendants *did* act in response to the tear gas infiltration. Plaintiffs rely on the legal rule

that discretionary immunity requires Defendants to "tak[e] preventive measures . . . if legally required" because the immunity does not cover a general failure to act. *Garrison*, 334 Or. at 274. But Plaintiffs ignore that the immunity covers "the government's choice of *means* for fulfilling that [legal] requirement" to act. *Id.* And here, there is no dispute that Defendants acted in an effort to mitigate Plaintiffs' tear gas exposure. As discussed above, Defendants strategically placed portable air filters in the MCDC and operated the building's HVAC system in an attempt to reduce AICs' tear gas exposure. And for purposes of discretionary immunity, the efficacy of Defendants' protective actions does not matter because the immunity attaches "whether or not the discretion is abused." Or. Rev. Stat. 30.265(6)(c); *see Garrison*, 334 Or. at 277 (finding that the immunity applied because the plaintiff's "evidence indicates only an abuse of discretion").

As to the second requirement for discretionary immunity, Reese's decision not to evacuate the jail "involve[d] public policy as opposed to the routine day-to-day decision-making of public officials." *Verardo*, 319 Or. App. at 447. The "decision to evacuate" a maximum-security jail "is not a day-to-day decision." Objections, ECF 156 at 24. This observation is even more apparent when this Court considers the factual context of Reese's decision not to evacuate. Reese testified that one reason he decided not to evacuate the MCDC was because "we were in a pandemic, so we were trying to spread people out to keep them from getting sick." Reese Dep. 33:23–24, Gilmore Decl. Ex. 3, ECF 106-3 at 14. But in contrast to the MCDC, the MCIJ "has very few single cells and is mostly an open dorm where you just have bunks." Jarmer Dep. 27:5–7, Gilmore Decl. Ex. 7, ECF 106-7 at 5. Therefore, the MCIJ's "open dorm setting," Reese Dep. 34:5, Gilmore Decl. Ex. 3, ECF 106-3 at 15, presented hurdles to not only social distancing but also AIC safety. As "the only maximum security jail in the State," MSJ, ECF 89 at 21, the MCDC housed certain AICs who were "dangerous people who would in an open dorm setting

potentially" harm other AICs, Reese Dep. 34:7–9, Gilmore Decl. Ex. 3, ECF 106-3 at 15. Thus, Reese had to weigh many different policy considerations in his decision not to evacuate the jail.

As to the third requirement for discretionary immunity, there is no dispute that Reese, as the Multnomah County Sheriff, had the "authority to make" the decision whether to evacuate the MCDC. *Verardo*, 319 Or. App. at 447. The F&R relies on a factual dispute over whether Defendants Alexander and Wheeler *also* had the authority to evacuate the MCDC as a ground to deny Defendants discretionary immunity. F&R, ECF 154 at 171. But whether Alexander and Wheeler also had the authority to evacuate the MCDC is immaterial to whether Reese himself had this authority, and thus, this dispute of fact has no bearing on whether the third requirement is met. The F&R also claims that Defendants "frame[] their discretionary immunity defense as dependent" on the finding that "Reese had the 'sole authority to evacuate the MCDC during an emergency.'" *Id.* (quoting MSJ, ECF 89 at 90). But nowhere do Defendants actually frame their defense as dependent on this disputed fact, and even if Defendants had done so, the F&R does not explain why it must adopt Defendants' erroneous *legal* view as binding. In any event, Defendants are correct that the F&R's reliance on this dispute of *immaterial* fact "is an improper straw man argument attempting to defeat discretionary immunity." Objections, ECF 156 at 23.

Lastly, the F&R claims that Defendants fail to adequately address an expert's "opinions on available options [regarding evacuation] and what impact, if any, they would have had on their COVID protocols and objectives." F&R, ECF 154 at 172 (citing Stanley Decl., ECF 121 at 8–9). But the F&R conflates the requirements for discretionary immunity and the merits of Plaintiffs' negligence claims. Stanley's opinions that "the evacuation of all MCDC AICs to [the MCIJ] was feasible" and that there were other available detention facilities in the state that Defendants should have considered for AIC transfer may be relevant to whether Defendants

were negligent. Stanley Decl., ECF 121 at 8–9. But they do not take away from the fact that Reese's decision not to evacuate the jail was "the result of a choice among competing policy considerations, made at the appropriate level of government." *Turner*, 359 Or. at 652 (quoting *Garrison*, 334 Or. at 273). In sum, there is no genuine dispute of material fact that Defendants have satisfied the requirements for discretionary immunity, and Defendants are therefore entitled to summary judgment on Plaintiffs' negligence claims based on Defendants' failure to evacuate.

## CONCLUSION

This Court has reviewed the magistrate judge's F&R, ECF 154; Defendants' Objections to the F&R, ECF 156; and Plaintiffs' Response to Defendants' Objections, ECF 161. Based on that review, this Court ADOPTS IN PART AND DECLINES TO ADOPT IN PART the magistrate judge's F&R. Defendants' Motion to Strike, ECF 142, is GRANTED IN PART AND DENIED IN PART in accordance with the F&R, ECF 154 at 58–106. Defendants' Motion for Summary Judgment, ECF 89, is GRANTED IN PART AND DENIED IN PART as follows.

This Court GRANTS summary judgment to (1) the individual Defendants on Plaintiffs' Eighth and Fourteenth Amendment claims for failure to protect and failure to supervise based on qualified immunity (Claims 1 and 4 in the FAC, ECF 44 ¶¶ 91–98, 110–18); (2) all Defendants on Plaintiffs' Eighth and Fourteenth Amendment claims for delay and denial of essential medical care based on Plaintiffs' decision to no longer pursue these claims (Claim 2 in the FAC, *id.* ¶¶ 99–104); and (3) all Defendants on Plaintiffs' state negligence claims based on discretionary immunity under the OTCA (Claim 5 in the FAC, *id.* ¶¶ 119–23). This Court DENIES summary judgment to Multnomah County on Plaintiffs' Eighth and Fourteenth Amendment *Monell* claims based on the County's failure to protect Plaintiffs (Claim 3 in the FAC, *id.* ¶¶ 105–09).

**IT IS SO ORDERED**.

DATED this 30th day of January, 2026.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge